# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHAD PELISHEK,

          Plaintiff,

                                  Case No. 23-CV-

                                  **JURY TRIAL DEMANDED**

CITY OF SHEBOYGAN, MAYOR RYAN
SORENSON in his individual and official
capacity, ALDERPERSONS ON
SHEBOYGAN'S COMMON COUNCIL,
BARBARA FELDE, ROBERTA FILICKY-
PENESKI, AMANDA SALAZAR, all in their
individual and official capacities; and
DIRECTOR OF UPTOWN SOCIAL EMILY
RENDALL-ARAUJO in her individual and
official capacity;

          Defendants.

## COMPLAINT

Plaintiff Chad Pelishek, by his undersigned counsel, hereby alleges as follows:

### INTRODUCTION

1.      Plaintiff, Chad Pelishek, a sixteen-year employee of the City of Sheboygan, was a loyal, dedicated, extremely hard working, and highly successful City Director of Planning and Development. In 2021, a group of activists, under the leadership of a former Alderwoman, formed a "Diversity, Equity, Inclusion" ("DEI") collective that included Sheboygan's new 27-year-old mayor, at least one Alderwoman, and two female department heads. When the City Administrator refused to hire their "DEI consultants," sudden instances of "racism" began occurring throughout citizen events in Sheboygan.

2.      Plaintiff learned of these incidents and tried to raise those concerns to his colleagues. In return, the DEI collective published that Plaintiff was a racist because he expressed concerns about racism as a "white man," demanded his termination, fabricated a false narrative about him, and subjected him to severe abusive and hostile conditions that made his job nearly impossible.  To "pay" for his alleged "racism," the mayor and Council forced Plaintiff to turn over some of his duties to DEI activists, threatened him with discipline if he didn't comply, and "gagged" him from expressing his concerns to private citizens and legal counsel.  When Plaintiff discovered that public government records released by the Council had falsified information, Plaintiff was again told to remain silent and only show the "approved" message from the falsified records.

3.      Despite helping turn Sheboygan into a thriving city for businesses and families, Plaintiff learned the DEI "equity" rules the hard way: (1) do not be a heterosexual white male; and, if you are, (2) remain silent, fully compliant, and never oppose them.  When the City Administrator, Todd Wolf, broke these rules of "equity" by defending Plaintiff, he was publicly accused of harassment, dishonesty, and misconduct—without any chance to defend himself.  When Plaintiff had the evidence to prove the allegations were false, both he and his family were harassed, and Plaintiff was threatened by city officials.

4.      After eight months of gag orders, threats, harassment, being labeled as a "racist," and finally watching even his young children be harassed for information about him, Plaintiff's physical, emotional, and mental state took a serious turn, and he had no choice but to resign.  To date Plaintiff cannot find any similar work as a full-time employee because of the articles spread by city officials and their DEI collective affiliates—all of which accused him of racism and threatened to "come after" anyone who defended or associated with a white man "racist."

5.      Plaintiff now brings claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C. §2000e, *et. seq.* ("Title VII") and violations of the First and Fourteenth

Amendments of the United States Constitution under 42 U.S.C. § 1983.

**PARTIES**

6.      Plaintiff Chad Pelishek was employed by the City of Sheboygan for sixteen years.  He was the Director of Planning and Development for the City of Sheboygan from May 6, 2013 to May 12, 2023.   Plaintiff is a heterosexual white male.  At all times material to the facts alleged in the foregoing complaint, Plaintiff was a citizen of the United States and resident of the State of Wisconsin, residing in Sheboygan, Wisconsin.

7.      Defendant City of Sheboygan ("City") is a municipality, organized pursuant to a body politic under the laws of the State of Wisconsin, whose address is 828 Center Avenue, Sheboygan, Wisconsin.

8.      Defendant Ryan Sorenson ("Sorenson") is the Mayor for the City of Sheboygan and was elected Mayor of Sheboygan on April 6, 2021. Sorenson has been the mayor of Sheboygan at all times material to the allegations in this Complaint. Sorenson (homosexual) is deeply involved with the Sheboygan DEI collective and is unofficially advised by his "mentor" and campaign manager, Mary Lynn Donohue, who founded the Sheboygan DEI group and Progressive Women of Sheboygan group (collectively "DEI group").   Sorenson is sued in his individual and official capacities.

9.      Defendant Barbara Felde ("Felde") (female) is an Alderwoman on the City of Sheboygan's Common Council.  Between 2021 and April 2023, Felde was the President of Sheboygan's Common Council.  Felde has been an Alderwoman on Sheboygan's Common Council at all times material to the allegations in this Complaint. She is sued in her individual and official capacities.

10.     Defendant Roberta Filicky-Peneski ("Filicky") (female) is an Alderwoman on the City of Sheboygan's Common Council.  Between 2021 and April 2023, Felde was the Common Council Council Vice President.  Filicky has been an Alderwoman on Sheboygan's Common Council at all

times material to the allegations in this Complaint. The President and Vice President of the Council are considered "Council leadership." Filicky-Peneski is sued in her individual and official capacities.

11.     Defendant Amanda Salazar ("Salazar") (female, Hispanic) is an Alderwoman on Sheboygan's Common Council.  She is involved personally with the DEI group in Sheboygan. Salazar has been an Alderwoman on Sheboygan's Common Council at all times material to the allegations in this Complaint. On April 2023, the Common Council voted to make Salazar the Vice President of the Common Council. She is sued in her individual and official capacities.

12.     Defendant Emily Rendall-Araujo ("Rendall") (female) is the Director of Senior Services (Uptown Social) for the City of Sheboygan and has been at all times material to the allegations in this Complaint. Rendall is very involved with Sheboygan's female DEI group and was the administrator of the Progressive Women of Sheboygan Facebook page until approximately September 2022.  The Common Council appointed Rendall as the City's Director of Senior Services (now "Uptown Social") in or around 2021.  She is sued in her individual and official capacities.

### *City of Sheboygan Authority, Roles, and Relevant Department and Practices.*

13.     Sheboygan's Common Council ("Council") is the policymaking body for the City of Sheboygan.   The Council is comprised of ten Alderpersons from Sheboygan's Districts and Sheboygan's Mayor, who is considered the presiding officer over the Common Council.

14.     The Alderpersons are elected as part-time officials and, to ensure oversight over day-to-day personnel and City operations, every year, the Council elects a President and Vice President over the Council ("Council Leadership") to meet weekly with the Mayor and City Administrator and ensure regular communications with Department heads.  Council Leadership is responsible for communicating and resolving all personnel matters on behalf of the full Council.

15.     In 2011, the Council assumed power and authority over all personnel and financial matters for the City and created the City Administrator position to be the "administrative arm" of the Council.  The City Administrator supervises department heads and personnel matters and reports to the Council.  Despite this, Sheboygan still has a "Mayor-Council" form of government under Wis. Stat. § 62.09, and the mayor is the "presiding officer" of the Common Council and Chief Executive Officer over the City.

16.     The City of Sheboygan has fifteen Departments.  Among these departments are the (1) Department of Human Resources, (2) "Uptown Social" (formerly "Senior Services"), and (3) Department of Planning and Development.  Only the Common Council has authority to appoint, train, and fire the Directors of these three departments.

17.     The City's "Senior Services" Department (now "Uptown Social") did not have a separate building until November 2022.  From 2021 – November 2022, Rendall operated out of Sorenson's (mayor) office.

18.     The Council Leadership (President and Vice President), Mayor, and City Administrator are considered "City Leadership."

19.     Although the Mayor and City Attorney in Sheboygan are elected positions, they are subject to oversight by the Council Alderpersons, who have the authority to conduct internal investigations into their conduct and may be removed or disciplined by the Alderpersons.

20.     On November 8, 2022, the Council directed the Mayor (Sorenson) to assume the powers and duties of the City Administrator—including supervision and reviews of department heads, personnel, and media communications.

21.     Sheboygan's Municipal Code of Ordinances contains policies for employees, including a "Code of Ethics" (Chapter 2) that prohibits employees from disclosing "confidential information" about "city matters." Sheb. Mun. Code Ord. 2-272. There is no definition for "city

matters," and employees who are not sure whether information is "confidential" must seek "prior approval" from the Common Council—whose agenda is set and overseen by the mayor. Sheb. Mun. Code 2-264.

22.    The Council's justification for their "confidential disclosures" policy declares that certain officers "cannot and should not be without" conflicting personal interests in the "decisions and policies of government." Sheb. Mun. Code Ord. 2-263.

23.    The City also has a policy that threatens employees with discipline if they make any "false statements" about a political appointment effort ("false statements" policy) or try to "commit fraud" ("fraudulent interference provision") on internal investigations related to the enforcement of allegations about bribery, political corruption, or City appointments.  Sheb. Mun. Code 82-3, 82-4, 82-5, and 82-6. ("No persons shall make any false statement or report … or in any manner commit *or attempt to commit any fraud preventing the impartial execution of this chapter and policies*." Sheb. Code 82-3, emphasis added.)

24.    Under the "false statements" policies and related provisions, ***elected officials*** are specifically exempt from the provisions prohibiting "false statements" and committing fraud on the City's "enforcement" of allegations about City "appointments," corruption, or bribery.  Sheb. Mun. Code 82-23(a) ("The provisions of this chapter (except sections 82-5 and 82-6) shall not apply to … Officers of the city government who are elected by the voters of the city…")

## VENUE & JURISDICTION

25.    This case arises under the Constitution and laws of the United States, and subject matter jurisdiction is therefore proper under 28 U.S.C. §§ 1331 and 1343.

26.    The District Court has jurisdiction over the claims herein under Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C. §2000e-5 and 28 U.S.C. §1331.

27.     On June 14, 2023, the Plaintiff filed a Charge of Discrimination with the EEOC complaining acts of discrimination alleged herein.  Attached to this Complaint as Exhibit 1 is a true and correct copy of the EEOC Charge of discrimination (with personal identifying information redacted).

28.     On June 15, 2023, the EEOC issued the Plaintiff a Notice of Right to Sue for his Charge of Discrimination. Attached as Exhibit 2 is a true and accurate copy of the Notice (with personal identifying information redacted).  This Complaint is being filed within 90 days of Plaintiff's receipt of the EEOC Notice of Right to Sue.

29.     The events or omissions giving rise to this cause of action occurred in Sheboygan County, Wisconsin, which is within the Eastern District of Wisconsin, Milwaukee Division.  Venue is therefore proper under 18 U.S.C. § 1391(b) and 42 U.S.C. §2000e-5(f).

30.     This Court has authority to grant the requested declaratory relief, attorneys fees and costs pursuant to 28 U.S.C. §§2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 57.

## FACTUAL BACKGROUND

31.     In 2000, Plaintiff graduated from the University of Wisconsin with a Bachelor of Science Degree in Environmental Policy and Planning, and for seven years, Plaintiff gained experience working in planning and design, grant writing, and civil engineering for private and municipal entities.

32.     Plaintiff was hired by City of Sheboygan in 2007 as the Economic Development Manager in the City's Department of Planning and Development.

33.     Due to his exemplary performance, Plaintiff was appointed by the City's then Mayor and City Administrator to be the City's interim Planning and Development Director in or around January 2011; and was officially confirmed as Sheboygan's Director of Planning and Development on May 6, 2013.

34.     As Director of Planning and Development for the City, Plaintiff was, in part, responsible for city planning and zoning, development, and city building inspection.

35.     As Sheboygan's Planning Director, some of Plaintiff's accomplishments have included nearly $1 billion dollars in City grant allocations and projects, facilitating the growth of Sheboygan by over 350 new businesses, business retention projects attracting citizens to Sheboygan, enabling sales of buildings for industrial growth to raise the City's revenues, and coordinating purchases of over 500 acres of expansion projects for Sheboygan's economic development.

36.     Plaintiff was also responsible for reporting government grant allocations, supervising roughly a dozen City employees, managing, and coordinating building inspections, helping to draft and determine eligibility for development grants, and serving on several boards, commissions, and committees related to the City's growth and economic development.

37.     Additionally, Plaintiff's job duties included City tours, meetings, and regular communications with City partners, including the Sheboygan Chamber of Commerce and the "Visit Sheboygan" organizations, among others.

38.     Between 2011 and November 7, 2022, Plaintiff's supervisor was the City Administrator (Todd Wolf). Although Plaintiff can only be fired by the Common Council, the Council considers the recommendations of his supervisor—which, starting on November 8, 2022, was the Mayor (Sorenson).

39.     Within Sheboygan, various community residents have formed "neighborhood associations" that are citizen-run and led to discuss any issues, concerns, or resolve disputes. The citizens choose "neighborhood leaders" to organize and facilitate the meetings.

40.     Sorenson stated he does not like these citizen neighborhood meetings because he wanted the DEI group to be appointed by the City to help "diversity issues in neighborhoods."

41.    The DEI group in Sheboygan mainly obtains consulting jobs through their private company, "Green Bicycle Company," managed by Heather Cleveland. The DEI group activists consist of mainly females, many of whom are active on the Progressive Women of Sheboygan Facebook page that Rendall moderated and led.

42.    Beginning in the summer of 2022, Sorenson and Rendall left City Hall together nearly every day. Several employees, including Plaintiff, observed Sorenson and Rendall texting each other, laughing, and leaving City Hall during work hours.

43.    In or around this time, Rendall publicly stated that her hobbies include "dismantling the patriarchy"—a reference to getting rid of males in supervisory positions.

44.    To help support the citizen neighborhood leaders, a City employee within Plaintiff's department acts as a contact person to provide any information or guidance for the neighborhood leaders. This employee is Janet Duellman (Ms. Duellman). Ms. Duellman's official job duties mainly involve environmental reviews, and citizen and landlord communications and guidance for land use improvement processes.

45.    In August 2022, Ms. Duellman told Plaintiff that a neighborhood leader was concerned because an "unknown man" appeared at a citizen neighborhood meeting and made a racial slur. On information and belief, activists affiliated with the DEI group arranged for the "unknown man" to appear and make the racial slur, and both Rendall and Sorenson knew of this effort.

46.    Plaintiff made multiple attempts to ask Sorenson for any information or resources that could help citizens address "racial slurs" at neighborhood meetings. Despite his multiple requests, Sorenson ignored Plaintiff and did not respond.

47.    On August 22, the Department heads, City Administrator, City Attorney, and one other employee, Carrie Arenz, had a regular department head meeting ("August 22 meeting"). At the end

of the meeting, Plaintiff raised the concerns about the racism issue in the community to see if anyone had information they could provide to help citizens address racism in neighborhood meetings.

48.    Rendall told Plaintiff to say "exactly" what racist comment was said at the neighborhood meeting, and Plaintiff, in response to Rendall, said that the unknown man "said he does not want any niggers living in his neighborhood." Only one department head present was black, Municipal Judge Natasha Torry (Judge Torry), and neither Judge Torry nor any other meeting attendee was upset during or following this exchange.

49.    Directly after meeting, Rendall told multiple people in the DEI group that Plaintiff was a racist and was making repeated offensive racial slurs.  Directly following this exchange between Rendall and Plaintiff on August 22, the "unknown man" never came back to the neighborhood meeting.

50.    Plaintiff was concerned that he had unintentionally offended the meeting attendees, so he communicated to apologize if any of them felt offended by his response to Rendall when he expressed his concerns about the racism incident and citizens involved. The Council knew about Plaintiff's apologies and communications to the meeting attendees.

51.    On August 26, in response to the information that Rendall had told the DEI group that Plaintiff made a racial slur, Mr. Wolf scheduled an emergency meeting to address any concerns, and the meeting was led by a highly experienced and qualified expert in diversity matters, Alonzo Kelly (black).  Sorenson attended this meeting in addition to the original August 22 meeting attendees.

52.    The August 22 statements by Plaintiff were recounted in full and Mr. Kelly *commended* Plaintiff for raising concerns about racism in the community and then mentioned that the employees needed to earn trust again with one another to express their concerns about citizen, diversity, or racism issues without fear of being chastised for doing so.

53.     When Mr. Kelly said this in the August 26 meeting, Rendall abruptly left the meeting visibly upset.

54.     On September 12, a local news reporter, Maya Hilty ("Hilty") emailed Mr. Wolf asking for an interview to address information she received that Plaintiff said a "racial slur" in a meeting.  On information and belief, Rendall and her DEI group associates disclosed Plaintiff making a "racial slur" to Hilty.

55.     Council Leadership (Felde and Filicky-Peneski) ordered that Mr. Wolf and Sorenson speak together with Hilty.  Plaintiff was shown that Mr. Wolf arranged the meeting for he and Sorenson to meet with Hilty together, per Council's orders, on September 20.

56.     On Friday, September 16, Sorenson left City Hall to meet with Hilty alone, before the officially scheduled meeting on September 20, and Sorenson was gone from City Hall for several hours.

57.     On September 19, the next business day after Sorenson's private meeting with Hilty, Hilty emailed Plaintiff directly for a comment on Plaintiff using a racial slur.  On information and belief, Sorenson told Hilty that Plaintiff made repeated racial slurs, implied that Plaintiff was a racist and stated that Rendall had "reported" Plaintiff's "racism."

58.     Mr. Wolf was out of the office, so Plaintiff approached City Attorney Adams to ask whether Council authorized him to comment to Hilty.  Adams told Plaintiff that he was not permitted by Council to comment to Hilty and that Plaintiff should direct Hilty to Mr. Wolf and Sorenson only.

59.     On information and belief, Mr. Wolf never used any employee names in his interview with Hilty and defended the Plaintiff's speech.

60.     On information and belief, Hilty asked Judge Torry (black) how she felt when Plaintiff used the "n-word," and Judge Torry, in response, told Hilty that the "slur" incident was "not a story"

and implied that she was not offended and understood Plaintiff's intent. When Hilty eventually published her article, Judge Torry's comments were not included.

61.     Both Felde and the Council members received multiple communications from employees and department heads stating that Plaintiff was not a racist and that Rendall told him to repeat "exactly" the racist statement that was made.

62.     Defendant Alderwoman Salazar and Alderman Zachary Rust spoke to Rendall and applauded her for "standing up to [Plaintiff's] racism." Attached as Exhibit 3 is a true and accurate copy of a text messages between Rendall and Salazar regarding Plaintiff's August 22 statements.

63.     Given Salazar, Rendall, and Sorenson's involvement with Donohue's DEI group, Mr. Wolf had a City employee involved with the DEI group, Abby Block, arrange a lunch on October 5 to ask if they would want to help the citizen neighborhood meetings. Prior to the lunch, Ms. Block warned Plaintiff and Mr. Wolf that the DEI group was "probably going to ask for money."

64.     The lunch was arranged for October 5 at a restaurant in Sheboygan between Plaintiff, Mr. Wolf, Ms. Block, Ale Guevara, and Jamie Haack (DEI lunch).

65.     The DEI affiliates did ask for $70,000, and when Mr. Wolf said he could not appoint them as consultants or give them money, Ms. Guevara threatened that they would "oppose" Mr. Wolf unless he paid "their group" affiliates to do "DEI" consulting work. Plaintiff felt very uncomfortable during the DEI lunch, and the three City employees left to return to City Hall.

66.     Hilty's article was published in newspaper format on October 11 (with the online version on October 10) entitled "Sheboygan Leader Says Racist Slur in Meeting" with a large picture of Plaintiff. Attached as Exhibit 4 is a true and accurate photograph of the newspaper (print) version of the "slur" article front page headline.

67.     The article implied that Plaintiff made an unsolicited racial slur and stated, "it is not OK for white people to say the N-word." The article did not mention Rendall by name and implied

that Mr. Wolf was more concerned about a "female employee" who reported the racist slur than about the racist slur itself.

68.     The DEI group's Ale Guevara made a comment outraged about Plaintiff's "racism" and demanding that action be taken against Plaintiff and Mr. Wolf for failing to discipline Plaintiff.

69.     Immediately after the article was published, Sorenson told the DEI group affiliates to send "outraged emails" to the Common Council in response to Hilty's article.  On information and belief, one of these outraged "DEI" emails specifically stated that "Emily Rendall-Araujo" should not be punished for reporting Plaintiff's racism—even though Rendall's name had not been used by Mr. Wolf nor in Hilty's article.

70.     On October 13, Defendant Alderwoman Felde (Council Leadership) and Sorenson encouraged City employees to file reports of City violations by employees specifically referencing the "racist slur" article about Plaintiff.  Attached as Exhibit 5 is an accurate copy of Felde's email.

71.     Plaintiff reported to Mr. Wolf that he was being harassed because of this incident, was set up by Rendall, and Mr. Wolf said that he would ask Council to support employees and interview Plaintiff, but Felde refused to interview or speak to Plaintiff about the August 22 slur.  On information and belief, Felde interviewed Rendall (female), Carrie Arenz (female), and Janet Duellman (female).

72.     During this time, Salazar, Filicky-Peneski, and Rendall all stated that "white men of privilege" cannot say things that women, homosexuals, or "persons of color" can say, and anything questionable said by a "white man" like Plaintiff is far worse than if said by someone else.

73.     At the public Council meeting on October 17, Plaintiff was forced to sit and watch public speeches by the female DEI group activists, based on the Sorenson's requests, demanding that Council fire Plaintiff and discipline him for his "racism."

74.     The Council met in closed session on October 17 and 24 to discuss Plaintiff's discipline for using the "racial slur," and Mr. Wolf was not allowed to attend because he had defended

Plaintiff. Filicky-Peneski later said that Salazar "led the charge" demanding Plaintiff be fired during the closed sessions.

75. On information and belief, both Salazar and Rendall repeated the racial slur fully to Council members and the public in their demands and statements to fire Plaintiff because of his alleged "racism" as a "white man of privilege."

76. After Mr. Wolf defended Plaintiff in the October 10 article, Council Leadership banned Mr. Wolf from speaking to the media and stated that only Sorenson was allowed to talk to the media about City or personnel matters. The following photograph is a statement on Facebook by Council Alderwoman Betty Ackley regarding Plaintiff's "racism" and reference to Sheboygan Alderwoman Grazia Perrella's statement about Plaintiff's racism.



77. Rendall met with Hilty on or around October 18, 2022, in Sorenson's conference room, and after that, two more articles were published in late October implying that Plaintiff, a white man, was a racist and that Mr. Wolf was failing to address "racism" and harassment complaints from females, including an article discussing how "angry" the DEI-affiliated city officials and female activists were. The following photograph is from an online version of the October 26 article.



78.     By October 31, 2022, all three unofficial "DEI group" leaders, Ale Guevara, Jamie Haack, and Heather Cleveland of the DEI's "Green Bicycle Company" had made public and private communications demanding change and/or calling for Plaintiff to be fired.

79.     On November 1, Sorenson met in his office with the DEI group "leaders," Guevara and Cleveland, in a "closed door" meeting.  On information and belief, Guevara referred to Sorenson in a friendly manner as "El Jefe," which means "The Boss" in Spanish.

80.     The Council published that they would meet again for *another* disciplinary closed session about Plaintiff at their November 7 Council meeting, and Plaintiff told Mr. Wolf that he believed the DEI group, including Sorenson, Salazar, and Rendall arranged for the "unknown man" to repeat a slur, enticed Plaintiff to repeat it, and then created this outcry using Hilty so that the DEI group could get him fired as a "white men of privilege" to "dismantle the patriarchy."

81.     Mr. Wolf responded that he would communicate these concerns to the Council Alderpersons before the November 7 meeting to help Plaintiff and stop the harassment of Plaintiff. On information and belief, Mr. Wolf sent a "confidential email" to the Council members expressing Plaintiff's concerns about what was going on at approximately 3:00 PM on November 7.

82.     At 6:00 PM, during the November 7 Council meeting, the Council (via Felde) publicly announced that Mr. Wolf was being investigated for allegations into *Mr. Wolf's* alleged misconduct.

83.     Plaintiff watched Mr. Wolf be immediately escorted out of the building by the City Attorney (Adams), placed on involuntary leave, and Adams' Assistant City Attorney Liz Majerus ("ACA Majerus") told employees they were not allowed to talk to Mr. Wolf and that City officials would tell them what was going on later.

84.     After the Council meeting, Plaintiff drove to Mr. Wolf's home and parked his car several blocks away so that no one affiliated with Council, Sorenson, or the DEI group would know that he was with Mr. Wolf.

85.     At around 11:30 PM, a City of Sheboygan Police car pulled up to Mr. Wolf's home to serve "directives" on Mr. Wolf from the Council, so Plaintiff hid in the kitchen so that he would not be reported to the Council.  The City of Sheboygan Police Department does not serve papers unless "ordered" by the Council Alderpersons or Mayor.

86.     After the City police officer left, Plaintiff read the Council's Directives letter with Mr. Wolf.  The letter ordered Mr. Wolf not to talk to City employees nor "persons that do business" with the City (an incalculable number), not to step foot on any City properties, and threatening Mr. Wolf with termination if he violated these directives and did not comply with the City's investigation.  The Directives letter had no details about the allegations that were being investigated.

87.     Plaintiff was terrified that the Council would send the police to *his* home in front of *his* wife and young children late at night, or otherwise threaten him if he was caught with Mr. Wolf, so Plaintiff left Mr. Wolf's home after reading the "directives" to Mr. Wolf and did not speak to Mr. Wolf again for several months.

88.     Adams stated that the Council ordered Plaintiff to report to the mayor (Sorenson) for direct daily supervision after Mr. Wolf was placed on leave and stated that Sorenson (mayor) would be assuming Mr. Wolf's City Administrator duties over personnel matters.

89.     On November 8, Sorenson stated that he believed Mr. Wolf's statements defending the Plaintiff were "false," and that Mr. Wolf needed "to be punished" for "embarrassing" the DEI group.  On information and belief, Adams stated that he "would do anything in his power to get rid" of Mr. Wolf and was "on the Mayor's [Sorenson] team" regarding the investigation into Mr. Wolf.

90.     On November 21, Sorenson delivered Plaintiff a letter with directives for the investigation ("investigation directives").  The directives stated only that a private attorney (Jill Hall) was working with Sorenson and would conduct the investigation into "certain allegations" and the "communications, conduct, and leadership" of Mr. Wolf.

91.     In the "investigation directives," Plaintiff was ordered to not speak to Mr. Wolf, to "fully cooperate" with the investigation and directives, and that he was not to disclose anything about the investigation or situation to any person until Sorenson "formally and expressly relieved this directive" unless he had a "legal right" to have a representative present.    Attached as Exhibit 6 is a true and accurate copy of Sorenson's "Investigation Directives" letter.

92.     On information and belief, the Council ordered Sorenson and Adams to work directly and in conjunction with the "investigator" (Jill Hall) to report all findings to Council.

93.     Plaintiff is not a represented employee and not part of any union, so Plaintiff asked Sorenson if he was authorized "under law" to obtain private legal counsel for himself, and Sorenson said that Plaintiff was not allowed to get a lawyer, that the section in that letter did not apply to him, and that City Attorney Adams was "Plaintiff's 'lawyer' for anything related to the City and the investigation."

94.     Sorenson's "investigation directives" remains in full force and effect against Plaintiff, and neither Council nor Sorenson has never "formally or expressly" relieved Plaintiff of them.

95.     On Thanksgiving weekend, Hall contacted Plaintiff on a Sunday afternoon to schedule his interview for the investigation.  Hall told Plaintiff not to "plan on recording" the interview.

96.     Plaintiff was scared without an attorney, so Plaintiff decided to record his interview with Hall to protect himself. Neither Hall nor any City official knew that Plaintiff recorded his interview with Hall.

97.     Throughout Hall's nearly two-hour interview with Plaintiff, Hall never told Plaintiff exactly what she was investigating but stated she was "not investigating" Plaintiff and was narrowly focused on Mr. Wolf and stated that there is "a reason [the City] brought [her] in" to conduct the investigation.

98.     During the interview, Hall asked Plaintiff to tell her if he had spoken to an attorney, and to describe what "concerns" he spoke, or would speak, to an attorney about. When Plaintiff stated he did not want to answer these questions due to Sorenson's threats, Hall pressed further asking, "you aren't going to tell what your concerns are?" On information and belief, the Council had Sorenson, Adams, and Hall get information about Plaintiff's potential legal claims against the City from Plaintiff's "investigation interview" under threat of discipline.

99.     Plaintiff told Hall about concerns regarding troubling financial matters with Progressive/DEI-connected individuals and the City that he was aware of, that those issues were under an external audit, that Rendall told Plaintiff to tell her "exactly" what racist statement was made, and that he believed Rendall's asking him to repeat it was a "set up" and "plotted attack."

100.    Hall also asked Plaintiff to describe any "factions" in City leadership and who was on the side of Rendall/Salazar/Sorenson and the DEI group versus on Plaintiff's (or Mr. Wolf's) side.

101.    Plaintiff also told Hall that the DEI group members (Guevara and Haack) threatened Mr. Wolf on October 5 after he denied their request for money from the City. Specifically, Hall asked Plaintiff "[d]o you recall [DEI leaders] saying that if Todd didn't pay them that they would publicly oppose him?" and Plaintiff responded "Yes, that was said."

102.    Approximately one week after Plaintiff's interview with Hall, the DEI group's Guevara and Haack sent the City a "cease and desist" letter threatening legal action against the City if any City official made further "false statements" about them making a "threat" for money.

103.    Additionally, days after Plaintiff's interview with Hall, Sorenson met with a man named Aaron Brault at a public coffee shop, Paradigm, in downtown Sheboygan, where many citizens were present; and Sorenson discussed starting a "public petition" to "get rid of" Plaintiff from his position. On information and belief, Sorenson asked for help starting a "public petition" to get rid of Plaintiff after Hall told Sorenson what Plaintiff said and confirmed.  Attached as Exhibit 7 is a true and accurate copy of Sorenson's calendar from December 8.

104.    On information and belief, Hall told Sorenson about Plaintiff's interview and that Plaintiff confirmed Mr. Wolf's statements about the October 5 DEI lunch and Rendall intentionally wanting Plaintiff to repeat a racial slur.

105.    Hall never followed up with Plaintiff, never asked Plaintiff for a single document, email, nor his contemporaneous written notes.  On information and belief, at least five other employees confirmed Plaintiff's accounts of Rendall and the DEI group, and Hall refused to accept any notes, documents, or records from other employees who offered if their statements supported Plaintiff (or Mr. Wolf).

106.    On or around November 28, while Mr. Wolf was on leave, Sorenson stated the City was sending Mr. Wolf a "gag order" to stop him from speaking at a Republican event about the DEI group ideologies and influence. On information and belief, in December 2022, Felde stated, "now that we've taken care of Todd [Wolf], we need to take care of his attorney!"

107.    At the Common Council meeting on January 9, 2023, eight Council Alderpersons publicly fired Mr. Wolf based on vague "conclusions" from the "investigation," and the Council made a statement implying that giving Mr. Wolf a hearing was not fair to employees.  On information and

belief, this statement was meant only to protect Rendall from being questioned about her involvement in the "slur outrage" against Plaintiff.

108.    Sorenson told the employees that Mr. Wolf was fired because of Hall's investigation and stated that the "final investigation report" would be completed and publicly released after Adams (City Attorney) was finished "editing" the report with Hall.

109.    Adams stated on at least two occasions in January 2023 that he was "editing" the "final investigation report" with Hall even though Adams was not part of Plaintiff's interview.

110.    Sorenson, Adams, and Council Leadership said and/or implied that Mr. Wolf's communications to the Council defending Plaintiff hurt Rendall.

111.    In or around January 2023, the City hired Adam Westbrook (Westbrook) (homosexual) as the Human Resources Director, and Westbrook asked Plaintiff to tell him everything that Plaintiff told Hall during the investigation while Adams was "editing" the "investigation report" for public release.

### The "Investigation Report" and Plaintiff's Resignation.

112.    After Mr. Wolf was fired, Plaintiff asked City Attorney Adams if Plaintiff "was next" to be fired by the Common Council, and Adams said, "that is not yet the plan." Adams told Plaintiff that Mr. Wolf "was in a lot of trouble" after he raised concerns about Plaintiff and that Mr. Wolf "really hurt" Plaintiff by defending him and that Mr. Wolf should have remained silent.

113.    Plaintiff most recent performance evaluation in December 2022 showed that Plaintiff was performing his job duties well and meeting the City's legitimate job expectations for his position as the Planning and Development Director.

114.    Following Sorenson's coffee shop meeting about Plaintiff in December, a woman named Tanya Des Armo ("Des Armo"), a Child Protective Services (CPS) worker, approached

Plaintiff's children without his knowledge or consent and started asking questions about their "Daddy" including if he made them upset.

115.    Des Armo is a member of the DEI-affiliated "Progressive Women of Sheboygan" Facebook group under the pseudonym "Tanya Sunshine" and is personally and politically affiliated with Rendall, Salazar, and Sorenson.

116.    For several months, Des Armo incessantly texted Plaintiff's wife asking about the Plaintiff and their children.

117.    On another occasion, Sorenson's International Committee Advisory Board Member Peter Jannsen also tried to approach Plaintiff's wife to ask about Plaintiff.

118.    On information and belief, Sorenson, Salazar, and Rendall told Des Armo and Jannsen to harass Plaintiff's family and try to find information about Plaintiff that the Defendants could use in a false light for further "public petitions" to have Plaintiff fired by the Council.

119.    The Common Council stated that they "knew" the public narratives and media articles about Plaintiff being a racist were "false" and "inaccurate" but they would not issue any public statement correcting these false narratives about the Plaintiff as a "racist."

120.    City partners started refusing to work with Plaintiff in or around December 2022 because of his purported "racism."  Westbrook (HR Director) told Plaintiff that City partners needed to be "reassured" that Plaintiff would "not say the N-word" when he worked with them.

121.    When Plaintiff asked Westbrook why the Council could not release any public statement or simply communicate with City partners what happened, that it was solicited, and that he is not a racist, Westbrook said that the "mayor" had to do that, and that "at this point, again, it would be inappropriate for [the City] to sit with the [City partners] and tell them ... start to finish the story of what happened."

122.     Plaintiff said it felt like Council was going to allow the false narratives and hostility to continue because he responded to Rendall as a "white man of privilege," and Westbrook responded, "you are not being discriminated against" and that Plaintiff has no "protected status."

123.     On or around February 3, 2023, Sorenson told Plaintiff that he was paying DEI activist Heather Cleveland $30,000 to assume some of Plaintiff's job duties and refused to re-appoint Plaintiff to the Harbor Centre Business Improvement District Board—where Plaintiff had served for roughly eight years.

124.     Sorenson nominated Rendall for a prestigious award from the Chamber of Commerce that she was not qualified for—but that Plaintiff readily qualified for as Sheboygan's Planning and Development Director.

125.     After this, Sorenson publicly implied that Plaintiff was responsible for an incomplete draft of the City's "strategic goals" project that Plaintiff had no ultimate control over.  The project was to be completed by a private company (Baker Tilly) with the assistance of all fifteen department heads, but after Mr. Wolf was fired, the Council and Sorenson changed the City's "strategic goals" to only "DEI issues" with no details—leaving Baker Tilly no information to complete the draft— which Sorenson blamed on Plaintiff saying there were multiple "strikes against" him.  However, the same day Plaintiff was blamed, the Council and Sorenson publicly announced a $30,000 raise for another department head (female) who had an equal position to Plaintiff on the Baker Tilly project.

126.     In or around February 2023, Sorenson ordered Plaintiff to complete a $50,000 multi-month development grant proposal project within two days—one that Sorenson had previously appointed Cleveland to do in November 2022 (instead of Plaintiff), and that Cleveland did not complete.  Sorenson threatened Plaintiff that he must successfully complete it and that the grant's failure would fall on Plaintiff.  Plaintiff worked nearly thirty hours within two days and successfully completed the grant proposal—despite the severe toll on his physical and mental health.

127.     During this time, the Council had released several "public records" relating to "disciplinary" matters involving Plaintiff regarding the "slur" without ever providing him proper notice or any opportunity to redact his name—including Council releasing closed sessions records about Plaintiff in January 2023.

128.     Plaintiff reported at least three times to Filicky-Peneski (Council Leadership) that he was being harassed, that he was set up, that Rendall, Sorenson, Salazar and the DEI group were targeting him because he is a "white man of privilege," but Filicky stated that there was nothing Council could do about this.

129.     Mr. Wolf filed a lawsuit in federal court against the Defendants on February 6, 2023, alleging in part, that the "investigation" by Hall was biased, that he told the truth about the DEI October 5 threat, and that he was defamed as a liar by City officials in conjunction with his firing. (*Wolf v. City of Sheboygan, et. al.,* 23-CV-149, E. D. Wis., February 6, 2023).

130.     On February 7, ACA Liz Majerus sent a City-wide gag order telling employees they were not allowed to speak to Mr. Wolf or Mr. Wolf's attorney because it might be used as evidence against the City. The email recipients include Common Council members. Attached as Exhibit 8 is a true and accurate copy of the email from the City Attorney's Office to all City employees.

131.     During a City-sponsored gala on or around February 16, 2023, Rendall, ACA Liz Majerus, another department head David Biebel (Department of Public Works), and Alderman Zachary Rust loudly cursed Mr. Wolf, demeaned his lawsuit, called him names, and made repeated derogatory and inappropriate remarks in public about Mr. Wolf and his allegations.  On information and belief, one of the named attendees herein stated that Todd Wolf is "a fucking asshole" and many people overheard that at the event.  A true and accurate copy of an email from an anonymous citizen expressing concerns about the City officials' behavior is attached as Exhibit 9.

132.    Several other City employees and/or officials received this email, but no disciplinary action, City-wide statements, nor other action has ever been taken against Rendall (female), Majerus (female), David Biebel, Rust, or others responsible for the public cursing at the City-sponsored event. On information and belief, Sorenson ordered the gala organizers to provide all the names of persons at adjoining tables to find out who sent the email.

133.    After Mr. Wolf's lawsuit was filed, Westbrook told Plaintiff that the "final investigation report" was complete and being publicly released, and Westbrook showed Plaintiff a copy of the "investigation report" which stated and implied in part that Mr. Wolf "retaliated" against Rendall for reporting Plaintiff's "racism," and that Mr. Wolf lied about the DEI group threatening him on October 5.

134.    Specifically, the "investigation report" stated and/or implied that Plaintiff confirmed to Hall that (1) he made an unsolicited racial slur on August 22, (2) Mr. Wolf disclosed the August 22 "slur" to the media and public against Council's orders, and (3) Plaintiff said there was no threat at the October 5 lunch with Mr. Wolf—all of which were factually untrue based on Plaintiff's interview with Hall.

135.    Plaintiff told Westbrook (HR) that the report contained false statements about what happened and what Plaintiff said in his interview, and Plaintiff stated the "investigation report" should not be released to the public with these false statements and that Plaintiff was ordered not to have an attorney, third party, or record the interview.  Westbrook said that Hall "probably recorded it" so the report is accurate and implied Plaintiff should not dispute it.

136.    The next day, the City (through Human Resources) sent an email to Plaintiff stating that City employees were not allowed to talk to anyone about Mr. Wolf's (federal) lawsuit allegations (including the "investigation") without the City's "lawyers" present, but that the "investigation

report" could be provided for persons who had questions. Attached as Exhibit 10 is a true and accurate copy of the March 8 email.

137. On information and belief, the "final investigation report" was "edited" to fabricate information specifically in retaliation for Mr. Wolf expressing Plaintiff's concerns and for filing his lawsuit against the City.

138. Plaintiff told Council Leadership (Vice President) Defendant Filicky-Peneski that it seemed the DEI group had a "war on white men," expressed his concerns about the investigation report being released to the public with false statements, and that people who supported him were being targeted. In response to his concerns, Filicky-Peneski told Plaintiff that there was "nothing she could do" about it.

139. In one meeting, Council Leadership, Sorenson, and Westbrook discussed the report being the "full truth" of everything that happened and reminding employees not to disclose "anything about the investigation" to anyone. During this meeting, Plaintiff broke down in tears saying this was wrong, and no official present made any comment.

140. The Council has never disciplined nor threatened to discipline Rendall under the "Confidential Disclosures" nor "False Statements" policies and practices for disclosing that Plaintiff was a "racist" who made frequent unsolicited racial slurs to incite a public outcry.

141. Throughout February and March, every time that Plaintiff felt threatened, or expressed concerns or had emotional reactions to his working environment, Des Armo texted Plaintiff's wife to ask for information about Plaintiff.

142. Plaintiff also grew concerned in 2023 when he discovered that Abby Block (female, DEI group) was falsifying her timecard and adding hours of work that were impossible for her to complete. After Plaintiff raised this issue to Westbrook (HR) with documentary evidence, Westbrook implied that Plaintiff was retaliating against Ms. Block and took over managing her timecards.

143. Additionally, the City forced one white male employee in the Department of Public Works to take a demeaning job working for Rendall at a far less pay rate while offering promotions and opportunities for non-white employees who had less experience, and similar or worse, performance issues.

144. Other employees who defended Plaintiff (or Mr. Wolf) were given warnings by the City, had false allegations added to their personnel files, or were fired and otherwise threatened. On information and belief, Sorenson went through one employee's personal cell phone after he saw a text message from Plaintiff, and then threatened her from communicating.

145. Plaintiff's emotional trauma severely intensified after seeing the false statements in the investigation report specifically relating to his interview and statements and knowing of the "spies" that were sent to his family to find information that could be used against him, so Plaintiff took voluntary leave from the City under the Family Medical Leave Act (FMLA leave) on or around March 27, 2023.

146. In April 2023, the Common Council voted to promote Salazar to Council Leadership in the position of Vice President of the Common Council.

147. While on FMLA, Plaintiff's 11-year-old daughter went on an outing with a friend to the John Michael Kohler Arts Center for her birthday. Neither Plaintiff nor his wife were present at the Arts Center for the event. Filicky-Peneski showed up to the Arts Center and asked Plaintiff's daughter about her "daddy," what he was doing, and who he was talking to.

148. On information and belief, Salazar ordered Filicky-Peneski to try and determine whether Plaintiff was speaking to the public about the "investigation report" or to Mr. Wolf.

149. While Plaintiff was still on FMLA leave, City officials stated to citizens that Plaintiff was "suspended," suspected of "misconduct," was potentially "stealing money" and "was in a lot of trouble" despite Plaintiff's most recent performance review being excellent.

150.    Plaintiff believed that the Council, under Salazar's new Council Leadership role and Sorenson as his supervisor, was going to fire him and falsely accuse him of serious misconduct when he returned from FMLA leave.

151.    Plaintiff could no longer handle further threats and harassment of himself and his family based on the communications that he would be falsely accused and/or fired after he returned from FMLA, so Plaintiff submitted his resignation notice during his FMLA leave and resigned on May 12, 2023, without ever stepping foot back into City Hall.

152.    Following his notice of resignation to the City, Plaintiff filed a written request for his complete personnel file from the City's Human Resources Department, but to date, Defendants have failed and refused to turn over Plaintiff's final personnel records to him.  On information and belief, the Defendants have fabricated or otherwise falsified negative information to plant in Plaintiff's personnel file.

153.    The Common Council has never given Plaintiff any written or official reprimand or performance-related concern related to any misconduct.

154.    On or around June 15, 2023, the EEOC notified the City that Plaintiff filed a Charge of Discrimination against them.   Plaintiff did not tell any City employee, colleague, or friend that he filed a Charge with the EEOC or was in the process of filing a Charge.

155.    After the EEOC notified the City of Plaintiff's Charge, Des Armo and Jannsen ceased all communications with Plaintiff's family—and have not communicated since then.

156.    Plaintiff did not speak to Mr. Wolf, nor feel safe speaking to Mr. Wolf or private legal counsel until May 2023.

157.    Plaintiff has been replaced by a female with less experience and qualifications than he possessed for his position.

158.    Because of Defendants' actions, prospective employers also view Plaintiff less favorably and are fearful of public outcry if they offer him a permanent position as a regular employee.

159.    Plaintiff has been rejected from five full-time positions since he felt forced to resign from the City based on the (still) false narratives from Rendall, Sorenson, Salazar, the Council, and the local media that he is a racist.

160.    Plaintiff cannot rely on the City to give him a favorable recommendation, and the City's decision to allow the false public narrative of him as a "racist" reflects poorly on his ability as a decorated and highly successful City Planner and Developer. This makes it more difficult, if not impossible, for Plaintiff to obtain gainful employment in his prior profession as a municipal planning and development director—or even in any full-time employment capacity.

161.    Plaintiff has been turned down for every full-time position that he has applied for and at this time, Plaintiff is only able to get temporary contract consulting work for far less than he was making in his previous employment.

162.    Plaintiff expected and planned work in his position for another twenty years prior to the Defendants' hostility and harassment that forced him to resign.

163.    Defendants' harassment and retaliatory actions have rendered it impossible for Plaintiff to transfer to, or obtain, an equivalent position commensurate with his level of expertise, achievement, and experience at a similarly prestigious pay scale with similar duties—namely because even municipalities that might desire Plaintiff's skills are afraid of the public scrutiny or "DEI-inspired" outcry from the false narratives that he is a "racist."

164.    Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damages because of Defendant's discriminatory acts, retaliation, and harassment against him.

165.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendants, Plaintiff has in the past incurred, is now incurring, and will in the future incur, a loss of

earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures.

166.    At all times relevant to this Complaint, each and all the acts alleged herein were attributed to the Defendants, who acted both individually and/or under color of a policy, custom, and/or practice of the City of Sheboygan through its officials, employees, and affiliates.

167.    The conduct of Defendants, as set forth above, was outrageous and warrants the imposition of punitive damages against the individual Defendants.

168.    No previous application has been made for the relief requested herein.

169.    Plaintiff has no other adequate or speedy remedy under any City policy or law to address his injuries.

## CAUSES OF ACTION

### CLAIM ONE
**TITLE VII**
**(42 U.S.C. § 2000e, *et seq.*)**
*CITY OF SHEBOYGAN*

170.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

171.    Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from discriminating against employees on the basis of their sex, sexual orientation, race, and/or religion.

172.    By committing the foregoing acts of discrimination and harassment against Plaintiff and others similarly situated to Plaintiff, the City has violated Title VII.

### *Hostile and Abusive Work Environment*

173.    The City's policies, customs, and practices are permeated with discriminatory and anti-white heterosexual male animus including, but not limited to, express statements that Plaintiff,

as a white heterosexual male, does not belong to any protected status and, thus, is not permitted to express concerns about harassment.

174.    The City's policies, customs, and practices create hostile and abusive working environment for Plaintiff and other white males similarly situated to Plaintiff.

175.    By publicly and otherwise severely punishing any employee that defended Plaintiff or opposed the harassment he was receiving, the City condones a hostile and abusive working environment for Plaintiff.

176.    The actions and conduct complained of herein were severe and pervasive and affected Plaintiff's working conditions by creating a hostile and abusive work environment that seriously affected his physical, mental, emotional, and psychological well-being.

177.    Plaintiff's race and gender were motivating and/or determinative factors in the Defendants discriminatory treatment and hostility against Plaintiff, including without limitations, perpetuating public narratives that Plaintiff was a racist, trying to elicit "public petitions" to fire Plaintiff, altering Plaintiff's job duties, making his working environment very difficult, and constructively discharging Plaintiff by communicating that he was suspended and suspected of misconduct.

178.    Plaintiff perceived his working environment to be abusive and hostile, and he communicated that to the City through supervisors, human resources, and to the Common Council over the span of six months.

179.    The Common Council knew and should have known of the harassment and hostility that Plaintiff was facing and they failed and/or refused to take any remedial measures to correct and stop the harassment.

180.    The City created and perpetuated a hostile work environment, turned a blind eye to Plaintiff's hostile and abusive conditions by retaliating against those who raised concerns about the unlawful conduct Plaintiff was subjected to.

181.    A reasonable white man in Plaintiff's circumstances would consider the working environment to be abusive or hostile.

### *Disparate Treatment*

182.    Plaintiff is a male, was highly qualified for his position, was performing his reasonable job expectations, and received good performance evaluations and reviews every year.

183.    Rendall (female) is similarly situated to Plaintiff in all material respects.

184.    Plaintiff was subjected to an adverse employment action when he was constructively discharged by the City following eight months of hostility as a "racist," refusals to correct false information about him, "gag orders" from the City, and communications that he would be fired for misconduct when he returned from leave.

185.    The City takes no adverse employment actions against similarly situated females, including Rendall, who also repeated the "slur" and expressed concerns about harassment, specifically where they oppose Plaintiff or other white males.

186.    Said violations were done intentionally, with malice, willfulness, and/or reckless indifference to Plaintiff's protected rights and warrant the imposition of punitive damages.

187.    As a direct and proximate result of said unlawful employment practices in violation of Title VII, Plaintiff has suffered and is suffering humiliation, degradation, emotional distress, other consequential damages, lost wages, costs, and attorney's fees.

188.    Plaintiff suffered irreparable injury and monetary damages because of Defendants' discriminatory and abusive conduct and inactions unless and until this Court grants the relief requested herein.

## CLAIM TWO
### Violation of Plaintiff's Fourteenth Amendment Rights to
### Equal Protection of the Law
### (42 U.S.C. § 1983)

189.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

190.    The Equal Protection clause of the Fourteenth Amendment prohibits the government from denying employees equal protection of the law based on their race, gender, or protected expressions.

191.    The Supreme Court has long recognized that sex-based discrimination by government actors that does not serve important governmental objectives and is not substantially related to the achievement of those objectives is unconstitutional. *See, e.g., J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 146 (1994) (jury selection); *Davis v. Passman*, 442 U.S. 228, 234–36 & n.12 (1979) (employment discrimination).

192.    The City's customs and practices that claim white men have "no protected status" and, thus, must deal with false accusations, harassment and hostility is not reasonably related to any important government interest.

193.    The Defendants' policies and practices burden Plaintiff's fundamental rights, target a specified class of persons (white males), and have no rational or legitimate basis.

194.    The Defendants allow similarly situated employees and officials like Liz Majerus, Rendall, Abby Block and others to associate with the DEI group (who also filed a suit against the City via Guevara and Haack); while denying Plaintiff from associating with Mr. Wolf, a private citizen.

195.    Plaintiff was subjected to insults, severe harassment, and public humiliation that was subjectively and objectively offensive.

196.     Plaintiff's gender and race were motivating factors in Defendants' discriminatory treatment of Plaintiff, including without limitation, in creating a hostile and abusive work environment, false accusations, punishment and threats of punishment in violation of Plaintiff's equal protection rights.

197.     The conduct complained of was severe and pervasive and unreasonably interfered with the Plaintiff's employment by creating an abusive and hostile environment.

198.     By overseeing a plot to set up Plaintiff to repeat a racial slur, spreading to the news media and public that Plaintiff was a racist, and then enticing female DEI group supporters to demand Plaintiff's firing to the Council and public as a "racist," Sorenson and Rendall directly participated in Plaintiff's constitutional injuries.

199.     By sending Des Armo and Jannsen to find information from Plaintiff's wife and children that could be spun in a false light to incite another "public petition" to fire Plaintiff through media and public harassment, Sorenson, Rendall, and Salazar directly participated in the violations of Plaintiff's Fourteenth Amendment rights.

200.     As Council Leadership and Alderpersons, Felde, Filicky-Peneski, and Salazar knew and/or should have known of Plaintiff's harassment, and they refused and/or failed to correct it.

201.     The Defendant Alderpersons knew and/or should have known about the harassment and hostility that Plaintiff was subjected to and knowingly failed to correct the actions, fired Plaintiff's supervisor who asked that Council fix the harassment, directed, facilitated, turned a blind eye, and failed to properly train, supervise, or oversee Sorenson (as Plaintiff's interim "supervisor"), Westbrook, and Rendall.

202.     The Defendant Alderpersons' failure to supervise and/or train Sorenson to supervise Plaintiff and Westbrook for Human Resources exhibited a deliberate indifference to Plaintiff's Fourteenth Amendment rights.

203. Plaintiff was constructively discharged because of the hostile and abusive working environment, retaliation and defamation of those who expressed concerns about Plaintiff's harassment, and the Defendants' communications that Plaintiff was "suspended," suspected of misconduct, and would be in a "lot of trouble" when he returned from leave.

204. By denying the Plaintiff (male) the rights and privileges of employment that females are granted, and replacing Plaintiff with a less qualified female, the Defendants are violating and have violated Plaintiff's equal protection rights.

205. The Defendants' "false statements" policy and practices allow elected officials (Sorenson, Salazar, and City Attorney Adams) to make false statements and commit fraud on internal investigations regarding harassment by white males.

206. The policies, customs, and practices challenged here that led to the violation of Plaintiff's constitutional rights remain in full force and effect and employees that express concerns about Plaintiff's treatment are subjected to retaliation.

207. As a direct result of the individual Defendants' violations of Plaintiff's clearly established rights, Plaintiff has suffered and will continue to suffer substantial damages including loss of employment income and benefits, employment opportunities, loss of reputation, emotional distress, physical and psychological injuries including, but not limited to, severe humiliation and embarrassment, and other pecuniary and non-pecuniary losses, expenses, and legal fees.

208. The conduct and actions of the individual named Defendants was intentional, malicious, willful, and/or in reckless disregard of the Plaintiff's equal protection rights, thereby entitling plaintiff to an award of punitive damages against the Defendants.

209. Under 42 U.S.C. §§ 1983 and 1988, the Plaintiff is entitled to appropriate relief for the humiliation, emotional harm, lost wages, and other damages available to the Plaintiff, including punitive damages against the Defendants.

# CLAIM THREE
## Violation of the Plaintiff's First Amendment Rights
## Retaliation
## (42 U.S.C. § 1983)

210.     Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

211.     The First Amendment to the United States Constitution protects the rights of public employees to speak on matters of public concern outside of their official job duties.

212.     A public employee does not forfeit his First Amendment rights merely because he learns information growing out of his public employment, nor because he expresses his concerns privately rather than publicly.

213.     Courts have long recognized that matters of public concern include expressions about racism, gender discrimination, and public corruption, including fraudulent government records.

214.     The City's "false statements" policies and practices permit elected officials to "commit fraud" on internal investigations by falsifying "evidence," testimonies, and releasing such false information to the public to retaliate or otherwise threaten and punish employees based on their protected class or expressions.

215.     The customs, policies, and practices exhibit a deliberate indifference to Plaintiff's Constitutional rights.

216.     The Defendants' policies and practices complained of herein were the moving force behind Plaintiff's First Amendment rights violations.

### *Speech re: Racism Concerns (August 2022)*

217.     Plaintiff's speech on August 22 expressing concerns about community racism and responding to Rendall with "exactly" the racist comment made was made outside of Plaintiff's job duties, as a private citizen, on matters of public concern.

218.    Plaintiff's speech did not oppose or violate any written or official policy and did not harm working relationships because the Council knew Rendall enticed Plaintiff to repeat the racist slur, and that Plaintiff's speech was not subjectively or objectively offensive to either Judge Torry (black) or Mr. Kelly (black) who had knowledge of the full exchange that was made privately at the end of a meeting.

219.    Plaintiff's job duties did not include expressing citizen concerns about racism in the community at neighborhood meetings.

220.    Plaintiff's interest in privately expressing Ms. Duellman's concerns about racism at neighborhood meetings and responding "exactly" to Rendall's request outweigh any interests the City may proffer in the efficiency of City services.

221.    Plaintiff suffered an adverse action when Rendall, Salazar and Sorenson told the DEI group and the local news media that Plaintiff was a racist, frequently made racial slurs, and told their DEI group friends to send "outraged" emails to demand Council to fire Plaintiff damaged Plaintiff's reputation and standing in the community.

222.    The adverse actions and inactions Plaintiff was subjected to following his protected speech would chill a person of ordinary firmness from engaging in similar protected speech or ever expressing any concern about racism in the community.

### *Speech re: DEI's "War on white Christian men" and "fraudulent public records"*

223.    Plaintiff's speech expressing concerns about the DEI group's "war on white Christian men" and the City's fraudulent public "investigation" report was made outside of his job duties, as a private citizen, on matters of public concern.

224.    Plaintiff's job duties did not include raising concerns about targeted discriminatory harassment campaigns or fraudulent internal investigation "public" reports.

225.    Plaintiff's statements did not harm working relationships because they were made privately to Filicky-Peneski and the City's Human Resources Director, both on matters of clearly established public concern.

226.    Plaintiff's interests in expressing concerns about a DEI group's targeting of "white Christian men" and a falsified public record outweigh any legitimate interest the Defendants may proffer in the necessary provision of their public services.

227.    Plaintiff suffered an adverse action when Defendants coordinated multiple "public petitions" to fire Plaintiff, forced Plaintiff to turn over job duties to the DEI group (Heather Cleveland), threatened Plaintiff with "strikes against" him, and communicated that Plaintiff was suspended, suspected of serious misconduct, "in a lot of trouble," and would be fired when he returned from leave.

### *Defendants' Liability*

228.    The Defendants actions and inactions that led to the violations of Plaintiff's First Amendment rights were motivated, in part, by Plaintiff's protected speech.

229.    By punishing, and threatening to punish, harassing, and otherwise making Plaintiff's work environment impossible, miserable, and abusive, the Defendants individually and in their official capacities were personally responsible for Plaintiff's injuries.

230.    By confirming to the media (Hilty) that Plaintiff was a racist on September 16, asking the DEI group to engage in outrage against Plaintiff, arranging "public outcry" and news articles to fire and harass Plaintiff, forcing the Plaintiff to turn some of his job duties to the DEI group's Heather Cleveland, Sorenson directly participated in the violations of Plaintiff's First Amendment rights.

231.    By enticing Plaintiff to repeat a racial slur, spreading to the public and media that Plaintiff made frequent racial slurs and that she was "standing up to Plaintiff's racism" in an

intentional false light, Rendall directly participated in the violations of Plaintiff's First Amendment rights.

232.   By encouraging and applauding the manufactured public "outrage" against Plaintiff based on his protected speech, ordering Filicky and Des Armo to harass Plaintiff's family, and demanding Plaintiff's firing, Salazar directly participated in the violations of Plaintiff's First Amendment rights.

233.   The Defendant Alderpersons, as Council Leadership, knew about the retaliatory and adverse actions and directed, condoned, and/or knowingly turned a blind eye to Plaintiff's injuries.

234.   Said violations were done intentionally with malice and/or reckless indifference to Plaintiff's First Amendment rights and warrant the imposition of punitive damages against the individual Defendants.

235.   As a direct and proximate result of the Defendants' violations of Plaintiff's clearly established First Amendment rights, Plaintiff has suffered reputational injuries, damages and losses set forth in this Complaint as well as attorneys' fees and costs.

**<u>CLAIM FOUR</u>**
**Violation of the Plaintiff's First Amendment Rights**
**Prior Restraint**
**(42 U.S.C. § 1983)**

236.   Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

237.   The First Amendment prohibits the government from restricting protected speech of public employees where such restrictions are not necessary for the efficient operations of government. *Pickering v. Bd. of Educ. of Township High Sch. Dist.*, 391 U.S. 563 (1968).

238.   The City's "confidential disclosures" and "false statements" policies and related practices allow City officials to arbitrarily engage in content-based restrictions on employee speech

under threat of discipline or termination—including speech related to conflicts of interest, bribery, or corruption related to City appointments.

239.    The City's policies and practices exhibit a deliberate indifference to Plaintiff's (and other employees') First Amendment rights, and the threatened enforcement of the policies were the moving force behind the Defendants' unconstitutional restraints on Plaintiff's protected speech.

240.    The Defendants' enforcement of these policies punished and threatened to punish Plaintiff for exercising his First Amendment rights.

241.    The City's directives between November 2022 and March 2023 punished or threatened punishment of employees and chilled Plaintiff's potential protected expressions in violation of the First Amendment.

242.    Sorenson's November "investigation directives" and orders that Plaintiff was not allowed to speak to, nor have, private legal counsel during the investigation violated Plaintiff's First Amendment rights to association, petition, and expression.

243.    The November "investigation directives" on Plaintiff chilled Plaintiff's potential First Amendment rights and were not reasonably tailored to further the City's purported interest in investigating "certain allegations" and "conduct, communications, or leadership by the City Administrator."

244.    The City's February 7 directive was also an unconstitutional prior restraint on all 450+ City employees and violated Plaintiff's First Amendment right to associate with Mr. Wolf (a private citizen) as a private citizen and is not reasonably related to the City's public services.

245.    Plaintiff's interests in being able to speak freely to Mr. Wolf or other private citizens does not outweigh the City's purported interest in interfering with and avoiding "evidence" in Mr. Wolf's federal judicial proceeding.

246. The City's March 8 Directive restricting employees from speaking at all about Mr. Wolf's federal lawsuit—including the DEI group, concerns about the "investigation report," or other matters of public concern, "without the City's attorneys present" is not reasonably tailored to any legitimate government services.

247. Plaintiff's interest in speaking about topics contained within Mr. Wolf's lawsuit, including the DEI group threats and the City's fraudulent "investigation report" far outweighs the City's purported interest in defending itself from Mr. Wolf's federal civil rights case.

248. The Supreme Court has recognized that eyewitness testimonies in judicial proceedings are protected speech under the First Amendment. *Lane v. Franks,* 573 U.S. 228 (2014).

249. The City's directives, policies, and related practices were meant to, and did, chill Plaintiff's protected speech, expressions, and associations under the First Amendment.

250. The City cannot proffer any legitimate or reasonable justification related to the City's public services that were reasonably tailored to meet these needs.

251. Defendant Alderpersons Felde, Filicky-Peneski, and Salazar knew and/or should have known about the November, February, and March Directives and directed, ordered, condoned, approved, and/or knowingly turned a blind eye to the violations of Plaintiff's First Amendment rights.

252. The Defendant Alderpersons and Sorenson exhibited gross negligence in failing to train and supervise the new Human Resources Director (Westbrook), and acting "City Administrator" duties by Sorenson, as well as the "investigation directives" from Sorenson, Hall and Adams.

253. By ordering Plaintiff not to speak to legal counsel, and then using Hall to compel Plaintiff's protected expressions and rights to remain silent about his communications with any private legal counsel, the individual Defendants directly participated and/or turned a blind eye to Plaintiff's injuries.

254.     The City's policies, customs, directives, and practices have a severe chilling effect on the protected speech of employees and seriously chilled Plaintiff's protected speech and associations with private citizens and legal counsel.

255.     Said violations were done intentionally with malice and/or reckless indifference to Plaintiff's protected First Amendment rights and warrant the imposition of punitive damages against the individual Defendants.

256.     As a direct and proximate result of the Defendants' violations of Plaintiff's First Amendment rights, Plaintiff has suffered the chilling of his First Amendment rights under punishment or threat of punishment, as well as reputational injuries, damages and losses set forth herein as well as attorneys' fees and costs.

## REQUEST FOR RELIEF

Plaintiff Chad Pelishek seeks damages and equitable relief pursuant to the Defendants' unlawful conduct, and specifically prays that the Court grant the following relief:

257.     A declaratory judgment against the City of Sheboygan that the acts and practices complained of herein are in violation of Title VII;

258.     Enjoining and permanently restraining the City of Sheboygan from continuing and practicing the violations alleged herein;

259.     A declaratory judgment that the acts and practices complained of herein violated the Plaintiff's First Amendment rights;

260.     A declaratory judgment that the acts and practices complained of herein violated the Plaintiff's First Amendment rights;

261.     An injunction prohibiting the Defendants from making any disparaging comments about the Plaintiff to employees, business, potential employers, or citizens privately or publicly;

262.    An injunction compelling the Defendants to remove any subsequent or negative performance or job-related information from his personnel file;

263.    Compensatory damages to the Plaintiff that cover back pay; lost benefits; front pay; lost earnings, earning capacity, past pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, all of which the Plaintiff has suffered as a result of the Defendants' conduct;

264.    Punitive Damages to Plaintiff under Title VII and 42 U.S.C. § 1983, against the Defendants;

265.    Any other such damages as this Court deems appropriate under Title VII and 42 U.S.C. § 1983, as well as Plaintiff's reasonable attorney fees and costs under 42 U.S.C. § 1988; and

266.    Granting such other and further relief as this Court may deem just, proper, and equitable, including injunctive relief for past violations and preventing future violations.

267.    Plaintiff requests a trial by jury.

Dated: August 7, 2023.

Respectfully Submitted,

*/s/ Jennifer DeMaster*
Jennifer DeMaster
State Bar No. 1124201
attorney@jenniferdemaster.com

DeMaster Law LLC
361 Falls Rd # 610
Grafton, WI 53024
Phone: (414) 235-7488
Fax: (262) 536-0515

*Attorney for Plaintiff*