# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHAD PELISHEK,

                  Plaintiff,

                                 Case No.  2:23-CV-1048-WED

                                 **JURY TRIAL DEMANDED**

CITY OF SHEBOYGAN, MAYOR RYAN
SORENSON in his individual and official
capacity, ALDERPERSONS ON
SHEBOYGAN'S COMMON COUNCIL,
BARBARA FELDE, ROBERTA FILICKY-
PENESKI, AMANDA SALAZAR, all in their
individual and official capacities; DIRECTOR OF
UPTOWN SOCIAL EMILY RENDALL-
ARAUJO in her individual and official capacity,
CITY ATTORNEY CHARLES ADAMS in his
individual and official capacity;

                  Defendants.

---

## AMENDED COMPLAINT

---

Plaintiff Chad Pelishek, by his undersigned counsel, hereby alleges as follows:

### INTRODUCTION

1.      Plaintiff, Chad Pelishek, a sixteen-year employee of the City of Sheboygan, was a loyal, dedicated, extremely hard working, and highly successful City Director of Planning and Development.   A dedicated public servant, Plaintiff worked with various groups, boards, committees, businesses, and residents to help turn Sheboygan into a thriving city.  In his sixteen-years, Plaintiff had no prior allegations of wrong-doing or "racism."

2.      In August 2022, Plaintiff tried to raise concerns about an incident involving a racial slur in a citizen meeting.  After Plaintiff's coworker told him to repeat what was said and then

published his response to the public under false pretenses, Plaintiff was subjected to manufactured "outrage" and demands for his termination by the local "Diversity Equity Inclusion and Belonging" collective ("DEI Group"). Plaintiff learned the DEI "equity" rules the hard way: (1) being born a heterosexual white male makes you privileged and a "racist;" and, (2) if you are a heterosexual white male, you must remain silent, fully compliant, and never oppose anything a woman or progressive DEI activist says-including false allegations.

3. When his supervisor, City Administrator Todd Wolf ("Wolf") inquired about why there was such outrage against Plaintiff, the Defendants stated that "white men of privilege" are not allowed to say things about racism. When Wolf, also a heterosexual white male, tried to defend Plaintiff and expressed concerns about the DEI group, the Defendants publicly accused Wolf of harassment, dishonesty, and misconduct and fired him.

4. In response to Plaintiff's statements expressing concerns about racism and potential political corruption with City officials and the DEI group activists, the Defendants forced Plaintiff to turn over some of his duties to a female DEI activist, threatened him with discipline if he didn't comply with impossible demands, and "gagged" him from speaking to private citizens.

5. After eight months of gag orders, threats, harassment, intimidation, as well as being publicly labeled a "racist," Plaintiff's physical, emotional, and mental state took a serious turn, and he had no choice but to resign. To date Plaintiff cannot find any equivalent work and pay because of the false publications by city officials and their DEI affiliates accusing him of racism and subjecting him to silence.

6. Plaintiff now brings claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C. §2000e, *et. seq.* ("Title VII") and violations of the First and Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983.

**PARTIES**

7. Plaintiff Chad Pelishek was employed by the City of Sheboygan for sixteen years. He was the Director of Planning and Development for the City of Sheboygan from May 6, 2013 to May 12, 2023. Plaintiff is a heterosexual white male. At all times material to the facts alleged in the foregoing complaint, Plaintiff was a citizen of the United States and resident of the State of Wisconsin, residing in Sheboygan, Wisconsin.

8. Defendant City of Sheboygan ("City") is a municipality, organized pursuant to a body politic under the laws of the State of Wisconsin, whose address is 828 Center Avenue, Sheboygan, Wisconsin.

9. Defendant Ryan Sorenson ("Sorenson") is the Mayor for the City of Sheboygan and was elected Mayor of Sheboygan on April 6, 2021. Sorenson has been the mayor of Sheboygan at all times material to the allegations in this Complaint. Sorenson is not a heterosexual and is involved with the "LGBTQ+" organizations and DEI group in Sheboygan. Sorenson is sued in his individual and official capacities.

10. Defendant Barbara Felde ("Felde") is an Alderwoman on the City of Sheboygan's Common Council. Between 2021 and April 2023, Felde was the President of Sheboygan's Common Council. Felde has been an Alderwoman on Sheboygan's Common Council at all times material to the allegations in this Complaint. She is sued in her individual and official capacities.

11. Defendant Roberta Filicky-Peneski ("Filicky") is an Alderwoman on the City of Sheboygan's Common Council. Between 2021 and April 2023, Filicky was the Common Council Council Vice President. Filicky has been an Alderwoman on Sheboygan's Common Council at all times material to the allegations in this Complaint. Filicky-Peneski is sued in her individual and official capacities. Together with Felde, Filicky was considered ("Council Leadership" between 2022 and April 2023).

12.     Defendant Amanda Salazar ("Salazar") (female) is an Alderwoman on Sheboygan's Common Council.  Salazar has been an Alderwoman on Sheboygan's Common Council at all times material to the allegations in this Complaint. On April 2023, the Common Council voted to make Salazar the Vice President of the Common Council. She is sued in her individual and official capacities.

13.     Defendant Emily Rendall-Araujo ("Rendall") (female) is the Director of Senior Services (Uptown Social) for the City of Sheboygan and has been at all times material to the allegations in this Complaint. Rendall is very involved with Sheboygan's female DEI group and was the administrator of the Progressive Women of Sheboygan Facebook page until approximately August 2022.  The Common Council appointed Rendall as the City's Director of Senior Services (now "Uptown Social") in or around 2021.  She is sued in her individual and official capacities.

14.     Defendant Charles Adams ("Adams") is the City Attorney for the City of Sheboygan and has been at all times material to the allegations herein.  Adams is sued in his individual and official capacities.

### *City of Sheboygan Authority, Roles, and Relevant Department and Practices.*

15.     Sheboygan's Common Council ("Council") is the policymaking and administrative body for the City of Sheboygan.  The Council is comprised of ten Alderpersons from Sheboygan's Districts and Sheboygan's Mayor, who is the presiding officer over the Common Council.

16.     The Alderpersons are elected as part-time officials and every year, the Council elects a President and Vice President over the Council to oversee day-to-day matters and are responsible for reporting back important matters to the Common Council.  The Council President and Vice President (collectively "Council Leadership") meet weekly with the Mayor and City Administrator to ensure regular updates from Department heads.

17.     In 2011, the Council assumed power and authority over all personnel and financial matters for the City and created the City Administrator position to be the "administrative arm" of the Council.  The City Administrator supervises department heads and personnel matters and reports to the Council.  Despite this, Sheboygan still has a "Mayor-Council" form of government under Wis. Stat. § 62.09, and the mayor is the "presiding officer" of the Common Council and Chief Executive Officer over the City.

18.     The City of Sheboygan has fifteen Departments.  Among these departments are (1) Human Resources, (2) "Senior Services" (now called "Uptown Social"), and (3) the Department of Planning and Development.  Only the Common Council has ultimate authority to hire and fire the Directors of these three departments with input from the Mayor and City Administrator.

19.     Although the Mayor and City Attorney in Sheboygan are elected positions, the Council has authority to conduct internal investigations into their conduct and may remove or discipline these officials for cause pursuant to Wis. Stats. §17.12(1)(a).

20.     The City also has a policy that threatens employees and citizens with discipline, possibly jail time and fine(s) if they make any "false statements" about a political appointment effort or try to "commit fraud" on internal investigations related to the enforcement of allegations about bribery, political corruption, or City appointments.  Sheb. Mun. Code 82-3, 82-4, 82-5, and 82-6. ("*No persons* shall make any false statement or report … or in any manner commit *or attempt to commit any fraud preventing the impartial execution of this chapter and policies*." Sheb. Code 82-3, emphasis added.)

21.     Under the "false statements" policies and related provisions, ***elected officials*** are specifically exempt from the provisions prohibiting "false statements" and committing fraud on the City's "enforcement" or investigations into allegations about corruption, political appointments, or

bribery. Sheb. Mun. Code 82-23(a) ("The provisions of this chapter (except sections 82-5 and 82-6) shall not apply to … Officers of the city government who are elected by the voters of the city…").

22. The Defendants have used this policy to impose directives on employees' compelling their silence about any matter or threatening punishment on employees that express concerns about these issues only if they involve the Defendants political allies, associated groups, or specific content that is not an "approved" narrative of factual events, thereby actively engaging in speaker, virepoint, or content-based restrictions of a specific message.

23. Sheboygan's Employee Handbook has policies regarding harassment and investigations of harassment, and states in relevant part, that "any employee who knowingly makes false accusations of harassment will be subject to appropriate disciplinary action up to an [sic] including discharge." Sheb. Employee Handbook (2016), Sec. 20(VII)(E). Such employment policy is in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000(e).

24. The Defendants have used the False Statements and harassment reporting policies to arbitrarily label certain contents or "narratives" as "true" or "false" to discourage certain employees or persons from raising concerns about harassment, discrimination, or potential public corruption.

## VENUE & JURISDICTION

25. This case arises under the Constitution and laws of the United States, and subject matter jurisdiction is therefore proper under 28 U.S.C. §§ 1331 and 1343.

26. The District Court has jurisdiction over the claims herein under Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C. §2000e-5 and 28 U.S.C. §1331.

27. On June 14, 2023, the Plaintiff filed a Charge of Discrimination with the EEOC complaining acts of discrimination alleged herein. Attached to this Complaint as Exhibit 1 is a true and correct copy of the EEOC Charge of discrimination (with personal identifying information redacted).

28.     On June 15, 2023, the EEOC issued the Plaintiff a Notice of Right to Sue for his Charge of Discrimination. Attached as Exhibit 2 is a true and accurate copy of the Notice (with personal identifying information redacted). This Complaint is being filed within 90 days of Plaintiff's receipt of the EEOC Notice of Right to Sue.

29.     The events or omissions giving rise to this cause of action occurred in Sheboygan County, Wisconsin, which is within the Eastern District of Wisconsin, Milwaukee Division. Venue is therefore proper under 18 U.S.C. § 1391(b) and 42 U.S.C. §2000e-5(f).

30.     This Court has authority to grant the requested declaratory relief, attorneys fees and costs pursuant to 28 U.S.C. §§2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 57.

## FACTUAL BACKGROUND

31.     In 2000, Plaintiff graduated from the University of Wisconsin with a Bachelor of Science Degree in Environmental Policy and Planning, and for seven years, Plaintiff gained experience working in planning and design, grant writing, and civil engineering for private and municipal entities.

32.     Plaintiff was hired by City of Sheboygan in 2007 as the Economic Development Manager in Sheboygan's Department of Planning and Development.

33.     Due to his exemplary performance, Plaintiff was appointed by Sheboygan's then Mayor and City Administrator to be Sheboygan's interim Planning and Development Director in or around January 2011; and was officially confirmed as Sheboygan's Director of Planning and Development on May 6, 2013.

34.     As Director of Planning and Development, Plaintiff was, in part, responsible for city planning and zoning, development, and city building inspections, and was required to attend all Common Council meetings.

35.     Some of Plaintiff's accomplishments have included nearly $1 billion dollars in City grant allocations and projects, facilitating the growth of Sheboygan by over 350 new businesses, business retention projects attracting citizens to Sheboygan, enabling sales of buildings for industrial growth to raise the City's revenues, and coordinating purchases of over 500 acres of expansion projects for Sheboygan's economic development.

36.     Plaintiff was also responsible for reporting government grant allocations, supervising roughly a dozen City employees, managing, and coordinating building inspections, helping to draft and determine eligibility for development grants, and serving on several boards, commissions, and committees related to Sheboygan's growth and economic development.

37.     Additionally, Plaintiff's job duties included City tours, meetings, and regular communications with "city partners," including the Sheboygan Chamber of Commerce and the "Visit Sheboygan" organizations, among others.

38.     Plaintiff can only be fired by Sheboygan's Common Council, but the Council strongly considers the recommendations of Plaintiff's supervisor—which, starting on November 8, 2022, was the mayor (Sorenson).

39.     Between July 2020 and November 7, 2022, Wolf was Plaintiff's supervisor, and after Wolf was placed on leave and ultimately fired, the City did not hire a new City Administrator during Plaintiff's tenure.

40.     Plaintiff's most recent performance evaluation in 2022 showed that Plaintiff was performing his job duties well as Sheboygan's Planning and Development Director.

41.     From 2021 – November 2022, Rendall, as the head of "Uptown Social," operated out of Sorenson's office.  Beginning in the summer of 2022, Sorenson and Rendall left City Hall together nearly every day.

42.     In or around 2022, the Defendants were aware that Rendall publicly stated her hobbies include "dismantling the patriarchy"—a reference to getting rid of males in leadership roles.

43.     In August 2022, an employee told Plaintiff that a citizen neighborhood association leader was concerned because an "unknown" citizen appeared at a neighborhood meeting and made a racial slur and the employee told Plaintiff about this.

44.     Plaintiff tried to ask Sorenson for information that could help citizens address these types of issues at neighborhood meetings, and despite multiple requests, Sorenson ignored Plaintiff and did not respond.

45.     On August 22, several employees, including Rendall, Adams, Wolf, and Plaintiff, were at a closed meeting ("August 22 meeting").  At the end of the meeting, Plaintiff raised the concerns about the community racism issue and asked if anyone had any advice that could be useful for citizen neighborhood groups.

46.     Rendall told Plaintiff to say "exactly" what racist comments were being made at neighborhood meetings, and in response to Rendall, Plaintiff said that an unknown man said he 'does not want any niggers living in his neighborhood.'"

47.     Although Rendall was the only person who wanted to know what was being said at neighborhood meetings, she failed to provide any advice or information to address the racist comments.

48.     No meeting attendee expressed any concern nor seemed upset at the meeting.

49.     Several hours later, Sorenson said that Rendall told several citizens in the public that Plaintiff made a racial slur, and this was a big problem.

50.     Learning this, Wolf arranged for a follow up meeting with a human resources and diversity expert (a black male) for August 26.

51.     The August 26 meeting was attended by the original August 22 attendees, the diversity expert, and Sorenson.

52.     The diversity expert (black male) stated that Plaintiff's intentions during the August 22 meeting were good, that Plaintiff did the right thing and was trying to help address community racism issues; and in response to this, Rendall abruptly left the meeting visibly upset. On information and belief, Wolf informed Felde and Filicky that the diversity expert stated that Plaintiff did nothing wrong and acted in good faith to express concerns about racism.

53.     On September 12, Plaintiff learned that a local news reporter emailed the City asking for comment about Plaintiff making a racial slur on August 22, and Council Leadership (Felde and Filicky) asked that Wolf and Sorenson meet with the reporter together to comment.

54.     On September 19, the reporter emailed Plaintiff directly to comment on him using a racial slur. On information and belief, Sorenson met secretly with the reporter outside City Hall before the official September 20 meeting and confirmed that Plaintiff made the slur.

55.     Plaintiff asked Adams if he was allowed to comment to the reporter, but Adams said Plaintiff could not comment to the reporter and ordered Plaintiff to direct the reporter to Wolf and Sorenson.

56.     On information and belief, Wolf did not use any employee name, defended the context of Plaintiff's speech, and expressed concerns about another employee leaking things to that reached the media in a false light to hurt well-meaning employees (Plaintiff) and that such actions would make other employees scared to express concerns about racism.

57.     Plaintiff told Wolf that he was scared about Rendall's statements reaching the media and Wolf stated that Council Leadership (Felde and Filicky) would interview the August 22 meeting attendees and report what happened to the full Council to ensure the situation was not further blown out of proportion.

58.    No one from the Council ever interviewed the Plaintiff, but on information and belief, Felde interviewed at least three other female employees.

59.    On information and belief, the Council was informed by several meeting attendees that they were not offended and understood the context of Plaintiff's "slur" was meant to address and express concerns about racism; but Rendall told the Council members that Plaintiff was a racist and that she was "standing up" to Plaintiff's racism.

60.    On October 5, Wolf said that Plaintiff could attend a lunch meeting with the DEI group to get information related to plaintiff's concerns about racism in the community ("DEI Lunch") where two of the DEI representatives, Ale Guevara (Guevara) and Jamie Haack (Haack) were present.

61.    Prior to the DEI Lunch, a female City employee affiliated with the DEI group warned Plaintiff and Wolf that the DEI representatives were "probably going to ask for money."

62.    The DEI group asked for $70,000 at this lunch, and when Wolf said he would not pay them, Guevara threatened to "oppose" Wolf.

63.    The article from the reporter about the "slur" was first published in newspaper format on October 11 (with the online version on October 10) entitled "Sheboygan Leader Says Racist Slur in Meeting" with a large picture of Plaintiff.  Attached as Exhibit 3 is a true and accurate copy of a partial scan of the newspaper (print) version of the "slur" article front page headline.

64.    The article implied that Plaintiff made an unsolicited racial slur and stated, "it is not OK for white people to say the N-word," and included statements by Guevara demanding action against Plaintiff and Wolf for defending Plaintiff.  Ex. 3.

65.    After the article was published, Plaintiff learned that Council Leadership banned Wolf from speaking to the media, and Felde sent a city-wide email to all employees encouraging them to file reports and complaints of discrimination using the City's "whistleblower" program.

66.    Additionally, after the article was published, Sorenson told his political allies to send "outraged emails" to the Common Council about Plaintiff in response to the article, and Council was aware that Sorenson made these requests to the public. On information and belief, one of these "outraged citizen" emails to the Council specifically stated that "Emily Rendall-Araujo" should not be punished for reporting Plaintiff's racism—even though Rendall's name had *not been used* by the reporter nor by Wolf in the article.

67.    On information and belief, Sorenson and Salazar encouraged these politically allied "citizens" to speak out at a public Council meeting against Plaintiff in light of the "slur" incident and article that discussed Wolf's defense of Plaintiff's speech in context.

68.    Rendall, Filicky, and Salazar have stated, and expressed during this time, that "white men of privilege" are not allowed to speak about racism or discrimination and should remain quiet about community or social matters.

69.    At the public Council meeting on October 17, Plaintiff was forced to sit and watch public speeches by female Progressive/DEI activists connected to Council members (including Salazar), Rendall, and Sorenson, suggesting that Council fire or discipline Plaintiff for his alleged "racism" and "do something" to address the "racism".

70.    Sheboygan Council Alderwomen publicly admonished Plaintiff's alleged racism by voicing support for the female Progressive/DEI activists and reiterated their commitment to ensuring "change" in response to the "racism" issues and the article about Plaintiff.

71.    The Council met in closed session on October 17 and 24 with Adams and Sorenson to discuss Plaintiff's discipline for using the "racial slur," and Wolf, although Plaintiff's supervisor and a regular closed session attendee, was not allowed to attend because he had defended Plaintiff.

72.    On information and belief, during the closed sessions, Salazar "led the charge" demanding that Plaintiff be fired, that Wolf be fired for defending Plaintiff, and Salazar, herself said

in full the racial slur ("n-word") during the closed session in making those demands. No action has ever been taken against Salazar, and she was voted to Council Vice President in April 2023.

73.     On information and belief, in October, Rendall met with the same reporter in City Hall, and shortly after that, another article was published about Plaintiff's racism at City Hall and how a "female employee" had reported Plaintiff's alleged "racism."

74.     On November 1, Sorenson met in his office with Guevara and another DEI representative, Heather Cleveland ("Cleveland"), both of whom had publicly called for Council to take action in response to Plaintiff's alleged "racism." On information and belief, during this meeting, Guevara referred to Sorenson in a friendly manner as "El Jefe," which means "The Boss" in Spanish.

75.     The Council published that they would meet again for *another* disciplinary closed session about Plaintiff at their November 7 Council meeting, and Plaintiff told Wolf that he believed that Rendall and Sorenson set him up to orchestrate outcry and get him fired to bring in one of their female political or DEI allies into his position, and Wolf said that he would relay those concerns to the Council before the Council meeting that night.

76.     On November 7, Wolf asked the Council members for permission to discipline Rendall for the false narratives about Plaintiff, and Wolf expressed his concerns about the DEI group using the manufactured "slur" matter during the October 5 lunch to obtain payments from the City.

77.     Several hours after Wolf communicated this, the Council (via Felde) publicly announced that *Wolf* would be investigated for misconduct and stated that Adams (City Attorney) was going to hire an outside lawyer to conduct the investigation.

78.     Plaintiff watched as Wolf was placed on involuntary leave during the Council meeting and escorted out of City Hall by Adams. Adams' Assistant City Attorney Liz Majerus told Plaintiff and a few other employees there that they were not allowed to talk to Wolf and would learn more later about what was happening.

79.     After the Council meeting, Plaintiff secretly drove to Wolf's home and witnessed a City of Sheboygan police officer serve a "gag order" on Wolf in front of Wolf's family at 11:30 PM ordering Wolf not to talk to employees or step foot on City properties.

80.     Plaintiff was terrified that the Council would send the police to his home in front of his family, so Plaintiff immediately left.

81.     Back at work, Adams said that Council wanted Plaintiff to "report to the Mayor" in Wolf's absence and that Sorenson was assuming City Administrator responsibilities in the interim while Wolf was under investigation.

82.     On information and belief, during this time in City Hall, Sorenson stated that Wolf needed "to be punished" for his communications defending Plaintiff, and Adams stated that he "would do anything in his power to get rid of" Wolf.

83.     In November, Defendants and other City officials began verbally distinguishing and referring to employees and citizens as members of the "Mayor's Team," or "Todd's [Wolf] Team," in both public and private settings, including employee meetings, and Adams said he was "on the mayor's [Sorenson] team" regarding the investigation into Wolf.

84.     On November 21, Sorenson handed Plaintiff a letter stating that Plaintiff was being ordered to participate in an interview for the Council's investigation into Wolf, that the investigation would be conducted by an attorney, Jill Hall, and "Jill" would contact Plaintiff to schedule his interview.

85.     Plaintiff told Sorenson that he would like to have an attorney with him during his interview, and Sorenson said that (city attorney) Chuck Adams was Plaintiff's attorney and plaintiff was not authorized to retain private legal counsel for the investigation interview.

86.     The letter and statements from Sorenson implied that he was working with Hall to conduct the investigation, ordered Plaintiff to not speak to Wolf or anyone about the investigation

until Sorenson "formally and expressly relieved this directive.". Attached as Exhibit 4 is a true and accurate copy of the November 21 letter.

87.    The letter ordered Plaintiff to fully comply with the investigator and stated, with very few details, that the investigation was about "certain allegations" involving Wolf and the "communications, conduct, and leadership" of Wolf.  The letter appeared to imply that Sorenson was working with Hall to help her conduct the investigation into Wolf.  *See* Ex. 4.

88.    Plaintiff has never been "formally and expressly" relieved of these directives by Sorenson nor by any other city official.

89.    On information and belief, the Council and Adams knew about the November 21 letter.

90.    Plaintiff asked Sorenson if he could speak to or retain an attorney for Hall's investigation, and Sorenson said that Plaintiff was not allowed to retain nor talk to an attorney and stated that City Attorney Adams was "Plaintiff's 'lawyer.'"

91.    On Thanksgiving weekend, Hall contacted Plaintiff to schedule his interview for the investigation and discouraged Plaintiff from recording the interview, and Plaintiff was scared because he believed his statements to Hall would be used against him by the Defendants.

92.    Throughout Hall's nearly two-hour interview with Plaintiff, Hall never told Plaintiff what she was investigating, but she assured Plaintiff she was "not investigating" him and stated that there was "a reason [the Council] brought [her] in" to conduct the investigation into Wolf.

93.    Plaintiff told Hall that the DEI group threatened Wolf at the October 5 DEI Lunch after Wolf denied their request for money.  Specifically, Hall asked Plaintiff "[d]o you recall [DEI representatives] saying that if Todd [Wolf] didn't pay them that they would publicly oppose him?" and Plaintiff responded "Yes, that was said."

94.    Hall asked Plaintiff to tell her if he had spoken to an attorney, and to describe what "concerns" he spoke, or would speak, to his attorney about.  When Plaintiff stated he did not want to

answer these questions, Hall pressed further asking, "you aren't going to tell what your concerns are?" On information and belief, Hall was ordered by the Defendants, in part, to gather information about Plaintiff's potential legal claims against the City while Plaintiff was under threat of discipline to fully comply with the investigation.

95.     Plaintiff told Hall about the "slur" exchange with Rendall on August 22, that there were concerning "external" political factions involved with City officials and financial issues under external audit involving the DEI group's affiliated persons, Salazar, and potentially Sorenson.  On information and belief, Sorenson was informed about what Plaintiff said to Hall.

96.     Approximately one week after Plaintiff's interview with Hall, Sorenson met with a Sheboygan County employee at a public coffee shop in downtown Sheboygan, where citizens are frequently present.  On information and belief, Sorenson discussed starting a "public petition" to fire Plaintiff after Sorenson learned what Plaintiff said to Hall.

97.     In or around December 2022, City partners started refusing to work with Plaintiff because of his purported "racism."

98.     On information and belief, in or around December 2022, Felde, in a meeting with Sorenson and Filicky stated, "now that we've taken care of Todd [Wolf], we need to take care of his attorney!"

99.     At the Common Council meeting on January 9, 2023, eight Alderpersons, including Felde, Filicky, and Salazar, publicly fired Wolf and the Council made a statement implying that giving Wolf a hearing to defend himself was not fair to employees and Wolf was being fired to protect employees.  On information and belief, this statement was meant only to protect Rendall from her involvement in the outcry against Plaintiff.

100.     Sorenson stated that Wolf was fired because of Hall's investigation that Wolf made "false statements" about the DEI group and that Hall's "final investigation report" would be completed and publicly released after Adams was finished "editing" the report with Hall.

101.     In January 2023, Adams stated on at least two occasions that he was "editing" the "final investigation report" with Hall, and Plaintiff asked Adams and other city officials not to release his name on the report or any records or personnel matters in any way.

102.     Despite these requests, the Defendants authorized and released several records relating to disciplinary and other matters naming Plaintiff and referencing the "slur" matter without ever providing notice or any opportunity for Plaintiff to redact his name—including closed sessions records about the Plaintiff, which contained no redactions.

### *The "Investigation Report" and Plaintiff's Resignation.*

103.     Plaintiff asked Adams if he "was next" to be fired by the Common Council, and Adams said, "that is not yet the plan." Adams told Plaintiff that Wolf "was in a lot of trouble" after he raised concerns about Plaintiff and the DEI group, and that Wolf should have remained silent because his defense of plaintiff "really hurt" Plaintiff.

104.     In or around January 2023, the Council hired a Human Resources Director ("HR"), a homosexual male, and the HR Director immediately asked Plaintiff to tell him everything that Plaintiff told Hall while Adams was "editing" the "investigation report" with Hall for public release, and Plaintiff disclosed what he said to Hall during his interview.

105.     On information and belief, Adams, and Sorenson learned from Hall and the HR Director what Plaintiff said and would potentially testify to including Plaintiff's concerns about financial corruption, the external audit, Rendall and Sorenson's "set up," and the DEI group ties to City officials.

106.     When Plaintiff complained to the new HR Director about how the hostility and harassment of him being labeled a "racist" was affecting his job, the HR Director stated that city partners needed to be "reassured" that Plaintiff would "not say the N-word" when he was working with them as part of his job duties.

107.     Plaintiff, again, asked the HR Director to encourage the Common Council to issue a public statement correcting the narratives of "racism" about him, and HR Director stated that Council "knew" the public narratives were "false" and "inaccurate" but that the City would not issue any public statement correcting these false narratives stating that the Mayor could talk to city partners but, "at this point, again, it would be inappropriate for [the Council] to sit with [city partners] and tell them ... start to finish the story of what happened."

108.     Plaintiff told the HR Director that he felt like he was being discriminated against given the protections for Emily because the Council was going to allow the false narratives of him as a racist to continue making his job impossible, and the HR Director responded, "you are not being discriminated against" and that Plaintiff has no "protected status" to raise complaints about discrimination and implied Plaintiff must simply deal with Rendall's complaints about him.

109.     In or around February 2023, Sorenson told Plaintiff that he was paying Cleveland (female) $30,000 to assume some of Plaintiff's job duties and refused to re-appoint Plaintiff to the Harbor Centre Business Improvement District Board—where Plaintiff had served for roughly eight years.

110.      Sorenson nominated Rendall for a prestigious award from the Chamber of Commerce that she was not qualified for—but that Plaintiff readily qualified for as Sheboygan's Planning and Development Director.

111.     After this, Sorenson publicly implied that Plaintiff was responsible for an incomplete draft of the City's "strategic goals" project that Plaintiff had no ultimate control over.  The project

was to be completed by a private vendor with the assistance of all fifteen department heads. Plaintiff has no authority to determine, much less approve, the City's overall strategic goals, which are set by the Mayor and Common Council.

112.    The same day Sorenson implied Plaintiff's responsibility to the Council for the "Strategic goals" project incompletion, Sorenson and the Common Council announced a $30,000 raise for a female department head who was also part of the "strategic goals," project.

113.    Additionally, Sorenson ordered Plaintiff to complete a $50,000 multi-month development grant proposal project within two days—one that Sorenson had previously appointed Cleveland (female) to do in November 2022 (instead of Plaintiff), and that Cleveland did not complete. Sorenson threatened Plaintiff that he must successfully complete it and that the grant's failure would fall on Plaintiff. Plaintiff worked nearly thirty hours within two days and successfully completed the grant proposal—despite the severe toll on his physical and mental health.

114.    Finally, in or around February 2023, Sorenson told Plaintiff to remember that "there are already two strikes against you," which Plaintiff believed to be a threat despite having no knowledge of any performance-related "strikes."

115.    During this time, Plaintiff's wife and minor children were also harassed by the defendants or their affiliates who approached them on multiple occasions asking personal information about Plaintiff. On information and belief, the Defendants asked their affiliates to get information from Plaintiff's family that they could spin or use against him for another public outcry or petition.

116.    On February 6, Wolf filed a lawsuit in federal court against the Defendants alleging, in part, that he was falsely accused, had no knowledge of the charges against him and was not allowed to defend himself, and that Hall's investigation was biased.

117.    Sorenson and the new HR Director approached Plaintiff to discuss Wolf's lawsuit and stated that Plaintiff would be the "main witness" in Wolf's lawsuit.

118.     On February 7, the City Attorney's (Adams) office sent a City-wide gag order (*February 7 Directive*) banning all City employees and officials from speaking to Wolf or Wolf's attorney because it might be used as "evidence." Attached as Exhibit 5 is a true and accurate copy of the email from the City Attorney's Office to all City employees.

119.     The letter stated that any employee that violated this or spoke to Wolf or Wolf's attorney could be used as "witnesses" against the City. "City-wide" emails include Common Council members and elected officials. Ex. 5.

120.     Prior to the *February 7 Directive*, no City-wide Gag Order had ever been sent out for any legal claims or lawsuits against the City by former employees, and no other city-wide Gag Order has been imposed for any other lawsuit or legal claim against the City since Wolf's lawsuit was filed.

121.     After Wolf's lawsuit was filed, the HR Director told Plaintiff that the "final investigation report" ("Report") was complete and being publicly released, and Westbrook showed Plaintiff a copy of the Report which implied that Plaintiff made an unsolicited racial slur, that Wolf "retaliated" against Rendall for reporting Plaintiff's "racism," that Wolf lied about the DEI lunch threat on October 5, and that Wolf made false statements expressing these concerns to the Council.

122.     The Report revealed that Council hired Hall to investigate, in part, Wolf's alleged "retaliation" against *Rendall* for Rendall's alleged "reporting" of Plaintiff's racism.

123.     Despite Plaintiff's statements to Hall during his November interview, the Report stated or implied, in part, that *Plaintiff confirmed* he made an *unsolicited* racial slur, that Rendall reported Plaintiff's "racism," that Council Leadership told Wolf not to speak to the reporter about the "slur," and that Plaintiff confirmed the DEI group did *not* ask for money or make any threat on October 5.

124.     Plaintiff told the HR Director and Filicky that the Report contained false statements attributed, and harmful, to Plaintiff and should not be released to the public. The HR Director responded that the City considered the Report the "final facts" of what happened, that Plaintiff should

have recorded it (despite being discouraged from doing so by Hall) and that Plaintiff should not dispute the Report.

125.    The next day, the HR Director sent an email to Plaintiff, city department heads, Sorenson and Adams stating, in part, that department heads, including Plaintiff, were not allowed to talk to (1) anyone about "Wolf" without the City's outside attorneys being present, and (2) must direct all public or media requests only to Sorenson, Adams, or the (new) HR Director for a "complete answer" but were otherwise prohibited from commenting on Wolf's federal lawsuit allegations, including the published Report, and factual statements about threats and potential political corruption. ("*March 8 Directive*"). Attached as Exhibit 6 is a true and accurate copy of the March 8 email from the new HR Director.

126.    Plaintiff told Filicky that the Report did not accurately reflect his statements to Hall, but the Council did not dispute nor correct the *March 8 Directive*.

127.    In a follow up meeting to this, Sorenson, and Adams reiterated that the Report was the "full truth" of everything that happened and reminding employees not to disclose anything they knew about Wolf, his allegations, or the investigation to anyone in the public without the city's "outside attorneys" present.  On information and belief, Adams and Sorenson directed the new HR Director (Westbrook) to impose the *March 8 Directive* specifically to threaten Plaintiff from disclosing his concerns that the Report had false information about Plaintiff's statements to Hall.

128.    During the follow-up meeting, Plaintiff broke down in tears saying the information about him in the Report was wrong and begged Sorenson and Adams not to release the report or his name, and neither Sorenson nor Adams redacted Plaintiff's name nor corrected any information.

129.    On information and belief, Adams and Sorenson, both elected officials, worked with Hall to make the final Report inaccurately suggest that Rendall legitimately reported Plaintiff's racism, that Wolf made false statements about the DEI Lunch threats and group efforts, that Wolf

retaliated against Rendall for "reporting Plaintiff's racism," and that Plaintiff confirmed all of this during Hall's investigation.

130.    When they published the Report in full, the Defendants knew Plaintiff opposed the statements about him in the Report, that the Report was in relation to a personnel matter, and that the Report was marked "Attorney-Client Privilege" by Hall.

131.    Plaintiff believed if he made any further statements that contradicted the Report, Plaintiff could also be accused of "committing fraud" in conjunction with the city's "enforcement" of the False Statements policy into allegations of bribery or political appointments.

132.    If any department head or employees present at the August 22 meeting made a statement contrary to the Report, they too could be punished for violating the "false statements" policy, *February 7 Directive* and Directives to keep information about the investigation "confidential" and only use Adams as their "attorney" for things related to the investigation.

133.    Employees, including Plaintiff, became and remain fearful of ever raising concerns about racism or political bribery and corruption matters that involve the political allies or friends of Sorenson, Rendall, Salazar, or other City officials.

134.    Plaintiff was also terrified that if he were subpoenaed to testify under oath in Wolf's lawsuit that he would be fired or disciplined under the City's policies and directives.

135.    Between January and March 2023, Plaintiff told Filicky several times that he was set up and targeted by Rendall and Sorenson, that Sorenson was making his job impossible and giving away his duties, and that there was a "war" on white men in Sheboygan with the DEI group influence. Filicky agreed but stated that there was "nothing" she could do about this.

136.    Plaintiff was terrified to bring any legal claims or complaints against the City while he was employed because of the Defendants directives and use of the "False Statements" and "harassment reporting" policies and practices that made Wolf appear dishonest and unstable with a

public firing and no chance to defend himself, and Plaintiff had witnessed the Defendants' use of law enforcement to threaten employees in their private homes late at night.

137. In February 2023, Rendall and ACA Liz Majerus (female) attended a public gala for the City's sponsored table and at least one City official at the table exclaimed "Todd Wolf is a fucking asshole" with others making very loud and inappropriate comments about Wolf (a private citizen). On information and belief, the Defendants knew about the inappropriate statements and behaviors, but no actions were taken against Rendall, Majerus, or the other attendees at this event.

138. The Council has never disciplined nor threatened to discipline Rendall under the City's policies or directives even though she intentionally and repeatedly stated that Plaintiff was a racist and she was "standing up" to Plaintiff's racism, and despite the Defendants knowing the context that Plaintiff was trying to express concerns to stop racism in the community on August 22.

139. In one incident around February 2023, Plaintiff was concerned that a female employee was falsifying her timecard and adding hours that were impossible for her to complete. After Plaintiff raised this issue to the HR Director with documentary evidence, the HR Director implied that Plaintiff had bad or discriminatory motives for his concerns and then HR took over managing her timecards.

140. Since Wolf was fired, the City has forced other white male employees to work in demeaning jobs with less pay, for minor performance issues, while offering females or non-white employee's opportunities to "file complaints" against white male employees that such employees were not likewise encouraged to file themselves.

141. Other employees who defended Plaintiff or Wolf were given warnings by the new HR Director, had false allegations added to their personnel files, were fired, or otherwise threatened. On information and belief, Sorenson went through one employee's personal cell phone after he saw a text message from Wolf, and then threatened her about her communications.

142. Plaintiff's emotional trauma severely intensified after seeing the false information in the Report released to the public, and fearing that he, too, would be accused of "committing fraud" on an investigation under the False Statements policy if he disputed the report. As a result, and to protect his mental, emotional, and physical health, Plaintiff took voluntary leave from the City under the Family Medical Leave Act (FMLA) on or around March 27, 2023.

143. On information and belief, while Plaintiff was on FMLA leave, Defendants stated that Plaintiff was suspected of misconduct and implied that Plaintiff was suspended rather than on leave, and Plaintiff believed that Defendants would publicly fire him when he returned from FMLA leave.

144. Plaintiff was again scared that he would be falsely accused with no chance to defend himself, and Plaintiff finally submitted his resignation notice during his FMLA leave and resigned on May 12, 2023.

145. Following his notice of resignation to the City, Plaintiff requested his complete personnel file from the City's Human Resources Department, but to date, Defendants have refused to turn over Plaintiff's final personnel records to him. On information and belief, the Defendants have fabricated or otherwise falsified negative information to plant in Plaintiff's personnel file.

146. Plaintiff did not feel safe speaking to Wolf or anyone about the directives and conduct by City officials until May 2023.

147. Plaintiff remained scared to take any legal action to stop the City or speak at length to any legal counsel until May 2023 because of the Defendants' February and March gag orders and multiple threats.

148. Plaintiff has been replaced by a female with less experience and qualifications than he possessed for his position.

149. Plaintiff was rejected from multiple positions after he felt forced to resign from the City based on the (still) false narratives from Defendants that he is a racist.

150.     Plaintiff cannot rely on the City to give him a favorable recommendation, and the City's decision to allow the false public narrative of him as a "racist" reflects poorly on his ability as a decorated and highly successful City Planner and Developer.

151.     Plaintiff has been unable to find employment commensurate with his prior pay rate, benefits, duties and experience.

152.     Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damages because of Defendant's discriminatory acts and retaliation against him.

153.     As a direct and proximate result of the discriminatory, abusive, and retaliatory actions and inactions of Defendants, Plaintiff has incurred, and will continue to incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures.

154.     At all times relevant to this Complaint, each and all the acts alleged herein were attributed to the Defendants, who acted both individually and under color of a policy, custom, and/or practice of the City of Sheboygan through its officials, employees, and affiliates.

155.     The conduct of Defendants, as set forth above, was outrageous and warrants the imposition of punitive damages against the individual Defendants.

156.     The Defendants have and continue to promote sexism and racism by imposing consequences on, or threatening, those that speak out about discrimination or racism based on their race and gender (white male); or based on the content and viewpoints of their potential speech.

157.     No previous application has been made for the relief requested herein.

158.     Plaintiff has no other adequate or speedy remedy under any City policy to address his injuries and was expressly discouraged from filing complaints with the City's HR Department

**First Cause of Action**
**Title VII**
**42 U.S.C. § 2000e,** *et seq.*

159.     Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

160.     Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from discriminating against employees on the basis of their sex, sexual orientation, race, and/or religion.

161.     By committing the foregoing acts of discrimination and harassment against Plaintiff and others similarly situated to Plaintiff, the City has violated Title VII.

### *Hostile and Abusive Work Environment*

162.     The City's policies, customs, and practices are permeated with discriminatory and anti-white heterosexual male animus including, but not limited to, express statements that Plaintiff, as a white heterosexual male, does not belong to any protected status and, thus, is not permitted to express concerns about harassment, discrimination, or retaliation.

163.     The City's policies, customs, and practices create hostile and abusive working conditions for Plaintiff and other white males similarly situated to Plaintiff.

164.     By publicly and otherwise severely punishing any employee that defended Plaintiff or opposed the harassment he was receiving, the City condones a hostile and abusive working environment for Plaintiff.

165.     The actions and conduct complained of herein were severe and pervasive and affected Plaintiff's working conditions by creating a hostile and abusive work environment that seriously affected his physical, mental, emotional, and psychological well-being.

166.     Plaintiff's race and gender were motivating and/or determinative factors in the Defendants discriminatory treatment and hostility against Plaintiff, including without limitations, perpetuating public narratives that Plaintiff was a racist, trying to elicit "public petitions" to fire Plaintiff, altering Plaintiff's job duties, making his working environment very difficult, and

constructively discharging Plaintiff by communicating that he was suspended and suspected of misconduct.

167. Plaintiff perceived his working environment to be abusive and hostile, and he communicated that to the City through supervisors, human resources, and to the Common Council over the span of six months.

168. The actions and in-actions of Defendants occurred consistently and purposely resulting in a hostile and abusive work environment for the Plaintiff and other similarly situated white males.

169. The Common Council knew and should have known of the harassment and hostility that Plaintiff was facing and they failed and/or refused to take any remedial measures to correct and stop the harassment.

170. The City created and perpetuated a hostile work environment, turned a blind eye to Plaintiff's hostile and abusive conditions by retaliating against those who raised concerns about the unlawful conduct Plaintiff was subjected to.

171. A reasonable person in Plaintiff's circumstances would consider the working environment to be abusive or hostile.

### *Disparate Treatment*

172. Plaintiff is a male, was highly qualified for his position, was performing his reasonable job expectations, and received good performance evaluations and reviews every year.

173. Rendall (female) is similarly situated to Plaintiff in all material respects.

174. Plaintiff was subjected to an adverse employment action when he was constructively discharged by the City following eight months of hostility being publicly labeled as a "racist," refusals to correct false information about him, "gag orders" from the City, and communications that he would be fired for misconduct when he returned from leave.

175.     The City takes no adverse employment actions against similarly situated white females, including Rendall, who also repeated the "slur" and expressed concerns about racism.

176.     Said violations were done intentionally, with malice, willfulness, and/or reckless indifference to Plaintiff's protected rights and warrant the imposition of punitive damages.

177.     As a direct and proximate result of said unlawful employment practices in violation of Title VII, Plaintiff has suffered and is suffering humiliation, degradation, emotional distress, other consequential damages, lost wages, costs, and attorney's fees.

178.     Plaintiff suffered irreparable injury and monetary damages because of Defendants' discriminatory and abusive conduct and inactions unless and until this Court grants the relief requested herein.

**Second Cause of Action**
**Violations of Plaintiff's Fourteenth Amendment Rights to**
**Equal Protection of the Law**
**(42 U.S.C. § 1983)**

179.     Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

180.     The Equal Protection clause of the Fourteenth Amendment prohibits government employers from denying employees equal protection of the law based on their race, gender, or protected expressions.

181.     The Supreme Court has long recognized that sex-based discrimination by government actors that does not serve important governmental objectives and is not substantially related to the achievement of those objectives is unconstitutional. *See, e.g., J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 146 (1994); *Davis v. Passman*, 442 U.S. 228, 234–36 & n.12 (1979).

182.     Plaintiff was subjected to insults, severe harassment, and public humiliation that was subjectively and objectively offensive.

183.    Plaintiff's gender and race were motivating factors in Defendants' discriminatory treatment of Plaintiff, including without limitation, in creating a hostile and abusive work environment, false accusations, punishment and threats of punishment in violation of Plaintiff's equal protection rights.

184.    The conduct complained of was severe and pervasive and unreasonably interfered with the Plaintiff's employment by creating an abusive and hostile environment.

185.    By overseeing a plot to set up Plaintiff to repeat a racial slur and spreading to the public that Plaintiff was a racist, Rendall acted with discriminatory intent to fire Plaintiff based on her desire to "dismantle the patriarchy" and ensured the hostility and discriminatory treatment that plaintiff was forced to endure.

186.    The individual Defendants knew of Plaintiff's harassment, discriminatory treatment and injuries based in part on his race and gender, and they directly participated, directed, refused to correct it, failed to train persons in supervisory positions over plaintiff, facilitated, and otherwise knowingly turned a blind eye to Plaintiff's constitutional injuries.

187.    By denying the Plaintiff (male) the rights and privileges of employment that females are granted, and replacing Plaintiff with a less qualified female, the Defendants are violating and have violated Plaintiff's equal protection rights.

188.    Plaintiff was constructively discharged after enduring nearly eight months of hostility, impossible working conditions, and multiple gag orders prohibiting him from obtaining legal counsel, and finally communicating that Plaintiff, too, would be publicly fired and falsely accused with no chance to defend himself after he returned from FMLA leave.

189.    The actions and inactions by the individual Defendants occurred pursuant to, and because of, the City's customs and practices that "white men of privilege" have no protected status,

cannot be discriminated against nor raise discrimination complaints, and must endure false accusations, abusive working conditions, and remain silent about political or social concerns.

190. The actions and inactions by the individual Defendants are strengthened by the City's False Statements policy that allows elected officials to "commit fraud" or make false statements related to investigations into potential political corruption or bribery.

191. The City's customs and practices create and promote a hostile and abusive working environment that also subjects employees to discriminatory treatment based in part on their race and gender (white males), with no rational basis nor legitimate or compelling city interest.

192. As a direct result of the individual Defendants' violations of Plaintiff's clearly established rights, Plaintiff has suffered and will continue to suffer substantial damages including loss of employment income and benefits, employment opportunities, loss of reputation, emotional distress, physical and psychological injuries including, but not limited to, severe humiliation and embarrassment, and other pecuniary and non-pecuniary losses, expenses, and legal fees.

193. The conduct, actions and inactions of the individual named Defendants was intentional, malicious, willful, and/or in reckless disregard of the Plaintiff's equal protection rights, thereby entitling plaintiff to an award of punitive damages against the Defendants.

194. Under 42 U.S.C. §§ 1983 and 1988, the Plaintiff is entitled to appropriate relief for the humiliation, emotional harm, lost wages, and other damages available to the Plaintiff, including punitive damages against the Defendants.

## **Third Cause of Action**
### **Violation of the Plaintiff's First Amendment Right to Freedom of Speech Retaliation**
### **(42 U.S.C. § 1983)**

195. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

196. The First Amendment to the United States Constitution protects the rights of public employees to speak on matters of public concern outside of their official job duties.

197. A public employee does not forfeit his First Amendment rights merely because he learns information growing out of his public employment, nor because he expresses his concerns privately rather than publicly.

### August 22 Speech

198. Courts have long recognized that concerns about racism are matters of public concern.

199. The City, through the statements, actions, and practices of the Defendants, has adopted a custom and practice whereby "white men of privilege" are not allowed to express concerns about racism or diversity issues in the community.

200. Plaintiff's speech on August 22 expressing concerns about community racism and responding to Rendall with "exactly" the racist comment made was a matter of public concern that outweighed the City's interest in the necessary provision of their public services.

201. Plaintiff's job duties did not include expressing citizen concerns about racism in the community or finding vendors or resources to help address such "racism" issues, and as such, was protected expression.

202. Plaintiff's speech, in context, did not oppose or violate any written or official policy nor was Plaintiff's speech subjectively or objectively offensive.

203. Plaintiff's speech, despite being made privately during work hours, is still protected because it was not a part of Plaintiff's reasonable job duties.

204. Plaintiff suffered an adverse action when the Defendants falsely confirmed publications that Plaintiff was racist, encouraged, and incited public outcry, fired his supervisor (Wolf) for defending him, and intentionally refused to correct the adverse actions against Plaintiff or the false narratives that he is a "racist" to City partners and the public.

205. The adverse actions Plaintiff was subjected to following his protected speech would chill a person of ordinary firmness from engaging in similar speech on matters of public concern.

206. By requesting public outcry and refusing to stop the hostility from political activists or false narratives that Plaintiff is a "racist," and firing his supervisor, the individual Defendants directly participated, directed, facilitated, and/or knowingly turned a blind eye to Plaintiff's injuries.

207. The Defendants actions and inactions that led to the violations of Plaintiff's First Amendment rights were motivated, in part, by Plaintiff's protected speech at the August 22 meeting about matters of public concern.

### Statements about the DEI Group and Political Influence

208. Courts have long recognized that matters of public concern include undue political influence, corruption, bribery, threats, and misuse of taxpayer money.

209. The City, through the statements, actions, and practices of the Defendants, has adopted a custom and practice whereby "white men of privilege" are not allowed to express concerns about racism and retaliating against employees that express concerns about the DEI group influence with City officials.

210. Plaintiff's statements about the October 5 DEI threat and political corruption with city officials are matters of public concern.

211. Plaintiff's job duties did not include making or reporting potential financial corruption, bribery, threats, or undue political influence in Sheboygan.

212. Plaintiff's statements to Hall, and repeated to the HR Director (and Filicky), never prevented Defendants from efficiently providing services (or even threatened to do so), and therefore were protected expression.

213. Plaintiff's interests in making the statements to Hall and the HR Director about the potential DEI financial dealings, threats, and undue influence at the City outweighed any interests the City may proffer related to their public services.

214. Plaintiff suffered an adverse action when the Defendants coordinated public petitions to get rid of him, threatened him from speaking about these matters, turned over job duties to a female DEI activist, gave him impossible job tasks, blamed him for issues that he had no control over, and then communicated that Plaintiff was suspected of misconduct during his FMLA leave.

215. The adverse actions Plaintiff was subjected to following his protected speech would chill a person of ordinary firmness from engaging in similar speech on matters of public concern.

216. The Defendants actions and inactions that led to the violations of Plaintiff's First Amendment rights were motivated, in part, by Plaintiff's protected speech about the DEI group.

### Defendants' Liability

217. Defendants' retaliatory and unconstitutional actions against Plaintiff were done pursuant to their customs and practices that retaliate against employees who express concerns about their political allies, including the Sheboygan DEI group, including Wolf.

218. By punishing, threatening to punish, harassing, turning a blind eye, and otherwise making Plaintiff's work environment impossible, miserable, and abusive, the Defendants were personally responsible for Plaintiff's injuries and the adverse actions Plaintiff suffered as a result of his protected speech about racism in the community and the DEI group's political influence.

219. Defendants' retaliatory and unconstitutional actions against Plaintiff violated his rights to free speech under the First Amendment.

220. Defendants' retaliatory and unconstitutional actions against Plaintiff were done pursuant to their customs and practices that retaliate against employees who express concerns about racism or the Sheboygan DEI group and their affiliates at the City.

221.    Said violations were done intentionally with malice and/or reckless indifference to Plaintiff's First Amendment rights and warrant the imposition of punitive damages against the individual Defendants.

222.    As a direct and proximate result of the Defendants' violations of Plaintiff's clearly established First Amendment rights, Plaintiff has suffered reputational injuries, damages and losses set forth in this Complaint as well as attorneys' fees and costs.

**<u>Fourth Cause of Action</u>**
**Violation of the Plaintiff's First Amendment Rights**
**Prior Restraint (*February 7 Directives*)**
**(42 U.S.C. § 1983)**

223.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

224.    The First Amendment prohibits the government from restricting an employee's rights to associate or speak with specific private citizens that are unrelated to any compelling or legitimate government interest.

225.    The Defendants' directives prohibiting Plaintiff from obtaining private legal counsel for Hall's investigation and speaking to two private citizens (including Wolf) in the *February 7 Directive* burdened Plaintiff's First Amendment rights and chilled his protected speech, associations, and expressions that Plaintiff (and all City employees) would enjoy as a private citizen.

226.    The Defendants' practices and customs of publicly ostracizing specific persons without due process effectively threatened similar treatment on Plaintiff and burdened his First Amendment rights to associate as a private citizen with Wolf or private legal counsel during Hall's investigation.

227.    The Defendants' directives, policies, and related practices impose blanket restrictions on Plaintiff's rights to associate with or obtain legal counsel, chill his rights to petition the government

for a redress of grievance, and constitute speaker-based restrictions targeting specific private citizens (including Wolf).

228. The Defendants cannot proffer any legitimate interest in the efficiency of their public services that was served by denying Plaintiff the right to have a private attorney present with him during Hall's investigation.

229. The Defendants' threatened enforcement of their *February 7 Directive* following the public accusations and firing of Wolf chilled Plaintiff's protected rights under the First Amendment to the United States Constitution.

230. The City's purported interest in limiting "witnesses" or "evidence against them" in Wolf's federal lawsuit is not reasonably related to the City's provision of their public services.

231. Plaintiff's interests in speaking to or associating with a specific private citizen (Wolf) outweigh the City's purported interests and are not reasonably limited to achieve those ends.

232. The individual Defendants personally participated, directed, facilitated, and/or knew of the *February 7 Directives*, and turned a blind eye to Plaintiff's constitutional injuries.

233. Said violations were done intentionally with malice and/or reckless disregard to Plaintiff's protected speech, expressions, and associations under the First Amendment to the Constitution and warrant the imposition of punitive damages against the individual Defendants.

234. As a direct and proximate result of the Defendants' actions, inactions, and violations of Plaintiff's First Amendment rights, Plaintiff has suffered injuries, damages, as well as reputational injuries, chilling of his speech and association, and losses set forth in this complaint, as well as attorneys' fees and costs.

**Fifth Cause of Action**
**Violation of the Plaintiff's First Amendment Rights**
**Prior Restraint (*March 8 Directive*)**
**(42 U.S.C. § 1983)**

235.     Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

236.     The First Amendment prohibits the government from restricting the protected speech of public employees that they would enjoy as private citizens on matters of public concern.  *Pickering v. Bd. of Educ. of Township High Sch. Dist*., 391 U.S. 563 (1968).

237.     The Supreme Court has recognized that eyewitness testimonies in judicial proceedings are protected speech under the First Amendment.  *Lane v. Franks,* 573 U.S. 228 (2014).

238.     Additionally, prior regulations on employee speech may not extend further than reasonably necessary to accomplish a legitimate government employer interest in the efficiency of their public services nor burden protected speech that employees would enjoy as private citizens.

239.     The City's arbitrary and discriminatory enforcement of their False Statements policies justified the Defendants' *March 8 Directive* that chilled Plaintiff's protected speech and expressions regarding Wolf, the Report or allegations related to matters of public concern.

240.     The Defendants' policies and practices exhibit a deliberate indifference to Plaintiff's (and other employees') First Amendment rights, and the threatened enforcement of the policies were the moving force behind the Defendants' unconstitutional restraints on Plaintiff's protected speech.

241.     The *February* and *March 8 Directives* burdened Plaintiff's (and employee's) protected speech by impliedly threatening them from being witnesses in a federal judicial proceeding and burdening their speech by ordering that the "city's lawyers" must be present if Plaintiff made any statements about Wolf's lawsuit allegations that included matters of political corruption, bribery, and constitutional violations.

242.     The City cannot proffer any legitimate interest as an employer that was served by ordering employees, and Plaintiff, to not speak about Hall's investigation or allegations in a federal

lawsuit to anyone without the "city's lawyers" present, and such restrictions burdened Plaintiff's protected speech and expressions.

243. Plaintiff's interests in speaking to anyone about Hall's investigation, his statements and concerns of the Report's "conclusion," and his personal knowledge of public allegations about bribery or corruption outweighed any interest the City may proffer in the efficiency of their public services.

244. The *March 8 Directives* were unconstitutional restraints on Plaintiff's rights to speak about a public Report and federal lawsuit allegations involving potential public corruption, racism, and bribery—all of which are matters of public concern.

245. Plaintiff had the right as a private citizen, outside of his job duties, to speak to persons without the City's lawyers present about the published investigation Report and Wolf's public lawsuit allegations involving potential political corruption, bribery and constitutional rights violations.

246. The *March 8 Directive* burdened Plaintiff's protected speech and expressions by compelling a specific viewpoint (the "Report") and mandating that the "city's lawyers" must be present which chilled Plaintiff's protected speech on matters of public concern.

247. The individual Defendants directly participated by drafting, directing, facilitating and/or knowingly turning a blind eye to the imposition of the *March 8 Directive* that chilled Plaintiff's protected speech in violation of the First Amendment to the United States Constitution.

248. Said violations were done intentionally with malice and/or with reckless disregard to Plaintiff's First Amendment rights and warrant the imposition of punitive damages against the individual Defendants.

249. As a direct and proximate result of the Defendants' actions, inactions, and violations of Plaintiff's First Amendment rights, Plaintiff has suffered injuries, damages, reputational injuries and losses (compensatory and punitive) set forth in this complaint, as well as attorneys' fees and costs.

## REQUEST FOR RELIEF

Plaintiff Chad Pelishek seeks damages and equitable relief pursuant to the Defendants' unlawful conduct, and specifically prays that the Court grant the following relief:

250.    A declaratory judgment against the City of Sheboygan that the acts and practices complained of herein are in violation of Title VII;

251.    Enjoining and permanently restraining the City of Sheboygan from continuing and practicing the violations alleged herein;

252.    A declaratory judgment that the acts and practices complained of herein violated the Plaintiff's First Amendment rights;

253.    A declaratory judgment that the acts and practices complained of herein violated the Plaintiff's Fourteenth Amendment rights;

254.    An injunction prohibiting the Defendants from making any disparaging comments about the Plaintiff to employees, businesses, employers, or citizens privately and/or publicly;

255.    An injunction compelling the Defendants to remove any subsequent or negative performance or job-related information from Plaintiff's personnel file;

256.    Compensatory damages to the Plaintiff that cover back pay; lost benefits; front pay; lost earnings, earning capacity, past pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, all of which the Plaintiff has suffered as a result of the Defendants' conduct;

257.    Punitive Damages against all named individual Defendants awarded to Plaintiff under 42 U.S.C. § 1983;

258.    Any other such damages as this Court deems appropriate under Title VII and 42 U.S.C. § 1983, as well as Plaintiff's reasonable attorney fees and costs under 42 U.S.C. § 1988; and

259. Granting such other and further relief as this Court may deem just, proper, and equitable, including injunctive relief for past violations and preventing future violations.

260. Plaintiff requests a trial by jury.

Dated: October 15, 2023.

Respectfully Submitted,

/s/ Jennifer DeMaster
Jennifer DeMaster
State Bar No. 1124201
jennifer@demasterlaw.com


DeMaster Law LLC
361 Falls Rd # 610
Grafton, WI 53024
Phone: (414) 235-7488
Fax: (262) 536-0515

*Attorney for Plaintiff*