# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

CHAD PELISHEK,

        Plaintiff,

      v.                                Case No. 23-CV-1048

CITY OF SHEBOYGAN, et al.,

        Defendants.

---

## DECISION AND ORDER

---

### 1. Background

    This appears to be a simple and, in the scope of federal litigation, routine case—plaintiff Chad Pelishek alleges that he was constructively discharged by the City of Sheboygan in retaliation for concerns he raised about racist comments a citizen made in a public meeting.

    Pelishek, however, does not see this as a simple case. In a kitchen sink complaint (and amended complaint) he alleges that a complex conspiracy is afoot in Sheboygan city hall with a clique of the mayor's loyalists—those bent on advancing what Pelishek sees as a nefarious agenda of diversity, equity, and inclusion—seeking to oust straight white men like himself. *See generally Pelishek v. City of Sheboygan*, No. 23-CV-1048, 2024

U.S. Dist. LEXIS 41909 (E.D. Wis. Mar. 11, 2024). According to Pelishek, when he raised his concern about racist comments a citizen made in a public meeting, a co-worker demanded that he state exactly what the citizen had said. Pelishek repeated the racial slur, which led certain individuals to spin his complaint on its head, paint him as a racist, publicly smear him, and undertake a concerted campaign of sabotage with the eventual goal of firing him. *Id.* at *1. This incident led to the ouster of the city administrator, Todd Wolf, who filed his own lawsuit, *see Wolf v. City of Sheboygan*, 23-cv-149 (E.D. Wis.); *see also Wolf v. City of Sheboygan*, No. 23-CV-149, 2023 U.S. Dist. LEXIS 156172 (E.D. Wis. Sep. 5, 2023), which the parties stipulated to dismiss with prejudice on June 18, 2024.

Pelishek alleges that his harassment became unbearable. Rather than sticking around to be fired, he quit and then sued.

## 2. Pelishek's Motion for Sanctions (ECF No. 57)

Pelishek accuses the defendants of having "consistently worked in bad faith to make everything as difficult as possible" and having "willfully destroyed evidence …." (ECF No. 58 at 4.) He asks the court to "enter default judgment against all Defendants or strike their pleadings, defenses, and issue adverse jury instructions regarding the destroyed communications and all other information not produced in discovery as well as assessing reasonable costs and attorney's fees and any other relief the Court deems appropriate." (ECF No. 58 at 31.)

## 2.1. Defendants' Alleged Destruction of Evidence

"A court may impose sanctions for spoliation under Federal Rule of Civil Procedure 37 or under its own inherent power." *Pas v. Bd. of Regents of the Univ. of Wis. Sys.*, 664 F. Supp. 3d 893, 905 (E.D. Wis. 2023). In assessing whether spoliation occurred, the court's first step is to determine when the duty to preserve evidence arose. *Id.*; *see also* Fed. R. Civ. P. 37, Comment to the 2015 Amendment ("The rule does not apply when information is lost before a duty to preserve arises."). The duty to preserve evidence arises when the party knows, or should know, that litigation is imminent. *Trask-Morton v. Motel 6 Operating Ltd. P'ship*, 534 F.3d 672, 681 (7th Cir. 2008).

### 2.1.1.  Duty to Preserve

In his initial brief in support of his motion for sanctions Pelishek offered vague assertions as to when the defendants' duty to preserve evidence arose. For example, he asserted that the duty to preserve arose "at a minimum, August 2022 – May 2023." (ECF No. 58 at 7.) Later, he asserted that "each of the Defendants anticipated litigation relating to Pelishek as early as November 2022, and certainly by early 2023." But he never identified what happened during these months that triggered the duty to preserve.

At other points in his brief Pelishek appears to argue that the duty to preserve arose when the defendants recognized that Wolf was likely to file a lawsuit. (*See, e.g.,* ECF No. 58 at 8 ("Adams told the Council and Mayor (Sorenson) that litigation was

likely in convincing the City to conduct an investigation into Pelishek's supervisor (Wolf) who tried to defend him.").) However, Pelishek fails to present any authority to support the notion a litigant can assert a spoliation claim by piggybacking on a duty to preserve that arose in a separate matter. If the defendants failed to preserve evidence after they should have known that Wolf was going to file a lawsuit, any resulting spoliation claim belongs to Wolf alone. Pelishek must establish when the defendants knew or should have known that *his* claim was likely to give rise to litigation.

The defendants in response noted Pelishek's failure to pin down when the duty to preserve documents arose. Therefore, in reply Pelishek attempted to be more specific. Ordinarily, such matters raised for the first time in reply are not properly before the court. *See Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013). It is a party's obligation to include in his initial brief all legal and factual support necessary to sustain his motion.

Consequently, Pelishek has failed to sustain his burden to prove that the duty to preserve arose earlier than when the city received notice of his EEOC complaint, which the city concedes was on June 15, 2023. (ECF No. 81 at 8.) The city was served with Pelishek's complaint initiating this action on August 7, 2023. (ECF No. 81 at 8.)

Even if the court were to consider the arguments that Pelishek improperly raised for the first time in reply, it would not affect the court's conclusion. Pelishek points to a recording purportedly made during a January 30, 2023, meeting between him and HR

Director Adam Westbrook. (ECF Nos. 92 at 7l; 94, ¶ 2; Exhibit V.) The meeting related to how the city was going to address a concern raised by the Chamber of Commerce regarding Pelishek's involvement in an upcoming event. A participant in the meeting (presumably Westbrook) repeatedly expressed support for Pelishek and acknowledged the difficult position Pelishek was placed in because of the false narrative that had emerged about his use of the racial slur and the city's limited ability to correct that narrative until an internal investigative report was completed.

Pelishek stated once during that meeting that he felt like he was being "discriminated" against because of the city's failure to publicly correct the narrative of what occurred. Westbrook corrected Pelishek, explaining that it was not discrimination because he was not being treated differently due to any protected status. Westbrook empathized with Pelishek but explained that the city had to wait for the investigator's report. In the meantime, leaders such as the mayor would communicate to concerned individuals and entities like the Chamber of Commerce that the public narrative was incorrect.

This isolated assertion of discrimination falls far short of the sort of notice required to alert the city and the individual defendants of impending litigation. It is important to remember that the duty to preserve is often quite burdensome for an organization. Passing references like this, which may occur regularly in an organization the size of the City of Sheboygan, do not trigger such a significant burden.

The circumstances suggest that Westbrook understood Pelishek's assertion of "discrimination" as an unsophisticated misuse of a legal term of art whereby Pelishek intended merely to communicate that he believed he was being treated unfairly. When Westbrook pointed out that discrimination required disparate treatment based on a protected status, Pelishek offered nothing further. He did not, for example, say he was alleging he suffered an adverse employment consequence because of his race or gender. Even had he done so, it is doubtful that such a comment would have been sufficient to put the city on notice that litigation was imminent. Without any such statement, it is easy to conclude that Pelishek's passing reference to discrimination fell short.

Pelishek alternatively asserts that he "told Sorenson and the HR Director in early March that he and his lawyer would take the issue of his purported 'racism' and humiliation to the courts." (ECF No. 92 at 7; *see also id*. ("All individual Defendants should have known of Pelishek's pending litigation by, at most, March 2023 after Pelishek complained about discrimination to the HR Director Adam Westbrook and told Westbrook and Sorenson he was getting a lawyer to let courts resolve his complaints about Rendall and the racism campaign.").) In support, he cites an answer he gave in his deposition (ECF No. 92 at 7), but the cited passage does not support his assertion.

Pelishek testified that "when the Hall report was released" (ECF No. 94-2 at 4, 348:7-8), he read the report, got upset, and told Westbrook and Sorenson, "I will need to get an attorney and that this will be figured out in court …." (ECF No. 94-2 at 4, 348:21-

6

22.) Superficially, this sounds like Pelishek is threatening to file a lawsuit. But Pelishek omits the context of the statement, which makes it clear that he expressed an interest in having an attorney assist him in his role as a witness in the Wolf matter, and that the court proceedings where the matter "will be figured out" would be Wolf's lawsuit, not some new lawsuit that Pelishek intended to bring. (*See* ECF No. 94-2 at 2, 346:19-347:9 (Pelishek testifying about an incident where Sorenson and Westbrook informed him that he would be a main witness in the Wolf matter and Pelishek may have responded that he needed to seek an attorney).) Moreover, Pelishek's statement as to when this meeting occurred is not supported by the citation, which does not establish when the Hall report was released much less that it was released in early March.

### 2.1.2. Pelishek's Specific Claims

Having concluded that the defendants' duty to preserve evidence arose no earlier than June 15, 2023, when the city received notice of Pelishek's EEOC complaint, the court must decide whether Pelishek has shown that any defendant destroyed evidence after this date and, if so, whether that destruction was in bad faith. *See Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013); *see also Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010) ("The crucial element in a spoliation claim is not the fact that the documents were destroyed but that they were destroyed for the purpose of hiding adverse information.").

Pelishek points to five categories of information that one or more defendants destroyed or otherwise failed to preserve: (1) Sorenson's text messages; (2) Rendall's text messages; (3) Mitel call log data; (4) logon data; and (5) server data.

### 2.1.2.1.    Data

As to the last three categories, Pelishek has not come remotely close to demonstrating that any failure to preserve was the result of bad faith. Pelishek merely speculates that, because upgrading a server allows for choices as to which data will be transferred to a new server, some data may have been lost when the city upgraded its servers. The defendants respond, "Plaintiff's suggestion that a software update was used as a way to intentionally fail to preserve emails and data without evidence is a frivolous claim rooted in pure speculation." (ECF No. 81 at 25.) Pelishek has failed to present evidence that any data was actually lost in this upgrade much less that it was relevant and deleted in a bad faith effort to keep it from him because it was damaging to the defendants.

Pelishek also alleges that the city failed to preserve logs of internal phone calls (calls between city employees) because it did not subscribe to Mitel's cloud service (which would have allowed for storage for up to seven years) and instead allowed for the auto-deletion of call logs after 31 days. (ECF No. 58 at 14.) But Pelishek does not suggest how such call logs—records of who called whom and when—are relevant, much less how they are likely to contain evidence damaging to the defendants. In any

event, Pelishek has failed to show that it was because of a bad faith effort to destroy damaging evidence that the city failed to change its retention setting for call log data.

Similarly, there is no evidence that the login data was consciously destroyed; it was automatically deleted due to a failure of the city to change its retention settings. Again, Pelishek has failed to show that the deletion was the result of bad faith. Call logs and computer login data are of such trivial and tangential relevance in a case like this that it is easy to recognize why it apparently did not occur to the defendants and their attorneys (including the City Attorney) to specifically seek out this data and ensure its preservation. And, for the same reason, it strains credulity to infer from the absence of action to preserve these records that any defendant was motivated by a bad faith intent to destroy damaging evidence. The court cannot envision how such records are likely to be materially damaging, and Pelishek has advanced no such argument.

The fact that the city's longstanding practices of deleting call logs and login data after relatively short periods may have violated state public records laws does not establish bad faith. *See* Fed. R. Civ. P. 37, Comment to the 2015 Amendments ("The fact that a party had an independent obligation to preserve information does not necessarily mean that it had such a duty with respect to the litigation, and the fact that the party failed to observe some other preservation obligation does not itself prove that its efforts to preserve were not reasonable with respect to a particular case.").

### 2.1.2.2. Text Messages

Pelishek points to an October 27, 2022, text exchange between Sorenson and Rendall-Araujo. One screenshot includes the following exchange:

> Rendall-Araujo: "My mom says "Be sure to tell the mayor the good things he is doing too.'"
>
> Rendall-Araujo: "Good luck with all of this!"
>
> Sorenson: "I'm very anxious today"
>
> Rendall-Araujo: "I'm sure"
>
> Rendall-Araujo: "I mean. Will he finally just fucking"

(ECF No. 59-9 at 11.) This is the bottom of the screenshot, although the relevant text bubble ends abruptly, suggesting that "fucking" was not the last word of Rendall-Araujo's text and that the text would continue if a person holding the phone had scrolled down.

The next screenshot appears to depict the same conversation but omits the last text referenced above. It states:

> Rendall-Araujo: "My mom says "Be sure to tell the mayor the good things he is doing too.'"
>
> Rendall-Araujo: "Good luck with all of this!"
>
> Sorenson: "I'm very anxious today"
>
> Rendall-Araujo: "I'm sure"
>
> Rendall-Araujo: "Are you coming in today?"

(ECF No. 59-9 at 12.)

Pelishek asserts that this

> shows that Defendant Sorenson deleted the second text entirely and everything that follows. Defendant (Mayor) Sorenson intentionally destroyed the text knowing that it was damaging to both he and Rendall solely to deprive Pelishek from using it in this litigation. The fact that the first page shows the partial text indicates the communication was damaging and calls into question how many other text messages from himself Sorenson intentionally deleted.

(ECF No. 58 at 10.) Pelishek states that he cannot get the text messages from Rendall-Araujo because she both deleted her text messages and replaced her phone. (ECF No. 58 at 11.)

Sorenson responds that he did not intentionally delete any text message, and, in any event, the messages are not relevant. (ECF No. 81 at 18.)

Of course, the issue is not Sorenson's deletion of the, "I mean. Will he finally just fucking" text from the second screenshot. After all, that text message was not actually withheld from Pelishek—it was on the first screenshot, which was produced to Pelishek. The issue is what was the rest of that text and what else may have been deleted.

The text that Sorenson deleted in the second screenshot ("I mean. Will he finally just fucking") was unflattering to his friend and co-defendant, Rendall-Araujo, if for no other reason than the unprofessional vulgarity. It is reasonable to infer that Sorenson deleted it either to avoid embarrassing his friend or because he thought its disclosure would hurt their defense. But aside from denying having intentionally deleted

anything, Sorenson points to the time stamps on the screenshots to argue that the deletion must have been accidental. (ECF No. 81 at 18.)

The time stamps actually support the opposite conclusion. The screen shots include the time only to the minute. A person screenshotting a text chain would be expected to produce multiple screenshots in a minute. This intuition is confirmed by looking at the timestamps on the sequence of the whole series of screenshots provided to the court: 3:09; 3:10; 3:10; 3:10; 3:10; 3:11; 3:11; 3:11; 3:11; 3:11; 3:12; 3:13. (ECF No. 59-9.) The only screenshot taken at 3:12 is the one that includes the "I mean. Will he finally just fucking" text. Although Sorenson had been producing four or five screenshots per minute, it took him much longer—what may have been as much as nearly two minutes—to capture the "I mean. Will he finally just fucking" text and the next screenshot. The inclusion of the "I mean. Will he finally just fucking" text from the 3:12 screenshot (ECF No. 59-9 at 11) and its omission from the 3:13 screenshot (ECF No. 59-9 at 12) supports the inference that it was during this time (which could have been anywhere from a second to just shy of two minutes) that Sorenson deleted that text message.

Sorenson has not offered an explanation for how the, "I mean. Will he finally just fucking" text was deleted other than to assert that it was not intentional. Instead, he argues that the screenshots were made (and thus any text deleted) before the duty to preserve arose in this case and, in any event, the text exchange is not relevant.

Sorenson asserts that the screenshots were made "well before his duty to preserve evidence specific to this litigation attached either on June 15, 2023 or August 7, 2023" (ECF No. 81 at 19) because he made those screenshots "in response to the litigation surrounding Todd Wolf." Pelishek's attorney, who also represented Wolf, disputes that the screenshots were ever produced in Wolf's case.

Simply because Sorenson created the screenshots in relation to the Wolf matter does not mean that they were created before the duty to preserve arose in this matter. Wolf's case overlapped with Pelishek's. In fact, discovery in Wolf's case would not have begun in earnest until after the court issued its scheduling order on September 22, 2023. If Sorenson did not produce the screenshots until after September 22, 2023, he would have produced them at least a month after Pelishek filed this lawsuit.

However, before Wolf filed his lawsuit, he initiated administrative proceedings and his attorney made open records requests. (*See, e.g.,* ECF No. 59-1 at 1-3 (open records request dated November 7, 2022, for, among other things, "All text messages from, to and between Mayor Ryan Sorenson on his City-funded mobile phone to Emily Rendell-Araujo"" between December 1, 2021, and November 7, 2022).) Presumably, Sorenson made these screenshots soon after the November 7, 2022, open records request for the messages (ECF No. 59-1 at 3); *see* Wis. Stat. § 19.35(4)(a) (requiring records to be provided "as soon as practicable and without delay"), and therefore the screenshots would have been created before the duty to preserve arose in this action.

In the absence of evidence that Sorenson deleted the text message after the duty to preserve arose, Pelishek's motion fails. Pelishek has failed to sustain his burden.

Finally, although it is unnecessary to the court's conclusion, the court notes that there is little reason to suspect that the text (or any additional text that may have been deleted) was relevant to Pelishek's claim. It is unclear who the "he" in the text refers to. It may be a reference to Wolf, but there is absolutely no hint that Sorenson and Rendall-Araujo were discussing Pelishek. Pelishek is scarcely mentioned in the text chain, and then only tangentially, while Wolf is frequently referenced amidst irrelevant and trivial exchanges.

There is then the issue of Rendall-Araujo's phone and text messages. Pelishek alleges that she routinely deleted text messages to free up space whenever her phone notified her that she was nearing capacity. She also obtained a new phone. (ECF No. 58 at 11.) In support, Pelishek cites "Exhibit J," which corresponds with ECF No. 59-10, Rendall-Araujo's response to Pelishek's interrogatories and requests for production. Pelishek does not cite to any portion of this 12-page document, and the court again reiterates that it is not its role to search lengthy documents for support of a party's assertions.

Nonetheless, having reviewed this document, Rendall-Araujo states that she does not know when she deleted text messages or got a new phone. (ECF No. 59-10 at 7.) But she did state that she did not delete any text messages after Wolf filed his

lawsuit, and thus she would not have deleted any text messages after the duty to preserve arose months later in this matter with, at the earliest, the city receiving notice of Pelishek's EEOC complaint.

Because Pelishek has failed to demonstrate that Rendall-Araujo deleted any electronically stored information after the duty to preserve arose, much less that Rendall-Araujo deleted that information in bad faith, he is not entitled to relief.

Pelishek's motion for sanctions for the defendants' alleged failure to preserve electronically stored information will be denied.

### 2.2. Defendants' Alleged Withholding of Discovery

Pelishek separately seeks sanctions because the defendants allegedly withheld discovery. He alleges: the city falsely stated that no one transferred to "Uptown Social" between August 2022 and May 2023 (ECF No. 58 at 18); Adams provided an incomplete answer when he did not disclose that Mitel is the city's service for internal calls (ECF No. 58 at 18-19); Sorenson withheld an email (ECF No. 58 at 19); Sorenson failed to provide any texts between himself and Westbrook during the period after Westbrook was hired by the city (ECF No. 58 at 20); and the city has failed to provide any discovery in response to his request for all ESI that was destroyed or overwritten (ECF No. 58 at 21).

Pelishek also accuses the defendants of having "improperly narrowed Pelishek's discovery requests by imposing hyper-technical meanings to each question so they

could conceal and withhold relevant information." (ECF No. 58 at 22.) He complains that, in response to his requests for relevant communications, the defendants "only searched for specific keywords to conceal relevant information ignoring Pelishek's Definitions and Instructions that 'or' or 'and' are interchangable [sic]." (ECF No. 58 at 22.) As another example, he points to his request for "all detailed 'billing statements showing all call logs' from the City's landline phones" and complains that the city produced only statements showing the bill amount; the city never produced any call logs. (ECF No. 58 at 23.) And while complaining that the defendants provided too little, Pelishek also complains that the defendants provided too much. He asserts, "The Defendants produced hundreds of pages and even copies of irrelevant and nonresponsive documents that did not need to be produced merely to delay and exhaust Pelishek's lesser resourced counsel, delay this motion, these proceedings, and hope to drown Pelishek in irrelevant ESI to avoid being caught in their withholding and spoliation." (ECF No. 58 at 23.)

Pelishek largely does not address these aspects of his motion in reply.

### 2.2.1.   Transfer Employees

Pelishek requested that the city "[i]dentify, and produce all supporting documentation, all City employees that were transferred to the City's Department of Senior Services (Uptown Social) between August 2022 – May 2023." (ECF No. 59-11 at 28, Interrogatory No. 15.) The city responded that there were no such transfers. (ECF

No. 59-11 at 28.) Pelishek asserts that this answer was an "intentional false statement" and was "an egregious violation of discovery rules and applicable laws." (ECF No. 58 at 18.) He refers to this as "blatant perjury" and an "effort to conceal information…." (ECF No. 58 at 18-19.)

As it turns out, Pelishek was wrong. The employee that Pelishek thought was transferred to Uptown Social was never transferred to that department but was merely assigned to that building while remaining employed by the Department of Public Works. (ECF No. 82 at 3, ¶ 14.) Pelishek abandoned this issue by not addressing it in reply.

### 2.2.2. Mitel

Pelishek accuses the city of intentionally concealing "the use of the Mitel Phone System." (ECF No. 58 at 14, 18.)

In response the city again asserts that Pelishek simply misunderstands what Mitel is. Mitel is not a service provider but rather is a physical phone system. Pelishek asked for "service providers" and the city disclosed its service provider—AT&T. (ECF No. 81 at 35.) It disclosed the Mitel system in discussions with Pelishek's counsel when it was attempting to help her better understand how the city's phone system worked. (ECF No. 81 at 35-36.)

Again, Pelishek abandons this issue by not addressing it in reply.

### 2.2.3. Email

Pelishek accuses Sorenson of intentionally withholding an email that Pelishek sent Sorenson stating that he could not hire Heather Cleveland's Green Bicycle Company. (ECF No. 58 at 19.) He continues, "Despite the existence of this email, the only documents Sorenson and the City produced in response were those between he and Cleveland and Adams stating (without copying Pelishek) that Pelishek had approved hiring GBC in December 2022 and February 2023." (ECF No. 58 at 19-20.)

Although Pelishek asserts that Sorenson did not produce the subject email "in response," he does not say in response to what. He does not cite to any specific discovery demand that he believes triggered any defendant's obligation to produce the email. Without proof that the email was within the scope of a proper discovery demand, it is impossible for the court to conclude that any defendant improperly withheld it.

### 2.2.4. Westbrook Texts

Pelishek states that he requested texts between Adams and Westbrook through June 1, 2023. (ECF No. 58 at 20.) He received texts only from November and December 2022, with the communications ending just before Westbrook was hired by the city. Pelishek asserts, "The likelihood that Adams and Westbrook stopped texting each other after Westbrook was hired as the City's HR Director is improbable, and the City's continued withholding of relevant communications delays these proceedings and inhibits Pelishek's ability to present his case." (ECF No. 58 at 20.)

18

That Adams and Westbrook ceased texting each other once they began working together is hardly improbable. Now that they were both city employees and able to communicate in person, perhaps there was no need to text. In no way does the absence of texts support the inference that any defendant is withholding discoverable information.

### 2.2.5. Destroyed or Overwritten ESI

Pelishek requested that the defendants:

> Identify all documents, server backups, or City archives that have been altered or destroyed between November 7, 2022 – the present day. To fully respond to this request, state (1) what was deleted or destroyed (i.e. "entire backup from date of backup" or "individual document" with general description), (2) the date and time of the backup or document(s) that was deleted or destroyed and (3) the person or office that deleted/destroyed the backup.

(ECF No. 59-11 at 23, Interrogatory No. 11.)

The defendants note that this discovery request includes "essentially, every single document that had ever been deleted off of the City server from November 7, 2022 to the present day, which is a grossly overboard request that seeks information not even remotely related to the remaining claims in this case." (ECF No. 81 at 25-26.) They note that Pelishek's request tends to belie a basic misunderstanding of the nature of how computer backups work, and that Pelishek has not taken the basic step of deposing the city's IT director. (ECF No. 81 at 25-26.)

It is unnecessary to belabor the point, but as just one narrow example of the countless ways in which this interrogatory calls for an astronomical amount of information, consider how an internet browser works. When navigating the internet, a browser collects cookies—small files that facilitate website functions. A user will accumulate thousands of cookies, generally without any notice to the user. Browsers may be configured to delete cookies automatically whenever the browser is closed, on a set schedule, or only when done manually by the user. Pelishek's interrogatory would require the defendants to identify every such deleted cookie. It would be a challenge to do this for a single computer, but Pelishek has demanded that the city do this for every computer, mobile device, or internet capable device used by anyone across the whole of city government. And this is just as to the extremely narrow category of internet cookies. Pelishek demands *every* deleted or overwritten file. It would be unsurprising if Pelishek's request encompassed billions of records, the vast majority of which would be totally irrelevant.

Pelishek's demand is disproportional to the point of absurdity.

### 2.2.6.  Narrowing of Search Requests / Keywords

Pelishek asserts that he "has requested relevant communications in multiple requests and the Defendants only searched for specific keywords to conceal relevant information …." (ECF No. 58 at 22.) For example, Pelishek has demanded, "All communications with anyone listed in the Defendants' initial disclosures (5.24.24)

between June 1, 2023 – present day relating to the above captioned case or plaintiff Chad Pelishek." (ECF No. 59-11 at 6, Request No. 10.)

Pelishek's assertion that the defendants' demand for specific keywords was an attempt to "conceal relevant information" is baseless and belies a basic misunderstanding as to the norms and practicalities regarding discovery of electronically stored information. Pelishek demands that the defendants (or more accurately defense counsel) manually review all communications from 20 people (*see* ECF No. 59-7 at 2-7) over the span of more than a year for anything relating to Pelishek or the present action, which is again grossly disproportionate to the needs to the case.

It is also a request that is less likely to produce relevant and discoverable information. The period post-dates Pelishek's resignation, and thus the communications from this period are unlikely to relate to the events that gave rise to this suit. To the extent that there are relevant communications from this period, they are much more likely to be privileged or protected by the work product doctrine. These circumstances do not merit requiring the defendants to incur the significant burdens in time and resources necessary to manually review more than a year's worth of communications of 20 people.

### 2.2.7. Call Logs

Pelishek states that he "requested all detailed 'billing statements showing all call logs' from the City's landline phones." (ECF No. 58 at 23.) He complains that the city produced only the bill amount and failed to produce any call log. (ECF No. 58 at 23.)

The defendants respond that they did not provide Pelishek with "unredacted billing statements showing call logs" because no such documents exist. (ECF No. 81 at 22.) The city provided its billing statements, which do not include call logs. (ECF No. 81 at 22.)

If call logs are not included in the billing statements, Pelishek's request did not obligate the city to separately seek out call logs. The city provided Pelishek with the information that it had that was within the scope of his request. Nothing more was required.

### 2.2.8. Additional Documents

Finally, Pelishek complains that the defendants

produced hundreds of pages and even copies of irrelevant and nonresponsive documents that did not need to be produced merely to delay and exhaust Pelishek's lesser resourced counsel, delay this motion, these proceedings, and hope to drown Pelishek in irrelevant ESI to avoid being caught in their withholding and spoliation.

(ECF No. 58 at 23.)

Discovery routinely results in the production of more than the requestor intended. As noted, Pelishek's requests were not always finely crafted. A poorly crafted

discovery demand can be expected to result in the production of something other than what counsel intended. Pelishek has failed to prove that the defendants engaged in a sanctionable "document dump."

### 2.3. Conclusion as to Pelishek's Motion for Sanctions or, in the Alternative, to Compel (ECF No. 57)

Pelishek has failed to prove that any defendant destroyed evidence in bad faith after the duty to preserve arose with respect to his claims. He has further failed to prove that any defendant improperly withheld discoverable information such that sanctions are appropriate. Pelishek has failed to prove that any defendant improperly withheld any discovery such that there is anything for the court to compel the defendants to produce. Finally, Pelishek has failed to prove that the defendants engaged in a sanctionable document dump. Accordingly, Pelishek's motion for sanctions or, in the alternative, to compel (ECF No. 57) will be denied.

Having denied Pelishek's motion to compel, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed R. Civ. P. 37(a)(5)(B). Accordingly, the defendants may submit any request for reasonable expenses within 14 days of this order. Pelishek may respond no later than 14 days thereafter. The defendants may reply within seven days thereafter.

The defendants also request costs under 28 U.S.C. § 1927 (ECF No. 81 at 50-51), which states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In many respects, Pelishek's counsel's conduct could be fairly characterized as unreasonable. However, the facts are insufficient to support a conclusion that counsel's conduct was also vexatious. Counsel's conduct appears to be more indicative of unfamiliarity with discovery norms, a failure to craft appropriate and proportional discovery demands, and a lack of judgment as to how to best address discovery difficulties. These may present shortcomings in terms of counsel's professional responsibilities, *see, e.g.*, Wis. SCR 20:1.1, but the court does not find, at this point, that the defendants have shown counsel's conduct to be vexatious. Accordingly, the defendants' request for costs under 28 U.S.C. § 1927 is denied.

### 3. Charles Adams's Motion to Quash (ECF No. 69)

Pelishek subpoenaed Verizon for Charles Adams's phone records. He did so despite Adams having already provided him the relevant records.

The subpoena identifies two phone numbers, one of which is Adams's and the other belonging to his adult son, and it also seeks information for any "other numbers associated with the account of Charles Adams." (ECF No. 71-1 at 3.) Adams testified

during his deposition that he has a family plan with Verizon and that his account includes service for his wife and their three adult children. (ECF No. 97-2 at 2.) Adams redacted his family information from the records he provided Pelishek. Adams seeks to quash the subpoena because it seeks information that is both irrelevant and intrudes on his privacy interests as well as that of non-party family members. (ECF No. 70.)

Pelishek responds that Adams lacks standing to quash the subpoena because it is directed to Verizon and the privacy interests allegedly infringed are those of his family, not him. He contends that, if Adams's family members want to protect their privacy interests, they must retain counsel and file their own motion to quash. (ECF No. 88 at 8.) He further seeks sanctions against Adams and defense counsel for having brought the motion to quash.

The circumstances under which a party may challenge a subpoena issued to a third-party are limited. *Johnson & Johnson v. Advanced Inventory Mgmt.*, No. 20 CV 3471, 2020 U.S. Dist. LEXIS 151248, at *5 (N.D. Ill. Aug. 20, 2020). Although "[a] subpoena issued pursuant to Rule 45 is subject to the general relevancy standard for discovery described in Rule 26(b)(1)," *Anthony v. O'Fallon Twp. High Sch. Dist. 203 Bd. of Educ.*, No. 23-CV-00967-SPM, 2024 U.S. Dist. LEXIS 169664, at *3 (S.D. Ill. Sep. 19, 2024) (quoting *Hazlitt v. Apple Inc.*, No. 3:20-CV-421-NJR, 2021 U.S. Dist. LEXIS 112592, 2021 WL 2457987, at *2 (S.D. Ill. June 16, 2021)); *Pursley v. City of Rockford*, No. 18 CV 50040, 2020 U.S. Dist. LEXIS 50513, at *5 (N.D. Ill. Mar. 24, 2020) ("the Court must always consider

the relevance of the subpoenaed material when determining if a subpoena should be quashed"), courts have frequently held that only the person subject to a subpoena can raise relevance objections, *Johnson & Johnson*, 2020 U.S. Dist. LEXIS 151248, at *5 (citing cases).

Of course, a third-party served with a subpoena often has no idea what is relevant in the underlying case, and simply complying with the subpoena is often less burdensome than seeking to quash the subpoena. Consequently, some courts have entertained parties' relevance objections to third-party subpoenas. *See, e.g., Anthony*, 2024 U.S. Dist. LEXIS 169664, at *7; *Architectural Iron Workers' Local No. 63 Welfare Fund v. Legna Installers Inc.*, No. 22 C 5757, 2023 U.S. Dist. LEXIS 66607, at *9 (N.D. Ill. Apr. 17, 2023); *see also Special Mkts. Ins. Consultants, Inc. v. Lynch*, No. 11 C 9181, 2012 U.S. Dist. LEXIS 61088, at *5 (N.D. Ill. May 2, 2012) (addressing party's "undue burden" objection to a third-party subpoena); *Ultimate Timing, L.L.C. v. Simms*, No. 3:09-mc-6-RLY-WGH, 2010 U.S. Dist. LEXIS 12829, at *2 (S.D. Ind. Jan. 29, 2010) (granting party's motion to quash third-party subpoena as unduly burdensome).

Moreover, a party may seek to quash a third-party subpoena if it intrudes on a "personal right or privilege" of the party. *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 187 (N.D. Ill. 2013). This includes "the assertion of work product or attorney-client privilege, interference with business relationships, or production of private information about the party that may be in the possession of a third party." *Id.*

A party that lacks standing under Rule 45 may be able to achieve the same ends by seeking a protective order under Rule 26. *Bilek v. America's Health Ctr. Inc.*, No. 21-cv-1651, 2021 U.S. Dist. LEXIS 264036, at *3 (N.D. Ill. July 30, 2021) (quoting *Allstate Ins. Co. v. Electrolux Home Prods. Inc.*, No. 16-cv-4161, 2017 U.S. Dist. LEXIS 189229, 2017 WL 5478297, at *3 (N.D. Ill. Nov. 15, 2017); *Deleon-Reyes v. Guevara*, No. 1:18-cv-01028, 2020 U.S. Dist. LEXIS 99772, at *9 (N.D. Ill. June 8, 2020). Therefore, a court may construe a motion to quash brought by a party without standing as a motion for a protective order. *Bilek*, 2021 U.S. Dist. LEXIS 264036, at *4 (quoting *Buonavolanto v. LG Chem, Ltd.*, No. 18 C 2802, 2019 U.S. Dist. LEXIS 229629, 2019 WL 8301068, at *2 (N.D. Ill. Mar. 8, 2019)).

In demanding all records associated with Adams's account, the subpoena seeks information that is clearly irrelevant. The fortuity that Adams was the subscriber for his family's plan does not make the family's records relevant and discoverable. Even in attempting to defend his subpoena Pelishek focuses on Adams's cell phone records; he offers no argument as to how the records of Adams's family members are relevant. (*See* ECF No. 88 at 13.)

Pelishek offers to withdraw his request with respect to the phone number used by Adams's son. (ECF No. 88 at 15.) However, he does not address, and thus makes no concession with respect to, his demand for "other numbers associated with the account of Charles Adams," which by itself would encompass the records of Adams's son as well as those of Adams's wife, daughter, and other son.

27

Holding that Adams lacks standing to challenge Pelishek's subpoena of Verizon for the phone records of Adams's family would be an invitation to discovery abuses. A person should not be forced to retain counsel and file a motion to quash a subpoena merely because their spouse or parent happens to be involved in litigation with a plaintiff who seems to view discovery as a test to ensure that no stone is left unturned. Many would not or could not afford to resort to these measures, and as a result discovery requests that serve no purpose other than to harass a party's family would go unchecked. Even the less cumbersome steps of filing a motion to quash pro se or coordinating with current counsel (if counsel were willing and able to file a motion to quash on their behalf) is more than what a person in the position of Adams's family members should be expected to do to protect themselves from frivolous intrusions.

The court need not wade into the weeds of the issue of standing versus converting Adams's motion to one for a protective order because Adams retains a privacy interest in the phone records. The records are, after all, ultimately his records as the subscriber of the family account. Moreover, spouses have an independent privacy interest in their partners' private information, and parents have an interest in protecting the private interests of their children.

"[I]n determining whether to quash a third-party subpoena based upon a party's privacy interests, courts weigh the relevance of the information against the strength of the privacy interest." *Pursley*, 2020 U.S. Dist. LEXIS 50513, at *5. When balanced against

the fact that Pelishek has shown the records to have no plausible relevance, it takes only the slightest privacy interest to tip the balance against Pelishek.

Modifying the subpoena to limit it to Adams's records (and to exclude the records related to his family's phones) is inappropriate and unnecessary. Although Adams's individual records may be properly the subject of a third-party subpoena, Pelishek has failed to demonstrate the need for such a subpoena here. Adams already provided Pelishek those records.

Accordingly, Adams's motion to quash will be granted.

## 4. Motions to Restrict Documents

### 4.1. Document in Support of Plaintiff's Motion to Compel or for Sanctions (ECF No. 60)

Under Civil Local Rule 79, if a party designates a document as confidential under a protective order, an opponent who wishes to file that document with the court must maintain that confidentiality either by filing it under seal or restricting it to case participants. It is then the designating party's burden to show that the document should be kept from the public. The filing party has the option to object to the continued confidentiality.

Through a muddled attempt to use this procedure, Pelishek filed redacted Common Council Minutes as Exhibit C (ECF No. 59-3) to his attorney's declaration in support of his motion to compel or for sanctions. He then objected to those redactions (ECF No. 60), and as a separate docket entry filed an unredacted version of the same

documents (ECF Nos. 61; 61-1). He asks that the court replace the redacted versions with the unredacted version. The unredacted version should not have been a separate docket entry; it should have been another exhibit to the declaration.

It does not appear that the defendants have responded to Pelishek's objection or otherwise shown that the documents filed as ECF Nos. 61 and 61-1 must remain confidential. Accordingly, the documents filed as ECF Nos 61 and 61-1 will be publicly docketed. The court declines to order the Clerk to replace any document.

### 4.2. Documents in Support of Motion to Quash (ECF No. 73)

Adams seeks to restrict Exhibits A, C, E, and F (ECF Nos. 71-1; 71-3; 71-5; 71-6) that he filed in support of his motion to quash. (ECF No. 73.) He asserts that these documents contain "personal, sensitive and non-public information." (ECF No. 73 at 2.) Specifically, he argues that Exhibits A and C—which include Pelishek's Verizon subpoena and related documents—must be restricted because they include his son's phone number. (ECF No. 73 at 2.) He asserts that Exhibits E and F must be restricted because they contain unredacted call logs that were designated as "Confidential—Attorney Eyes Only." (ECF No. 73 at 2.)

The fact that discovery was designated as confidential is not a sufficient factual basis for it to be restricted once it is filed in court. *See* Gen. L.R. 79(d)(3). "Absent a sufficient factual basis demonstrating good cause sufficient to seal the documents or

materials, the motion must be denied and the documents or materials publicly filed by the Clerk of Court, unless otherwise ordered by the Court." Gen. L.R. 79(d)(3).

Further, a filing may be withheld from the public in its entirety only when redaction is impractical. "To the extent possible, the movant should include with the public filing a version of the document or material that redacts only those portions of the document that are subject to the restriction/sealing request." Gen. L.R. 79(d)(2). No basis exists to withhold dozens of pages of documents from the public because within those documents is a confidential phone number. Rather, the filing party must redact the phone number and otherwise file the document publicly. Only if the redacted information is material to the matter pending before the court such that it must be provided to the court is it necessary for the filing party to also file a restricted unredacted version. Ensuring that, to the fullest extent possible, all documents filed with the court are available to the public fosters an understanding and accountability of the work of the judiciary.

The court finds that good cause exists to restrict Adams's call logs and his son's phone number. Therefore, Adams's motion to restrict the documents will be granted subject to Adams filing, within seven days of this order, redacted versions of Exhibits A, C, E, and F. As to Exhibits E and F, Adams has only established good cause for withholding the call logs attached to the emails; he has not shown that good cause

31

exists for withholding the accompanying emails. If Adams does not timely file redacted

versions of the referenced exhibits, the exhibits will be unsealed.

### 4.3. Documents in Support of Defendants' Response to Plaintiff's Motion for Sanctions (ECF No. 85)

The defendants also seek to restrict Exhibits A, B, and C to Ryan Sorenson's

declaration (ECF Nos. 84-1; 84-2; 84-3) and Exhibits S, T, and U to Warren E. Buliox's

declaration (ECF Nos. 86-19; 86-20; 86-21). (ECF No. 85.) The defendants describe these

documents as follows:

> a) Exhibit A of the Declaration of Ryan Sorenson (a portion of the personnel file of Plaintiff Chad Pelishek containing his 2022 annual performance review, produced as Confidential);
>
> b) Exhibit B of the Declaration of Ryan Sorenson (documents supporting Plaintiff Chad Pelishek's Family and Medical Leave Act "FMLA" request);
>
> c) Exhibit C of the Declaration of Ryan Sorenson (a portion of the personnel file of Plaintiff Chad Pelishek containing the resignation letter, produced as Confidential);
>
> d) Exhibits S and T of the Declaration of Warren Buliox (portions of the deposition transcript of Plaintiff Chad Pelishek, designated as Confidential); and
>
> e) Exhibit U of the Declaration of Warren Buliox (portions of the deposition transcript of Ryan Sorenson, designated as Confidential).

(ECF No. 85 at 3.)

Pelishek does not oppose the motion to restrict Exhibits A and B. (ECF No. 95 at

1.) He takes no position as to Exhibit C. (ECF No. 95 at 1.) With respect to Exhibits S and

T, Pelishek states that he "does not oppose publicly filing portions of his deposition that

do not contain confidential medical, family, or other private information, none of which is included in Defs. Exs. S & T," but does not indicate what portions of the exhibits that may include. (ECF No. 95 at 2.) He seems to suggest that the parties have agreed to go through the exhibits to identify what must remain confidential, but no redacted exhibits have been filed. As for Exhibit U, Pelishek appears to state he both opposes the motion and that the parties have agreed that pages 20, 62-65, 169 – 181 of Sorenson's deposition may be filed publicly. (ECF No. 95 at 2.)

Having reviewed the exhibits, the court finds there is good cause to restrict Exhibit A (ECF No. 84-1) and Exhibit B (ECF No. 84-2). The nature of these documents makes redaction impractical. In the absence of an objection from Pelishek to the public filing of the exhibit, the motion to restrict Exhibit C (ECF No. 84-3) will be denied.

As to Exhibits S and T (ECF Nos. 86-19 and 86-20), Pelishek, as the party that designated his deposition as confidential, has the burden to show that it must be withheld from the public. Gen. L.R. 79(d)(3). He has failed to do so, and based on the court's review there is no good cause to restrict the documents. Therefore, these documents will be docketed publicly.

Finally, Exhibit U (ECF No. 86-21) is a portion of Sorenson's deposition, which the defendants designated as confidential. They assert it must be restricted because it "refers to private City business interests." Having reviewed the exhibit, the court finds nothing in the document that merits restricting it from the public.

**IT IS THEREFORE ORDERED** that plaintiff Chad Pelishek's Motion for Sanctions or in the Alternative to Compel (ECF No. 57) is **denied**. The defendants may submit any request for reasonable expenses within **14 days** of this order. Pelishek may respond no later than **14 days thereafter**. The defendants may reply within **seven days thereafter**.

**IT IS FURTHER ORDERED** that defendant Charles Adams's Motion to Quash (ECF No. 69) is **granted**.

**IT IS FURTHER ORDERED** that the documents filed as ECF No. 61 and ECF No. 61-1 shall be unrestricted.

**IT IS FURTHER ORDERED** that Adams's motion to restrict documents filed in support of his motion to quash (ECF No. 73) is **granted** subject to Adams filing a redacted version of the subject document within seven days of this order.

**IT IS FURTHER ORDERED** the defendants' motion to restrict documents submitted in response to the plaintiff's motion for sanctions (ECF No. 85) is **granted in part**. It is granted with respect to the documents filed as ECF No. 84-1 and ECF No. 84-2. The motion is denied in all other respects.

Dated at Milwaukee, Wisconsin this 29th day of January, 2025.

WILLIAM E. DUFFIN
U.S. Magistrate Judge