UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHAD PELISHEK,

Plaintiff

v. Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

Defendants.

---

**BRIEF IN SUPPORT OF PLAINTIFF CHAD PELISHEK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF THE CITY'S LIABILITY (MONELL) FOR HIS FIRST AMENDMENT PRIOR RESTRAINT CLAIM**

---

## INTRODUCTION

Plaintiff Chad Pelishek seeks partial summary judgment on his First Amendment prior restraint claim against the City of Sheboygan (City). From November 2022 through March 2023, the City issued a series of directives that restricted Pelishek's speech on issues involving racism and discrimination, misuse of taxpayer funds, alleged extortion of City money and public corruption, and disputing public reports about such issues. These directives were not merely suggestions—they were mandatory policies and included an order that any communications or opinions with private citizens required the presence of the City's legal counsel. The final directive, before Pelishek went on FMLA leave prior to his resignation, threatened him and other officials with discipline for any failure to comply.

The undisputed factual record demonstrates that the City's March 8 directives constituted an unconstitutional prior restraint on Pelishek's speech in violation of the First Amendment. The City cannot show that its restrictions were narrowly tailored to serve a compelling government interest, nor can it

establish that its interests outweigh Pelishek's First Amendment rights. As such, Pelishek is entitled to judgment as a matter of law on his prior restraint claim under 42 U.S.C. § 1983. Pelishek reserves the issue of damages associated with this judgment for trial.

## FACTS

Chad Pelishek was employed by the City of Sheboygan from 2007 – May 2023. PELISHEK DECL. ¶¶ 25. By August 2022, Pelishek was the Director of Planning and Development for the City. On August 22, 2022, Chad Pelishek attended a department head meeting where he raised concerns about an incident in which a racial slur was used at a neighborhood meeting. PPMF[1] ¶¶4-6. In response, Emily Rendall-Araujo, a city official, instructed him to repeat the slur verbatim, stating that she wanted to hear "exactly" what had been said. PPMF ¶5. After Pelishek complied, Rendall-Araujo broadcasted Pelishek's repetition and stated she was standing up to his racism. PPMF ¶¶ 6-7.

Shortly thereafter, City Administrator Todd Wolf defended Pelishek, arguing that he had done nothing wrong. PPMF ¶¶ 16-17, 19, 30. Rendall-Araujo then went to media and spoke to a reporter. PPMF ¶7. News articles were published that implied Pelishek used an unsolicited racial slur and omitted that he was reporting statements about an incident involving a racial slur at a public meeting. PPMF ¶¶ 6-7, 8. The articles also stated that City Administrator was retaliating against females who were trying to bring racism to light. PPMF ¶¶ 6-7, 8. An October 26, 2022, article titled "*Sheboygan n-word racial slur incident prompts call for change at city*" focused on an overarching theme that there was racism at the City of Sheboygan and that the City Administrator was retaliating against women who tried to address racism or discrimination. PPMF ¶¶ 14-16. This article, and others, followed Rendall-Araujo's discussions with the media. PPMF ¶17.

Prior to the first publication, Pelishek asked City Attorney Adams, who was acting as the City's

---

[1] Plaintiff's Proposed Findings of Material Fact (PPMF) is filed simultaneously with this motion and brief and incorporated throughout.

Human resources director for complex human resources matters, whether he could respond and provide comment to the reporter. PPMF ¶ 8. Following this, Pelishek responded to Ms. Hilty directing her to the City Administrator and Mayor (Wolf and Sorenson) noting that he could not comment to her. PPMF ¶ 9.

In November 2022, Wolf raised concerns to City's Common Council members detailing concerns about racism allegations and an incident on October 5, where associates of Mayor Sorenson and Emily Rendall-Araujo, part of the DEI group, threatened Wolf unless they were paid $70,000 for consulting services. PPMF ¶ 19. That same day, the Council publicly placed Wolf on involuntary leave and launched an investigation into whether Wolf (1) made false statements about the October 5 DEI threat and City affiliations, and (2) retaliated against Rendall-Araujo for broadcasting racism concerns, including about Pelishek. PPMF ¶¶ 20-22.

The night Wolf was placed on leave, the City of Sheboygan, directed by Adams and Sorenson, ordered police officers to serve a directive they authored to Todd Wolf. PPMF ¶ 21. This directive functionally silenced Wolf and cut him off from speaking to citizens that did business with the City.

As part of the investigation, Pelishek was interviewed on November 29, 2022. PPMF ¶ 28. During the interview, Pelishek confirmed that a DEI group had made a financial threat during the October 5 meeting and reiterated that Rendall-Araujo instructed him to repeat the racial slur in August. PPMF ¶ 29. Pelishek also discussed his concerns about the Mayor and other officials' desires to hire and pay that DEI group based on regulatory guidelines for use of certain public funds as well as their being selected for certain jobs within the City. The City publicly fired Wolf on January 9 and the Mayor and other officials broadcasted statements that the investigation found Wolf lied about the DEI threat, influence, retaliated against Rendall-Araujo and was unsafe for employees. PPMF ¶ 30. Wolf filed a lawsuit after he was fired on February 6, 2023, and in response, the City Attorney's office issued a directive that no City employee was allowed to speak to Todd Wolf or his attorney about anything. PPMF ¶ 37.

Despite Pelishek's interview statements, the final investigative report, released on March 8, 2023, misrepresented his testimony, omitting critical details about the DEI group's threat, and inaccurately concluding that the DEI group never made any threat for money based on Pelishek's eyewitness interview. PPMF ¶ 40. The report also concluded that Wolf had retaliated against Rendall-Araujo by expressing concerns about her falsely claiming a racial slur and then broadcasting that as racism, discrimination, and retaliation within City Hall. PPMF ¶ 40. The day prior to the City's public release of the report, Pelishek told HR Director Westbrook that the report contained false information about his statements, including the DEI threat and implication that there was racism at the City and retaliation against females trying to address it. PPMF ¶ 36 and PELISHEK DECL. ¶ 20.

The following day, on March 8, 2023, HR Director Adam Westbrook issued a directive imposing broad restrictions on city employees regarding discussions of the investigation and the lawsuit Wolf had filed against the City. PPMF ¶ 43. The directives stated in part:

- **Employees were prohibited from discussing the investigation or lawsuit unless authorized.** *"Employees are not permitted to discuss the investigation or any related matters unless expressly authorized by the City."*
- **All media or public inquiries had to be directed to select officials.** *"All requests for comment or information regarding this matter must be referred to Mayor Sorenson, City Attorney Charles Adams, or the HR Director."*
- **Employees could not make independent statements about the investigation or lawsuit.** *"Any discussion of the investigation, including speculation, personal opinions, or unauthorized disclosures, is strictly prohibited and may result in disciplinary action."*
- **Failure to comply with the directive could lead to termination.** *"Failure to comply with this directive may result in disciplinary action, up to and including termination."*

- **Employees were barred from sharing personal opinions about the investigation or lawsuit.** *"Employees must not share personal views, interpretations, or opinions regarding the investigation, either internally with colleagues or externally with the public."*
- **All discussions had to involve the City's legal representatives.** *"Any employee who believes they have relevant information regarding this matter should report it directly to the City's legal representatives and refrain from independent discussions."*

*Id.* The March 8 directive had an immediate chilling effect on Pelishek's ability to speak freely about the situation. PPMF ¶¶ 49-50. He believed that discussing his concerns with an attorney, the EEOC, or even his wife could result in termination. PPMF ¶¶ 48-50. He feared that raising his concerns about the falsities in the investigative report or discussing the DEI threat could cost him his job. PPMF ¶¶ 48-50. He also understood that if he testified truthfully in Wolf's lawsuit—stating that key aspects of the report were false—he risked retaliation from the City. PPMF ¶¶ 17 and 48.

These restrictive directives, combined with an earlier February 7, 2023 directive prohibiting all employees from speaking to Wolf or his attorney, silenced Pelishek entirely. PPMF ¶ 37. Despite being a key witness in the case, he was prevented from seeking independent legal advice, speaking to his attorney (or any attorney), or reporting concerns about discrimination, retaliation, and workplace harassment. PPMF ¶¶ 35-36.

Ultimately, the stress and fear generated by these directives led to Pelishek taking FMLA leave. PPMF ¶ 49. While on leave, he remained hesitant to discuss the case with legal counsel or private citizens. *Id.* Realizing that his ability to speak on matters of public concern—especially regarding false allegations of racism, the influence of the DEI group, and retaliatory employment practices—was permanently restricted even to his family and friends, Pelishek ultimately resigned. PPMF ¶¶ 49-50. It was reasonable for Pelishek to resign because he was terrified of calling the City's legal counsel; he was concerned about

expressing his belief that the public report was false and that the falsity was perpetrated in high positions within the City. PELISHEK DECL. ¶¶ 22-27 . Pelishek also resigned over the City's attempt to cover up misuse of taxpayer funds, extortion threat, and racism and discrimination concerns prevalent from Rendall-Araujo. PELISHEK DECL. ¶¶ 22-27.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "go beyond the pleadings" and identify specific facts showing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co*., 884 F.3d 708, 717 (7th Cir. 2018).

## ARGUMENT

### I. THE CITY'S DIRECTIVES CONSTITUTED AN UNCONSTITUTIONAL PRIOR RESTRAINT ON PELISHEK'S SPEECH

Prior restraints on speech are "the most serious and least tolerable infringement on First Amendment rights" and are presumptively unconstitutional. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). While government employers may impose some restrictions on employee speech, such restrictions must be narrowly tailored to serve compelling governmental interests. *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465 (1995) ("NTEU"). Where a ban "chills potential speech before it happens ... the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Crue v. Aiken*, 204 F. Supp. 2d 1130, 1143 (C.D. Ill. 2002), aff'd, 370 F.3d 668 (7th Cir. 2004); citing *NTEU*, 115 S.Ct. at 1014.

The Seventh Circuit has established that to determine whether a government employer's restriction on speech constitutes an unconstitutional prior restraint, courts must consider: (1) whether the speech addressed a matter of public concern; (2) whether the government's interest in restricting the speech outweighs the interests of the employee(s) and the public in the speech; and (3) whether the restriction was narrowly tailored to meet that interest. *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749-50 (7th Cir. 1999); citing *NTEU.*

A pre-clearance directive or restriction "is a prior restraint if it meets four elements: (1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves 'appraisal of facts, the exercise of judgment, and the formation of an opinion' by the decision maker." *Samuelson v. LaPorte Cmty. Sch. Corp*., 526 F.3d 1046, 1051 (7th Cir. 2008); citing *SE. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

The City's directives relating to false reports, publications, extortion, corruption, racism and discrimination between September 2022 – March 2023 all either imposed blanket bans on a broad range of speech and were unconstitutional prior restraints that had a chilling effect on Pelishek's protected speech on matters of public concern unrelated to his job duties.

**A. The City's Directives Restricted Pelishek's Speech on Matters of Public Concern**

Speech involves matters of public concern when it relates to "political, social, or other concern[s] to the community" or is "a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). The Supreme Court has specifically recognized that workplace discrimination, misuse of taxpayer funds, misconduct by public officials, and potential corruption are all matters of public concern. *Pickering*

*v. Board of Education*, 391 U.S. 563 (1968) (allocation of public funds and potential misuse of taxpayer resources are "matters of legitimate public concern" and critical to informed community debate); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979) (discrimination in public employment practices is a "matter inherently of public concern");*Milwaukee Police Ass'n*, 192 F.3d at 750 (recognizing that police misconduct investigations are matters of public concern). Here, the undisputed evidence shows that the City's directives prohibited Pelishek from speaking on several matters of public concern:

**1. Alleged extortion and misuse of taxpayer money**.

Wolf's lawsuit (which prompted the February 7 directive) contained allegations of extortion and corruption involving DEI activists and City officials. The City cannot reasonably dispute that allegations of public corruption, an extortion threat, and misuse of taxpayer money are matters of public concern. Wolf alleged that the City conspired to fire him so they could hire DEI activist friends outside of lawful procurement policies. PPMF ¶¶ 17-19. This is a clear matter of public concern. See *Lane v. Franks*, 573 U.S. 228 (2014) (testimony or statements regarding corruption in a public program and misuse of public funds "obviously" involves a matter of public concern).

**2. Alleged government misconduct, false reports, and corruption**.

The March 8 directive restricted Pelishek and other department heads from discussing the details of a public investigation and report that Pelishek alleged contained false information about his interview statements. PPMF ¶¶ 43-44. The report was released to the public as the "conclusion" of what happened with a DEI extortion threat and retaliation and discrimination of Rendall-Araujo by Todd Wolf regarding her telling City officials and the public about racism at the City, including Pelishek's. PPMF ¶ 38. Department heads (and their employees) were directed that they must get permission and have the City Attorney Adams present for any discussions to any citizens about even their opinions regarding the Wolf lawsuit and the investigation regarding City-wide discrimination, extortion, and misuse of taxpayer

money. PPMF ¶ 43.

The Wolf lawsuit alleged that the investigation and report that the City released to the public about him contained false information. PPMF ¶ 34. Disputing a public report, let alone *opinions* that dispute a government-sanctioned report that contains false information is a matter of public concern. See *Id.* (2014); *Connick v. Myers*, 461 U.S. 138 (1983) (suggesting that potential corruption or abuse of public office involves on matters of public concern); *Swetlik v. Crawford*, 738 F.3d 818 (7th Cir. 2013) ("falsified government records affecting taxpayer funds" are of significant interest to the public and matters of public concern).

The public has a strong interest in knowing whether official government documents contain accurate information. *Id.* The speech at issue was not part of Pelishek's official duties. He was the Director of Planning and Development, not a communications officer or legal representative. Discussing whether he agreed with the public investigation report conclusions, hiring of DEI consultants, reporting discrimination and harassment to the EEOC, consulting with private attorneys about the financial threat, testifying truthfully for Todd Wolf's lawsuit, or disputing any official employer narrative to the media or as a private citizen was not among his job duties. Thus, the speech restricted by the directives was protected under the First Amendment.

**3. Workplace Discrimination**.

The initial incident leading to Rendall-Araujo's complaint about Wolf involved Pelishek reporting community racism at neighborhood meetings—an issue of public concern. In September 2022 Adams prohibited Pelishek from providing context about this matter to the media which led to public debate about racism and discrimination at the City. PPMF ¶ 9. Racism practices in a government agency is a matter of public concern. *See Pickering*. The Supreme Court has long held that racism and discrimination practices within government agencies—let alone in public community settings—is a matter of public concern. *See*

*Givhan*, 439 U.S. 410 (1979) (discrimination in public employment practices is a "matter inherently of public concern").

The investigation and report that ensued also concerned allegations that Administrator Todd Wolf had retaliated against Rendall-Araujo for broadcasting Pelishek's supposed racism. Workplace discrimination and retaliation are also matters of public concern. *See Kokkinis v. Ivkovich,* 185 F.3d 840 (7th Cir. 1999) (speech about gender discrimination and retaliation a matter of public concern that affects public trust and thus is elevated beyond a personal dispute)*;* see also *Connick v. Myers*, 461 U.S. 138, 146 (1983).

**B. The City's Interests Did Not Outweigh the interests of Pelishek, employees, and the public in information about an extortion threat, public corruption, racism and discrimination, and corruption, false reports, and misuse of taxpayer money.**

When a government restriction affects speech on matters of public concern, courts balance the employee's interest in speaking against the government's interest in promoting efficient public services. *NTEU;* citing *Pickering v. Bd. of Educ*., 391 U.S. 563, 568 (1968).

The City has offered three primary justifications for its directives: (1) to ensure "controlled workplace communications"; (2) to prevent "prejudicial statements" about Wolf's lawsuit; and (3) to control communications among department heads on "sensitive legal matters." None of these justifications can withstand scrutiny because no directives here were narrowly tailored to meeting any legitimate interest, and the Defendants cannot support these reasons beyond their mere speculation.

**1. "Controlled Workplace Communications" Cannot Justify the Restrictions**

The City's general interest in "controlled communications" and workplace efficiency fails to outweigh the interests of Pelishek, employees, and the public in truthful information about discrimination, retaliation, corruption, and false reports. *See Pickering,* (1968). Whether the City believed that any statements disputing the report or supporting Wolf's allegations were false does nothing to support the City's reasons for the directives. In *Pickering,* the Supreme Court emphasized that "statements by public

officials on matters of public concern must be accorded First Amendment protection" even if those statements may be false. *Id.,* citing *New York Times v. Sullivan*, 376 U.S. 254 (1964).

Pelishek, and potentially other City employees, believed there was false information in the investigation report which they were interviewed on. PPMF ¶ 39. The Court in *Pickering* held that allegations of false reporting of information to the public were "critical to public debate" about school finances. *Id.* Similarly, the Supreme Court in *NTEU* held that the broad restraint on communication unrelated to employee job duties outweighed speculative efficiency concerns, prioritizing employee and public information rights. *See NTEU; Rankin v. McPherson,* 483 U.S. 378 (1987) (Efficiency and communication control were insufficient without evidence of impact on operations); *see also Wolfe v. Barnhart*, 446 F.3d 1096, 1106 (10th Cir. 2006) (rejecting government employer's claims that restrictions were necessary to maintain order and efficiency as "speculative" where agency failed to demonstrate how restricted speech would disrupt operations).

Here, the City has no evidence and has only made speculative assertions that Pelishek's potential speech or any employee speech providing even their "opinions" about the investigation report or Wolf's lawsuit allegations would have disrupted workplace operations. But even if they had adduced such attenuated evidence, their justifications would still fail because the directives were not, at all, narrowly tailored to ensuring efficiency of any City operations, nor explanation as to how potential misuse of taxpayer funds and false reporting as private citizens would help make employee jobs more efficient. The directives were issued without any showing that allowing Pelishek to consult with an attorney, speak about the investigation, or dispute false information would have impeded the City's functions. This speculative harm cannot outweigh Pelishek's substantial interest in speaking on matters of public concern.

**2. Preventing "Prejudicial Statements" About Litigation Is Not a Sufficient Justification**

The City's second justification—that the directives were necessary to prevent employees from making statements prejudicial to Wolf's lawsuit—similarly fails.

The March 8 Directives expressly and unequivocally chilled speech to *all persons* (citizens, media, etc.), but it covered both Wolf's lawsuit allegations *and* the public investigation and report that Pelishek stated had inaccurate information. The City's entire justification for these directives is essentially that they did not want Pelishek, or other employees, to make any statement that would hurt their public defensive posture to the public regarding the investigation, report, and the Wolf litigation, regardless of the truth or factual nature of a potential employee statement. PPMF ¶ 45.

The City's restrictions "permitting speech only in the presence of the City's legal counsel" does not cure it unconstitutional applications, because no employee, let alone Pelishek, would be expected to call the City's legal counsel to show up simply for him to talk to his wife, family, or friends about his interview and personal knowledge of the investigation subjects, the DEI meeting, and the retaliation facets regarding Rendall-Araujo and Wolf. These directives had a clear chilling effect on Pelishek's protected speech. Courts have long held that such pre-clearance directives, let alone demands that the City's legal counsel to be present for any private citizen speech about the public report or a lawsuit, are insufficient. *NTEU* (1995) (speculative justifications insufficient); see also *Harman v. City of New York*, 140 F.3d 111, 117 (2d Cir. 1998) (invalidating a policy requiring employees to obtain prior approval before speaking to the media or attorneys).

In *Whitney v. City of Milan*, 677 F.3d 292, 298 (6th Cir. 2012), the Sixth Circuit overturned the district court's dismissal of an employee's First Amendment claims in nearly identical circumstances. The Plaintiff in *Whitney,* was a friend of a former employee who filed a lawsuit and had personal information about her friend's claims. *Id.* Overturning the district court's summary judgment granting for the Defendant city there, the Sixth Circuit held that government interests in preventing prejudice to litigation, divided loyalties, and maintaining a defensive posture in litigation were all insufficient to outweigh an employee's interest in speech on matters of public concern. The same is true here. The City has adduced

no evidence to support their demands that employee's must obtain City clearance, *or the presence of City's legal counsel,* to even express their opinions about an investigation report or former City Administrator's lawsuit regarding misuse of taxpayer funds.

**3. The "Sensitive Legal Matters" Justification Cannot Support the March 8 Directive.**

The City's third justification—that the March 8 directive targeted only department heads involved in "sensitive legal matters"—is equally unpersuasive for the same reasons. The Supreme Court has held that a government employer cannot silence truthful speech that contradicts an official report. See *Swetlik*, 738 F.3d 818 (7th Cir. 2013) ("falsified government records affecting taxpayer funds" are of significant interest to the public and matters of public concern).

Department heads like Pelishek were not "involved" in legal matters; they, specifically Pelishek, were witnesses to publications regarding Rendall-Araujo's retaliation and discrimination complaints and DEI infiltration into payments by the City or for City services. Pelishek was a witness to the October 5 lunch threat for money by Sorenson and Rendall-Araujo's friends that was the subject of the investigation and Wolf's lawsuit. PPMF ¶¶ 10-11. The directive prohibited employees, and Pelishek, from correcting false information in the report—information directly relevant to their personal knowledge without approval from City officials and the presence of the City's legal counsel even for opinions about these subjects to his family and friends.

Further, the fact that the March 8 directives were limited to department heads does not save it from constitutional scrutiny. The City's argument that *NTEU* applies only to directives sent to "hundreds" of employees is incorrect as a matter of law. The constitutional analysis turns on the nature of the restriction and broad expressions chilled as a result of such restrictions, not the "number of employees" affected. Indeed, many courts have held that directives sent even to a few employees, supervisors, or even one employee were unconstitutional prior restraints under *NTEU.* See *Barone v. City of Springfield*, 902 F.3d 1091, 1106 (9th Cir. 2018) (finding an unconstitutional prior restraint where a directive was given to only

one employee); *Moonin v. Tice*, 868 F.3d 853 (9th Cir. 2017) (directive to supervisory staff only unconstitutional prior restraint); *Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir. 1977) (one employee ordered not speak publicly about office operations regarding his lawsuit finding broad restriction on external communications); *Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006) (SSA supervisor told specific group employees and ruled unconstitutional prior restraint).

**C. The City's Directives Were Not Narrowly Tailored.**

Even if the City's interests were sufficient to outweigh Pelishek, employee, and the public's access to information on these subjects, the directives were not narrowly tailored to serve those interests. A restriction is not narrowly tailored if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). The March 8 directives contained no limiting language or procedural safeguards instructing employees and department heads to seek approval to speak about the public investigation, the report, and the Wolf lawsuit, including even expressing their opinions. Further, it mandated that any communications to any person about the investigation or Wolf lawsuit required the presence of the City's legal counsel—including necessarily communications with private citizens, friends, or family members about the investigation report and Wolf lawsuit. According to the directives, this required Pelishek and other City employees to call and have the City's legal counsel present for any private citizen discussions.

These directives contained no temporal limitations, subject-matter restrictions, or procedural safeguards on their face. The City has no evidence that any narrowing or clarifications were provided to Pelishek or any employees beyond their own arguments in this litigation. The directives did not specify that employees could speak on these matters as private citizens, outside of work, or on matters unrelated to the litigation. The City has produced no information, nor can they, that they communicated any such limitations to its employees, including Pelishek. Courts have routinely struck down similarly broad

directives. In *Harman v. City of New York*, 140 F.3d 111, 124 (2d Cir. 1998), which the Seventh Circuit has referenced in similar litigation, the Second Circuit invalidated a policy requiring employees to obtain prior approval before speaking to the media, finding it lacked "any guidelines to limit the discretion of the agency decision-maker." The City's directives here similarly lacked any guidelines or limitations.

## II. THE CITY IS LIABLE UNDER *MONELL* FOR THE UNCONSTITUTIONAL PRIOR RESTRAINT

To establish municipal liability under 42 U.S.C. § 1983, Pelishek must show that the constitutional violation resulted from: "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Howell v. Wexford Health Sources, Inc*., 987 F.3d 647, 653 (7th Cir. 2021). The undisputed evidence demonstrates that the City is liable under each of these theories:

### A. The Directives Were Official City Policies.

The March 8 directives were formal municipal policies sent and ratified by the City's Director of Human Resources and Labor Relations, Adam Westbrook. The City's Human Resources Director Adam Westbrook possessed final policymaking authority over all employee and personnel conduct for his roles. PPMF ¶ 2. As the Seventh Circuit has explained, the relevant inquiry is "whether [an official] is a policymaker in a particular area, or on a particular issue." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009). Here, City of Sheboygan ordinances delegate policymaking authority to the Human Resources Director on all personnel conduct. PPMF ¶ 2. Directives issued by Adam Westbrook, as the City's Human Resources and Labor Relations Director constituted official City policy over conduct and speech of all personnel.

### B. The City also Had a Custom and Practice of Restricting Protected Speech.

Even if the directives were not formal policies, the City had a persistent practice of silencing employees that was so widespread as to constitute custom:

1. The City sent multiple directives over a four-month period (November 2022 to March 2023) restricting employee speech. PPMF ¶¶ 21-25.
2. The City Attorney's directive to Pelishek that he could not speak or comment to the media about the racial slur incident in September 2022. (while the City Attorney was the acting Human Resources Director). PPMF ¶ 9.
3. November 7 directives to Todd Wolf served via police on orders of City Attorney and Mayor. PPMF ¶ 22.
4. The November 21, 2022 directive was issued by Mayor Sorenson, the City's chief executive officer. PPMF ¶ 22.
5. The February 7, 2023 directive was issued by the City Attorney's office to all City employees. PPMF ¶ 37. See *NTEU* (addressing that overly broad restrictions could chill protected speech on matters of public concern or government issues).
6. The directives were issued by different officials (Mayor, City Attorney, HR Director) demonstrating a coordinated, City-wide approach.
7. The City enforced these directives through intimidation, including sending police to Wolf's home to serve his directive. PPMF ¶ 22.
8. The City continued this practice even after Pelishek filed this lawsuit, sending an email to all employees declaring his allegations false. PPMF ¶ 51.

This pattern of behavior demonstrates a municipal custom and practice of restricting protected speech by public employees on issues of racism, misuse of taxpayer funds, false reports, corruption, and discrimination practices. See *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (finding a custom where there was "a pattern of conduct that was widespread before the plaintiff felt its impact").

The Mayor, City Attorney, and HR Director each had executive authority, legal advising authority, and/or policymaking authority for employee conduct. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (holding that a municipality is liable when the decision to adopt a particular course of action is made by an official with final policymaking authority). As acting HR Director in September 2022, Adams had policymaking authority under Sheboygan ordinances to enact formal policies, with which he prohibited Pelishek from speaking to a reporter about a racism incident.

The City cannot escape liability by arguing that the directives were unauthorized. The officials who

issued them were acting in their official capacities, using City resources, and exercising authority delegated to them under City ordinances.

## CONCLUSION

The undisputed facts demonstrate that the City of Sheboygan's prior restraint was unconstitutional, unsupported, and a result of the City's policies and long-held practice and custom of restricting protected speech of their employees, including and especially Pelishek. These directives prohibited him from discussing racism and discrimination within the City and the community, misuse of taxpayer funds, an extortion threat, public investigation into the same, and disputing false information in a report funded by taxpayers. The City's asserted interests did not outweigh the interests of Pelishek, employees, and the public in the information about these subjects and issues.

Because there is no genuine issue of material fact as to whether the City violated Pelishek's First Amendment rights through an unconstitutional prior restraint, and because the City is liable for these violations under *Monell*, Pelishek is entitled to judgment as a matter of law regarding the City's liability on his First Amendment prior restraint claim and a declaratory judgment that the City violated his First Amendment rights. Pelishek reserves the issue of damages for trial.

WHEREFORE, Plaintiff Chad Pelishek respectfully requests that this Court grant his Motion for Partial Summary Judgment on his First Amendment prior restraint claim against the City of Sheboygan.

Respectfully submitted this March 3, 2025.

*/s/ Jennifer T. DeMaster*
Jennifer DeMaster
Wis. Bar No. 1124201
attorney@jenniferdemaster.com
DEMASTER LAW LLC
361 Falls Rd # 610
Grafton, WI 53024
Phone: (414) 235-7488
Fax: (262) 536-0515

Christopher I. Kachouroff
VA Bar No. 44216*
MCSWEENEY, CYNKAR & KACHOUROFF, PLLC
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com

*Attorneys for Plaintiff Chad Pelishek*