IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**CHAD PELISHEK,**

Plaintiff,

v.  Case No.: 2:23-CV-1048

**CITY OF SHEBOYGAN, et al.**

Defendants.

## DEFENDANTS' SUPPLEMENTAL MATERIAL FACTS IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants, City of Sheboygan, Ryan Sorenson, Charles Adams and Emily Rendall-Araujo (collectively, "Defendants"), submit the following supplemental material facts in support of their opposition to Plaintiff's Motion for Partial Summary Judgment.

1. The February 7, 2023 email and the March 8, 2023 email were the only communications that he relied on to support his First Amendment prior restraint claims in both written discovery and his deposition. **(ECF No. 13 at ¶¶ 225-234, 239-249; ECF No. 118-7, pp. 83-84, 88 – Buliox Supp. Decl. at ¶ 4, Ex. C -- Pelishek Dep. 420-421, 425; ECF No. 118-17, p. 9 -- Pl.'s Amend. and Supp. Resp. to City of Sheboygan's Interrog., dated September 11, 2024, No. 14; Buliox Supp. Decl. at ¶ 2, Ex. A -- Pl.'s Am. and Supp. Resp. to City of Sheboygan's Interrog., dated September 11, 2024, No. 15.)**

2. Plaintiff only alleges that the False Statements policy contained in Mun. Code Sec. 18-3 is involved in the prior restraint claim involving the March 8, 2023 email , <u>not the February 7 email</u>. **(ECF 13 at ¶¶ 223-234, 234-249 -- Pl.'s Am. Compl.)** (Emphasis added).

3. Mun. Code Sec. 18-3 provides that "[n]o persons shall make any false statement or report with regard to <u>any test, certification or appointment made under any provisions of this chapter</u> or in any manner commit or attempt to commit any fraud <u>preventing the impartial execution of this chapter and policies</u>."

https://sheboygan.municipalcodeonline.com/book?type=ordinances#name=Sec_18-3_False_Statements,_Reports

4. Plaintiff did not refer to the False Statement policy contained in Mun. Code Sec. 18-3 or any of the other Mun. Code Sec. 18-4 - 18-6 in his answers to City Interrogatories No. 14 or 15 when he was asked to identify all facts that he relied on to support his prior restraint claim set forth in his Fourth and Fifth Causes of Action. **(ECF No. 118-17, p. 9 -- Pl.'s Amend. and Supp. Resp. to City of Sheboygan's Interrog., dated September 11, 2024, No. 14; Buliox Supp. Decl. at ¶ 2, Ex. A -- Pl.'s Amend. and Supp. Resp. to City of Sheboygan's Interrog., dated September 11, 2024, No. 15.)**

5. Plaintiff acknowledged that the March 8, 2023 email did not involve any City test, certification or appointment; or any attempt to commit fraud. **(Buliox Supp. Decl. at ¶ 4, Ex. C -- Pelishek Dep. 431-433.)**

6. Plaintiff's job description provided that an essential responsibility of his position was to "maintain effective public relations" and "provide information to news media representatives, business/industry representatives, civic groups, service organizations, and government officials, in both oral and written forms." **(Buliox Supp. Decl. at ¶ 5, Ex. D -- Plaintiff's Job Description.)**

7. Plaintiff's job duties and responsibilities as the Director of Planning and Development specifically included working with the neighborhood groups to establish neighborhood associations and neighborhood strategic plans. **(Buliox Supp. Decl. at ¶ 5, Ex. D -- Plaintiff's Job Description.)**

8. The published mission statement for the City of Sheboygan Planning and Development department is to "actively promote a diverse, safe and dynamic community and enhance the living, working and recreational choices for all Sheboygan citizens and visitors." **(Buliox Supp. Decl. at ¶ 6, Ex. E -- Copy of City of Sheboygan Planning and Development mission statement -- https://www.sheboyganwi.gov/departments/planning-development/.[1])**

9. During the August 22, 2022 department meeting, Plaintiff repeated a racial slur that one of his employees had reported to him that had been said by an attendee at a neighborhood association meeting. Plaintiff asked the group if anyone was aware of community-based services that might be able to help neighborhood associations address these types of issues. **(ECF No. 39 at Answer to ¶ 45 -- Defs.' Answer to Pl.'s Am. Compl.)**

10. When questioned during his deposition about whether Rendall-Araujo asked him to say the full n-word during the August 22nd meeting, Plaintiff said: "I don't think so." **(ECF No. 118-2, p. 10 -- Pelishek Dep. 126.)**

11. Plaintiff admitted during his deposition that "he did not think it was acceptable to say the full n-word when describing the incident that occurred at the neighborhood association meeting. Plaintiff also admitted that he could have chosen not to repeat the full n-word. **(ECF No. 118-2, pp. 9-11 -- Pelishek Dep. 125-127.)**

12. Veronica Valdez testified only that that Rendall-Araujo told her about the racial slur incident after it had happened. According to Valdez, Rendall-Araujo stated "I know I asked what was said, but you didn't have to say the N word. You didn't have to say it." (**ECF No. 128-1, p. 5 -- Valdez Dep. 117.**)

---

[1] This jurisdiction has long held that matters of public record may be considered by the court when evaluating a motion to dismiss. See *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

13. Plaintiff and Wolf asked Abby Block, an employee in the Planning and Development department, to schedule a meeting with Jamie Haack ("Haack") and Ale Guevera ("Guevera"). **(Buliox Supp. Decl. at ¶ 3, Ex. B -- Pelishek Dep. 170-171.)**

14. Plaintiff, Wolf, and Block met Haack and Guevera for lunch on October 5, 2022 to discuss resources to help educate the city staff on neighborhood and community outreach efforts around race, ethnicity and diversity. **(Buliox Supp. Decl. at ¶ 3, Ex. B -- Pelishek Dep. 170-171.)**

15. Plaintiff attended the October 5, 2022 lunch with Guevara and Haack in his official capacity as the Director of Planning and Development. **(Buliox Supp. Decl. at ¶ 3, Ex. B -- Pelishek Dep. 205.)**

16. The purpose of the October 5, 2022 lunch was to explore resources to educate the city staff and neighborhood associations. **(Buliox Supp. Decl. at ¶ 3, Ex. B -- Pelishek Dep. 168-173.)**

17. Sorenson met with Guevera and Heather Cleveland on November 1, 2022 to discuss issues relating to refugees in the Sheboygan Community. **(ECF No. 39 at Answer to ¶ 74 -- Defs.' Answer to Pl.'s Am. Compl.**)

18. The City retained von Briesen & Roper to conduct an investigation on or about November 14, 2022. The engagement letter with von Briesen & Roper states that the firm was retained to investigate matters regarding the activities and communications of Plaintiff [Todd Wolf] as well as investigate allegations asserted by Plaintiff [Todd Wolf] in his November 7, 2022 letter to Common Council." **(Buliox Supp. Decl. at ¶ 7, Ex. F -- von Briesen Nov. 16, 2022 Engagement Letter.)**

19. Plaintiff was required to participate in an interview with Jill Hall as an essential job duty. **(ECF No. 13 at ¶ 84 and 13-4.)**

20. In fact, the letter issued to Plaintiff from the City notified him that the interview and requirements related thereto were part of his essential job duties. **(ECF No. 13-4.)**

21. Plaintiff secretly recorded his interview with Attorney Hall. **(Buliox Supp. Decl. at ¶ 3, Ex. B -- Pelishek Dep. 128-132.)**

22. Plaintiff acknowledged that the recording of his interview with Attorney Hall was accurate, unaltered, and a true representation of what was said. **(Buliox Supp. Decl. at ¶ 3, Ex. B -- Pelishek Dep. 185-186)**

23. When Jill Hall asked if Emily Rendall-Araujo had asked "'[a]re things being said?' or '[w]hat was being said?'" during the neighborhood association meetings, Plaintiff answered "I'm pretty sure she said, '[w]hat is being said?'" **(ECF No. 127-2, ~ timestamp 0:32:40-35:40 -- Recording of Hall Interview.[2])**

24. "Emily asked him what was being stated and he said, '[t]here is people saying that they don't want,' quote/unquote, 'N-I-G-E-R' -- misspelled – and I'm not going to say the word because I've been chastised for it -- living in their neighborhoods.'" **(ECF No. 127-2 ~ timestamp 0:32:40-35:40 -- Recording of Hall Interview.)**

25. Attorney Jill Hall asked Plaintiff a follow up question to find out if he said the full n-word first when he told the group about the incident or if he started by saying "n-word," in quotation marks, and then said the full word upon further questioning and Plaintiff confirmed to Attorney Hall that he said the full n-word first. **(ECF No. 127-2 ~ timestamp 0:32:40-35:40 -- Recording of Hall Interview.)**

26. During his interview with Attorney Hall, Pelishek conveyed to Attorney Hall that Guevera and Haack told Wolf that the City needed to hire a DEI HR Director that could help lead

---

[2] Interview with Jill Hall and Chad Pelishek, produced by Plaintiff as MM PEL0004, and attached as Exhibit 2 to the Declaration of Chad Pelishek and marked as ECF No. 127-2. This same recording was also produced in the Wolf litigation as MM Wolf 0007 and is referred to in Pelishek's deposition using that bates number.

the City's DEI initiatives and that the City would need at least $70,000 to hire a consultant to get this going. **(ECF No. 127-2 ~ timestamps 1:06:45-1:07:32 -- Recording of Hall Interview.)**

27. Attorney Hall asked Plaintiff, "Did they say -- did Ale or Jamie make any threats toward Todd in any way during the meeting?" Plaintiff answered "Well, I mean, in the beginning they said that they -- you know -- that the city needed to -- you know, that he basically failed for not putting money in the budget to hire outside consultants and that it's going to take money to do this and until he -- you know, since he does the budget, until he, you know, puts money in there, this DEI initiative is never going to be anything and it's going to fall on his shoulders. So I don't know if you consider that to be a threat. I mean, they basically said they wanted money, and the reason they wanted the money was to do those three things that I said." **(ECF No. 127-2 ~ timestamp 1:15:03-1:16:00 -- Recording of Hall Interview.)**

28. Attorney Hall asked Plaintiff "[d]o you recall them [Haack and Guevera] saying that if Todd didn't pay them that they would publicly oppose him?" **(ECF No. 127-2 ~ timestamp 1:16:00-1:16:26 -- Recording of Hall Interview.)** Plaintiff responded "Yes, that was said." **(ECF No. 127-2 ~ timestamp 1:16:26-1:16:40 -- Recording of Hall Interview.)**

29. When asked for the context of the answer made in the statement above, Plaintiff stated, in part, "'If this city doesn't embrace this, you know, the groups -- these groups are going to come out and, you know, oppose what the city is doing and not support any of it.'" When questioned further "[w]hen you say 'the city doesn't embrace this,' do you mean the fact that there needs to be budgeting for these efforts?" Plaintiff responded "[y]es. And that there's been limited dollars put in the budget and that it was Todd's fault because he puts the budget together and he didn't put the money in there." **(ECF No. 127-2 ~ timestamp 1:16:40-1:18:54 -- Recording of Hall Interview.)**

30. Plaintiff received the February 7, 2023 email and the March 8, 2023 email at his City email address in his capacity as Planning and Development Director of the City. **(ECF No. 118-7, pp. 84, 89 -- Pelishek Dep. 421, 426.)**

31. Plaintiff admitted that the February 7, 2023 email and the March 8, 2023 email did not prevent him from retaining an attorney to represent him in relation to his interview with Attorney Hall or in relation to the Hall investigation. **(ECF No. 117 at ¶ 72 -- DPFOF 72; ECF No. 118-7, pp. 86-87 -- Pelishek Dep. 423-424; ECF No. 13-5 -- February 7, 2023 Email.)** In fact, Plaintiff's interview with Attorney Hall was completed in November 2022, well before the February 7, 2023 email was sent. **(ECF No. 13, ¶¶ 84-92 -- Pl.'s Am. Compl.; ECF No. 117 at ¶ 72 -- DPFOF 72; ECF No. 118-7, pp. 86-86 -- Pelishek Dep. 423-424.)**

32. Plaintiff retained Attorney DeMaster in November 2022. **(ECF No. 117 at ¶ 73; ECF No. 118-7 at pp. 86-87 -- Pelishek Dep. 423-424; Buliox Supp. Decl. at ¶ 3, Ex. B -- Pelishek Dep. 28.)**

33. HR Director Adam Westbrook ("Westbrook') and Sorenson met with Plaintiff shortly after Wolf filed his lawsuit (on February 6, 2023) to let Plaintiff know that he had been specifically mentioned in the Complaint. **(ECF No. 39 at Answer to ¶ 117 -- Defs.' Answer to Compl.)**

34. Plaintiff admitted during his deposition that during the February 2023 meeting referenced in the statement above, "he may have referenced that he needed to seek an attorney." On further questioning, Plaintiff acknowledged that he could not confirm whether he made that statement at the meeting where Westbrook and Sorenson told him about Wolf's lawsuit or the following meeting on March 7, 2023. **(Buliox Supp. Decl. at ¶ 4, Ex. C -- Pelishek Dep. 347-348.)**

35. Sorenson and Westbrook did not say anything else at the February meeting referenced in the statement above. **(Buliox Supp. Decl. at ¶ 4, Ex. C -- Pelishek Dep. 347-348.)**

36. During the March 7 2023 meeting with Sorenson and Westbrook, where Plaintiff was provided with a copy of the Hall report, Plaintiff did not make any statements to them that the Hall report contained false information, omitted key facts or misrepresented his testimony from his investigation interview. **(Sorenson Supp. Decl. at ¶¶ 4-5; Buliox Supp. Decl. at ¶ 4; Ex. C, pp. 348-349 – Pelishek Dep.)**

37. On March 8, 2023, City Attorney Adams ("Adams") lawfully authorized the release of Hall's investigation report as required under the state public records law in response to open records requests received by the City of Sheboygan. **(*Wolf*, 23-cv-149, ECF No. 65 at Answer to ¶ 259 -- Defs.' Answer to Pl.'s Am. Compl; ECF No. 120, p. 2 -- Adams Decl., ¶ 7.)**

38. Attorney Hall stated in her report that "sufficient evidence existed to call into question Wolf's claim that Guevara and Haack demanded $70,000 from him on October 5, 2022. Attorney Hall noted that the women's attorneys had filed a cease and desist letter to the City based on the repeated published claims of bribery and extortion by Wolf creating liability risk for the City." **(*Wolf*, 23-cv-149, ECF No. 36, Ex. 15 p. 5 -- Hall Report.)** Attorney Hall further noted in her report that "there was sufficient evidence to warrant a hearing to determine whether or not Wolf chose to single out Rendall-Araujo with the press and in the public in violation of City policies against retaliation, harassment and insubordination and also in violation of the Council directive not to discuss City matters with the press." **(*Wolf*, 23-cv-149, ECF No. 36, Ex. 15 p. 4 -- Hall Report.)**

39. Plaintiff admitted that there were no false statements in the Hall report related to information he provided to Attorney Hall during his witness interview. **(Buliox Supp. Decl. at ¶ 4, Ex. C -- Pelishek Dep. 354-361.)**

40. The March 8, 2023 email directed City employees to refrain from commenting about matters related to Todd Wolf or any business of the City relating to Todd Wolf to anyone without the

presence of an attorney on behalf of the City because of the Wolf litigation. **(ECF No. 118-7, pp. 89 -- Pelishek Dep. 426.)**

41. Plaintiff admitted that there was nothing in the March 8, 2023 email which said that he could not talk about the Hall report. (**ECF No. 118-7, pp. 98-99 -- Pelishek Dep. 477-478.**)

42. Plaintiff admitted that the February 7, 2023 email and the March 8, 2023 email did not prevent him from speaking to anyone other than Wolf and Attorney DeMaster about any subject matter. **(ECF No. 118-7, pp. 98-99 -- Pelishek Dep. 477-78; ECF No. 118-7, pp. 84, 91 -- Pelishek Dep. 421, 428.)**

43. Plaintiff testified that after the March 8, 2023 email and before his resignation, he spoke with his wife, Carrie Arenz, Joe Folgers, employees in the planning and development department, Aaron Guenther, and Ross Otten about both the Wolf litigation and the allegations contained in his own litigation. (**ECF No. 118-7, ¶¶ 91-93 -- Pelishek Dep. 428-430.**)

44. A majority of the March 8 email was dedicated to explaining why the City was releasing the Hall investigation report and the process involved. **(ECF No. 13-6 -- March 8, 2023 Email.)**

45. While the email encouraged City directors to refer people that asked about the investigation report to the document itself and encouraged them to say that they were not the best person to discuss the report with them, it did not require them to do so. **(ECF No. 13-6 - March 8, 2023 Email.)**

46. The March 8, 2023 email did not restrict City employees from speaking to the media or the public. **(ECF No. 13-6 -- March 8, 2023 Email; ECF No. 118-7, p. 91 -- Pelishek Dep. 428.)**

47. When Plaintiff received the February 7, 2023 email, he did not speak with Assistant City Attorney Liz Majerus or Westbrook to inform them that he had retained Attorney DeMaster to

represent him and needed to be able to speak with Attorney DeMaster. **(ECF No. 118-7, pp. 85-90 -- Pelishek Dep. 422, 427.)**

48. Plaintiff testified that "what led to the FMLA" was a meeting that he had with Sorenson and Westbrook on March 7, 2023 where they provided him with a copy of the Hall report to review and he realized that the Hall report was not going to exonerate him. **(Buliox Supp. Decl. at ¶ 4, Ex. C -- Pelishek Dep. 348-351.)**

49. Plaintiff resigned effective May 12, 2023 and upon his resignation was no longer a city employee subject to the alleged directives in the February 7 and March 8 emails. **(ECF No. 13 at ¶ 144 -- Pl.'s Am. Compl.)**

50. Plaintiff resigned because he believed that Defendants were saying that he was suspected of misconduct and implying that he was suspended rather than on leave and that he would be falsely accused of misconduct with no chance to defend himself. **(ECF No. 13 at ¶¶ 143-144, Pl.'s Am. Compl.)**

51. Plaintiff further speculated that he was going to be fired when he returned to work from his FMLA leave because he had watched what happened to Wolf and thought there was a good chance that he would be next. **(Buliox Supp. Decl. at ¶ 4, Ex. C -- Pelishek Dep. 368-369.)**

52. Plaintiff further testified that he thought he would be fired upon his return to work because his access to his City email address had been shut off while he was on FMLA leave. **(ECF No. 118-7, pp. 57-60 -- Pelishek Dep. 365-368.)**

53. Pelishek admitted that no one told him he would be fired and he had no evidence to support his speculation that he was be fired upon his return from FMLA leave. **(ECF No. 118-7, pp. 60-61 -- Pelishek Dep. 368-369.)**

54. Plaintiff repeatedly testified that his interest in speaking about the racial slur incident and the Hall report was to address his own concern that the public perceived him to be a racist. **(Buliox Supp. Decl. at ¶¶ 3, 4, Ex. B, C -- Pelishek Dep. 213 - 214; 281-284; 436-437; 451-454.)**

55. The City had experienced significant disruption in the workplace as a result of the racial slur incident as well as the Hall investigation which culminated in Wolf's termination and subsequent litigation. **(ECF No. 128-3; ECF No. 128-4; Majerus Decl. at ¶ 3; Video from Common Council meetings on 10/17/2022 -- https://youtu.be/3T9nkJknLCI), and 1/9/2023 (https://youtu.be/8bFMX8xqeuU.)**

56. According to Plaintiff, his involvement in the racial slur incident and the resulting media attention negatively impacted his ability to perform his job. **(Buliox Supp. Decl., at ¶ 8, Ex. G -- MM PEL 003 ~ timestamp 02:09-19:50.)**

57. With respect to the February 7 and March 8 emails, the City has an interest in ensuring workplace harmony and reducing disruption of City employees' abilities to perform their duties. **(Majerus Decl. at ¶ 4.)**

58. With respect to the February 7 and March 8 emails, the City had an interest in ensuring that Plaintiff, a management level employee, whose words and actions could bind the City, did not speak about Wolf's active litigation filed against the City with Wolf or his attorney; requiring notification of contact by Wolf or his attorney to the City Attorney's office and requiring that communications about Wolf or City business involving Wolf occur in the presence of the City's attorney. **(Majerus Decl. at ¶ 5.)**

59. After receiving the February 7 and March 8 emails, Plaintiff did not contact Assistant City Attorney Majerus or former HR Director Westbrook to inform them that he had retained Wolf's counsel, Attorney DeMaster, as his own attorney and would need to communicate with Attorney DeMaster. **(ECF No. 117 at ¶¶ 75, 84.)**

60. The February 7 and March 8 emails had a built in temporal limitation. The directives no longer applied, if you were not a City employee/director or the Wolf litigation concluded, whichever occurred first. **(ECF Nos. 13-5, 13-6.)**

61. Plaintiff had no personal interest in being able to speak with Todd Wolf or his attorney on or after February 7, 2023, and testified at his deposition that "I had no personal interest in speaking with them even though Ms. DeMaster was my attorney." **(ECF No. 118-7, pp. 84-85 -- Pelishek Dep. 421-422.)**

62. Plaintiff had no personal interest in speaking with Todd Wolf outside of the presence of City attorneys. **(ECF No. 118-7, pp. 89-90 -- Pelishek Dep. 426-427.)**

63. Plaintiff stated that the extent of his personal interest in speaking with Todd Wolf's attorney outside of the presence of City attorneys was as Plaintiff's personal counsel. **(ECF No. 118-7, pp. 90 -- Pelishek Dep. 427.)**

64. According to Plaintiff, who had been employed with the City for 16 years at the time the February 7 and March 8 emails were issued, the City had not issued any other city wide communications restraining employees from speaking about other litigation filed against the City. **(ECF No. 39 at ¶ 120 -- Pl.'s Am. Compl.)**

65. Plaintiff resigned his employment effective May 12, 2023, and upon his resignation was no longer a city employee subject to the alleged *directives* in the February 7 and March 8 emails. **(ECF No. 13 at ¶ 144 -- Pl.'s Am. Compl.)**

66. The Wolf litigation, which served as the impetus behind the February 7 and March 8 emails, resolved on June 18, 2024. **(*Wolf*, 23-cv-149, ECF No. 106 -- Dismissal.)**

67. Plaintiff was unable to identify any injuries or damages that he sustained as a result of either the February 7, 2023 email or the March 8, 2023 email which form the basis of his First Amendment prior restraint claims. **(ECF No. 118-7, pp. 94-97 -- Pelishek Dep. 436-439.)**

Dated this 11th day of April, 2025.

    Respectfully submitted by,

    **MWH Law Group LLP**

By:    */s/ Warren E. Buliox*
    Warren E. Buliox
    Kerrie Murphy
    Julie Bittner
    Emery Harlan
    735 N. Water Street, Suite 610
    Milwaukee, WI 53202
    (414) 436-0353 Phone
    (414) 436-0354 Facsimile
    warren.buliox@mwhlawgroup.com
    kerrie.murphy@mwhlawgroup.com
    julie.bittner@mwhlawgroup.com
    emery.harlan@mwhlawgroup.com

    **COUNSEL FOR DEFENDANTS CITY OF SHEBOYGAN, RYAN SORENSON, CHARLES ADAMS AND EMILY RENDALL-ARAUJO**