# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

-----------------------------------------------------

CHAD PELISHEK,


        Plaintiff,           CONFIDENTIAL


   -vs-                Case No. 2:23-CV-1048


CITY OF SHEBOYGAN, et al.,


        Defendants.

-----------------------------------------------------

        Examination of CHAD PELISHEK, taken at
the instance of the Defendants, under and pursuant to
the applicable Rules of Civil Procedure, before
SAMANTHA J. SHALLUE, a Registered Professional
Reporter and Notary Public in and for the State of
Wisconsin, at MWH Law Group, 735 North Water Street,

Suite 610, Milwaukee, Wisconsin, on July 31, 2024,

commencing at 10:10 a.m. and concluding at 4:49 p.m.


HUDSON COURT REPORTING & VIDEO     (800) 310-1769

**New York**      **Hudson Court Reporting & Video**      **New Jersey**
**212-273-9911**      **1-800-310-1769**      **732-906-2078**
Case 2:23-cv-01048-WED   Filed 04/12/25   Page 2 of 19   Document 151-2

1    Q    Did you use your personal e-mail account to

2         communicate with anyone besides your attorney

3         regarding your claims in the amended complaint?

4                   MS. DeMASTER:  Objection as to form

5         of the question.

6                   THE WITNESS:  I think I shared the

7         complaint with my mom through e-mail, Karen

8         Pelishek.

9    BY MS. MURPHY:

10   Q    Anything else?

11   A    No.

12   Q    When did you hire your attorney in relation to

13        the allegations you're asserting in this

14        litigation?

15                  MS. DeMASTER: Objection.  Objection.

16        This is privileged as far as when he

17        retained --

18   BY MS. MURPHY:

19   Q    I'm not asking you about anything you said to

20        her.  I'm asking you when you hired her.

21   A    November of 2022.

22   Q    Did you know Amanda Salazar before she was

23        elected as an alderperson?

24   A    Yes.

25   Q    And how did you know her?

1          MS. MURPHY:  Yep.

2          MS. DeMASTER:  He doesn't have this,

3     and he doesn't remember every single word he

4     said to Attorney Hall.

5  BY MS. MURPHY:

6  Q    You tape recorded your witness interview with

7       Jill Hall, didn't you?

8  A    Yes.

9  Q    And you did so without her knowledge, didn't

10      you?

11 A    Yes.

12 Q    In fact, she asked you if you were recording

13      that interview, and you told her that you were

14      not recording it, didn't you?

15 A    I don't know.

16 Q    Would you like to hear the tape to refresh your

17      recollection, or do you recall telling her that

18      you were not recording it?  You can answer the

19      question.

20 A    I may have said that.

21 Q    Did anyone tell you to record your interview

22      with Attorney Hall?

23 A    No.

24 Q    So you just decided on your own to record your

25      interview with Attorney Hall?

1          MS. DeMASTER:  I'm just going to go

2     ahead and reiterate another objection.  If any

3     of these questions are going to call for

4     attorney-client -- my client's already answered

5     the question, and we're trying to answer right

6     now and object.

7          MS. MURPHY:  What's your objection?

8          MS. DeMASTER:  I'm saying I'm going

9     to go ahead and reiterate the fact that I have

10    told my client to not answer anything that

11    might ask for anything attorney-client

12    privilege, work product, communications,

13    anything like that.  So he's going to answer

14    questions outside of that.

15         MS. MURPHY:  So you're objecting to

16    my question about whether or not --

17         MS. DeMASTER:  Not a specific

18    question.  I am objecting on general grounds.

19         MS. MURPHY:  Well, I need you to

20    object to a specific question.  I don't need

21    general grounds for an objection.

22         MS. DeMASTER:  I'm objecting on

23    general grounds.

24         MS. MURPHY:  So you don't have an

25    objection to this specific question?

1          MS. DeMASTER:  That objection

2     includes that specific question and other

3     specific questions.

4          MS. MURPHY:  So you are objecting

5     based on attorney-client privilege to whether

6     or not anyone told him to record the interview?

7          MS. DeMASTER:  I am reiterating a

8     past general objection that will go to any

9     question that might ask that.

10    BY MS. MURPHY:

11    Q    What device did you use to record your

12         interview with Attorney Hall?

13    A    Cell phone.

14    Q    Did you plan to record it when it started, or

15         did you decide during the interview to go ahead

16         and hit "record"?

17    A    At the beginning.

18    Q    So I'm going to introduce -- and I've got

19         copies of these audio recordings on a flash

20         drive that we can mark.  This is actually

21         WOLFMM00007.  I believe it is also PELISHEK004,

22         but I didn't get that till last night, so I'm

23         sorry about that.

24          MS. DeMASTER:  Let me just object

25     because he might not know every number, and I

1    don't believe that's accurate.  You said this

2    is Wolf's?  What did you say about Wolf?

3            MS. MURPHY:  The Pelishek recording

4    of his interview with Attorney Hall was

5    provided in Wolf.

6            MS. DeMASTER:  Okay.  Just asking for

7    clarification.

8            MS. MURPHY:  So for purposes of

9    identifying the document it is WOLFMM00007.

10           MS. DeMASTER:  I see.

11           MS. MURPHY:  Which is also -- the

12   same recording was produced that I got late

13   yesterday, PELISHEK004.

14           MS. DeMASTER:  I see.  Thank you for

15   clarifying.

16           MS. MURPHY:  You are welcome, and I'm

17   going to play timestamp 8:19 to 8:22 into the

18   record.

19           (Discussion off the record.)

20           (Exhibit No. 3 was marked.)

21           MS. MURPHY:  It's actually starting

22   at 8:12.  I can't get it any closer than that.

23           MS. DeMASTER:  That's fine.

24           (Audio recording was played.)

25   BY MS. MURPHY:

1   Q   So does that refresh your recollection that you

2         told Attorney Hall that you were not recording

3         this interview?

4   A   Yes.

5   Q   And you did that eight minutes into your

6         interview with her, correct?

7   A   Yes.

8   Q   And the interview went for an hour and 50-plus

9         minutes.  If that's what the audio recording

10        shows, would you have any reason to dispute

11        that?

12   A   No.

13   Q   Did you tell Jill Hall that Emily asked you

14        what was being stated and you said "There is

15        people saying that they don't want,"

16        quote/unquote, "N-I-G-E-R" -- misspelled --

17        "and I'm not going to say the word because I've

18        been chastised for it -- living in their

19        neighborhoods"?

20            MS. DeMASTER:  Objection as to form;

21        foundation.

22  BY MS. MURPHY:

23   Q   Do you recall making that statement?

24   A   Yes.

25   Q   And isn't it true that Attorney Hall asked you

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Case 2:23-cv-01048-WED   Filed 04/12/25   Page 8 of 19   Document 151-2

1    break.

2                        (Brief recess taken.)

3                        MS. MURPHY:  We are back on the

4         record.

5    BY MS. MURPHY:

6    Q    I want to talk about the October 5th, 2022,

7         lunch with Jamie Haack and Ale Guevara.  Who

8         was involved in getting a meeting scheduled

9         with Jamie and Ale on October 5th of 2022?

10   A    Abby Block.

11   Q    You and Todd were not involved in that?

12   A    Well, we talked about getting together with

13        them after we had a previous meeting with

14        Kristin Stearns.

15   Q    And so you first tried to meet with Kristin

16        Stearns, and why were you trying to meet with

17        Kristin Stearns?

18   A    Because somebody suggested that maybe the

19        Lakeshore Community Health organization could

20        help do some training of city employees.

21   Q    So did Lakeshore Community Health Care provide

22        community outreach services?

23   A    Yes.

24   Q    And did you ask -- and is Kristin Stearns --

25        what's her position with Lakeshore Community

1    Health Care?

2  A  President.

3  Q  Did you ask her if Lakeshore Community Health

4    Care would be willing to partner with the City?

5  A  Yes.

6  Q  And was that to provide training to both your

7    staff and neighborhood associations regarding

8    DEI, racial issues, that type of thing?

9  A  Yes.

10  Q  Okay.  And when did you start investigating

11    that with Kristin Stearns?

12  A  I don't know the exact day.

13  Q  It was after the racial slur incident, though,

14    right?

15  A  I believe so, yes.

16  Q  So after that time the city administrator began

17    looking for resources for both your department

18    and, you know, that could help you with the

19    neighborhood associations; is that right?

20  A  Yes.

21  Q  And why didn't you move forward with Lakeshore

22    Community Health Care?

23  A  Because she told us she needed to get her house

24    in order before she could do community

25    outreach.

New York       Hudson Court Reporting & Video       New Jersey
212-273-9911        1-800-310-1769        732-906-2078
Case 2:23-cv-01048-WED   Filed 04/12/25   Page 10 of 19   Document 151-2

1   Q    So they couldn't help you with the services

2         that you were seeking, right?

3   A    Yes.

4   Q    And did Kristin then refer you to Jamie?

5   A    Yes.

6   Q    And was Kristin Stearns part of the Sheboygan

7         DEIB group?

8   A    Yes.

9   Q    Okay.  How did -- did Kristin facilitate an

10        introduction to Jamie Haack for you?

11   A    Yes.

12   Q    Did you know Jamie Haack before you met with

13        her on October 5th of 2022?

14   A    Yes.

15   Q    How did you know her?

16   A    From the John Michael Kohler Arts Center.

17   Q    Is that where she works?

18   A    Yes.

19   Q    Okay.  Who contacted Jamie Haack to try to

20        schedule a meeting with her?

21   A    Abby Block.

22   Q    And did Abby do that at your direction?

23   A    I believe at mine and Todd's.

24   Q    Because you're Abby's immediate boss, right?

25   A    Yes.

**New York**          **Hudson Court Reporting & Video**          **New Jersey**
**212-273-9911**          **1-800-310-1769**          **732-906-2078**
Case 2:23-cv-01048-WED    Filed 04/12/25    Page 11 of 19    Document 151-2

1    Q    And was that contact by phone or by e-mail?

2    A    I don't know.

3         (Exhibit No. 10 was marked.)

4    BY MS. MURPHY:

5    Q    I'm handing you Deposition Exhibit 10.  Take a

6         moment to review it and let me know when you're

7         done.

8    A    Okay.

9    Q    So is this the e-mail correspondence where

10        Kristin Stearns facilitates an introduction

11        between you, Todd, Abby, and Jamie Haack?

12   A    On September 13th?

13   Q    And then Todd responds that he's looking

14        forward to meeting Jamie and outlining some of

15        the needs that the City has; is that right?

16   A    Yes.

17   Q    And Jamie indicates that she's -- on behalf of

18        the SDEIB initiative she's happy to coordinate

19        a time for all of you to meet and update one

20        another on approaches for community equity work

21        in Sheboygan; is that right?

22   A    Yes.

23   Q    Okay.  When the meeting was finalized, the

24        meeting date, Jamie told you that Ale would be

25        attending the meeting with her, didn't she?

1    A    I don't believe so.

2              (Exhibit No. 11 was marked.)

3    BY MS. MURPHY:

4    Q    You're being handed Deposition Exhibit 11.

5         Take a moment to look at it and let me know

6         when you've reviewed it.

7    A    Okay.

8    Q    Okay.  So on Page 2 of Exhibit 11 Jamie Haack

9         sends an e-mail on September 28th at 3:54 p.m.;

10        is that correct?

11   A    Yes.

12   Q    And it's to Abby, and it copies you and Todd

13        and Ale Guevara; is that right?

14   A    Yes.

15   Q    And in that she says in the first line "It

16        would be great for myself and Ale Guevara to

17        meet with you on 10/5 at noon"; is that

18        correct?

19   A    Yes.

20   Q    So you did -- were aware that Ale Guevara was

21        going to be at that October 5th lunch before

22        you arrived, correct?

23   A    I guess so.  I didn't recall this e-mail.

24   Q    Who attended the lunch on behalf of the City on

25        October 5th?

1    A    Myself, Todd Wolf, and Abby Block.

2    Q    And why did the three of you want to meet with

3         them?

4    A    Because we were looking for resources to help

5         educate city staff on neighborhoods.

6    Q    Were you interested in doing some community

7         outreach around race and ethnicity and

8         diversity?

9    A    Yes.

10   Q    What happened during the meeting on

11        October 5th?

12   A    There was discussion about some of the concerns

13        and things that were going on at the City, and

14        then there was discussion about if there were

15        any resources with the group, and basically

16        they stated that they were looking for funding

17        in order to move their initiatives forward,

18        that they were a separate group broken off from

19        the original DEI Collective.

20   Q    Jamie and Ale did not demand $70,000 from

21        Mr. Wolf at that meeting, did they?

22             MS. DeMASTER:  Objection as to

23        foundation.

24   BY MS. MURPHY:

25   Q    You were at the meeting, right?

```
1        Hall was that "If the City doesn't embrace
2        this, you know, these groups are going to come
3        out and, you know, oppose the City if they
4        don't support any of it," and "When you said
5        the City doesn't embrace this, do you mean the
6        fact that there needs to be budgeting for these
7        efforts," and you said "Yes," and that "There's
8        limited dollars in the budget and that it's
9        Todd's fault because he puts the budget
10       together and he didn't put the money in there
11       for it"?
12               MS. DeMASTER:  I'm going to object.
13       This has been asked and answered.  Once again,
14       this is badgering of him.  You subjectively
15       believe something.  We have heard the
16       recording.  He's answered this.  It's been
17       asked and answered.
18  BY MS. MURPHY:
19  Q    You would acknowledge that the recording is a
20       true and accurate copy -- or a true and
21       accurate recording of what you said during your
22       interview with Jill Hall?
23  A    Yes.
24  Q    Since you recorded it?
25  A    Yes.
```

1    Q    And you didn't alter it at any time after you

2         made the recording, correct?

3    A    Correct.

4    Q    Okay.  Do you know whether the Sheboygan DEIB

5         group is different from the Sheboygan

6         Collective?

7    A    I believe so.

8    Q    Okay.  Do you know whether Todd put money in

9         the budget for all-staff training?

10             MS. DeMASTER:  Objection as to

11        foundation; form.

12             THE WITNESS:  I don't believe so.

13   BY MS. MURPHY:

14   Q    You don't believe he put money in the budget

15        for all-staff training?

16   A    I don't know if he put money in the budget.

17   Q    Well, training was provided to all staff when

18        Todd was city administrator for annual

19        discrimination and harassment, training with

20        Alonzo Kelly for microaggression, correct?

21   A    Yes.

22   Q    And there was additional training on mental --

23        I think it was emotional intelligence and other

24        training provided to management, correct?

25   A    Yes.

1          MS. DeMASTER:  Objection; asked and

2     answered.

3          MS. MURPHY:  You can answer.

4          THE WITNESS:  The Mayor.

5    BY MS. MURPHY:

6    Q    Did both you and Todd engage in discussions

7         with Kristin Stearns and Jamie Haack and Ale

8         Guevara trying to look into the issue -- the

9         neighborhood association issue and ways to

10        assist them?

11   A    Yes.

12   Q    And you did that in your official capacity in

13        your city employment, correct?

14   A    Yes.

15   Q    The next thing you allege in your answer to

16        Interrogatory No. 4 in relation to the -- what

17        the City of Sheboygan did is that they

18        "condoned the harassment and false

19        allegations/public outcry of racism while

20        refusing to publish any correction to the

21        narratives and facilitating/financing a public

22        investigation only to protect" -- you say

23        "Rendall."  You're referring to Emily

24        Rendall-Araujo, though, correct?

25   A    Yes.

1   Q    Okay.  Do you recall receiving an e-mail that

2          Todd Wolf sent to all city users on

3          September 23 of 2022 where he informed all city

4          users that you were asked to describe the

5          situation occurring in the community and you

6          said a racial slur matching what was used in

7          the actual incident?  Do you recall him saying

8          that in an e-mail?

9   A    I recall that dialogue, but I don't know the

10         actual date of the e-mail.

11   Q    Okay.  So if that's what the e-mail says, you

12         wouldn't dispute it, that he shared that

13         information with all city users?

14   A    Correct.

15   Q    Okay.

16               MS. DeMASTER:  Are you referring to

17         Exhibit 15?

18               MS. MURPHY:  Nope, I'm not.  I'm

19         referring to an e-mail on September 23 of 2022.

20  BY MS. MURPHY:

21   Q    So what do you contend the City should have

22         done that they didn't do in relation to the

23         allegations in the article?

24   A    They should have released a statement that I

25         wasn't a racist.

**New York**               **Hudson Court Reporting & Video**             **New Jersey**
**212-273-9911**                     **1-800-310-1769**                 **732-906-2078**
Case 2:23-cv-01048-WED    Filed 04/12/25    Page 18 of 19    Document 151-2

1  Q  The article doesn't call you a racist, does it?

2  A  No, but the public perception was.

3  Q  What investigation are you referring to when

4     you claim that the City financed and

5     facilitated an investigation only to protect

6     Ms. Rendall-Araujo?

7  A  Can you provide where that is?

8  Q  It's at Page 17 of your answer to City

9     Interrogatory No. 4.

10 A  Jill Hall's investigation.

11 Q  Okay.  In relation to the -- the false

12    narrative that you say was occurring in the

13    media, didn't you really just want the articles

14    to stop and the -- the focus on it to stop?

15 A  Yes.

16 Q  So if the City had released a press release,

17    wouldn't that have just drawn more attention to

18    the situation?

19 A  I can't answer that.  I don't know.  It may

20    have; it may not have.

21 Q  Okay.  So in relation to Jill Hall's

22    investigation, do you have any evidence, other

23    than speculation, to support that the City

24    financed a sham -- a -- a sham investigation

25    only to protect Ms. Rendall-Araujo?