# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------

CHAD PELISHEK,

                                    CONFIDENTIAL

      Plaintiff,                  VOLUME II

      -vs-                 Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

      Defendants.

------------------------------------------------------

      Examination of CHAD PELISHEK, taken at the instance of the Defendants, under and pursuant to the applicable Rules of Civil Procedure, before SAMANTHA J. SHALLUE, a Registered Professional Reporter and Notary Public in and for the State of

Wisconsin, at MWH Law Group, 735 North Water Street,

Suite 610, Milwaukee, Wisconsin, on

September 12, 2024, commencing at 9:08 a.m. and

concluding at 4:59 p.m.

HUDSON COURT REPORTING & VIDEO      (800) 310-1769

**New York**              **Hudson Court Reporting & Video**           **New Jersey**
**212-273-9911**                 **1-800-310-1769**            **732-906-2078**
Case 2:23-cv-01048-WED    Filed 04/12/25   Page 2 of 27   Document 151-3

1           MS. DeMASTER:  Objection; form.

2           THE WITNESS:  I guess to clarify, I

3       misspoke.  I don't have any information.

4   BY MS. MURPHY:

5   Q    Okay.  And there was nothing in the articles

6       published in the media that was false about

7       you, correct?

8           MS. DeMASTER:  Objection; form.

9           THE WITNESS:  Which articles?

10  BY MS. MURPHY:

11  Q    The Sheboygan Press articles: October 10th,

12      October 26th, December 10th, I believe.  Any of

13      them.

14  A    As I stated previously and to add some

15      clarification, the -- the articles did not

16      share the context of the -- of the racial slur,

17      and it showed that I -- it insinuated I just

18      came into the meeting and issued a racial slur

19      unsolicited.

20  Q    You recall us going through these articles

21      during your last deposition, correct?

22  A    Yes.

23  Q    I'm going to hand you Deposition Exhibit 19

24      which is the Sheboygan Press article from

25      October 26th.  I'm going to refer you to Page 2

1    and have you read the first two paragraphs of

2    that article.

3              MS. DeMASTER:  I'm just going to

4         renew my objection as to foundation.  I believe

5         this article was edited, but subject to that

6         you can answer.

7              THE WITNESS:  Okay.

8    BY MS. MURPHY:

9    Q    That article does indicate the context of

10        the -- in which you repeated the n-word,

11        correct?

12   A    I believe so.

13   Q    There's nothing false in those two paragraphs

14        about what you said, correct?

15   A    Correct.

16   Q    Okay.  I'm going to have you take a look at

17        Exhibit 18 which is another article in the

18        Sheboygan Press and have you look at this

19        paragraph starting with "He did use the

20        phrase."  Read that for me.

21   A    Out loud?

22   Q    No, read it to yourself.

23   A    Okay.

24   Q    And Exhibit 18 also talks about your use of the

25        phrase, correct?

1   A    If that's Exhibit 18, yes.

2   Q    And it says that you said the word not with the

3        intent to hurt or harm anyone, but with the

4        intent to help others, correct?

5   A    Correct.

6   Q    Okay.  I'm going to have you look at Page 1 of

7        that same article in Exhibit 18, the third

8        paragraph starting with the word "Pelishek."

9   A    Okay.

10   Q    And that paragraph makes clear that you said

11        the slur while quoting a resident's comment

12        from a neighborhood meeting, correct?  Correct?

13   A    Yes.

14   Q    And that you did so to provide an example --

15        you used the offensive word as an example of a

16        racist incident brought to your attention and

17        asked other department heads how the City could

18        help address the issue; is that accurate?

19   A    Yes.

20   Q    So once again it explained the context in which

21        you used the slur, correct?

22            MS. DeMASTER:  Objection; form.

23  BY MS. MURPHY:

24   Q    Correct?

25   A    I believe so.

**New York**           **Hudson Court Reporting & Video**           **New Jersey**
**212-273-9911**           **1-800-310-1769**           **732-906-2078**
Case 2:23-cv-01048-WED   Filed 04/12/25   Page 5 of 27   Document 151-3

1    Q    And it didn't contain any false information,

2        correct?

3    A    I believe so.

4    Q    You believe that it did contain false

5        information or it did not?

6    A    That it did not.

7    Q    Okay.  What information do you have to support

8        your allegation that Mayor Sorenson asked the

9        public to send outraged e-mails to council

10       about your purported racism?

11   A    Well, there was a -- I don't know if these --

12       I -- there were comments made at that council

13       meeting about people that had contacted

14       alderpersons and that alderpersons had said

15       that they received communications from the City

16       that they should submit concerns that they

17       have.

18   Q    So they got a communication from the City to

19       submit concerns that they had, correct?

20   A    I guess I'm not sure of the definition of

21       "concerns."

22   Q    Do you have any evidence that Mayor Sorenson

23       asked citizens to send outraged e-mails about

24       you?

25           MS. DeMASTER:  Objection; form.

**New York**            **Hudson Court Reporting & Video**           **New Jersey**
**212-273-9911**            **1-800-310-1769**           **732-906-2078**
Case 2:23-cv-01048-WED   Filed 04/12/25   Page 6 of 27   Document 151-3

1          the mayor, Adam Westbrook, and yourself?

2     A    I don't believe so.

3     Q    What did you say in response to their comment

4          that you would be the main witness in that

5          lawsuit?

6     A    I didn't understand the reason why it would

7          have been -- why I would have been the main

8          witness, and I may have referenced that I

9          needed to seek an attorney.

10    Q    You don't recall if you said that or not?

11              MS. DeMASTER:  Objection; misstates

12         testimony.

13              THE WITNESS:  I can't confirm if it

14         was at that meeting or the following meeting

15         after that.

16    BY MS. MURPHY:

17    Q    Okay.  And did the mayor or Adam Westbrook say

18         anything else in that meeting?

19    A    Related to?

20    Q    Anything.  I mean, did they say anything else

21         during that meeting?

22    A    I don't believe so.

23    Q    Did you say anything else during that meeting?

24    A    I'm not sure.

25    Q    As you sit here today, can you recall saying

1      anything else during that meeting?

2   A  I'm not sure.

3   Q  Did you record that meeting?

4   A  I did not.

5   Q  You referenced another meeting.  When was the

6      next meeting that you had with Mr. Westbrook?

7   A  The last meeting was when the Hall report was

8      released.

9   Q  Where did that meeting take place?

10  A  In my office.

11  Q  Who was present?

12  A  Mayor Sorenson, Adam, and myself.

13  Q  What was said by the mayor and Adam?

14  A  That the Hall report -- actually, Adam gave me

15     a copy of the Hall report to read, and when I

16     read it I almost lost it because it did not

17     reference anything that I had stated in my

18     review and it insinuated that I was a racist.

19  Q  So after they handed you the report and you

20     read it, what was said?

21  A  I said that I will need to get an attorney and

22     that this will be figured out in court at which

23     time Mr. Westbrook asked Mr. Sorenson to leave

24     the room.

25  Q  And did the mayor say anything during that

1    meeting?

2  A    I don't recall.

3  Q    So as you sit here today you don't recall him

4       saying anything?

5            MS. DeMASTER:  Objection; asked and

6       answered.

7            THE WITNESS:  I don't recall him

8       saying anything.

9  BY MS. MURPHY:

10 Q    Okay.  So what did Adam say during that

11      meeting?

12 A    He referenced the fact that there was

13      discussion in the Hall investigation about the

14      demand for money at the -- with the DEI group

15      and that that didn't align with the testimony

16      that I had previously told him, and he was

17      trying to -- he was trying to understand which

18      information was correct.

19 Q    And how did you respond?

20 A    I think I then responded that it'll have to be

21      figured out in court.

22 Q    Did either of you say anything else during that

23      meeting?

24 A    I don't believe so.  I don't know.

25 Q    Did you record that meeting?

1    A    I did not.  I just want to clarify that I had

2         hoped that that Hall investigation was going to

3         be released, number one, without names because

4         we were led to believe by Attorney Adams that

5         the names would be redacted, and the names were

6         not redacted, and when I read the report and it

7         said that I uttered a racial slur with no

8         context to that I felt that this -- and read

9         further that it was retaliation against -- it

10        was an investigation into Todd Wolf's things

11        against Emily for retaliation, and there was no

12        exoneration in that report over what I had

13        said.  I at that point realized that the stress

14        and panic and anxiety and stuff was so much

15        that I needed to do something major, and it's

16        what led to the FMLA.

17   Q    So this meeting occurred on March 7th of 2023

18        according to your notes Bates stamped

19        PELISHEK000316.  When did you write down what

20        happened during that meeting?

21   A    Can I see the notes?

22   Q    Maybe.  Can you tell me when you wrote down

23        what happened during this meeting?

24   A    I can't tell you for sure.

25   Q    So did you write it down when you got back to

1          your office or shortly thereafter?

2    A    You're not going to let me see the notes to

3          refresh my memory?

4    Q    Well, I don't think you need them to answer

5          that question which is why I'm not giving them

6          to you.

7    A    Then I don't think I'm going to answer that

8          question.

9    Q    You don't have a choice.

10               MS. DeMASTER:  Sorry, just to

11         clarify, you're just asking, like, when he

12         wrote the notes?

13               MS. MURPHY:  When he wrote the notes.

14               THE WITNESS:  The notes are dated.

15   BY MS. MURPHY:

16   Q    March 7, 2023, at 12:00 p.m. is what you -- I

17         assume that's when the meeting took place.

18   A    I would have probably -- at that point I was

19         not writing the notes during the day.  I was

20         writing sticky notes and taking them home and

21         doing it in the evening.

22   Q    Okay.  So you would have written this note

23         after you got home that night?

24   A    Probably.

25   Q    Okay.  I'm handing you your notes and I'm

1    private investigation done by an outside law

2    firm that was hired by the common council to

3    investigate conduct of office over what a

4    newspaper article that's getting her

5    information secondhand is writing?

6  Q    So now -- I'm going to withdraw that question.

7         (Exhibit No. 24 was marked.)

8  BY MS. MURPHY:

9  Q    Mr. Pelishek, you have been handed Exhibit 24

10    which is a copy of the Hall report dated

11    February 6 of 2023.  I would like you to take a

12    review of this report and tell me what

13    information in here is factually inaccurate

14    about you.

15  A    The statement on Page 4 that says "However, in

16    the course of the investigation, no attendee of

17    the August 22, 2022, meeting, including

18    Mr. Pelishek himself, supported Wolf's repeated

19    assertion that Ms. Rendall-Araujo demanded that

20    Mr. Pelishek repeat the racial slur.  Evidence

21    suggests that Ms. Rendall-Araujo told Wolf on

22    August 24, 2022, that she went to her friends

23    group for advice on how to address the issue of

24    the director's use of the racial slur.

25    Evidence also suggests that Wolf continued to

1    publicly attribute untoward motives toward" --

2    oh, not that.  Stopping before that sentence.

3  Q  Okay.  So you believe that the first two

4    sentences of the third paragraph on Page 4 of

5    Ms. Hall's report refer to you and are

6    inaccurate?

7  A  That is correct.

8  Q  Okay.  Anything else?

9  A  So that it's not -- the other one is not

10    directly related to me, although it says "No

11    attendee of the August 5, 2022, meeting except

12    Wolf provided evidence supporting Wolf's claim

13    that the women demanded $70,000 from the City."

14  Q  Anything else?  Oh, and that's at Page 5?

15  A  Page 5 of 6.

16  Q  Page 5 of 6, the fourth paragraph, correct?

17    I'm counting the blocked one as a paragraph.

18  A  Yes.

19  Q  Okay.  Anything else?

20  A  It's the insinuation on Page -- where it uses

21    the word "utterance."

22  Q  What page are we talking about?

23  A  Page 3 of 6, the last sentence of the third

24    paragraph.

25  Q  Read the sentence to me.

1    A    "Evidence suggests that Ms. Rendall-Araujo

2         reported only to a group of five people on

3         August 22, 2022, but did not talk with the

4         media at any time of the matter of Pelishek

5         uttering a racial slur on August 22 of 2022."

6    Q    Okay.  Is that -- have you read the entire

7         report, and is that everything that you believe

8         includes information that --

9    A    There's another reference to that up in the

10        first paragraph on that same page.  "Among

11        other topics, he talked extensively about

12        personnel matters and discipline regarding a

13        director who disclosed Pelishek's utterance of

14        a racial slur in the media."

15   Q    Can you just show me where you're referring to?

16   A    (Witness indicates.)

17   Q    Okay.  Is that everything that you found in the

18        report that you take issue with?

19   A    I believe so.

20   Q    Okay.  So let's start with the first bullet on

21        Page 3, the one you just talked about, "Among

22        other topics, he talked extensively about

23        personnel matters."  "He" is Mr. Wolf in that

24        sentence, correct?

25   A    Yes.

1    Q    Okay.  So that sentence isn't -- you know,
2         refers to conduct that Mr. Wolf engaged in, not
3         that you engaged in, correct?
4    A    I believe so.
5    Q    And Mr. Wolf did talk about discipline
6         regarding a director who had disclosed your
7         utterance of a racial slur, didn't he?  I mean,
8         the statement's true.
9              MS. DeMASTER:  Objection as to form.
10             THE WITNESS:  I guess that's how you
11        interpret it, but I'm not going to agree with
12        that.
13   BY MS. MURPHY:
14   Q    Well, you've literally testified that one of
15        the allegations of harassment is that Mr. Wolf
16        was terminated because he was trying to pursue
17        discipline against Emily, right?  I mean, you
18        literally have said that earlier today, and
19        that's what this sentence says, correct?
20             MS. DeMASTER:  I'm just going to
21        object as to form.
22             MS. MURPHY:  You can answer.
23             MS. DeMASTER:  If you know you can
24        answer.
25             THE WITNESS:  I believe so.

1   BY MS. MURPHY:

2   Q    Okay.  So you are not aware of anything as you

3        sit here today that makes that sentence untrue,

4        correct?

5   A    I don't think so.

6   Q    I don't understand what your "I don't think so"

7        means.  Are you aware of any evidence that

8        makes that sentence incorrect?  Yes or no.

9   A    No.

10  Q    Okay.  Next one.  Further down on Page 3 of the

11       Hall report you said that the last sentence of

12       Paragraph 3 which says "Evidence suggests that

13       Ms. Rendall-Araujo reported only to a group of

14       five friends on August 22, 2022, but did not

15       talk with the media at any time on the matter

16       of Pelishek uttering a racial slur on

17       August 22, 2022."  That sentence relates to

18       Ms. Rendall-Araujo, not you, correct?

19  A    Correct.

20  Q    Okay.  So there's no false statement about you

21       in that sentence, is there?

22            MS. DeMASTER:  Objection.  That

23       misstates testimony.  You can answer.

24            MS. MURPHY:  You can answer the

25       question.

1          THE WITNESS:  Can you please repeat

2     it?

3 BY MS. MURPHY:

4 Q    Is there any false statement about you

5     contained in that sentence?

6 A    No.

7 Q    Let's turn to Page 4 of Ms. Hall's report.  The

8     next sentence you identified is in Paragraph 3

9     that says "However, in the course of the

10     investigation no attendee of the August 22,

11     2022, meeting, including Mr. Pelishek himself,

12     supported Wolf's repeated assertion that

13     Ms. Rendall-Araujo demanded" -- and that's in

14     quotes -- "that Mr. Pelishek repeat the racial

15     slur."  You recorded your interview with

16     Ms. Hall, didn't you?

17 A    Yes.

18 Q    So that -- and you recorded the whole thing,

19     correct?

20 A    Yes.

21 Q    So that recording is going to document what you

22     said during your interview with Ms. Hall,

23     correct?

24 A    I believe so.

25 Q    And you didn't do anything to alter that

1    recording, correct?

2  A    No.

3  Q    Okay.  You also indicated the next sentence

4    which is "Evidence suggests that

5    Ms. Rendall-Araujo told Wolf on August 24,

6    2022, that she went to her friends group for

7    advice on how to address the issue of the

8    director's use of a racial slur."  What does

9    that sentence have to do with you?

10  A    I think it just has to do with the fact that my

11    name is in there.

12  Q    It's not.  It says "the director's use of a

13    racial slur."  It doesn't say your name.

14  A    Well, it insinuates that because that was the

15    narrative that was in the public.

16  Q    Okay.  Is that the entire reason you identified

17    that as a sentence that related to you?

18  A    Yes.

19  Q    And you were not there during the meeting that

20    Emily had with Mr. Wolf, correct?

21  A    Correct.

22  Q    And you have no information to indicate that

23    that sentence is false, do you?

24  A    Correct.

25  Q    Okay.  I think the last bullet you identified

**New York**        **Hudson Court Reporting & Video**        **New Jersey**
**212-273-9911**        **1-800-310-1769**        **732-906-2078**
Case 2:23-cv-01048-WED    Filed 04/12/25    Page 18 of 27    Document 151-3

1       is on Page 5 of 6 where you say --

2                    MS. DeMASTER:  Just to clarify,

3       sorry, you were talking about the sentence

4       starting with "Evidence"?

5                    MS. MURPHY:  It's the very next

6       sentence in that paragraph.

7                    MS. DeMASTER:  Okay.  Sorry.

8    BY MS. MURPHY:

9    Q    I think the last sentence that you identified

10       that you took issue with in this report is on

11       Page 5 of 6 which said "No attendee of the

12       October 5, 2022, meeting except Wolf provided

13       evidence supporting Wolf's claim that the women

14       demanded $70,000 from the City."  Did I read

15       that accurately?

16   A    Yes.

17   Q    And, again, you recorded your interview with

18       Attorney Hall, so that --

19   A    And I clearly told her at that meeting, just

20       like I told you here, that I -- that they did

21       demand money.

22   Q    And the audio recording will be the evidence of

23       what you said during your interview with

24       Ms. Hall, correct?

25   A    I guess.

1       support your speculation that you would be

2       fired upon return from your FMLA leave?

3                   MS. DeMASTER:  Objection as to form.

4       You can answer.

5                   THE WITNESS:  I do not.

6   BY MS. MURPHY:

7   Q    Okay.  In Paragraph 143 of your amended

8        complaint you allege based on information and

9        belief that while you were on FMLA leave

10       defendants stated that you were suspected of

11       misconduct and implied that you were suspended

12       rather than on leave and you believed that you

13       would be publicly fired when you returned from

14       FMLA leave.  I'm going to show you that,

15       Paragraph 143.  Did any defendant make that

16       statement to you?

17  A    Not directly to me.

18  Q    What information do you have that any defendant

19       did make that statement?

20  A    There was information that I was on leave

21       because I embezzled money from the City, and it

22       came from a city representative.

23  Q    Who gave you that information?

24  A    An outside person.

25  Q    Provide me with the name of that person,

1       please.

2   A   Aaron Guenther through my legal counsel.

3   Q   And where did Mr. Guenther obtain this

4       information?

5   A   I can't --

6               MS. DeMASTER:  Objection as to form.

7               THE WITNESS:  I can't answer that

8       one.

9   BY MS. MURPHY:

10  Q   So you don't have any information to support

11      your allegation in Paragraph 143 based on your

12      own personal knowledge, correct?

13              MS. DeMASTER:  Objection --

14              THE WITNESS:  Well, Aaron Guenther --

15  BY MS. MURPHY:

16  Q   Do you have any personal knowledge to support

17      your allegation in Paragraph 143 of your

18      amended complaint?

19  A   No.

20  Q   Okay.  Did Aaron Guenther tell you directly

21      that you were on leave because you embezzled

22      money from the City?

23  A   Yes.

24  Q   So then why did you testify moments ago that

25      that information came from Mr. Guenther through

1  Q    That was told after the August 22nd meeting,
2       wasn't it?
3  A    I'm not sure about that.  Do you have any --
4  Q    The August 22nd, 2022, agenda does not indicate
5       that conversations made during -- or made
6       during that meeting are confidential, does it?
7  A    I don't know.  Can I see the information?
8  Q    I just need you to look just at that agenda.
9  A    I guess it doesn't use those exact words.
10 Q    So it doesn't indicate that anything said
11      during that meeting was confidential, correct?
12 A    Correct.
13 Q    Okay.  We're running out of time, so I'm going
14      to move on.  I want you to look at your answer
15      to Interrogatory No. 14 which asks you to
16      identify each and every fact you rely on to
17      support your prior restraint claim against the
18      City of Sheboygan in relation to your fourth
19      cause of action which involved a February 7th,
20      2023, e-mail.  It is on Page 11 of your
21      answers.  Take a look at your amended and
22      supplemented response and let me know if that
23      indicates or includes all of the factual
24      information you are relying on to support that
25      claim.

```
1    A     Yes.

2                (Exhibit No. 27 was marked.)

3    BY MS. MURPHY:

4    Q     You've been handed Deposition Exhibit 27 which

5          is a copy of the February 7, 2023, e-mail.

6          This was sent by Assistant City Attorney

7          Majerus and sent only -- and sent to all city

8          users, correct?

9    A     Yes.

10   Q     And it was sent to you in your capacity as

11         planning and development director, correct?

12   A     Yes.

13   Q     And it was sent to you at your official city

14         e-mail address; is that right?

15   A     Yes.

16   Q     And this e-mail only directs city employees to

17         have no communication with Mr. Wolf or his

18         attorney, Ms. DeMaster; is that correct?

19   A     Yes.

20   Q     What personal interest did you have in being

21         able to speak with Todd Wolf or his attorney?

22   A     When?

23   Q     On February 7th of 2023 or after.

24   A     What personal interest did I have?

25   Q     Yeah.
```

1   Q   "Including Wolf."  What city directives,

2       policies, and related practices do you claim

3       imposed blanket restrictions on your right to

4       associate and obtain legal counsel?

5   A   The February 7th directives.

6   Q   Is that it, just that single e-mail?

7   A   Yes.

8   Q   Okay.  And that e-mail didn't prevent you from

9       retaining Ms. DeMaster, did it?

10  A   No.

11  Q   Thank you.  I want you to take a look at your

12      answer to Interrogatory No. 15 which asks you

13      to identify every fact that you rely on to

14      support your prior restraint claim against the

15      City in relation to your fifth cause of action

16      which involves the March 8th e-mail.  Take a

17      look at your answer.

18          MS. MURPHY:  We'll go off the record

19      for a second.

20          (Discussion off the record.)

21  BY MS. MURPHY:

22  Q   Have you had a chance to review your answer?

23  A   Yes.

24  Q   The March 8th of 2023 e-mail was sent by former

25      HR Director Westbrook to all city users,

**New York**         **Hudson Court Reporting & Video**        **New Jersey**
**212-273-9911**         **1-800-310-1769**        **732-906-2078**
Case 2:23-cv-01048-WED    Filed 04/12/25    Page 24 of 27    Document 151-3

1     and expressions regarding Wolf, the report or

2     allegations related to matters of public

3     concern.  Explain to me what you rely on to

4     support your allegation that the false

5     statements ordinance -- that the false

6     statements ordinance has anything to do with

7     the March 8th, 2023, e-mail that Mr. Westbrook

8     sent?

9  A    Where did you read the --

10  Q    Paragraph 239.

11  A    And your question was?

12  Q    Tell me what information you rely on to support

13     a contention that the false statements

14     ordinance has anything to do with the March 8th

15     e-mail.

16           MS. DeMASTER:  I'll object as to

17     form, but you can answer if you know.

18           THE WITNESS:  I don't know.

19  BY MS. MURPHY:

20  Q    Okay.  You can look at Exhibit 25 which is a

21     copy of the false statements ordinance, and

22     also you have Exhibit 23 which is the

23     March 8th, 2023, e-mail.  Is there any

24     reference in the March 8th, 2023, e-mail to any

25     test that the City administered?

**New York**          **Hudson Court Reporting & Video**          **New Jersey**
**212-273-9911**          **1-800-310-1769**          **732-906-2078**
Case 2:23-cv-01048-WED    Filed 04/12/25    Page 25 of 27    Document 151-3

1    A    I don't believe so.

2    Q    Is there any reference in the March 8th, 2023,

3         e-mail to any certification that the City

4         provided?

5    A    I don't believe so.

6    Q    Is there any reference in the March 8th, 2023,

7         e-mail to any appointment made by the City?

8    A    I'm not going to answer that, again, because I

9         don't know what the word "appointment" means.

10   Q    Well, people are appointed to positions,

11        correct, by the City?

12   A    Yes.

13   Q    Is there any reference to any appointment to

14        any position by the City in that March 8th,

15        2023, e-mail?

16   A    I don't believe so.

17   Q    Is there any reference in that e-mail to any

18        attempt to commit fraud?

19   A    Because it states that in that policy?

20   Q    Yep.

21   A    I don't know.  I don't believe so.

22   Q    Okay.  So I want you to look at Paragraph

23        241 -- I think part of this might be the answer

24        to it -- in your amended complaint which reads

25        "The February and March 8 directives burdened

1             plaintiff's (and employees') protected speech

2             by impliedly threatening them from being

3             witnesses in a federal judicial proceeding and

4             burdening their speech by ordering that the

5             City's lawyers must be present if plaintiff

6             made any statements about Wolf's lawsuit

7             allegations that included matters of political

8             corruption, bribery, and constitutional

9             violations." What language in the February 7th

10            e-mail do you claim impliedly threatened you

11            from being a witness?

12                   MS. DeMASTER: I'm going to object as

13            to form, but subject to that you can answer.

14 BY MS. MURPHY:

15   Q     And here's Exhibit 27 which is that e-mail.

16   A     Can you restate the question?

17   Q     What language in this February 7th e-mail do

18            you claim impliedly threatened you from being a

19            witness in a federal judicial proceeding?

20   A     I don't know.

21   Q     So you can't identify any language in that

22            e-mail that impliedly threatened you from being

23            a witness in a federal judicial proceeding?

24   A     Other than the fact that the City is a

25            defendant and that it's a federal lawsuit and

**New York**          **Hudson Court Reporting & Video**          **New Jersey**
**212-273-9911**          **1-800-310-1769**          **732-906-2078**
Case 2:23-cv-01048-WED     Filed 04/12/25     Page 27 of 27     Document 151-3