UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

-----------------------------------------------------

CHAD PELISHEK,


                Plaintiff,             CONFIDENTIAL


        -vs-                    Case No. 2:23-CV-1048


CITY OF SHEBOYGAN, et al.,


                Defendants.

-----------------------------------------------------

                Examination of CHAD PELISHEK, taken at

the instance of the Defendants, under and pursuant to

the applicable Rules of Civil Procedure, before

SAMANTHA J. SHALLUE, a Registered Professional

Reporter and Notary Public in and for the State of

Wisconsin, at MWH Law Group, 735 North Water Street,

Suite 610, Milwaukee, Wisconsin, on July 31, 2024,

commencing at 10:10 a.m. and concluding at 4:49 p.m.


HUDSON COURT REPORTING & VIDEO        (800) 310-1769

1    BY MS. MURPHY:

2    Q    Okay.  Did you talk with him about the racial

3         slur incident that occurred on August 22 of

4         2022 prior to filing your lawsuit?

5    A    I did.

6    Q    When did that occur?

7    A    Probably in September or October when the --

8         the first article came out in '23.  '23.  No,

9         '22.

10   Q    So the first article came out October 10th.

11   A    Of 2022.

12   Q    So you talked to him before that?

13   A    Yes.

14   Q    And what did that conversation consist of?

15   A    I just repeated what happened with the racial

16        slur and --

17   Q    What did he say?

18   A    He was surprised, but he knew that it -- he

19        knows what my character is, and he knew that it

20        was not intended to be what was actually said.

21   Q    Was that an in-person or by phone conversation?

22   A    In-person.

23   Q    Did you have any e-mail communications with

24        Russ Otten?

25   A    No.

1    Q    Any texts about the incident?

2    A    No.

3    Q    Any other instant messaging or written form of

4         communication with Russ Otten?

5    A    Nope, only in person.

6    Q    Okay.  How many times before you filed your

7         amended complaint do you think you talked with

8         Russ Otten about it?

9              MS. DeMASTER:  Objection; asked and

10        answered.

11             THE WITNESS:  I don't know.  I

12        believe 75 to 100.

13   BY MS. MURPHY:

14   Q    Do you and Russ Otten socialize?

15   A    Yes.

16   Q    What do you do when you socialize?

17   A    Go out to dinner, have bonfires.

18   Q    How frequently would you say you were

19        socializing with Russ Otten in the fall of

20        2022?

21   A    Not much.  One or two times.

22   Q    And how about in 2023?

23   A    I -- 12 to 16, 12 to 20, something like that.

24   Q    So you've said you've talked to him about the

25        allegations in the complaint maybe 50 times and

1   you talked to him before you filed the

2   complaint 75 to 100 times.  So when would you

3   be seeing him that frequently if you were

4   talking in person?

5   A   Picking up our kids at school.

6   Q   Okay.  So most of those conversations occurred

7       while you were picking up your kids at school?

8   A   Hm-hm.

9   Q   How long have you known Aaron Guenther?

10  A   Less than a year.

11  Q   And how did you first get introduced to him?

12  A   He reached out to me after the complaint was

13      originally filed.

14  Q   How many times have you talked with him about

15      the allegations in your amended complaint,

16      whether it was before or after you filed the

17      complaint?

18          MS. DeMASTER:  I'm going to just

19  object to this, these questions about the

20  allegations in his amended complaint.  There's

21  a lot of allegations in there.

22          MS. MURPHY:  Yep.

23          MS. DeMASTER:  Can you be more

24  specific or if this -- I'm just going to object

25  that this is a little overbroad, but subject to

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

CHAD PELISHEK,

                              CONFIDENTIAL

       Plaintiff,                  VOLUME II

     -vs-                 Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

       Defendants.

--------------------------------------------------------

       Examination of CHAD PELISHEK, taken at the
instance of the Defendants, under and pursuant to
the applicable Rules of Civil Procedure, before
SAMANTHA J. SHALLUE, a Registered Professional
Reporter and Notary Public in and for the State of

Wisconsin, at MWH Law Group, 735 North Water Street,

Suite 610, Milwaukee, Wisconsin, on

September 12, 2024, commencing at 9:08 a.m. and

concluding at 4:59 p.m.

HUDSON COURT REPORTING & VIDEO      (800) 310-1769

**New York**             **Hudson Court Reporting & Video**             **New Jersey**
**212-273-9911**                **1-800-310-1769**               **732-906-2078**
Case 2:23-cv-01048-WED     Filed 04/11/25     Page 5 of 21     Document 152-26

1          Adams edited the Hall investigation report?

2                    MS. DeMASTER:  Objection; form.

3          Subject to that, you can answer.

4   BY MS. MURPHY:

5   Q    Well, you allege in your answer to -- your

6        amended and supplemental answer to City

7        Interrogatory 4 that one of the things that

8        City Attorney Adams did was hire Hall and work

9        with her to protect and exonerate Rendall and

10       edited her report to make it seem as though you

11       had made an unsolicited racial slur.  What

12       evidence do you have to support that

13       allegation?

14  A    The evidence I have is Attorney Adams coming

15       into management team meetings on three

16       occasions and stating that he is working with

17       Hall to edit the report.

18  Q    Give me the dates of those meetings.

19  A    I can't recall the actual dates.

20  Q    But sometime before her report was issued --

21  A    Yes.

22  Q    -- and after she was hired, correct?

23  A    Correct.

24  Q    During department head meetings?

25  A    Yes.

1      MS. DeMASTER: Objection; badgering.
2 It's asked and answered.
3      THE WITNESS: No, I don't have any
4 evidence to prove that because I wasn't in the
5 closed sessions.
6 BY MS. MURPHY:
7 Q  Correct. And even if he had encouraged the
8 common council to fire Todd Wolf, how is that a
9 violation of your right to equal protection
10 under the law?
11      MS. DeMASTER: Objection; form. You
12 can answer.
13      THE WITNESS: I don't have an answer.
14 BY MS. MURPHY:
15 Q  Okay. Then you make a statement that he was
16 the final word on items published for public
17 records and redactions. What public records
18 that were provided in response to open records
19 requests are you talking about in that
20 sentence?
21 A  Just in general. It was a general practice
22 that any public records requests had to go to
23 the city attorney's office, and the city
24 attorney was the final call on what was
25 released, and employees had no idea what was

1 sent out to the public.
2 Q  Okay. And so you're not referring to any
3 specific document in relation to that
4 allegation?
5 A  Can you reference the sentence?
6 Q  Sure. It's the second-to-last sentence in the
7 middle paragraph of your answer to the
8 Individual Interrogatory No. 2 that starts with
9 "Final word on items published," and I can just
10 read it into the record. You allege that City
11 Attorney Adams was the "final word on items
12 published for public records and redactions and
13 that he chose to publish things that hurt
14 plaintiff and Todd Wolf and exonerated only a
15 female and homosexual publicly despite
16 plaintiff's repeated requests." So I'm just
17 trying to find out if there are any specific
18 documents that you are referring to in relation
19 to that allegation.
20 A  There's no specific documents, but there's
21 requests.
22 Q  I'm sorry, I don't understand. There were open
23 records requests? Is that what you're saying?
24 A  There were repeated requests to have the City
25 release something to exonerate me in that -- in

1 the stuff that was published previously.
2 Q  Repeated requests by whom?
3 A  Me.
4 Q  To who?
5 A  City officials.
6 Q  List them for me.
7 A  Ryan Sorenson, Adam Westbrook.
8 Q  Anyone else?
9 A  No.
10 Q  And any response by City Attorney Adams to open
11 records requests, how would a response to an
12 open records request be a violation of your
13 right to equal protection under the law?
14      MS. DeMASTER: Objection to form.
15      THE WITNESS: I can't answer that.
16 BY MS. MURPHY:
17 Q  Have we talked about all of the allegations
18 that you assert against City Attorney Adams
19 where you allege that he either harassed you,
20 discriminated against you or violated your
21 right to equal protection under the law?
22      MS. DeMASTER: Objection; form.
23      THE WITNESS: I believe so.
24      MS. MURPHY: Okay. This is a perfect
25 time for a break.

1      (Brief recess taken.)
2      MS. MURPHY: We can go back on the
3 record.
4 BY MS. MURPHY:
5 Q  I'm going to have you take a look back at your
6 amended and supplemental answer to City
7 Interrogatory No. 4.
8      MS. DeMASTER: I'm sorry, you said
9 City?
10      MS. MURPHY: Yep.
11 BY MS. MURPHY:
12 Q  And specifically in relation to your
13 allegations against Mayor Sorenson. Does your
14 amended and supplemental answer to
15 Interrogatory No. 4 include all of the conduct
16 that you allege Mayor Sorenson engaged in that
17 created a hostile work environment for you?
18 A  I believe so.
19 Q  What information do you have that Mayor
20 Sorenson knew of Ms. Rendall-Araujo's purported
21 anti-male motivation and the City's
22 anti-straight white male bias?
23 A  Well, Ms. Rendall-Araujo was at a public
24 meeting and had stated that her goal in life is
25 to dismantle the patriarch and take males out

Pages 273 to 276

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 7 of 21    Document 152-26

1 of leadership positions.
2 Q When was that?
3 A I don't know the actual date.
4 Q Were you present at that meeting?
5 A I was not.
6 Q Well, then how do you know that she made that
7 statement?
8 A I've seen it written.
9 Q Where did you see it written?
10 A A social media post.
11 Q What social media post?
12 A I can't say which one. I believe Facebook.
13 Q What Facebook? Where was it posted?
14 A I can't recall the exact name of the page.
15 Q So you've never heard her make that statement,
16 correct?
17 A I have not.
18 Q Okay. What was -- but my question is what
19 information do you have that Mayor Sorenson
20 knew of Ms. Rendall-Araujo's purported
21 anti-male motivation?
22 MS. DeMASTER: Objection; asked and
23 answered.
24 THE WITNESS: I don't have an answer
25 on that.

1 BY MS. MURPHY:
2 Q So you don't have any information to support
3 that allegation?
4 MS. DeMASTER: Objection; misstates
5 the testimony.
6 BY MS. MURPHY:
7 Q Do you have any information to support that
8 allegation?
9 MS. DeMASTER: Objection; asked and
10 answered.
11 THE WITNESS: I don't believe so.
12 BY MS. MURPHY:
13 Q Okay. What information do you have to support
14 your allegation that the mayor had knowledge of
15 the City's purported anti-straight white male
16 biases?
17 A And you -- where do you see that in here?
18 Q Under the first line of your allegations
19 against Mayor Sorenson in your amended and
20 supplemental response to City Interrogatory
21 No. 4.
22 A The information I have related to that is at
23 the council meeting when -- at one of the
24 council meetings when I believe Todd was put on
25 leave there was information that was shared to

1 outside people to have them e-mail their
2 council members about my actions related to the
3 August 22nd meeting.
4 Q Is that the extent of the information you have
5 to support your allegation?
6 MS. DeMASTER: Objection as to form.
7 THE WITNESS: I believe so.
8 BY MS. MURPHY:
9 Q Okay. You then have an allegation that says
10 "did not stop city attorney." What were you
11 referring to in relation to conduct that Mayor
12 Sorenson purportedly engaged in that was
13 hostile towards you?
14 A Well, the city attorney has repeatedly said
15 that he doesn't -- he reports to the council,
16 and he is elected by the constituents of the
17 City of Sheboygan. Likewise, the mayor is the
18 same way. So nobody could really tell City
19 Attorney Adams to stop doing what he was doing
20 except maybe the mayor because they were both
21 elected officials.
22 Q What do you claim Mayor Sorenson failed to stop
23 the city attorney from doing?
24 A He failed to stop the -- the -- false
25 narratives and the -- the information that

1 happened on August 22nd.
2 Q The city attorney didn't speak to the media,
3 correct?
4 A I don't know that.
5 Q Do you have any information that he did?
6 A I can't answer that.
7 Q Well, you can. You either have information
8 that the city attorney talked to the media or
9 you don't have information that the city
10 attorney talked to the media. Which is it?
11 A I don't know.
12 Q You don't know if you have information about
13 whether the city attorney talked to the media?
14 MS. DeMASTER: Objection as to form.
15 You can answer if you know.
16 BY MS. MURPHY:
17 Q Well, no one's going to know besides you, so..
18 A Do I have information?
19 Q Yeah.
20 A I've heard information.
21 Q What have you heard?
22 A As in related to what he said to the media?
23 Q What have you heard that the city attorney
24 spoke to the media about regarding the racial
25 slur incident?

Pages 277 to 280

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 8 of 21    Document 152-26

1          friends after the racial slur episode.  I don't

2          know what the extent of those comments were,

3          but they were people from the public.

4     BY MS. MURPHY:

5     Q    Any other information to support that

6          allegation?

7     A    I don't believe so.

8     Q    Okay.  What information do you have to support

9          your allegation that Emily told the City that

10         you made repeated slurs like "colored people"?

11    A    It was information that was in the

12         whistleblower complaint as well as Alderperson

13         Filicky-Peneski calling me and telling me to

14         stop using the term "colored people."

15    Q    Did Alder Filicky-Peneski tell you that Emily

16         told her that you had used that word?

17    A    She did not.

18    Q    Where did Janet Duellman see Emily meeting with

19         Maya Hilty?

20              MS. DeMASTER:  Objection; form.

21              THE WITNESS:  In her office in the

22         mayor's suite when her office was in city hall.

23    BY MS. MURPHY:

24    Q    And her office was the mayor's conference room

25         at that time?

1  employees after plaintiff submitted his
2  resignation"?
3  A  I believe it was an e-mail.
4  Q  Do you recall the date of the e-mail?
5  A  I do not.
6  Q  And who was the e-mail to?
7      MS. DeMASTER:  Objection; form.
8      THE WITNESS:  I believe department
9  heads.
10 BY MS. MURPHY:
11 Q  So when you say "issued letter to employees,"
12 the employees you're referring to are city
13 department heads?
14 A  I can't confirm that for sure.
15 Q  Okay.  What do you contend Mr. Westbrook said
16 in that e-mail that implied that you may have
17 left the City for misconduct?
18 A  I believe the letter -- the correspondence or
19 e-mail referenced the stuff that -- the
20 information that was put in my resignation
21 letter and the stuff that had happened up to
22 this point.
23 Q  What information that was in your resignation
24 letter do you contend implied that you may have
25 left for misconduct?

1  A  The -- the reporting of racism and the -- and
2  the whole process related to that.
3  Q  I'm just lost on what you're trying to tell me,
4  so are you alleging that Mr. Westbrook shared
5  information that you included in your
6  resignation letter with the city department
7  heads?
8  A  I don't know that.
9  Q  Okay.  And the only reason I ask that is you
10 said that the e-mail referenced information
11 that you put in your resignation letter.  So
12 I'm just trying to understand what in your
13 resignation letter -- which you wrote, right --
14 would have implied that you left because of
15 misconduct?
16     MS. DeMASTER:  Objection as to form;
17 foundation.  You can answer if you know.
18     THE WITNESS:  I don't know.
19 BY MS. MURPHY:
20 Q  Well, you don't think you included anything in
21 your resignation letter where you inferred that
22 you were leaving for misconduct, right?
23 A  Correct.
24 Q  Okay.  So can you tell me what Mr. Westbrook
25 communicated that you are relying on to say

1  that he implied that you left because of
2  misconduct?
3      MS. DeMASTER:  Objection as to form.
4      THE WITNESS:  I don't have an answer.
5  BY MS. MURPHY:
6  Q  So as you sit here today you don't have any
7  evidence or information to support your
8  allegation that Mr. Westbrook sent a
9  communication implying that you left because of
10 misconduct?
11     MS. DeMASTER:  Objection; misstates
12 the testimony.
13     THE WITNESS:  I've had correspondence
14 with another City employee after the fact that
15 he referenced the fact that I -- that there was
16 comments made that I was leaving the City and
17 that there may have been some misconduct.
18 BY MS. MURPHY:
19 Q  And so you believe that that information was
20 sent in a letter or some sort of written
21 communication to employees?
22 A  Yes.
23 Q  Okay.  What City employee told you that?
24 A  Derek Muench.
25 Q  Do you have any other information besides a

1  communication with Derek Muench that -- to
2  support this allegation?
3  A  I don't believe so.
4  Q  Okay.  The next allegation of misconduct you
5  have in relation to Mr. Westbrook is that he
6  "would not release or encourage release of any
7  statement that plaintiff was reporting racism
8  and the context where he was asked to repeat
9  the slur so the public would not think he was a
10 racist anymore."  What information do you have
11 to support that allegation?
12 A  Meetings in my office with him.
13 Q  Okay.  So what statements do you claim he made
14 to you in meetings in your office?  Was it your
15 office or his office that you were meeting in?
16 A  He came into my office.
17 Q  Okay.  So what -- what do you claim he said
18 during those meetings?
19 A  The first time I said that I wanted to file a
20 complaint against Emily for what was going on,
21 and he told me that I couldn't do that because
22 I just needed to play it out and that it had
23 happened prior and that he couldn't fix what
24 happened in the past and release any context
25 related to that.

Pages 337 to 340

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 10 of 21    Document 152-26

1 meeting?
2 A  I don't recall.
3 Q  So as you sit here today you don't recall him
4 saying anything?
5      MS. DeMASTER:  Objection; asked and
6 answered.
7      THE WITNESS:  I don't recall him
8 saying anything.
9 BY MS. MURPHY:
10 Q  Okay.  So what did Adam say during that
11 meeting?
12 A  He referenced the fact that there was
13 discussion in the Hall investigation about the
14 demand for money at the -- with the DEI group
15 and that that didn't align with the testimony
16 that I had previously told him, and he was
17 trying to -- he was trying to understand which
18 information was correct.
19 Q  And how did you respond?
20 A  I think I then responded that it'll have to be
21 figured out in court.
22 Q  Did either of you say anything else during that
23 meeting?
24 A  I don't believe so.  I don't know.
25 Q  Did you record that meeting?

1 A  I did not.  I just want to clarify that I had
2 hoped that that Hall investigation was going to
3 be released, number one, without names because
4 we were led to believe by Attorney Adams that
5 the names would be redacted, and the names were
6 not redacted, and when I read the report and it
7 said that I uttered a racial slur with no
8 context that I felt that this -- and read
9 further that it was retaliation against -- it
10 was an investigation into Todd Wolf's things
11 against Emily for retaliation, and there was no
12 exoneration in that report over what I had
13 said.  I at that point realized that the stress
14 and panic and anxiety and stuff was so much
15 that I needed to do something major, and it's
16 what led to the FMLA.
17 Q  So this meeting occurred on March 7th of 2023
18 according to your notes Bates stamped
19 PELISHEK000316.  When did you write down what
20 happened during that meeting?
21 A  Can I see the notes?
22 Q  Maybe.  Can you tell me when you wrote down
23 what happened during this meeting?
24 A  I can't tell you for sure.
25 Q  So did you write it down when you got back to

1 your office or shortly thereafter?
2 A  You're not going to let me see the notes to
3 refresh my memory?
4 Q  Well, I don't think you need them to answer
5 that question which is why I'm not giving them
6 to you.
7 A  Then I don't think I'm going to answer that
8 question.
9 Q  You don't have a choice.
10      MS. DeMASTER:  Sorry, just to
11 clarify, you're just asking, like, when he
12 wrote the notes?
13      MS. MURPHY:  When he wrote the notes.
14      THE WITNESS:  The notes are dated.
15 BY MS. MURPHY:
16 Q  March 7, 2023, at 12:00 p.m. is what you -- I
17 assume that's when the meeting took place.
18 A  I would have probably -- at that point I was
19 not writing the notes during the day.  I was
20 writing sticky notes and taking them home and
21 doing it in the evening.
22 Q  Okay.  So you would have written this note
23 after you got home that night?
24 A  Probably.
25 Q  Okay.  I'm handing you your notes and I'm

1 referring you to PELISHEK000316 for the entry
2 on March 7, 2023, and ten lines down you say
3 that you said to Adam "Will the City be
4 redacting the names?"  Adam said, 'No.  Chuck
5 said the names have been out there previously
6 and there would be no reason to redact the
7 names.'"  Did I read that accurately?
8 A  Yes.
9 Q  And these were written the night this meeting
10 occurred on the day the meeting occurred,
11 correct?
12 A  I believe so, but to clarify I would say that
13 Chuck -- that I wrote what Adam -- Adam was
14 saying that Chuck said that the names had been
15 out there previously and that there was no
16 reason to redact the names.
17 Q  So you were told during that meeting that the
18 names would not be redacted, correct?
19 A  During that meeting, yes, but prior we had been
20 told they were going to be redacted.
21 Q  Okay.  So that refreshes your recollection
22 about what was said during the March 7th
23 meeting about redactions in the Hall report,
24 correct?
25 A  Clarifying.  On redactions in the Hall report

Pages 349 to 352

New York                Hudson Court Reporting & Video                New Jersey
212-273-9911                  1-800-310-1769                    732-906-2078
Case 2:23-cv-01048-WED    Filed 04/11/25    Page 11 of 21    Document 152-26

1  related to the names?
2  Q   Yep.  You were told during that meeting on
3      March 7th that the names would not be redacted
4      from the Hall report, correct?
5  A   Yes.
6  Q   All right.  And what do you think was -- was
7      false in the Hall report?
8  A   Do you have a copy of the Hall report?
9  Q   You've said there are false statements in the
10     Hall report.  What false statements are there?
11 A   I'm not going to -- if you can provide a copy
12     of the Hall report, I'll be happy to show you,
13     but it's related to the utterance of the racial
14     slur and the way that it's written it doesn't
15     provide any context.
16 Q   The context had been provided repeatedly in the
17     media articles, correct?
18         MS. DeMASTER:  Objection; misstates
19     testimony and form.
20         THE WITNESS:  If you believe the
21     newspaper, sure.
22 BY MS. MURPHY:
23 Q   Well, weren't you worried about people
24     believing the newspaper?
25 A   Well, don't you think people would believe a

1  private investigation done by an outside law
2  firm that was hired by the common council to
3  investigate conduct of office over what a
4  newspaper article that's getting her
5  information secondhand is writing?
6  Q   So now -- I'm going to withdraw that question.
7         (Exhibit No. 24 was marked.)
8  BY MS. MURPHY:
9  Q   Mr. Pelishek, you have been handed Exhibit 24
10     which is a copy of the Hall report dated
11     February 6 of 2023.  I would like you to take a
12     review of this report and tell me what
13     information in here is factually inaccurate
14     about you.
15 A   The statement on Page 4 that says "However, in
16     the course of the investigation, no attendee of
17     the August 22, 2022, meeting, including
18     Mr. Pelishek himself, supported Wolf's repeated
19     assertion that Ms. Rendall-Araujo demanded that
20     Mr. Pelishek repeat the racial slur.  Evidence
21     suggests that Ms. Rendall-Araujo told Wolf on
22     August 24, 2022, that she went to her friends
23     group for advice on how to address the issue of
24     the director's use of the racial slur.
25     Evidence also suggests that Wolf continued to

1  publicly attribute untoward motives toward" --
2  oh, not that.  Stopping before that sentence.
3  Q   Okay.  So you believe that the first two
4      sentences of the third paragraph on Page 4 of
5      Ms. Hall's report refer to you and are
6      inaccurate?
7  A   That is correct.
8  Q   Okay.  Anything else?
9  A   So that it's not -- the other one is not
10     directly related to me, although it says "No
11     attendee of the August 5, 2022, meeting except
12     Wolf provided evidence supporting Wolf's claim
13     that the women demanded $70,000 from the City."
14 Q   Anything else?  Oh, and that's at Page 5?
15 A   Page 5 of 6.
16 Q   Page 5 of 6, the fourth paragraph, correct?
17     I'm counting the blocked one as a paragraph.
18 A   Yes.
19 Q   Okay.  Anything else?
20 A   It's the insinuation on Page -- where it uses
21     the word "utterance."
22 Q   What page are we talking about?
23 A   Page 3 of 6, the last sentence of the third
24     paragraph.
25 Q   Read the sentence to me.

1  A   "Evidence suggests that Ms. Rendall-Araujo
2      reported only to a group of five people on
3      August 22, 2022, but did not talk with the
4      media at any time of the matter of Pelishek
5      uttering a racial slur on August 22 of 2022."
6  Q   Okay.  Is that -- have you read the entire
7      report, and is that everything that you believe
8      includes information that --
9  A   There's another reference to that up in the
10     first paragraph on that same page.  "Among
11     other topics, he talked extensively about
12     personnel matters and discipline regarding a
13     director who disclosed Pelishek's utterance of
14     a racial slur in the media."
15 Q   Can you just show me where you're referring to?
16 A   (Witness indicates.)
17 Q   Okay.  Is that everything that you found in the
18     report that you take issue with?
19 A   I believe so.
20 Q   Okay.  So let's start with the first bullet on
21     Page 3, the one you just talked about, "Among
22     other topics, he talked extensively about
23     personnel matters."  "He" is Mr. Wolf in that
24     sentence, correct?
25 A   Yes.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED     Filed 04/11/25     Page 12 of 21     Document 152-26

1    is on Page 5 of 6 where you say --

2         MS. DeMASTER: Just to clarify,

3    sorry, you were talking about the sentence

4    starting with "Evidence"?

5         MS. MURPHY: It's the very next

6    sentence in that paragraph.

7         MS. DeMASTER: Okay. Sorry.

8    BY MS. MURPHY:

9    Q   I think the last sentence that you identified

10   that you took issue with in this report is on

11   Page 5 of 6 which said "No attendee of the

12   October 5, 2022, meeting except Wolf provided

13   evidence supporting Wolf's claim that the women

14   demanded $70,000 from the City." Did I read

15   that accurately?

16   A   Yes.

17   Q   And, again, you recorded your interview with

18   Attorney Hall, so that --

19   A   And I clearly told her at that meeting, just

20   like I told you here, that I -- that they did

21   demand money.

22   Q   And the audio recording will be the evidence of

23   what you said during your interview with

24   Ms. Hall, correct?

25   A   I guess.

1   Q   Because you made that audio recording and you

2   didn't alter it, right?

3   A   Correct.

4   Q   Okay. Have we discussed all of the meetings

5   that you had with Mr. Westbrook where you

6   discussed the racial slur incident or anything

7   related to your allegations in this amended

8   complaint?

9   A   I believe so.

10   Q   Okay. Which meeting do you claim Mr. Westbrook

11   told you that you can't be discriminated

12   against because you have no protected status?

13   A   The meeting with Veronica in Mr. Westbrook's

14   office.

15   Q   And do you also claim that during that same

16   meeting he told you that you did not engage in

17   any protected conduct by complaining about

18   hostility? Did that happen in the same

19   meeting?

20   A   I believe so.

21   Q   And you also recorded that meeting, correct?

22   A   Yes.

23   Q   Did you alter that audio recording at all?

24   A   No.

25   Q   Okay. When do you allege Mr. Westbrook told

1   you that Emily Rendall-Araujo could make

2   complaints even if they were not true because

3   she is female?

4   A   The first meeting.

5   Q   So in January of 2023 when he was in your

6   office you claim that he made that statement?

7   A   Yes.

8   Q   Is there some reason you didn't make any notes

9   of that meeting with Mr. Westbrook?

10   A   I can't -- I don't know.

11   Q   Did you have any e-mails with Mr. Westbrook

12   following that meeting relating to those

13   comments?

14   A   I don't know.

15   Q   Any other witness to that comment that can

16   corroborate what you're saying?

17   A   I feel like I answered that question already,

18   and the answer was no.

19   Q   Okay. Any other conduct that you allege

20   Mr. Westbrook engaged in that was -- that

21   created a hostile work environment for you?

22   A   I don't believe so.

23   Q   Okay. And the last paragraph in this table --

24   well, the last one on Page 4 of your amended

25   and supplemental answer to City's Interrogatory

1   No. 4 you refer to an allegation that during

2   your FMLA leave you believe others had access

3   to information about your medical condition.

4   Who do you -- who are you referring to when you

5   say "others"?

6   A   People within the public.

7   Q   Who in the public?

8   A   Citizens.

9   Q   So you don't have any -- the identity of any

10   citizen in particular that you believe had

11   access to your FMLA information?

12   A   Well, a number of patients of my wife's had

13   indicated that I was on FMLA and leave from the

14   City, and I don't know who those are because of

15   HIPAA.

16   Q   Is that the extent of information that you have

17   to support your allegation that you believe

18   others had access to information about your

19   medical condition while you were on FMLA leave?

20   A   I did receive a card during that time from City

21   Attorney Chuck Adams' wife to my house saying

22   that I should -- that she hopes that everything

23   is well and that I can come back soon.

24   Q   Anything else that you rely on to support that

25   allegation?

Pages 361 to 364

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 13 of 21    Document 152-26

1         others can.  You testified earlier that you

2         never heard Ms. Rendall-Araujo make that

3         statement, correct?

4   A    I'm not sure.

5            MS. MURPHY:  Can you find that?

6        (Previous question and answer read.)

7   BY MS. MURPHY:

8   Q    Okay.  Does that refresh your recollection?

9   A    Yes.

10   Q    Did you complain to Mr. Wolf about Emily

11        saying, "White men of privilege can't repeat

12        slurs that others can"?

13   A    Yes.

14   Q    So you did that without ever having heard her

15        make that statement?

16   A    Yes, because it was a narrative I heard in the

17        public.

18   Q    Where did you hear this narrative in the

19        public?

20            MS. DeMASTER:  Objection; asked and

21        answered.

22            THE WITNESS:  As I stated previously,

23        through, I believe, Amanda Salazar and Mary

24        Lynne Donohue.

25   BY MS. MURPHY:

1  Q   No, you said that Mr. Wolf told you that those

2       two made a statement that "White men of

3       privilege can't say things."  Do we need to

4       check that testimony, too?

5  A   You're correct.

6  Q   Okay.  So when did you complain to Mr. Wolf

7       that Emily was saying, "White men of privilege

8       can't repeat slurs that others can"?

9  A   I can't give you the exact time.

10  Q   Was it in September, October or November?

11  A   I'm guessing it was before he was put on leave.

12  Q   And what did he do about this complaint?

13  A   He never reported to me what he did, so I don't

14       know.

15  Q   So you don't know -- he could have done

16       something.  You have no idea what he did with

17       your complaint, right?

18  A   Correct.

19  Q   Okay.  Did you follow up with him on the

20       complaint?

21  A   On the white men of privilege complaint?

22  Q   Yeah, the one that you just said you made to

23       him.

24  A   I mean, there was dialogue with him after that

25       about it, but I just --

**New York**        **Hudson Court Reporting & Video**        **New Jersey**
**212-273-9911**        **1-800-310-1769**        **732-906-2078**
Case 2:23-cv-01048-WED   Filed 04/11/25   Page 15 of 21   Document 152-26

1   Q   What was the dialogue?

2   A   Related to the fact that white men had more

3       privilege than other people and that we needed

4       to -- that him and I -- that there was a target

5       against us and that I needed to be -- watch

6       what I say.

7   Q   What did you expect Mr. Wolf to do with your

8       complaint?

9   A   Well, I had hoped that they were going to hire

10      this PR company to help clean up the narratives

11      and --

12   Q   Do you believe he did anything to follow up on

13      any of the complaints you made to him?

14   A   I can't answer that.

15   Q   Is there some reason you didn't name him as a

16      defendant in this lawsuit?

17   A   I can't answer that.

18   Q   Well, it's your lawsuit.  You can answer that.

19   A   I don't know.

20   Q   You don't know why you didn't name him?

21   A   The main reason that I probably didn't name him

22      is because he was the only person that was

23      defending me in city hall during this whole

24      thing.

25   Q   Do you believe he didn't do his job in relation

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 16 of 21    Document 152-26

1  Q   Who else?
2  A   Carrie Arenz.
3  Q   Who else?
4  A   Joe Folgers, the folks in the department,
5      planning and development.
6  Q   Who else?
7  A   That's all I recall.
8  Q   What about Aaron Guenther?
9  A   We may have talked that there was a lawsuit
10     filed, but I don't know that we got into any
11     details.
12 Q   In your deposition on July 31st you said you
13     discussed the allegations of your litigation
14     and Mr. Wolf's litigation with him.  Do you
15     recall that?
16 A   Yes.
17 Q   And that you also discussed the allegations of
18     your litigation and Mr. Wolf's litigation with
19     Russ Otten.  Do you recall that testimony?
20 A   Yes.
21 Q   Okay.
22 A   I just want to clarify that at the time I
23     didn't realize what the definition of
24     "allegations" was, and I didn't realize that it
25     was everything in that entire complaint, but...

1        MS. DeMASTER:  I want to -- could we
2  pause real quick?  Just so I don't have to
3  object, you were saying that he talked to Russ
4  and Aaron about the Wolf -- off the record.
5        (Discussion off the record.)
6        MS. MURPHY:  We need to go back on
7  the record.
8        MS. DeMASTER:  Okay.  I'm going to
9  object to the extent that it misstates the
10 testimony from earlier in the deposition as to
11 speaking about allegations in his complaint
12 rather than another complaint.
13       MS. MURPHY:  Okay.
14 BY MS. MURPHY:
15 Q   So is your testimony that you spoke with Russ
16     Otten and Aaron Guenther about the Wolf
17     litigation?
18 A   Yes.
19 Q   Did you speak with them about your litigation?
20 A   Yes.
21 Q   Okay.  You allege in Paragraph 239 of your
22     amended complaint that the City's arbitrary and
23     discriminatory enforcement of their false
24     statements policies justified their March 8th
25     directive that chilled your protected speech

1      and expressions regarding Wolf, the report or
2      allegations related to matters of public
3      concern.  Explain to me what you rely on to
4      support your allegation that the false
5      statements ordinance -- that the false
6      statements ordinance has anything to do with
7      the March 8th, 2023, e-mail that Mr. Westbrook
8      sent?
9  A   Where did you read the --
10 Q   Paragraph 239.
11 A   And your question was?
12 Q   Tell me what information you rely on to support
13     a contention that the false statements
14     ordinance has anything to do with the March 8th
15     e-mail.
16       MS. DeMASTER:  I'll object as to
17     form, but you can answer if you know.
18       THE WITNESS:  I don't know.
19 BY MS. MURPHY:
20 Q   Okay.  You can look at Exhibit 25 which is a
21     copy of the false statements ordinance, and
22     also you have Exhibit 23 which is the
23     March 8th, 2023, e-mail.  Is there any
24     reference in the March 8th, 2023, e-mail to any
25     test that the City administered?

1  A   I don't believe so.
2  Q   Is there any reference in the March 8th, 2023,
3      e-mail to any certification that the City
4      provided?
5  A   I don't believe so.
6  Q   Is there any reference in the March 8th, 2023,
7      e-mail to any appointment made by the City?
8  A   I'm not going to answer that, again, because I
9      don't know what the word "appointment" means.
10 Q   Well, people are appointed to positions,
11     correct, by the City?
12 A   Yes.
13 Q   Is there any reference to any appointment to
14     any position by the City in that March 8th,
15     2023, e-mail?
16 A   I don't believe so.
17 Q   Is there any reference in that e-mail to any
18     attempt to commit fraud?
19 A   Because it states that in that policy?
20 Q   Yep.
21 A   I don't know.  I don't believe so.
22 Q   Okay.  So I want you to look at Paragraph
23     241 -- I think part of this might be the answer
24     to it -- in your amended complaint which reads
25     "The February and March 8 directives burdened

Pages 429 to 432

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 17 of 21    Document 152-26

1   anything.
2 Q  Where in the March 8th e-mail does it say you
3   can't talk about the report? Because a moment
4   ago you just testified that there was no
5   language that prohibited you from speaking to
6   anyone other than former City Administrator
7   Wolf and his attorney.
8 A  It does not state that.
9 Q  Okay. So are you able to identify any
10   reputational injuries that you suffered as a
11   result of the February 7th e-mail or the
12   March 8th e-mail?
13 A  I'm not sure.
14 Q  I need a yes or a no answer to that because you
15   allege that you sustained reputational
16   injuries. I need to know what they are.
17 A  I'd have to say no.
18 Q  What other injuries are you referring to
19   that -- or do you allege you sustained as a
20   result of the First Amendment violations you
21   allege based on these two e-mails on
22   February 7th and March 8th?
23 A  I don't know.
24 Q  What?
25 A  I don't know.

1 Q  Okay. Can you identify any injuries that you
2   sustained as a result of those two e-mails?
3      MS. DeMASTER: Object as to the form
4   of the question.
5      THE WITNESS: I've stated before it
6   goes back to the release of the report and it
7   goes back to the fact that there was the false
8   narratives and the emotional injuries that were
9   tied to that.
10 BY MS. MURPHY:
11 Q  None of which relate to either of these two
12   e-mails; is that correct?
13      MS. DeMASTER: Objection. This has
14   been asked and answered.
15      THE WITNESS: I guess, yes.
16 BY MS. MURPHY:
17 Q  Okay. So you cannot identify any injuries that
18   you sustained as a result of the February 7,
19   2023, e-mail or the March 8, 2023, e-mail; is
20   that correct?
21      MS. DeMASTER: Objection; misstates
22   the testimony.
23      MS. MURPHY: No, it doesn't.
24      THE WITNESS: I believe yes.
25 BY MS. MURPHY:

1 Q  You believe yes, that you -- that you cannot
2   identify any damages that you suffered as a
3   result of these e-mails?
4 A  Correct.
5 Q  Okay.
6      MS. MURPHY: I believe we are done.
7      MS. DeMASTER: I'm just going to
8   object as to form, and I do have a couple of
9   follow-up questions.
10      MS. MURPHY: All right.
11      EXAMINATION
12 BY MS. DeMASTER:
13 Q  Chad, I just have a couple follow-up clarifying
14   questions here. You still have those March 8th
15   directives, correct?
16 A  Yes.
17 Q  I'm just reading this last point on the first
18   page, No. 2, bottom of Page 1. "If you are
19   asked by staff members or employees about what
20   is happening, this report is a public record,
21   and I encourage you to encourage them to read
22   the documents themselves." Do you see that?
23 A  Yep.
24 Q  All right. And is there anything about that
25   sentence that concerned you given your

1   conversations with Adam Westbrook about the
2   report?
3 A  Yes, because I believe the report contains
4   false information and people would have to read
5   the report and make their own interpretation of
6   what's in the report.
7 Q  Is there anything in these directives or in
8   this March 8th e-mail here -- and it's
9   Exhibit -- Defendant Exhibit 23 -- is there
10   anything in here that says that you can dispute
11   the factual findings of the report if anybody
12   asks you what's going on?
13 A  No.
14 Q  Did you feel when you saw these that you could
15   dispute that report?
16 A  Absolutely not.
17 Q  Did you feel that report as written hurt your
18   reputation?
19 A  Absolutely.
20 Q  Would you consider that a reputational injury?
21 A  Yes.
22 Q  I just have a couple more. You said in the
23   beginning of this deposition -- sorry -- that
24   your salary was $130,000 when you left the City
25   of Sheboygan; is that correct?

Pages 437 to 440

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 18 of 21    Document 152-26

1 A I believe so, yes.
2 Q Is that the exact amount? Do you know the
3 exact amount?
4 A I do not.
5 Q Is it fair to say that that was an estimate?
6 A Yes.
7 Q Okay. You testified before about applying to
8 jobs outside of Wisconsin, and you said you
9 applied to one, though, correct?
10 A Yes.
11 Q Have you ever had a lot of experience living or
12 working outside of Wisconsin?
13 A No, I've only lived in Wisconsin.
14 Q Any experience working outside of Wisconsin?
15 A No.
16 Q Was it scary to apply for jobs outside of
17 Wisconsin?
18 A Absolutely.
19 Q You had stated earlier that -- I just wanted to
20 kind of clarify this. Attorney Murphy and you
21 had talked a lot about evidence. She asked you
22 a lot of questions based on evidence. "What
23 evidence is there of this?" "What evidence is
24 there of that?" "Do you have any evidence?"
25 Do you recall those questions going through

1 your interrogatory responses?
2 A Yes.
3 Q Okay. Are you a lawyer?
4 A No.
5 Q Have you ever taken a law class?
6 A No.
7 Q Have you ever attended law school?
8 A No.
9 Q Have you ever been trained on being a lawyer or
10 understanding legal terminology?
11 A No.
12 Q Did you draft and write every single question
13 and discovery response?
14 A No.
15 Q But you reviewed them?
16 A Yes.
17 Q Okay. So did you understand -- did you
18 understand what you were talking about when
19 referencing something such as evidence or how
20 much evidence you have to support certain
21 allegations?
22 A No, because it -- it seems like a legal term.
23 Q A legal term. And before your deposition here
24 today have you been able to review every single
25 document over the last two, two and a half

1 years that you've potentially provided to your
2 attorney or --
3 A No.
4 Q Do you know which of those documents might
5 constitute evidence?
6 A Not knowing what the definition of that word
7 is, no.
8 Q Do you know what kind of evidence we're going
9 to show at trial in this case?
10 A No.
11 Q Do you know exactly which evidence you're going
12 to show at trial in this case?
13 A No.
14 Q So going back to that February 7th letter
15 [sic], that was a letter -- we referenced that.
16 I believe it was marked as Defendant
17 Exhibit 27. You talked about that a lot with
18 Attorney Murphy, and I just real quickly wanted
19 to clarify. That was the letter about the Todd
20 Wolf lawsuit, not talking to Todd Wolf or his
21 attorney. Is Todd Wolf the first employee or
22 former employee to ever sue the City of
23 Sheboygan?
24 A No.
25 Q Do you remember, like, in recent years if

1 another former department head or somebody had
2 sued Sheboygan?
3 A Let me just re-clarify the question. Are you
4 asking if there's -- if there's been other
5 department heads that have sued the City or --
6 Q Just any other employee in recent years.
7 A There's been other employee lawsuits.
8 Q Was that kind of directive issued against any
9 of those employees?
10 A No.
11 Q Were any of those employees female?
12 A Yes.
13 Q So that directive wasn't issued against any
14 other female employees who had sued the City?
15 A No.
16 Q Did you ever see a directive similar to that
17 before the Todd Wolf lawsuit?
18 A Absolutely not, and I had been there for 16
19 years.
20 Q We talked a little bit about your -- how you're
21 not a lawyer. Just real quickly, are you an
22 expert or a professional in matters of human
23 resources?
24 A No.
25 Q Or, you know, employee personnel?

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 19 of 21    Document 152-26

1    you any training on what confidential
2    information is?
3    A   No.  I mean, I knew what confidentiality meant
4    related to closed session discussions, but
5    anything related to personnel policies and
6    different things, no.
7    Q   So just to clarify, you stated earlier -- and I
8    think there was some confusion -- we talked
9    about I think your litigation or the Wolf
10   litigation, and you stated you had talked about
11   the litigation to Aaron Guenther, Russ Otten.
12   You stated that with Attorney Murphy.  When you
13   answered that, did you know what "litigation"
14   means?
15   A   No.
16   Q   So what were you referring to?  Let me scratch
17   that and clarify.
18          Were you -- did Todd Wolf file his
19   lawsuit publicly?
20   A   Yes.
21   Q   Was there an article about it in the newspaper?
22   A   I believe so, yes.
23   Q   Was your lawsuit filed publicly?
24   A   Yes.
25   Q   So when you talk about "litigation," do you

1    remember what you talked about?
2    A   We talked about the fact that there was a
3    lawsuit filed in the Eastern District of
4    Wisconsin Federal Court.
5    Q   A couple more.  I'm almost done.  You stated
6    earlier in your deposition that there was
7    nothing preventing you from applying to closer
8    jobs.  What did you mean by that?
9    A   I meant that there was -- that if there was a
10   job that opened up that -- that was comparable
11   to the jobs that I've held before and were
12   comparable compensation and didn't require
13   relocation of my family or anything I would --
14   I would have applied for them.
15   Q   So are you saying that there were no --
16   A   At the time when I was applying there were no
17   jobs comparable within the local market.
18   Q   Did you try -- did you try to find any work,
19   say, with the County of Sheboygan?
20   A   I did.
21   Q   And what happened?
22   A   I was going to be a contracted grant writer,
23   and they declined that -- they had -- they had
24   an interest in doing it, and then they declined
25   it and did not hire me.  I should also

1    acknowledge that the Fehr Graham environmental
2    job was also, I believe, a local job.  They
3    have a local Sheboygan office, and I believe
4    that they may have known about the narratives
5    related to that as well because I never got a
6    job offer.
7    Q   I believe earlier you had said something about
8    health issues or other things like that.  Can
9    you clarify a little bit any physical injuries
10   you've had as a result of your --
11   A   Sure.  So I've -- I've -- well, besides the
12   loss of sleep and issues with my wife and my
13   family, I've had low testosterone and hair loss
14   and anxiety and panic attacks.  I have high
15   blood pressure.
16   Q   And all of that started when all of this
17   started going on at the City?
18   A   Yes.
19   Q   You had testified earlier in the deposition
20   when talking about one of the articles that it
21   was a false narrative and something about you
22   repeating a racial slur.  Can you clarify, is
23   that the only injury you're alleging, or
24   what -- what happened to you?  Is it just about
25   an article or --

1    A   Well, it's the fact that it -- it implied that
2    I was a racist and that it was -- that I was
3    reporting on racism, but there was never any
4    context shared to -- shared to the community of
5    what actually happened.
6    Q   Thanks for saying that.  You had mentioned
7    context.  You stated earlier you read this
8    article there.  The article that I believe was
9    marked as Exhibit -- it's either Exhibit 18
10   or 19, one of those two.  And you saw that
11   article; you talked about it earlier, correct?
12   A   Yes.
13   Q   When those articles first came out, is that
14   what the article looked like, or did you have
15   it in any other format?  Did you ever get it in
16   any other format?
17   A   I believe one of those articles was edited, and
18   I did get it in a different format.
19   Q   What format was that?
20   A   Well, I believe the online version was
21   different than the printed version.
22   Q   Do you still have a copy of the printed
23   version?
24   A   I believe I do, yes.
25   Q   And so talk about the context of the article.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED     Filed 04/11/25     Page 20 of 21     Document 152-26

1     When you were going through that earlier in
2    your deposition you -- it mentioned that -- it
3    did -- the reporter in there did talk about how
4    you were reporting a racism incident that had
5    happened, correct?
6  A  Correct.
7  Q  Okay. Going back to August 22nd, would you
8    have ever said the slur if you hadn't been
9    asked by Emily Rendall-Araujo?
10  A  Absolutely not. I don't look at myself as
11    being a racist, and I was doing what I thought
12    was right to help an employee who asked for
13    help from a neighborhood meeting and to help
14    the neighborhood meetings.
15  Q  So to be clear, the only reason that that word
16    was uttered was because you believed you were
17    asked by Emily?
18  A  That is correct.
19  Q  Is that context that you wish would come out?
20  A  Yes.
21  Q  Was that context provided in those articles?
22  A  No.
23  Q  Was it provided anywhere in the Sheboygan Press
24    or in the Jill Hall report that you were
25    asked -- you believed you were asked to repeat

1    the slur?
2  A  No, it was not. No. Well, it was asked -- it
3    was asked in those articles for me to repeat
4    the -- that I repeated the slur, but it was
5    never given the context that I was reporting
6    racism and helping an employee who asked for
7    help.
8  Q  How did it feel when you left the management
9    meeting and learned that people in the public
10    were starting to hear this? Did you feel bad
11    for repeating it?
12  A  I went back to my office and cried in front of
13    my staff.
14  Q  How did it feel that it kept being brought up
15    over and over?
16  A  It was -- it was terrible. To this day I still
17    can't -- it haunts me every day, and it haunts
18    me every day that I go out into the public in
19    Sheboygan, and it's -- it's been terrible for
20    me and my family and --
21  Q  Just one more. You had stated that you were
22    feeling better and stopped seeing a therapist
23    in December of 2023. Does that still remain
24    true or --
25  A  I did state that I stopped seeing a therapist.

1    I didn't stop seeing a therapist because I was
2    doing better. I stopped seeing a therapist
3    frankly because I was working 40 miles away
4    from Sheboygan and there was just -- it was
5    very difficult to get back for appointments and
6    to continue on with the appointments the way
7    they were going, so I asked to stop the
8    appointments because I was committed to a new
9    job and I didn't want to have to take vacation
10    and leave early every week or twice a week to
11    fulfill the requirements of these appointments.
12  Q  Now, you did say, though, in your earlier
13    deposition testimony that you -- you were
14    feeling a little better in December of '23;
15    isn't that right?
16  A  I was feeling a little bit better because I had
17    gotten a different job and I was working away
18    from the Sheboygan area and the job was going
19    well.
20  Q  Do you think you're going to -- that you may
21    need therapy now, that things might be
22    different, or are you going to go back to
23    therapy?
24  A  Yes, because it's -- it's bringing it all back
25    out again, and it's been very difficult for me.

1    I've cried in front of department heads, and I
2    hate to cry in front of former colleagues, but
3    I guess that's the way it is.
4  Q  I'm sorry to make you cry. I just have one
5    thing left. A few weeks ago you got a -- you
6    were -- you saw some records that were provided
7    by your former therapist, Life Point
8    Counseling, to MWH Law Group relating to this
9    litigation. Do you remember seeing a copy of
10    those?
11  A  Yes.
12  Q  Is there anything about those -- some of those
13    records that you -- that stood out to you?
14  A  Yes. I don't think they're accurate.
15  Q  What do you mean they're not accurate?
16  A  I don't believe that the surveys in those
17    documents are related to me, and I think it's
18    somebody else's writing that took them, and
19    those surveys were never provided to me from
20    this Life Point when I requested the medical
21    records, but they were provided to the City's
22    legal counsel, and they were provided without
23    my permission because I never signed a
24    disclosure releasing them.
25  Q  Is that your handwriting on those surveys?

Pages 453 to 456

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Case 2:23-cv-01048-WED    Filed 04/11/25    Page 21 of 21    Document 152-26