```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WISCONSIN
--------------------------------------------------------

CHAD PELISHEK,

                    Plaintiff,

   -vs-                          Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

                    Defendants.

--------------------------------------------------------
```

        Examination of VERONICA VALDEZ taken at the instance of the Plaintiff, under and pursuant to the Federal Rules of Civil Procedure, before Dawn M. Lahti, a Certified Realtime Reporter, Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at Holiday Inn Express, 350 E. Seven Hills Road, Port Washington, Wisconsin, on July 12, 2024, commencing at 10:00 a.m. and concluding at 12:56 p.m.

Brown & Jones Reporting    414-224-9533
A Veritext Company    www.veritext.com
Case 2:23-cv-01048-WED   Filed 04/11/25   Page 1 of 12   Document 152-32

```
 1           A P P E A R A N C E S
 2
     DEMASTER LAW LLC, by
 3      MS. JENNIFER DeMASTER
        361 Falls Road, Suite 610
 4      Grafton, Wisconsin 53024
        appeared on behalf of the Plaintiff.
 5
 6   MWH LAW, by
        MR. WARREN BULIOX
 7      735 North Water Street, Suite 610
        Milwaukee, Wisconsin 53202
 8      appeared on behalf of the Defendants.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              * * * * *
 2              I N D E X
 3   Examination:                        Page
 4    BY MS. DeMASTER                      4
      BY MR. BULIOX                      113
 5    BY MS. DeMASTER                    123
      BY MR. BULIOX                      126
 6
 7
 8
 9
10
11
12   Exhibits Identified:                Page
13
     Exhibit 11  Email, 11/14/22           38
14
     Exhibit 12  Text Message with Amanda   65
15         Salazar and Emily Rendall-Araujo
16   Exhibit 13  Email, 2/7/23             72
17   Exhibit 14  Conversation Between Roberta  100
           Filicy-Peneski and Todd Wolf
18
     Exhibit 15  WHBL Article Misleads Readers  104
19
20
21   Disposition of Original Exhibits:
22   Attached to Original Transcript.
23
24
25
```

```
 1           TRANSCRIPT OF PROCEEDINGS
 2           VERONICA VALDEZ, called as a witness
 3   herein, having been first duly sworn on oath,
 4   was examined and testified as follows:
 5           MS. DeMASTER:  My name is Jennifer
 6   DeMaster.  I represent the plaintiff in this
 7   case, Chad Pelishek.
 8           MR. BULIOX:  I'm Warren Buliox.  I
 9   represent the defendant in this case.
10              EXAMINATION
11   BY MS. DeMASTER:
12   Q    So please state and spell your first and last
13        name for the record.
14   A    Veronica Valdez, V-E-R-O-N-I-C-A, V-A-L-D-E-Z.
15   Q    Have you ever done a deposition?
16   A    Never.
17   Q    This is your first time.  It's fairly common.
18        If you have any questions, I'll just go through
19        a few rules.  Instead of saying yes or no --
20        instead of nodding or saying uh-huh, uh-uh, say
21        clear answers, yes, no.  We'll try to speak
22        more clearly just so everybody can hear it.
23            If there's a question that I ask
24        that you don't understand, please feel free to
25        interrupt me.  I won't be offended.  You can
```

```
 1        just ask me to rephrase or clarify that.  If
 2        you don't understand the question, you can do
 3        that.
 4            If there's something I ask that
 5        you don't recall and then later I ask something
 6        and you remember it or you recall it again,
 7        feel free to just jump right in.  Again, I
 8        won't be offended, hey, you know what I
 9        actually do remember something about this and
10        you can do that.
11            So those are kind of the basic
12        rules.  If you have any questions, let me know.
13        I'll answer them as best I can just about how
14        this process goes, but it's fairly common
15        there.
16            What is your current job title?
17   A    I am the mayor's assistant and communication
18        specialist for the City of Sheboygan.
19   Q    And so you are currently employed by the City
20        of Sheboygan?
21   A    I am.  In the evenings I manage a restaurant
22        called Prohibition Bistro.
23   Q    What do they serve?
24   A    It's located right on the riverfront in
25        Sheboygan, and they serve neapolitan pizza and
```

1  of his employment, his demeanor, there was just
2  a lot of character change there.
3 Q  And you're talking about Chad?
4 A  Yeah.
5 Q  Was it hard to see?
6 A  It was extremely -- I mean, this is -- I'm
7  still in the first couple months of my
8  employment in onboarding when I'm kind of
9  seeing all of this chaos kind of ravel and
10  unfold.
11      And I'm wondering why maybe --
12  we hire consultant firms all the time. Why
13  isn't somebody coming in here to try to provide
14  direction on how to handle situations like this
15  because in the past even consulting firms that
16  I worked for has assisted and facilitated with
17  incidents in providing recommendations at
18  least.
19      So there was a lot of ways to
20  ask for help and to be able to get that. I
21  just wish the city would have acted much faster
22  on the importance of the incident investigation
23  and what they can do when you wait.
24 Q  Did you see Chad on a regular basis?
25 A  Yeah, I worked with him on a very regular

Page 55

1  basis. He actually facilitated and assisted in
2  a lot of my communications training. Any time
3  I had an open issue, I could go to him for
4  help.
5      I always have people calling or
6  requesting an update on projects, and he knew a
7  lot of history on the City of Sheboygan, so he
8  was actually one of the first calls I'm going
9  to make aside from Carrie Arenz, a former city
10  administrator's assistant, yeah.
11 Q  Personally to you -- did Chad ever personally
12  to you or talking about something else use a
13  racial slur?
14 A  I am trying to -- he definitely explained what
15  happened. There was an instance where we were
16  together in Germany where we heard about the
17  Alderperson Roberta Filicky-Peneski using the
18  racial slur, and we're listening to the
19  recording.
20      I never heard him use the entire
21  racial slur, but he did admit to what happened
22  in the management meeting --
23 Q  Okay.
24 A  -- after he was asked what was said in the
25  neighborhood meeting.

Page 56

1 Q  And did he ever say anything that personally
2  offended you about perhaps people of color or
3  other ethnicities?
4 A  I don't think that -- I was born and raised in
5  Sheboygan my entire life, so it's unfortunate
6  to experience racism, but it has happened in
7  our community.
8      I do believe there are
9  situations that people may not be aware of
10  culturally, so what offended me was the use of
11  a racial slur.
12      So I am a person of color. I
13  will take offense to that. I did make that
14  known to Chad. I think he did feel -- I know
15  he felt uncomfortable with the city at large
16  knowing he used that racial slur because I
17  don't think that he intended it in a way
18  directly to somebody using it -- the term
19  himself. I think he was repeating what he
20  heard in his neighborhood meeting. I do
21  believe it should have been censored.
22      So the fact that he just was
23  asked what was said, I think that he did not
24  rethink it at all to -- I don't know why he did
25  not, but I don't think that he felt he could

Page 57

1  share what was used in a neighborhood
2  association meeting that's supported by the
3  city and created by the city.
4 Q  Did you ever communicate that you wanted to see
5  Chad fired?
6 A  I told Todd explicitly and Carrie that in my
7  experience, and I've had this happen at Nemak
8  before, where somebody used a racial slur. And
9  typically what happens is a person is placed on
10  administrative leave while that incident is
11  investigated fully.
12      Why? Because it provides a
13  barrier for this person to get out of work and
14  to understand what was said and for the City of
15  Sheboygan to take the proper steps to address
16  that situation.
17      And there were people on the
18  phone call when the word was used. And I think
19  it was extremely important that they should
20  have investigated the situation because what it
21  did seem like was that you can use a racial
22  slur as a City of Sheboygan employee, and there
23  are no repercussions at one of the highest
24  levels as a department manager.
25 Q  And you stated a couple times that he was asked

15 (Pages 54 - 57)

Case 2:23-cv-01048-WED    Filed 04/11/25    Brown & Jones Reporting    Page 3 of 12    Document 152-32    414-224-9533
A Veritext Company    www.veritext.com

Page 58

1  to repeat what was said at the meeting.
2  A  From my understanding of the situation when I
3     was told what happened and I was not in that
4     room so I can't, right, verbatim repeat, but I
5     was told multiple times that he was asked what
6     did the person say.
7            So from what I heard, he came to
8     that meeting to say that we have some racism
9     and some major issues in our neighborhood
10    association meetings that were essentially
11    created by former mayors.  So it's supported
12    directly by our office and facilitated by his
13    employees.  So his employee Janet brought that
14    to him, and that's where he felt the need to
15    share that in that meeting.
16           From what I heard, Emily asked
17    what is being said?  And he's like, well, and
18    then stated that somebody said what are we
19    going to do about all these Ns moving to our
20    neighborhood.  So instead of censoring it, he
21    used the term.
22 Q  And you stated that you talked to Todd and
23    Carrie about something happening there.
24           Were you also upset mainly only
25    at Chad, or were you upset at that situation

Page 59

1  and how that was -- like with him being -- with
2  Emily asking him and then that happening and
3  how there needed to be something to make sure
4  that this didn't happen?
5  A  Well, so I had and worked with a couple
6     personal situations, right?  I've gone to
7     volunteer at nursing homes where I'm just
8     assisting, right, just spending time playing
9     chess with individuals.  And they ask my race
10    or ethnicity, and they've used a racial slur.
11           I've taken calls at the City of
12    Sheboygan where people have used -- called to
13    complain and have used racial slurs.  I have
14    worked in previous places of employment where
15    people have used racial slurs at the Chamber of
16    Commerce.  One of their employees used a racial
17    slur, and it was handled -- so different people
18    handle situations differently.
19           In my experience especially with
20    respect to just -- for people, it's just
21    there's -- and human resources general respect
22    for others.  That's discrimination, so it's
23    racial -- it's hate.  I don't know.  It's
24    terrible, but there's a way to handle that.
25    There's a method of investigation.

Page 60

1            So I definitely don't think
2     that -- I'm upset that it was handled -- that
3     it was not handled appropriately in my eyes as
4     an employee.
5  Q  As far as Chad, do you feel that it was
6     appropriate for that information to be made
7     public about what he said?
8  A  Do I feel if it was fair?
9  Q  Appropriate.
10 A  I feel that a municipality in the City of
11    Sheboygan should have very clear expectations
12    of their employees and should have a very clear
13    outline of rules and responsibilities of our
14    employees.  It's unfortunate that maybe that
15    was not clear in some sort of way that would
16    make somebody feel okay to use a racial slur.
17           So was he -- I wonder what was
18    in his handbook when he signed to be an
19    employee or what you agree to.  I think I know
20    what's expected of a department director, and
21    he fell below that with utilizing that racial
22    slur.
23           What was the question again so I
24    can answer that?
25 Q  That's fine.

Page 61

1  A  What was the question?  Do I think it was fair
2     if the information release?
3  Q  It was made public.  The information that he's
4     a -- the narrative that he's a racist.
5            Do you feel that was fair to
6     Chad?
7  A  I don't know what the rules and regulations are
8     on management meetings or what the level of
9     privacy is or what the policy is or what the
10    understanding is.
11           What I do know from that
12    situation was that people had left that meeting
13    and had began to get on their devices and
14    express how they felt about what they had just
15    heard.  And that's where conversations now got
16    into Facebook chats, large public forums and
17    groups.
18           I was trying to think personally
19    if I ever -- would I ever want that to be
20    known.  I just know that I wouldn't in any
21    capacity.  Yeah -- so.
22 Q  In your opinion, do you think Chad made a
23    mistake by responding to Emily that way, or was
24    this intentional because he wanted to offend
25    people?

1 A I think he definitely made a mistake. Given
2 Chad's personality type, he is not a very --
3 he's not a social butterfly. He is not
4 somebody who is -- I've never knew him or saw
5 in his character to be somebody who would act
6 with malicious intent towards somebody. I've
7 never seen him raise his voice. He's extremely
8 soft spoken.
9 So, no, I do not think that he
10 intended to hurt anybody in that meeting.
11 Q And did Mayor Sorenson ever tell you about --
12 your testimony -- I'll start that over.
13 Your testimony was that people
14 had gone on their devices after that meeting.
15 Did Mayor Sorenson tell you
16 about anybody at that meeting who had talked
17 about Chad --
18 A He did not. At the time that that occurred,
19 the office was being shared by Emily
20 Rendall-Araujo and Josh Drossel, her wellness
21 coordinator.
22 So when -- immediately following
23 that meeting, she came into the office right by
24 my desk and was like you wouldn't believe what
25 just happened. At the time she was already on

1 her phone. So then she began to share that
2 situation. And she was like, I can't believe
3 that, I'm talking to my friend group about it.
4 So she had let me know that she had.
5 As things had gone on, she had
6 said that somebody she told from her friend
7 group had told and went to -- or shared this
8 information on a Facebook chat group, and it's
9 a progressive women's group.
10 I am not a member of the group
11 so I can't see the conversations, but I know
12 there were screenshots shared of the
13 conversation and the anger that was now
14 starting to develop for Chad Pelishek, and
15 people were starting there to demand he be
16 fired and things like that.
17 Q You said Emily talked to you. Emily was in the
18 office at the time is what you stated. She was
19 working in the office?
20 A She had a shared office while Uptown Social was
21 being built, so Emily did share an office and a
22 conference room off to the left side of the
23 room, and she used that with her wellness
24 coordinator.
25 Q Does she have a close relationship with the

1 mayor at that time?
2 A I think so, yes.
3 Q Do they still have a close relationship?
4 A Yes.
5 Q Have you ever been a part of their
6 communications during that time?
7 A Yes. Emily felt extremely emotionally
8 overwhelmed just from what I could see from
9 that. Her husband is Peruvian. She has, I
10 think, a tremendous amount of love for people
11 from what I see. And especially working at
12 Uptown Social with the people that she does,
13 there's a certain level of patience that you
14 have to have.
15 The people she told -- one
16 included Amanda Salazar, and she has a very
17 diverse friend group, so I know she took
18 offense to it.
19 Q Did you tell Emily that you wanted Todd and
20 Chad both fired?
21 A I don't think I said that about Todd. I think
22 what I said -- if I can recollect what I said
23 was that in my experience, typically people are
24 placed on administrative leave while the
25 situation is investigated fully.

1 The results to that typically is
2 people lose their job for using racial slurs.
3 It's not accepted. There's no way to explain
4 that, and we work with members of the public.
5 Since then I know we've had
6 developers tell us that they stopped, working
7 with us after the racial slur which was very
8 hurtful to hear that people were cutting off
9 their relationship with the City of Sheboygan
10 because of the reputation that was in the
11 Sheboygan Press or the reputation that the
12 Sheboygan Press was creating.
13 Q Thank you.
14 (Exhibit 12 was marked for
15 identification.)
16 MS. DeMASTER: Would you please mark
17 this as Plaintiff's Exhibit 12.
18 BY MS. DeMASTER:
19 Q I am handing you a text message. This is a
20 public record between Amanda Salazar and Emily
21 Rendall-Araujo.
22 A Do you know what the state of this message is?
23 Q I believe you can see it on the very bottom.
24 It's kind of cut off.
25 A Oh, October 14th.

1 Q  Or maybe the day before that.
2 A  Okay.
3 Q  So here these were provided by Amanda talking
4    to Emily. So Emily's are on the left side, and
5    Emily is saying here you, Veronica, felt very
6    strongly they both need to go.
7         Do you know any other Veronica
8    that works with Emily?
9 A  No.
10 Q  Do you agree or disagree with this statement?
11 A  If that's her interpretation --
12         MR. BULIOX: Just objection as to
13    form in the document itself in terms of
14    foundation.
15         Subject to that, you can go ahead and
16    answer.
17         THE WITNESS: I'm not sure what her
18    feelings or interpretations are, so you'd have
19    to ask Emily. But if that's how she perceived
20    or she may have perceived something that I said
21    in a certain way, but I can only speak on how I
22    felt.
23 BY MS. DeMASTER:
24 Q  Is that what you meant -- if she proceeded
25    wrongly, that's one thing. Is that what you

1    meant?
2 A  I think that what I meant is that the situation
3    should have been investigated fully. Chad
4    should have been placed on administrative leave
5    while it was investigated.
6 Q  Was the situation ever investigated?
7 A  I don't know. Why I say that is because I
8    don't ever recall, right, filling out an
9    employee statement that would have said what
10    happened, what did you hear, how did this
11    situation transpire.
12         I do believe that Carrie and
13    Todd worked together based off all of our
14    concerns to try to provide direction to Chad
15    with an apology email, started to discuss DEIB
16    trainings that the city should incorporate,
17    right?
18         Because if Chad maybe was not
19    aware that he should have censored the word,
20    that there's something that we can do to
21    prevent this from happening, right? So let's
22    bring in a DEIB specialist so we can try to
23    focus on, right, correcting behavior and --
24    yeah, and providing some support.
25 Q  Just a clarification. When you say a DEIB

1    specialist, what does that refer to?
2 A  Diversity, equity, inclusion, and belonging is
3    what I'm familiar as those -- as that acronym
4    is.
5 Q  Was there ever any training -- any DEI or
6    diversity training?
7 A  In the past or during my time?
8 Q  During your time.
9 A  Yes. I worked with the chamber. So they do
10    different DEIB trainings. And there was a name
11    of a gentleman who's a motivational speaker but
12    claimed to be a DEIB professional, and I only
13    just questioned just his credentials because
14    motivational speaker was always like the big
15    thing on there.
16 Q  Do you remember his name?
17 A  I'm trying to recall. I can't. Alonzo Kelly,
18    that's what it was.
19 Q  Okay.
20 A  Todd worked with him in the past. Todd and
21    Carrie shared a time they used Alonzo Kelly and
22    did trainings at the police department, and
23    that's when Todd shared a significant number of
24    individuals from DPW police or fire, but they
25    sat in the bathroom instead of listening to the

1    message.
2         So I was really concerned as to
3    how we didn't acknowledge that at the time, how
4    people were not talked to about that, is that
5    in an employee file somewhere. And we're going
6    to do the same thing, so I did just question
7    that.
8         So I can't quite recall when
9    exactly the trainings were, but I do believe
10    Alonzo Kelly -- I did attend trainings within
11    the time with Alonzo Kelly. I can't recall if
12    it's from the staff or not. If I have a
13    specific date, I can always look back on that
14    too.
15 Q  Do you remember in general what the training
16    talked about or -- was it only Alonzo Kelly, or
17    was there any other diversity training while
18    you were with the City of Sheboygan?
19         I believe we had another witness
20    testify that there was one held at City Hall
21    and one held at UW.
22 A  Yes.
23 Q  Did you attend either of those?
24 A  I'm trying to recall. I had to have attended
25    the one at City Hall. I can't recall, though.

18 (Pages 66 - 69)

Case 2:23-cv-01048-WED    Brown & Jones Reporting    Document 152-32
                         Filed 04/18/25    Page 6 of 12    414-224-9533
                         A Veritext Company    www.veritext.com

Page 82

1  like that, or emails, if I had them, but not
2  that I can -- yeah. If you have something in
3  mind that you're speaking of, otherwise I just
4  have a fear of making generalizations or
5  anything like that.
6  Q  That's fine. This is your recollection.
7     Generalization is not a lie. You're trying to
8     remember. That's okay.
9  A  Okay.
10 Q  Don't worry about that.
11 A  Okay.
12 Q  None of this is intentional. You're trying to
13    remember.
14 A  Yeah.
15 Q  Do you remember what you told Jill Hall --
16 A  I can say right now I honestly don't even
17    remember anything past like, hey, I'm Jill
18    Hall. I can't even tell you who she works for.
19 Q  All right.
20 A  I know that sounds awful.
21 Q  Has anyone at the city ever told you to delete
22    any messages?
23 A  No. To delete any? Anybody at the city told
24    me to delete any messages?
25 Q  Any text messages.

Page 83

1  A  Not that I recall.
2  Q  Any group text messages?
3  A  The question is has anybody from the city? I
4     do not -- I can't remember.
5  Q  You can't remember?
6  A  No. I do know I've had multiple conversations
7     with people that use encrypted text messaging
8     apps to talk. I was told if it is a company
9     phone, if you're doing any company business
10    where they can be taken from the city or the
11    city can take or request that from you at any
12    time. I'm just trying to remember.
13           I don't remember. If there's a
14    specific person, situation, time, or place, I
15    can try to recall.
16 Q  Have you ever been on a group text message
17    thread with Emily -- that included Emily and
18    Mayor Sorenson?
19 A  Yes.
20 Q  Who all was on that group text?
21 A  Oh, yes. I think I do recall comments that --
22    an inappropriate comment that Emily had made,
23    and she was a little worried about -- yeah.
24 Q  Did she want the message to be deleted?
25 A  I feel it had something to do with Todd and

Page 84

1     something offensive towards Todd.
2  Q  She asked you guys to delete that message?
3  A  She may have. I'm not a big deleter of
4     messages.
5  Q  You never deleted a message?
6  A  I don't think so.
7  Q  Did Emily tell you she ever deleted a text
8     message about Todd or Chad?
9  A  I can't recall.
10 Q  Did she ever text to you in that group to talk
11    about Chad?
12 A  I have had conversations with her where she has
13    shared feelings with Chad about that
14    conversation.
15 Q  Did she do that over text message?
16 A  She could have. I know that I have had verbal
17    conversations with her on the phone and in text
18    messages where the whole -- yep.
19 Q  With a slur and everything?
20 A  Yes.
21 Q  You say Emily did have a text message -- any
22    text communication that you were included on
23    about Chad?
24 A  Yeah, she may have.
25 Q  Did you speak with her often?

Page 85

1  A  No.
2  Q  I want to go back -- fast-forward to Adam
3     Westbrook -- not Adam Westbrook.
4           Who was leading the Hall
5     investigation?
6  A  The attorney's office, right? I'm assuming the
7     attorney's office.
8  Q  Who were you told?
9  A  Attorney's office.
10 Q  So it wasn't Mayor Sorenson?
11 A  No. It's my understanding that the mayor is
12    not able to handle personnel issues in his
13    capacity as mayor. That would be like a city
14    administrator, interim city admin, NHR,
15    attorney's office with the direction here that
16    they're handling HR issues.
17 Q  And was it your understanding the City
18    Attorney's Office was helping to lead that
19    investigation?
20 A  Yes.
21 Q  And when did you first hear that the
22    investigation was concluded, the Hall
23    investigation?
24 A  I can't even remember.
25 Q  Do you remember there being a written report

22 (Pages 82 - 85)

Page 86

1  that was being prepared from that
2  investigation?
3 A  I want to say yes because I can't imagine what
4  she would be doing interviews without being
5  able to obtain some sort of --
6 Q  Did you ever hear -- did you ever hear somebody
7  say check Adams was helping her with a written
8  report?
9 A  I can't remember, but I guess I can assume that
10  they would be working together to put together
11  a report or develop findings as an assumption.
12 Q  Did Adam Westbrook ever -- did you ever talk to
13  Adam Westbrook about your concerns with some of
14  the community partners given the slur with
15  Chad?
16      You mentioned -- to provide some
17  background, you mentioned before that you were
18  concerned of the slur because you were hearing
19  from people around the city that they did not
20  want to work with Chad --
21 A  Yes.
22 Q  -- after hearing about this?
23 A  Yes.
24 Q  Kind of walk me through that. What did you
25  say? What did you talk about?

Page 87

1 A  To Adam Westbrook about my concerns with the
2  public?
3 Q  Um-hum.
4 A  I can't recall entirely.
5 Q  Just in general.
6 A  I'm sure that I just kind of discussed wanting
7  to ensure that we're not going to -- from my
8  recollection, I do worry about partners and how
9  they feel working with the City of Sheboygan,
10  so that's -- probably what I said is how is the
11  Chamber of Commerce and all their affiliates,
12  County Economic Development Corporation, all
13  their affiliates. And then Chad, so many
14  relationships he's built with so many people,
15  is that now going to be strained because of
16  this. See him, us, in a different light
17  because this right here looks and sounds -- the
18  article in the Sheboygan Press looks and sounds
19  like he's a racist leader.
20 Q  Did you think that narrative was false?
21 A  Yeah.
22 Q  To your knowledge, did alderpersons know that
23  narrative was false? Did Westbrook ever tell
24  you that?
25      MR. BULIOX: I'm sorry. Compound.

Page 88

1      MS. DeMASTER: I'm sorry about that.
2 BY MS. DeMASTER:
3 Q  To your knowledge, did you know that any alders
4  thought that the narrative was false?
5 A  Yeah -- yes. There were alders that did not
6  believe that he was a racist man but was just
7  asked to repeat what he had heard, and he did
8  just that.
9 Q  And as you stated that this was a mistake that
10  could be corrected; is that correct?
11 A  What do you mean?
12 Q  A mistake that could be -- this was a mistake
13  and not an intentional pattern of conduct.
14 A  Yeah. I don't think that he deliberately
15  wanted to say a racial slur, right, with intent
16  to someone. I think that just as the logical
17  thinker that he really is, he just was asked a
18  question and answered it without -- I don't
19  think that -- I think that -- I don't think
20  that he thought that this was going to happen.
21  I think he was just sharing with the team the
22  level of racism and direct words that are used
23  in the meeting.
24 Q  Thank you. You mentioned before that when Chad
25  first brought this up at that management

Page 89

1  meeting, he brought this up on behalf of his
2  employee Janet.
3      Who were you talking about?
4 A  Janet Duellman. She is the neighborhood
5  association liaison.
6 Q  And so you stated that Janet had told Chad
7  about this?
8 A  Yes.
9 Q  And he was raising this to help her; is that
10  correct?
11 A  Yes. He was raising his concern because he
12  wanted it to be known that there are members in
13  those neighborhood associations that are using
14  those racial slurs. These are city sponsored
15  and that we need to do something about that.
16      So he was raising that to let
17  everybody know what is happening in these
18  meetings and to do something about it, and he
19  was seeking guidance as to what do I do.
20 Q  Is it fair to say that Janet was reporting a
21  racism incident that she went --
22 A  This started with Janet, yes. Janet reported
23  what she heard to Chad from my understanding,
24  yes.
25 Q  And so Chad was raising that to others?

23 (Pages 86 - 89)

Case 2:23-cv-01048-WED    Brown & Jones Reporting    Filed 04/11/25    Page 8 of 12    Document 152-32    414-224-9533
A Veritext Company    www.veritext.com

Page 90

1  A  Yes. It is Chad's responsibility as the
2     department head to share concerns that are
3     extreme -- that are that extreme to the
4     management team especially to the mayor as that
5     is one of his initiatives to have that
6     neighborhood leadership cabinet.
7  Q  Of course. Did the mayor ever tell you that he
8     was pleased that Chad raised this issue?
9  A  I know that the mayor was definitely -- I don't
10    want to say thankful or grateful. He was -- I
11    think he was -- he wanted to be made aware that
12    that is occurring in our community because he
13    would never allow or accept that, so I think he
14    would be on the same page with Chad as to
15    wanting to address it.
16 Q  Did the mayor ever say anything to you about
17    wanting Chad to pay for his mistake in the
18    community?
19 A  No. Actually, the mayor felt really bad for
20    him.
21 Q  Did he?
22 A  He did. And he made a personal comment like
23    hopefully this trip to Germany will help him
24    get his mind off things. Hopefully this will
25    be nice for him. But from my experience with

Page 91

1     Chad there, he was too overwhelmed with what's
2     going on back home, the pressures and not
3     knowing what if my kids are getting out of
4     school and someone is yelling, your dad is a
5     racist, and his wife is a physician in the
6     community too.
7        So they're locales, so I think
8     that he went with the initiative to do great
9     things in Germany, but I don't think his head
10    was really in the game because of what was
11    happening.
12 Q  I understand. Thank you. Do you believe it
13    might have helped in your opinion, or did the
14    mayor ever tell you -- or in your opinion do
15    you believe that there was ever -- did the
16    mayor tell you -- I won't compound it.
17       Did the mayor ever tell you that
18    he felt that the city should release a short
19    public statement correcting that bulk
20    narrative? You stated that he told you he was
21    concerned about Chad.
22       Did he ever tell you about some
23    ideas about releasing a statement?
24 A  To the public?
25 Q  Yes, just correcting the narrative.

Page 92

1         MR. BULIOX: Objection just as to
2     form.
3         Go ahead and answer if you can.
4         THE WITNESS: I'm having trouble with
5     that only because, right, he had a conversation
6     with Maya Hilty about what happened. She had
7     questions for him, and they had their meeting.
8         So typically in my experience as
9     communications, you'd be working with city
10    administration to release something to the
11    public, right, to address that issue, but I
12    don't believe anything like that occurred.
13 BY MS. DeMASTER:
14 Q  Did you ever go with the mayor to -- you
15    mentioned there were city partners that you
16    were concerned about and didn't want to work
17    with Chad.
18       Did you ever go with the mayor,
19    ever talk to those city partners to be like
20    hey, look, the city is not going to release
21    anything but, look, it's not accurate or
22    something?
23 A  I know that I had met with Deirdre from the
24    Sheboygan County Chamber of Commerce. She's
25    the executive director because she was my

Page 93

1     former employer. And because we worked
2     directly with them as partners, she's
3     definitely made the statements like what the
4     hell is going on over there.
5         And because of this narrative in
6     the Sheboygan Press, right, she at first didn't
7     know what to think about him. I'm like go back
8     to all the times you worked with him. Of
9     course he shouldn't have said it, but there are
10    things to help members in our community to
11    understand the implications of this and how
12    this can really tear our community and entire
13    organization apart.
14       But then I shared with her and
15    was very explicit as to what was going on,
16    right, that this had gotten to a group, right,
17    and now all sorts of perceptions and feelings
18    and emotions are being just thrown out there,
19    and this is just -- I can tell you -- I told
20    her I can tell you what happened from my
21    understanding and then what you're saying in
22    all of the media.
23       If I was just a Sheboygan
24    resident that read what I read in the media, I
25    would think that Chad was a racist member of

24 (Pages 90 - 93)

Brown & Jones Reporting                    414-224-9533
A Veritext Company                         www.veritext.com

```
 1          mediator -- it's in management, some sort of --
 2          I'm trying to think of what the firm was
 3          called.  They were brought in to help us manage
 4          this, manage employee dysfunctionality, all of
 5          that work has stopped too that a lot of
 6          employees have asked us about.
 7                         We find it difficult to just
 8          answer.  It's new administration, so it's --
 9          we're moving different objectives so...
10     Q    How did you first learn about the racial slur
11          incident?
12     A    I learned about it when Emily came into the
13          office and told me about that right then and
14          there.
15     Q    What did Emily tell you?
16     A    She told me she looked visibly upset,
17          emotional, and basically just said somebody
18          dropped an N bomb in the management meeting.
19          I'm like "Who"?  She's on her phone and stuff,
20          and that's when she said it was Chad, and she's
21          like so I had to pull him aside after the
22          meeting and say hey, man, I know I asked what
23          was said, but you didn't have to say the N
24          word.  You didn't have to say it.  You could
25          have said the N word.
```

Brown & Jones Reporting   414-224-9533
A Veritext Company   www.veritext.com
Case 2:23-cv-01048-WED   Filed 04/11/25   Page 10 of 12   Document 152-32

1 offended?
2 A Yeah.
3 Q Why is that problematic to you?
4 A It's extremely problematic because you're
5 insinuating that some people may be offended by
6 racial slurs and some people are not.
7 It states that -- I have already
8 said multiple times that people are -- members
9 of the community are very taken back that a
10 leader of a department that has been a member
11 of the City of Sheboygan for 20-plus years uses
12 a racial slur, and there's maybe ineffective
13 transparency, communication. It's just the
14 fact it was used.
15 And now the lines are blurred
16 with what's happening in headlines and how the
17 racial slur was used in that meeting, right?
18 It's going to be very different
19 when somebody is saying to somebody you are
20 this and this and this, or I was in a
21 neighborhood meeting and a member in our
22 community used a racial slur, and that is what
23 we're trying to address here.
24 Which, again, I will state I
25 don't even know if the original root cause

1 problem has ever been addressed to this day.
2 MR. BULIOX: All right. Thank you
3 very much.
4 MS. DeMASTER: I have just a couple
5 redirects from that.
6 EXAMINATION
7 BY MS. DeMASTER:
8 Q In your opinion, if Todd or Chuck Adams,
9 anybody at the city, any leadership had asked
10 you to help coach Chad with writing an email
11 apology, do you think Chad would have been
12 receptive, or would he have told you to go
13 away?
14 MR. BULIOX: Objection. Calls for
15 speculation.
16 THE WITNESS: I would say no. I
17 would definitely say he would have said, yeah,
18 can you do it for me. He probably would have
19 said can you help me.
20 BY MS. DeMASTER:
21 Q Clearly communications you're very skilled and
22 Chad is not a social butterfly I think were
23 your words?
24 A Yeah.
25 Q And he would have been receptive?

1 A Yes. I think he would have. I can't think of
2 a time where he said, no, you can't help me.
3 And, again, that's kind of why I said we can
4 see where there's communications -- there's
5 support for communications and certain
6 situations. So it would just be helpful if
7 there was streamlined processes to support
8 personnel with this process.
9 Q Two more follow-ups. Warren was asking
10 about -- you asked if anybody else was
11 offended -- you heard from Emily that Judge
12 Torrey was offended.
13 You said -- were you talking
14 about others within that meeting, or did you
15 mean the community from the articles?
16 A Just based off of all the commentary that I
17 have seen on even our posts, yeah, people were
18 offended that we still had --
19 Q In the public?
20 A Yes, that we still had a leader. Based off of
21 their understanding what happened from reading
22 those news articles, when you spoke to
23 department heads who heard it right then and
24 there, I don't want to speculate, but right
25 there they didn't -- I never heard any

1 department head say he said it with intent to
2 somebody or at somebody.
3 Q One last thing. Have you ever heard the term
4 "white man" or "white man of privilege"?
5 A Yes.
6 Q Have you heard it just in the context that
7 white man -- was it -- is it offensive when a
8 white man like Chad makes that comment?
9 MR. BULIOX: So objection to the
10 extent that it goes beyond the scope of my
11 questioning.
12 MS. DeMASTER: It goes to the DEI
13 trainings -- or not maybe that -- or DEI
14 conversations that they were having at the city
15 before they have stopped recently.
16 THE WITNESS: What was the question?
17 BY MS. DeMASTER:
18 Q Whether that was problematic if maybe Emily
19 ever said anything to you or Amanda.
20 A That what was problematic?
21 Q That somebody like Chad who was a white man
22 said that.
23 MR. BULIOX: Objection. Form.
24 Assumes facts not in evidence.
25 Subject to that, go ahead and answer

Page 126

1   if you can.
2           THE WITNESS:  I'm sorry.
3   BY MS. DeMASTER:
4   Q   You made a comment that Amanda apparently said
5       the word that when you were in Germany you
6       found this out?
7   A   That Roberta Filicky-Peneski did?
8   Q   That Roberta did.  I'm sorry.
9   A   Yeah.
10  Q   So going back to during this time frame, was
11      anything said by Emily or Amanda, something
12      about why it was problematic that Chad said
13      that?
14  A   Yes.
15  Q   Do you remember what that was?
16  A   Yes.  I mean, it's a white male in a privileged
17      position allowed to use a racial slur.
18  Q   Final question.  Do you -- actually, no.
19          MS. DeMASTER:  That was the final
20      question.
21          MR. BULIOX:  I have a follow-up to
22      your follow-up.
23              EXAMINATION
24  BY MR. BULIOX:
25  Q   To your knowledge, was Chad aware of your role

Page 127

1       in the city?
2   A   Yes.
3   Q   Was he aware of your role in communications?
4   A   Yes.
5   Q   And did Chad ever ask you to put together a
6       draft of an apology letter or communication for
7       him?
8   A   No.
9           MR. BULIOX:  No further questions.
10      Thank you.
11          MS. DeMASTER:  We're good.
12          (Proceedings concluded at 12:56 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 128

1  STATE OF WISCONSIN  )
                       ) SS:
2  COUNTY OF MILWAUKEE )
3
4          I, Dawn M. Lahti, RPR, CRR and Notary
5  Public in and for the State of Wisconsin, do
6  hereby certify that the preceding deposition
7  was recorded by me and reduced to writing under
8  my personal direction.
9          I further certify that I am not a
10 relative or employee or attorney or counsel of
11 any of the parties, or a relative or employee
12 of such attorney or counsel, or financially
13 interested directly or indirectly in this
14 action.
15         In witness whereof, I have hereunder
16 set my hand and affixed my seal of office on
17 this 17th day of July, 2024.
18
19
20
21
22        DAWN M. LAHTI, RPR/CRR
23             Notary Public
        In and for the State of Wisconsin
24
   My commission expires April 16, 2028
25