# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHAD PELISHEK,

                Plaintiff

    v.                                       Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

                Defendants.

---

## [CORRECTED] PLAINTIFF CHAD PELISHEK'S BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

# Table of Contents

INTRODUCTION................................................................................................................ 1

LEGAL STANDARD ......................................................................................................... 2

ARGUMENT AND AUTHORITIES ................................................................................ 2

I.  Defendants are not entitled to summary judgment on Pelishek's First Amendment claim. .......................................................................................................................... 2

    a.  Pelishek Has Standing Because the City's Directives Chilled His Speech. .................... 2

    b.  Pelishek's Claim Is Not Moot.......................................................................................... 4

    c.  The City's Directives were unlawful Prior Restraints. .................................................... 5

II.  Defendants' Discriminatory Conduct against Pelishek under Title VII. ..................... 6

    a.  Disparate Treatment Based on Race and Gender. ........................................................... 7

        1.  Evidence sufficiently shows the City's discriminatory motive under the Direct Method.......................................................................................................... 7

        2.  Indirect Method. .................................................................................................... 9

        3.  Defendants subjected Pelishek to multiple adverse employment actions. ......... 10

            i.  Removed job duties, public reprimands, impossible work assignments and denial of complaint. ......................................................................11

            ii.  Constructive Discharge............................................................................ 12

    b.  Hostile and Abusive work environment. ....................................................................... 16

        1.  Pelishek was subjected to severe or pervasive harassment that altered the terms and conditions of his employment........................................................... 17

III.  Equal Protection under 42 U.S.C. §1983. ................................................................. 20

    a.  The City of Sheboygan is liable under *Monell*............................................................. 21

        1.  The City's DEI Policy and implementation practices were the moving force behind Pelishek's injuries............................................................................... 21

        2.  Ratification by Officials with Final Policymaking Authority also caused Pelishek's injuries. .............................................................................................. 23

b.     Individual Liability and Qualified Immunity. ................................................................ 24

      1.     Emily Rendall-Araujo is not entitled to qualified immunity. ............................ 25

      2.     Charles Adams is not entitled to qualified immunity. ........................................ 27

      3.     Sorenson is not entitled to qualified immunity. .................................................. 29

**CONCLUSION** ............................................................................................................................ **31**

## INTRODUCTION

Defendants seek summary judgment on claims that present sharp factual disputes, credibility contests, and a documented record of race and gender-based discrimination against Plaintiff Chad Pelishek—a straight white male Director for the City of Sheboygan. Defendants publicly defamed Chad Pelishek as a racist, created a hostile environment for several years that compounded exponentially in August 2022, and stripped away his job abilities and dignity until there was no other option but to resign lest he be publicly fired or further accused. The summary judgment standard does not allow the Court to weigh credibility, discount disputed facts, or resolve inferences in movants' favor. Yet Defendants ask the Court to do precisely that.

For months, Defendants subjected Mr. Pelishek to escalating public humiliation, reputational injuries, public outrage to force his departure, and adverse actions after he reported concerns about racism. The campaign included a manipulated investigative report omitting exculpatory facts, repeated refusals to investigate his complaints, unequal enforcement of workplace policies, unlawful gag orders preventing him from speaking to the press, attorneys, or colleagues on matters of public concern, denial of access to his counsel, and exclusion from job duties. Defendants created a workplace so hostile and intolerable that no reasonable person could have remained.

Defendants' strategy seeks to fragment the record and argue facts and individual defendants in isolation. Through this maneuver, they downplay the scope of the harassment and misstate both the factual and legal standards applicable at summary judgment. But the law requires that the totality of circumstances be considered, especially in claims of discrimination, retaliation, and constitutional deprivations. The record presents genuine disputes of material fact on each element of Pelishek's claims, precluding summary judgment. A jury could reasonably find that Defendants acted with discriminatory

1

intent, retaliated against protected speech, created a hostile work environment, and violated the First and Fourteenth Amendments. Accordingly, summary judgment must be denied.

## LEGAL STANDARD

In evaluating a motion for summary judgment, the Court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). Courts may not resolve factual disputes or make credibility determinations at the summary judgment stage. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

Discrimination claims, in particular, often turn on questions of fact regarding motive and intent. *McCann v. Badger Mining Corp.*, 965 F.3d 578, 589 (7th Cir. 2020); *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018). As the Seventh Circuit has explained, summary judgment is seldom appropriate in cases where motive or intent are at issue. *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985); see also *EEOC v. Miller Brewing Co.*, 650 F. Supp. 739, 746 (E.D. Wis. 1986). Where, as here, the record contains testimony, documents, and evidence from multiple witnesses disputing the employer's justification and supporting an inference of discriminatory or retaliatory motive, the case is triable before a jury.

## ARGUMENT AND AUTHORITIES

### I.    Defendants are not entitled to summary judgment on Pelishek's First Amendment claim.

#### a.    Pelishek Has Standing Because the City's Directives Chilled His Speech.

The City's directives imposed a classic prior restraint on speech, conferring standing under well-established First Amendment doctrine. See *NTEU v. United States*, 513 U.S. 454, 468 (1995); *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In early 2023, Chad Pelishek was directed not to speak about the Wolf

2

litigation, racism allegations, or the Hall Report findings with anyone—including his attorney—absent prior City approval and legal supervision. (DPF[1] ¶¶ 71 & 77 and PEL[2] Fact ¶1). Violation of these directives carried the threat of discipline and termination. (PEL Fact ¶1). Pelishek complied, refraining from speaking to legal counsel, City colleagues, and the press until after resigning after my FMLA leave. (PEL Fact ¶1). That chilling effect is a constitutionally recognized injury in fact. See *Norton v. City of Springfield*, 324 F. Supp. 3d 994, 1000 (C.D. Ill. 2018).

The City's suggestion that Pelishek lacks standing because he could not articulate economic "damages" misconstrues the doctrine. A First Amendment injury does not depend on monetary harm. It arises from compelled silence on matters of public concern and the inability to consult counsel about legal claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Elrod*, 427 U.S. at 373. Here, the chilling was direct, documented, and backed by disciplinary threat.

That Pelishek is not a lawyer and could not identify specific "legal injuries" at his deposition is irrelevant. (PEL Fact ¶2). He testified that he was afraid to contact his own attorney or pursue his EEOC complaint due to the City's written orders. (PEL Fact ¶1). That alone suffices for Article III standing. *NTEU*, 513 U.S. at 468 (standing exists where a directive "chills potential speech before it happens"). The harm was neither hypothetical nor speculative. Pelishek's months of silence—including his inability to consult legal counsel or correct the public narrative—were the natural and intended result of the City's prior restraint. (PEL Fact ¶ 1). Whether or not he ultimately faced termination is beside the point. Under binding precedent, a government order that "chills" speech is itself a concrete injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976)("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

---

[1] Pelishek incorporates by reference incorporates by reference his responsive facts along with the Defendants Proposed Findings of Fact, hereinafter referred to as "Resp. DPF."

[2] Hereinafter, Pelishek incorporates by reference his simultaneously filed Statement of Additional Facts which Require Denial of Summary Judgment (hereinafter referenced as "PEL Fact").

3

Because Pelishek's speech was chilled in response to such orders, he has standing to pursue his First Amendment claim.

    b. <u>Pelishek's Claim Is Not Moot.</u>

The City's argument that Pelishek's First Amendment claim is moot because the Wolf litigation concluded fails as a matter of law. A case remains justiciable where past harm occurred or where future recurrence is possible. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 189 (2000); *Hernandez v. City of Phoenix*, 43 F.4th 966, 975 (9th Cir. 2022). That remains true even after a challenged policy ends—damages for past unconstitutional speech suppression remain actionable. *McLean v. City of Alexandria*, 86 F. Supp. 3d 475, 481 (E.D. Va. 2015).

Here, Pelishek was subject to written and verbal gag orders barring him from speaking about the City's racism narrative, misconduct allegations, and the Wolf investigation. (DPF ¶¶71 & 77). That compelled silence caused real harm, not abstract concern. *Elrod*, 427 U.S. at 373. He refrained from consulting counsel, feared retaliation, and avoided potential claims—all while under official restriction. A chilling effect lingers even after threats are lifted. *Elrod*, 427 U.S. at 373; *see also, Norton v. City of Springfield*, 324 F. Supp. 3d 994, 1000 (C.D. Ill. 2018) (suppression alone creates injury, regardless of later policy change).

Moreover, the City's suppression was not confined to the Wolf litigation. As recently as August 2023, City officials—including outside counsel—circulated emails labeling Pelishek's claims "false," while continuing to restrict employee speech. (PEL Fact ¶3). One witness, Janet Duellman, who testified in his favor, is no longer employed, reinforcing the message that speech is still chilled. (PEL Fact ¶¶4, 5). This ongoing pattern shows both past and present injury. Under *Reyes v. City of Lynchburg*, 300 F.3d 449, 453 (4th Cir. 2002), and *AFGE v. United States*, 634 F. Supp. 336, 340 (D.D.C. 1984), the chilling of protected speech constitutes actionable harm. Like the plaintiffs in those cases, Pelishek seeks

damages for the months he was silenced, isolated, deterred from asserting his rights, and forced to resign because of his health. (PEL Fact 6¶) . This claim is not moot. The Court retains jurisdiction to redress the past violation and address the risk of recurrence. The City's argument fails as a matter of law.

c. <u>The City's Directives were unlawful Prior Restraints.</u>

The City's attempt to characterize its speech restrictions as mere workplace rules fails. These directives were unconstitutional prior restraints that chilled Pelishek's speech on matters of public concern—namely allegations of racism, retaliation, public corruption, and misuse of taxpayer funds. Prior restraints on speech are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Even in the workplace, such restrictions must be narrowly tailored and justified by actual—not speculative—government interests. *United States v. NTEU*, 513 U.S. 454, 465 (1995); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749–50 (7th Cir. 1999).

The City's February 7 and March 8 directives imposed sweeping prohibitions: employees were barred from discussing the Wolf litigation or related investigation, forbidden from expressing personal views even in private, and required to route all speech through the City Attorney—with threats of termination for violations. (DPF ¶¶ 71 and 77). These rules applied to Pelishek, a key witness to the DEI group's alleged threat and misrepresentations in the report, which was a crux of the Todd Wolf lawsuit. (PEL Fact ¶7). Despite informing HR the day before release that the report misrepresented his interview, the March 8 directive silenced him from correcting the record, speaking to his attorney, or even confiding in his friends or family about the false report. (PEL Fact ¶8).

Speech involving public corruption, discrimination, and misuse of funds is constitutionally protected. See *Lane v. Franks*, 573 U.S. 228 (2014); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Pelishek's speech addressed precisely these topics and was made as a citizen, not as part of his job

5

duties. *Garcetti v. Ceballos*, 547 U.S. 410 (2006). The City cannot justify its restrictions with vague claims of workplace control or litigation sensitivity. Courts have repeatedly rejected such speculative interests. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *Whitney v. City of Milan*, 677 F.3d 292, 298 (6th Cir. 2012). Nor were the directives narrowly tailored. They applied broadly to all communications, internal and external, without temporal or subject-matter limits. (DPF ¶¶ 71 and 77). Employee speech was stifled for those, like Pelishek, who feared public termination given the recent example of Todd Wolf. Far worse than compelling "pre-approval," the City here required *their attorneys* to be physically present for communications with any citizens (*Id.*). This level of control is not constitutionally permissible. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); *Barone v. City of Springfield*, 902 F.3d 1091, 1106 (9th Cir. 2018) (directive to a single employee found unconstitutional).

The directives chilled Pelishek from commenting on matters of public concern, reporting retaliation, seeking legal counsel, or truthfully testifying—all of which are protected acts. The City's sweeping restrictions burdened far more speech than necessary and served no compelling governmental interest. As a matter of law, they violated the First Amendment. Certainly, the City is not entitled to summary judgment. The City's asserted interests are vague, speculative, and unsupported by any evidence in the record, nor the language of the directives themselves. Summary judgment must be denied.

## II.  Defendants' Discriminatory Conduct against Pelishek under Title VII.

This section addresses two distinct but interrelated theories of liability under Title VII: disparate treatment and hostile work environment. Both claims arise from a shared core of facts—including Defendants' public branding of Plaintiff as a racist, the unequal enforcement of workplace policies, and the City's systematic denial of procedural protections afforded to others outside Plaintiff's race and gender. To avoid unnecessary repetition, Plaintiff presents the relevant facts once, primarily in support of

his disparate treatment claim. Those same facts, viewed under the applicable legal standard, independently establish that the workplace was so objectively hostile and subjectively intolerable that it altered the terms and conditions of Plaintiff's employment. While the claims are presented under a unified heading to reflect their shared evidentiary basis, each theory is analyzed separately under its own legal standard below.

      a.  <u>Disparate Treatment Based on Race and Gender.</u>

Pelishek can survive summary judgment for his Disparate Treatment claim by presenting either direct evidence of discrimination, or indirectly through the burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Pelishek has adduced factual evidence to support either method. Either method precludes summary judgment.

      1.  <u>Evidence sufficiently shows the City's discriminatory motive under the Direct Method.</u>

Plaintiff presents a "convincing mosaic" of circumstantial and direct evidence supporting an inference of unlawful discrimination under *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A plaintiff may prove discrimination without a "smoking gun" by assembling evidence—suspicious timing, biased remarks, disparate treatment, or pretext—that viewed holistically, points to discriminatory intent. *Ajayi v. Aramark*, 336 F.3d 520, 531 (7th Cir. 2003).

Here, the record reflects overt animus toward Chad Pelishek as a white, heterosexual male. When he attempted to file a harassment complaint, HR Director Adam Westbrook explicitly denied him from doing this. (PEL Fact ¶ 9). Westbrook feigned that he knew Rendall-Araujo's allegations of him were false and he acknowledged Pelishek's public humiliation. (PEL Fact ¶ 9). In light of Pelishek's complaint, HR Westbrook told him white men were not a "protected class"—a statement revealing institutional bias and a functional denial of equal workplace protection. (PEL Fact ¶ 9); *see Huri v. Office of the Chief Judge*, 804 F.3d 826, 834 (7th Cir. 2015).

7

After self-appointed DEI enforcer (PEL Fact ¶10), Director Rendall-Araujo instructed Pelishek to repeat a slur during a meeting, she falsely accused him of initiating it when she knew her question elicited exactly what was said. (PEL Fact ¶11). The City's investigative report ("Hall Report") conducted by an outside law firm contained contextual omissions that were not what Pelishek reported, namely that Rendall-Araujo had asked him to repeat the specific racial slur and that the DEI Group she was affiliated with tried to extort City Administrator Todd Wolf with a threat to pay them $70,000, they would oppose him publicly. (PEL Fact ¶¶12, 13). City Attorney Chuck Adams edited the outside law firm's written Hall Report, the final version of which did not contain Pelishek's account of the racial slur or the extortion threat. (PEL Fact ¶¶12, 14, 15). The City published the final report as the independent account of what happened. (DPF ¶77). When Pelishek requested redactions of his name and corrections before publication, Adams refused. (PEL Fact ¶16). Up to this point, Rendall-Araujo had freely discussed the matter publicly and online with her DEI friends and the reporter Maya Hilty. (PEL Fact ¶17). That disparity repeated throughout. Rendall-Araujo received institutional support, while Pelishek was barred from speaking—even to legal counsel—about retaliation, racial claims, or inaccuracies in the report. (PEL Fact ¶¶ 19, 20). Other officials, such as Amanda Salazar, a woman, who made similar statements, faced no discipline. (PEL Fact ¶21). Meanwhile, Pelishek was stripped of job responsibilities, disciplined in front of staff, publicly branded a racist. (PEL Fact ¶¶ 32-47). After his forced resignation, he was replaced by a female who has since resigned following performance related issues. Decl. DeMaster, Ex. 39, Sorenson Dep. pages.

City leaders repeatedly invoked his race and gender to justify disparate treatment. (PEL Fact 22, 23, 24.) Rendall-Araujo called him a "white man of privilege" and actively campaigned for his removal while promoting anti-male rhetoric. *Id.* DEI trainings and internal communications reinforced the narrative that white male perspectives were invalid or harmful. (PEL Fact 25). Further examples show a

systemic pattern: Carrie Arenz's complaint about offensive remarks by a gay male supervisor was ignored, (PEL Fact ¶¶ 26, 27) while Rendall-Araujo's embellished claims resulted in public vindication. (PEL Fact ¶¶ 18, 19, 28). The contrast highlights a policy of affording protection and credibility only to certain identities. On top of all this, the City's public DEI policy specifically highlights the City's intent to promote and encourage non-white "marginalized" people. (PEL Fact ¶ 29).

This evidence satisfies the "because of" requirement for Title VII. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). A reasonable jury could conclude Pelishek was targeted, silenced, and denied workplace protections due to his race, sex, and sexual orientation. That inference, supported by both direct and circumstantial evidence, precludes summary judgment and requires submission of his claims to a jury under *Ortiz*.

2. Indirect Method.

Under the indirect method, Pelishek must show: (1) background circumstances suggesting anti-white bias; (2) he met job expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees outside his class. *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The City does not dispute elements one or two. Pelishek has shown more than "fishy" facts—he has presented direct and circumstantial evidence of institutional bias against white men. See *supra* Part II (a)(1). The dispute centers on element four: whether Emily Rendall-Araujo and, to a lesser degree, Adam Westbrook are valid comparators. They are.

Comparators must be "similarly situated in all material respects," not identical. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Both Pelishek and Rendall-Araujo:

- Were department heads under the same disciplinary structure and reported to the same supervisors;

- Collaborated on major City initiatives and community planning;

- Held director-level roles with comparable visibility and responsibility. (PEL Fact ¶ 30).

9

The Seventh Circuit cautions against rigid comparator analysis. *Hull v. Stoughton Trailers*, 445 F.3d 949, 952 (7th Cir. 2006); *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). Courts routinely find comparator status where employees share rank, oversight, and exposure to discipline, even if duties differ. *Ajayi v. Aramark*, 336 F.3d 520, 532 (7th Cir. 2003); *Ford v. Steak 'N Shake*, 2019 WL 13292882, at *5 (C.D. Ill. Apr. 12, 2019).

Moreover, the City's own actions underscore this point: Todd Wolf was fired for wanting to discipline Rendall-Araujo, yet Pelishek was disciplined and silenced following her accusations. That disparity highlights their materially similar status. Westbrook, too, the HR Director who was a homosexual that made inappropriate sexual innuendos to a young male high school student, was subject to the same hierarchy and oversight. He satisfies the comparator standard.

Because both Rendall-Araujo and Westbrook received more favorable treatment in materially similar circumstances, Plaintiff meets the comparator element. Summary judgment should be denied.

3.  Defendants subjected Pelishek to multiple adverse employment actions.

 In *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024), the Supreme Court clarified that "some harm" to employment conditions—not just tangible or economic loss—is sufficient to trigger liability. The City only focuses on one of the adverse employment actions Pelishek has shown—constructive discharge. But the record shows Pelishek suffered three adverse actions that require denial of summary judgment: (1) hostile work environment, (2) material changes, removals, impossible tasks, and (3) constructive discharge.

The first adverse employment action, hostile work environment, is discussed more in depth factually in the next section, *infra* Part II(b). Under *Muldrow* and *Hunt*, the hostile conditions Pelishek endured—public defamation, ostracism from key external partners, and psychological torment—are more than sufficient to establish harm. *See infra* Part II(b). In *Ford v. Steak 'N Shake*, similar social isolation and interference with job functions were held sufficient to constitute an adverse action as a

hostile work environment. 2019 WL 13292882, at 14 (C.D. Ill. Apr. 12, 2019). The City's failure to quash the false racism accusations, especially when they dismantled Pelishek's working credibility and caused partners to sever ties, fulfills the legal threshold.

i. <u>Removed job duties, public reprimands, impossible work assignments and denial of complaint.</u>

Pelishek was subjected to materially adverse changes to his working conditions, including punitive task assignments, public reprimands, denial of legal consultation, and reassignment of duties, all of which satisfy the standard for adverse employment actions. An employment action that materially alters job responsibilities, imposes significant burdens, or impairs the ability to perform duties is adverse under Title VII. The *Muldrow* Court emphasized that "some harm" to employment terms or status suffices. Reprimands, impossible tasks, and denial of legal access have each been held actionable. See *Hunt*, 219 F.3d at 655; *E.E.O.C.*, 276 F.3d at 332; *Lindale*, 145 F.3d at 955; *Henn*, 819 F.2d at 829–30; *Ford*, 2019 WL 13292882, at *14.

Here, Sorenson removed Pelishek from a Board of Directors position on the Business Improvement District that Pelishek had held for almost 10 years. (PEL Fact ¶31). Sorenson also pushed Pelishek to work with Heather Cleveland and her DEI group despite the fact that she and her group recently demanding Pelishek's firing. (PEL Fact ¶¶33, 34). The Mayor gave Cleveland (what had been Pelishek's proposal writing duties) the task to finish a large grant. (PEL Fact ¶¶32-34). Cleveland was not an employee of the City and did not finish the grant. (*Id.*) Sorenson ordered Pelishek to complete the large application—normally requiring a month—in mere hours, under crushing pressure and without support. He did so. (PEL Fact ¶32). This was not a neutral administrative request; it was tailored to benefit Heather Cleveland, a DEI activist, and to sabotage Pelishek's ability to succeed.

Meanwhile, he was publicly berated, warned of accumulating "strikes" in front of his staff that were never investigated. (PEL Fact ¶ 35 and DPF ¶127). His core responsibilities were incrementally

11

stripped and assigned to a DEI group calling for his removal. Unknown to Pelishek, unknown officials were forging his name on documents showing payment of government funds to the DEI group. (PEL Fact ¶ 43) He was unable to perform his work or defend himself amid these escalating pressures and public perception that he was a racist that made multiple unsolicited racial slurs in his official capacity. (PEL Fact ¶32). He was publicly defamed (PEL Fact ¶¶36-42) and internally as having engaged in unsolicited racist conduct on multiple occasions, based on "embellished" stories from Rendall-Araujo (PEL Fact ¶18), and prohibited from speaking about the facts underlying these false accusations to anyone (PEL Fact ¶1) and the false narrative led to City partners refusing to work with him, making his job duties impossible (See, e.g., DPF ¶135.)

The City's conduct meets the adverse action threshold under Title VII and *Muldrow*, as it altered Pelishek's duties, stripped his prestige, and effectively impeded his ability to function or carry out his duties regarding development and City planning with businesses and partners. *Hunt* and *Ford* support this view—public reprimands and fabricated performance demands are quintessential adverse actions. Preventing legal consultation during this campaign deepened the harm (*Henn*), while the reassignment of his duties to political actors aligned with the DEI group (*Lindale*) confirmed that the changes were not innocuous. A jury could conclude that these materially adverse actions were deliberately orchestrated to punish and isolate Pelishek and eventually force him to resign.

### ii. Constructive Discharge.

The record establishes that Chad Pelishek did not merely endure a hostile work environment—he was subjected to conditions so intolerable, degrading, and threatening that any reasonable employee in his position would have felt compelled to resign. Under *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004), constructive discharge occurs when "the working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." The Seventh Circuit similarly recognizes that resignation becomes involuntary—and actionable—where harassment

12

is extreme and compounded by aggravating factors such as reputational destruction, threats to safety, and institutional retaliation. See *Ulrey v. Reichhart*, 941 F.3d 255, 261 (7th Cir. 2019); *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010); *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010).

Here, Pelishek was not only denied the ability to perform his job—he was publicly vilified, isolated, and rendered persona non grata in the community he was hired to serve. (PEL Fact ¶¶36-42) City partners were refusing to work with him. (PEL Fact ¶44 and DPF 134). His reputation was shattered when City officials using DEI Director Emily Rendall-Araujo's false narrative allowed him to be branded a racist. (PEL Fact ¶45). This narrative was widely disseminated on social media, including in the "Progressive Women of Sheboygan" Facebook group moderated by Rendall-Araujo, and the "Sheboygan DEIB" group who sent emails demanding action against him for his "racism." (PEL Fact ¶¶ 36-42, 46). The reputational damage infected City partnerships essential to his work, including the Sheboygan Chamber of Commerce, who ceased collaboration with him. (*Id.*).

Institutional actors did not merely tolerate this campaign—they enforced and reinforced it. The City's investigation report, edited by City Attorney Chuck Adams, deliberately omitted the fact that Pelishek had repeated a racial slur only after being instructed to do so by Rendall-Araujo. (PEL Fact ¶¶ 14, 15). It also falsely claimed that Pelishek denied experiencing a DEI-linked extortion threat. (PEL Fact ¶¶ 14, 15). When Pelishek pleaded for redactions and the chance to consult an attorney, he was told by HR Director Adam Westbrook that he could not obtain legal representation and was instead subjected to gag orders forbidding him to speak about the matter—even to his lawyer. (PEL Fact ¶ 1). Specifically, the City issued mass gag orders and speech related directives on two occasions within a day of Pelishek telling Human Resources that he wanted to get a lawyer (February 7) and that the investigation report had false information (March 8). (DPF ¶¶ 71 & 77). Further, within 24 hours of complaining to

13

Westbrook and Ryan Sorenson that he wanted to get a lawyer, Sorenson told a new Crisis Management PR company that there would soon be "another" big firing they would have to deal with. (PEL Fact ¶ 47).

The public campaign against Pelishek extended beyond his job. After the false accusations of Pelishek's "racism" circulated widely throughout the community, a Child Protective Services employee visited Pelishek's wife work and questioned his children. At the same time, his wife warned that she would leave him if he remained in his role, due to the deterioration of his health and safety and the concern for his children's mental health and fears watching him come close to death from panic attacks, anxiety, fear, and physical ailments. (PEL Fact ¶ 48). These are not the ordinary frictions of employment—they are the hallmarks of coercion and psychological collapse.

Compounding these facts were repeated acts of institutional intimidation. When City Administrator Todd Wolf defended Pelishek, he was put on leave, publicly accused of misconduct, and then fired. The same night that Wolf was put on leave, Pelishek visited Wolf. At 10:30 p.m., a uniformed police officer arrived to serve Pelishek a gag directive—on orders from Defendants Sorenson and Adams. (PEL Fact ¶ 49). Council Vice President Filicky-Peneski, who defended Pelishek on a recording, was censured and forced to apologize and scolded by Adams, Sorenson, and Westbrook in front of Pelishek solely for her defense of Pelishek while being pressured into issuing an apology to employees. (PEL Fact ¶ 19). When Pelishek was on FMLA leave for severe mental and physical deterioration, HR Director Westbrook stated that all employees needed to protect Rendall-Araujo and help her because of Filicky-Peneski's prior statements that Rendall-Araujo had embellished her stories against Pelishek. (PEL Fact ¶¶ 18,19).

Faced with this escalating climate of retaliation, isolation, and reputational ruin, Pelishek experienced severe mental and physical distress, including hair loss, anxiety, and clinical stress. (PEL

14

Fact ¶ 48). His physician placed him on FMLA leave and advised him not to return. (PEL Fact ¶ 48). He resigned on May 1, 2023, stating unequivocally that returning was not possible under the prevailing conditions. (*Id*). Immediately following his resignation notice, the City's Human Resources department sent a notice to employees indicating that Pelishek was terminated prior to Pelishek's final date of employment.

Courts have repeatedly recognized that where fabricated accusations of racism, threats of retaliation, and reputational harm intersect, constructive discharge may be established. See *Green v. Brennan*, 578 U.S. 547 (2016); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005); *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006). In *Green*, as here, an employer manufactured a false narrative and then pressured the employee to resign in the face of untenable working conditions. In *Whittaker*, the Court emphasized that public accusations eroding an employee's professional standing may justify resignation. And in *Ulrey*, a sustained campaign of exclusion and retaliation was sufficient to support a jury's finding of constructive discharge. That same legal principle governs here. Pelishek was denied access to complaint processes, forbidden to speak in his own defense, stripped of professional duties, and subjected to both public and private threats—backed by City leadership and enforced through gag orders and police presence. The cumulative effect was not merely demoralizing—it was career-ending.

Defendants may argue that constructive discharge sets a high bar. It does. But that bar is met where an employee reasonably concludes that remaining would cause lasting harm to his health, reputation, and safety. This includes psychological safety leading to physical deterioration, including that of his family and their safety. The evidence in this case—false allegations, institutional cover-ups, family intrusion, and fear of further retaliation—goes well beyond that standard. The cumulative toll was devastating. Pelishek suffered severe psychological distress, including hair loss, panic attacks, and

emotional anxiety. (PEL Fact ¶ 48). His wife warned that remaining in the job was not safe and that it would kill him because of his deteriorating health. She was concerned about the safety of his children given the community's reaction. (PEL Fact ¶ 48). A Child Protective Services employee asked his children questions about Pelishek while at his wife's work after the public outcry of his "racism" had grown prevalent. *Id.* See *Hrobowski v. Worthington Steel Co*., 358 F.3d 473, 476 (7th Cir. 2004) (psychological harm supports finding of hostile work environment). A jury could easily conclude that no reasonable person in Pelishek's position could have continued under these conditions.

Constructive discharge claims turn on reasonableness—a question of fact that should be left to the jury. See *E.E.O.C. v. Miller Brewing Co.*, 650 F. Supp. 739, 747 (E.D. Wis. 1986) ("What a reasonable person would do is a question of fact and normally should be left for the trier of fact"). Here, the hostile work environment—already sufficient on its own to defeat summary judgment—was exacerbated by aggravating factors of extraordinary magnitude: reputational destruction, public gagging, police intimidation, family trauma, and targeted retaliation by senior City officials.

At minimum, there is a genuine dispute of material fact on whether Pelishek was constructively discharged. A jury could readily find that Pelishek's resignation was not a choice, but a necessity. Summary judgment must be denied.

### b. Hostile and Abusive work environment.

To establish a hostile work environment under Title VII, a plaintiff must demonstrate: (1) he was subject to unwelcome harassment; (2) the harassment was based on his membership in a protected class; (3) the harassment was severe or pervasive enough to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833–34 (7th Cir. 2015); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). The Defendants do not argue elements one and four.

16

Pelishek has adduced sufficient evidence for element two—that the harassment was based on his race and gender. *See supra* Part II(a)(1) above. It was not random, personality-driven, or workplace-neutral; it targeted him because he is a straight white male. To defeat summary judgment, Pelishek must show sufficient evidence that the unwelcome conduct occurred "because of" or was motivated by a protected characteristic—here, race and gender. See *Huri v. Office of the Chief Judge*, 804 F.3d 826, 834 (7th Cir. 2015); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). Plaintiff has shown above that the harassment he endured over a period of four years, getting far worse after August 2022, was specifically because of he was a "white man of privilege" that was to remain silent, not report racism, and be subjected to public scorn even with false accusations to "learn his place" in the DEI culture the City and Rendall-Araujo demanded. Indeed, had Plaintiff not been a white male, he would have been allowed to file a harassment complaint, report racism without public humiliation or accusations of racism (as well as say a racial slur like Salazar), and he would have been protected with public acknowledgments of any negative statements about him just as Rendall-Araujo was with the altered investigation report.

1. Pelishek was subjected to severe or pervasive harassment that altered the terms and conditions of his employment.

The same conditions that drove Pelishek to feel he had no other option but to resign also created a severe or pervasive hostile environment. "As detailed above in Section II(A)(3), the same acts that constituted adverse employment actions—public humiliation, false allegations, gag orders, and social/professional isolation—also fostered a hostile and abusive work environment." For element three, Pelishek must show that the harassment was either severe or pervasive enough to alter the terms and conditions of employment. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005). That standard is plainly met here. The conduct and conditions Chad Pelishek endured were not only severe, but also pervasively hostile—so much so that a

17

reasonable jury could readily find that his workplace was rendered objectively abusive under Title VII and the Fourteenth Amendment.

The severity of the harassment began with a gross mischaracterization. In August 2022, Pelishek attempted to report a racially offensive slur he had heard. In doing so, he repeated the slur verbatim but only after following the instruction of self-appointed DEI director, Emily Rendall-Araujo during a confidential management meeting. Rather than treat the report as a good-faith disclosure, Rendall-Araujo weaponized it: she falsely stated to the media, City officials, and colleagues that Pelishek had made racist statements, including using the phrase "colored people," which he never said. (PEL Fact 18) These misstatements culminated in a widely disseminated October 10 article identifying Pelishek by name and photograph as the face of racism within the City. (DPF 36) Within days, the Mayor and City Council publicly echoed these accusations, sparking outrage at Council meetings and calls for Pelishek's termination—all tied directly to falsehoods originating within City leadership. Public humiliation can constitute actionable harassment. See *Harris*, 510 U.S. at 23. Pelishek was egregiously humiliated— including where the Mayor stood directly in front of him telling those calling for his firing to "keep speaking out" and be heard by others in an incident where Pelishek's face is the only one shown behind these statements. (PEL Fact 36-42).

The abuse was not limited to a single episode. For years, Pelishek had been subjected to DEI-driven marginalization, including being held to different dress standards than female employees, given impossible goals by leadership with ties to the DEI group, and targeted for termination as early as 2020 from a DEI group founder and City Alderwoman. PEL Fact 50. These pressures escalated in 2022 into full-blown professional and social exile. His coworkers and City partners shunned him. He was stripped of responsibilities, excluded from meetings, and denied collaborative support necessary to fulfill core

18

duties. See *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) (ostracism and workload manipulation support hostile work environment claims).

City leadership also silenced him. HR barred Pelishek from filing a formal harassment complaint against Rendall-Araujo, citing his race and gender as disqualifying (no discrimination "because of any protected status") and noting that Pelishek's complaints of harassment and hostility, coming from him, were not protected conduct. Later, the City imposed gag orders after he noted wanting to talk to an attorney that prohibited him specifically from discussing the incident even with his attorney, under threat of termination—restrictions never imposed when Rendall-Araujo made "embellished" complaints about his "racism." See *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 704 (7th Cir. 2001) (retaliatory gagging contributes to hostile environment).

Compounding the abuse was the City's institutional culture. Evidence shows that DEI policies were implemented in a manner that promoted disparate treatment of white, heterosexual men—silencing their complaints, casting any resistance as insubordination or bigotry, and affording unchecked power to a select group of actors. Unlike female employees or employees of color, Pelishek was denied access to equal complaint procedures, gagged, and demonized both internally and externally by City leaders. Those that publicly defended Pelishek were accused of false statements and misconduct. Internal documents and declarations from Carrie Arenz, Wolf, and another white male City employee confirm that DEI programs were enforced not as inclusionary tools but as mechanisms to punish dissent and reward ideological conformity while targeting white men. (PEL Fact 51)

These facts far surpass the threshold set by controlling case law. In *Woods v. City of Berwyn*, 803 F.3d 865 (7th Cir. 2015), the court recognized that false accusations of racism, especially when widely publicized and reinforced by employer silence or complicity, can create a hostile work environment. Here, Pelishek was not merely unsupported—his employer amplified the false narrative, enabling public

19

defamation, stripping him of workplace relationships, and driving him from his role. See also *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 829–30 (7th Cir. 1987) (constructive discharge depends on what was communicated to employees).

The Defendants' reliance on cases such as *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998), and *Patt v. Family Health Sys., Inc.*, 280 F.3d 749 (7th Cir. 2002), is misplaced. Those cases involved isolated slights or interpersonal frictions, a fallacy that the Defendants argue in raising merely four disjunctive "incidents" rather than the totality of the circumstances that the record shows here. Pelishek, by contrast, faced an institutional and unrelenting campaign to destroy his credibility, isolate him professionally, and block any recourse. The conduct he endured was not merely offensive—it was destructive, targeted, and job-ending.

Taken together, the coordinated false accusations, public humiliation, professional ostracism, institutional gagging, psychological deterioration, and discriminatory denial of redress would permit any reasonable jury to conclude that Chad Pelishek was subjected to a hostile work environment both severe and pervasive. This is not only a triable issue—it is a textbook case of systemic harassment that precludes summary judgment.

### III.   Equal Protection under 42 U.S.C. §1983.

To establish a violation of the Equal Protection Clause under § 1983, a plaintiff must show that: (1) he was treated differently than others similarly situated; and (2) the difference in treatment was motivated by discriminatory intent. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Swanson v. City of Chetek*, 719 F.3d 780, 783–84 (7th Cir. 2013). The requirements for proving discrimination under Title VII and the Equal Protection Clause are the same. *Silva v. Wisc.*, 917 F.3d 546, 559 (7th Cir. 2019); *Alamo v. Bliss*, 864 F.3d 541, 550 n. 16 (7th Cir. 2017).  Plaintiff has already established above a prima facie case under the Equal Protection Clause by showing that he was

20

subjected to adverse actions and an abusive work environment that was because of his race and gender. *See supra* Part II above. Pelishek had a clearly established right to be free from discrimination, harassment, ridicule, humiliation, and psychological assault based on his race and gender. *McPherson* (7th Cir. 2004) and *Mullenix v. Luna*, 577 U.S. 7 (2015).

        a.   <u>The City of Sheboygan is liable under *Monell*.</u>

A municipality is liable under 42 U.S.C. § 1983 where the constitutional violation resulted from: (1) an express policy, a widespread and persistent practice constituting custom or usage, or the decision of an official with final policymaking authority; and (2) that policy or custom was the moving force behind the constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021); *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). Summary judgment must be denied where a plaintiff adduces sufficient evidence that the City had a policy or custom of discriminatory conduct. Pelishek has done so here.

        1.   <u>The City's DEI Policy and implementation practices were the moving force behind Pelishek's injuries.</u>

On June 30, 2020, the City of Sheboygan published their DEI policy highlighting their commitment to "equity" which, according to their publication, ensures "fair outcomes by focusing on those who have been historically marginalized and excluded" with particular emphasis on "racial equity." The City's policy defines those they will focus on, including their employees, by highlight those who are "marginalized and excluded" are "people of color and other communities." This anti-white policy expressly highlights the City's adherence to focusing mainly on non-white persons and engaging in conduct that targets, what the City considers to be, "multiple forms of discrimination" against non-white persons. *Id.* Growing from this policy, City Administration and leadership was ordered, starting in July 2020, to implement consistent education, hire DEI consultants, and pursue raising up historically "marginalized" groups, that, in practice, included women. When the public

demanded Pelishek be fired, the Council invited them to speak in front of Pelishek, while denying him to make a comment, and then passed another DEI resolution affirming their commitment to the unlawful policies that permit harassing and unfair conduct against the "non protected class" of white men. (PEL Fact 36-42)

Emily Rendall-Araujo, a known "man-hater" was widely accepted as the unofficial DEI enforcer, educator and director who had approval from the City Administration and Mayor Sorenson to educate "white men of privilege" on how they should stay silent and how to talk. (PEL Fact 23, 24, 25). This was echoed, following Rendall's teaching, by Council Vice President Filicky-Peneski. (Id.) Rendall-Araujo was the "point person" on educating white men on how to speak properly and often told male employees that she and other non-white persons or females could make comments that some may find derogatory while noting that the comments were only offensive if uttered by a "white man of privilege." Id. The City's policy implementation and practices led to white males being severely punished for minor incidents, white males unable to complain about females, white males falsely accused of racism, retaliation, and false statements, and white males that complained silenced even from speaking to private legal counsel about ongoing injuries. (PEL Fact 51 – DPW Employee).

Egregiously, the policy, in practice, is not only anti-white, but specifically anti-male in that the DEI training Rendall-Araujo provided to various employees makes clear that adhering to DEI requires specifically (heterosexual) white men to behave far more differently than other persons—including remaining silent to be "taught." Confirming this, the DEI policy "commits to the continued and improved integration of equity into the fabric of [the City's] organization commits to the continued and improved integration of equity into the fabric of our organization." (PEL Fact 38)

Throughout the hostility subject to this case, Mayor Sorenson, Rendall-Araujo, HR Westbrook, and Charles Adams specifically encouraged public backlash and humiliation against Pelishek,

acknowledging the reality of racism, *not from the actual slur incident he was reporting,* but from *Pelishek* repeating the slur on Rendall-Araujo's request to do so. (PEL Fact 36-42).All top-ranking City officials knew Rendall-Araujo told Pelishek to repeat the slur at the August 22 meeting, and every single one facilitated, invited, and encouraged public humiliation, stripping his duties, and ensuring that he would always be seen as one that made unsolicited racial slurs, despite Pelishek having never made an unsolicited offensive racial comment. (PEL Fact 52). The City's DEI policy and enforcement practices were undoubtedly the moving force behind Pelishek's constitutional injuries.

As the court made clear in *Hall v. City of Chicago,*, municipal liability attaches where discriminatory practices are so persistent and widespread that policymakers knew or should have known of the violations and failed to act. 989 F.Supp.2d 699, 707 (N.D.Ill., 2013). Not only did policymakers know of the DEI enforcement, they condoned it, applauded and protected it, and passed continuing resolutions that enlarged its scope over white men of privilege at the City. (PEL Fact 51)

       2.   <u>Ratification by Officials with Final Policymaking Authority also caused Pelishek's injuries.</u>

The City of Sheboygan is liable under *Monell* because final policymakers ratified Rendall-Araujo's discriminatory conduct against Chad Pelishek. A municipality may be held liable when an official with final policymaking authority approves a subordinate's decision and the basis for it. *Thomas v. Cook Cty.*, 604 F.3d 293, 303 (7th Cir. 2010); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Here, both the Common Council and Human Resources Director Adam Westbrook ratified Rendall-Araujo's actions.

The Common Council knew Rendall-Araujo had instructed Pelishek to repeat the slur at the August 22 meeting and had worked with local media to publicly frame him. Yet rather than correcting the record, Council members doubled down—denouncing Pelishek in public meetings and encouraging calls for his termination. (PEL Fact 36-42) They passed a DEI resolution prioritizing advancement of non-white and female employees, refused to clarify that Pelishek had not volunteered the slur, and fired Todd Wolf for defending Pelishek and requesting discipline against Rendall-Araujo. Vice President Filicky-Peneski

admitted the Council knew the truth but chose to suppress it and punish those who spoke up, including Wolf, thereby endorsing the discriminatory retaliation against Pelishek.

Adam Westbrook likewise ratified the conduct. When Pelishek attempted to file a harassment complaint, Westbrook conveyed that white men were not a protected class and that he had not engaged in protected conduct. After Pelishek raised concerns about the false investigative report and considered hiring counsel, Westbrook issued a gag directive barring employees from discussing the report or lawsuit without City attorney oversight. This action—taken after Pelishek challenged Rendall-Araujo's narrative—cemented the City's support for the false public narrative and denied Pelishek access to redress. It also reinforced the message that defending Pelishek or challenging DEI narratives would be met with discipline or termination. These ratifications reflect not only institutional approval but discriminatory intent by final policymakers. *See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 674–76 (7th Cir. 2009) (municipal liability attaches where final policymakers act with discriminatory purpose). The City's decisionmakers chose to suppress exculpatory facts, retaliate against internal dissent, and protect false accusations against Pelishek—actions that satisfy Monell liability as a matter of law.

     b.   <u>Individual Liability and Qualified Immunity.</u>

Each named defendant acted under color of law and with discriminatory intent in depriving Plaintiff of his equal protection rights under § 1983. Individual liability attaches when a defendant personally participated in the deprivation of a constitutional right or facilitated and condoned unlawful conduct with discriminatory intent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Qualified immunity for government officials is "an immunity from suit rather than a mere defense to liability." *Mitchell,* 472 U.S., at 526, 105 S. Ct. 2806 (emphasis deleted). But qualified immunity does not apply where the official's conduct violated a constitutional right; and that right was clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Because each of these defendants engaged in

24

conduct that had already been held unconstitutional in similar circumstances by controlling authority, none are entitled to qualified immunity. Plaintiff's rights were clearly established, and the violations were intentional.

1. Emily Rendall-Araujo is not entitled to qualified immunity.

Emily Rendall-Araujo is not entitled to qualified immunity because she acted with discriminatory intent, materially influenced adverse actions through fabricated claims, and served as a biased subordinate under the cat's paw theory of liability. An employee who causes a constitutional violation by manipulating or tainting the decision-making process with discriminatory animus may be held individually liable. See *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011); see also *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007).

Rendall-Araujo harbored a known animus toward white men, which she made no effort to conceal. Resp. DPF ¶ 7. Her professional biography stated her "hobby" was dismantling the patriarchy, and she routinely expressed hostility toward men in the workplace, openly resenting the presence of white male leadership at City Hall. She specifically criticized Pelishek as a "white man of privilege" and asserted that such men should not be permitted to speak in the same manner as women. See *id.,* Decl. Wolf ¶13; Valdez Dep. 126:10-17. This bias was not theoretical. It informed her actions—and her campaign to end his career.

After instructing Pelishek to repeat a racially sensitive comment from a public meeting, Rendall-Araujo fabricated a false narrative portraying him as a racist. See Decl. DeMaster, Exs. 9, 10, 30. She mischaracterized the context and content of his speech, initiated internal and external condemnation, and served as the principal force behind the City's adverse response. *Id*. She personally informed Mayor Sorenson and members of the Common Council that Pelishek's conduct was racist, while deliberately omitting her own role in directing that speech. *Id.*

25

She did not conceal her intent. Following the publication of a second news article referencing efforts to "re-evaluate" Pelishek's position and fire him over the purported racial slur, Rendall-Araujo texted Sorenson: "I mean, when will he finally just f---ing…" The rest of the message—along with the surrounding context—was deleted by both Rendall-Araujo and Sorenson. (ECF 110 at 2). The implication is unmistakable: she was actively attempting to force Pelishek to resign and expressing frustration that he had not yet done so. *Id*. Given the October 26 article's focus on Pelishek, and the pressure campaign already in motion, there is no plausible reading of that message as directed at anyone else.

Rendall-Araujo's misconduct fits squarely within the scope of *Staub*. The Supreme Court made clear that when a subordinate's discriminatory animus is a proximate cause of an adverse employment action—even if others formally carry it out—liability attaches. *Staub*, 562 U.S. at 421. That standard is met here. Rendall-Araujo initiated and sustained the false narrative, misrepresented facts to decision-makers, and coordinated public pressure. She informed others that she was "standing up to racism," using that label to conceal her own discriminatory motive. (PEL Fact 17). Her intent was not to protect the City's values—it was to purge it of a white male official she disliked, a member of the "patriarchy" she sought to dismantle in coming to the City to "win." (PEL Fact 51 – See Decl Arenz). Her false claims were adopted by Sorenson and others without independent verification, causing Pelishek's reassignment, reputational harm, and constructive discharge. He was prohibited from performing his duties, made to assist new DEI officials, and subjected to internal directives designed to isolate him—all under the shadow of her false accusations.

The law clearly precluded qualified immunity under these circumstances. In *Taylor v. Ways,* 999 F.3d 478 (7th Cir. 2021)), the Seventh Circuit denied qualified immunity to a lower-level official who exhibited racial animus. The court held that when a subordinate's unlawful motive drives adverse action,

that actor is not protected. Similarly, in *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267 (2d Cir. 2016), the Second Circuit applied the cat's paw doctrine to hold an employer liable for a subordinate's fabricated misconduct report, which led to the plaintiff's firing. In both cases, reliance on the bad-faith narrative of a biased employee was enough to pierce the shield of immunity.

Rendall-Araujo's actions were calculated, targeted, and constitutionally impermissible. Her animus toward Pelishek was not just personal—it was rooted in an avowed hostility to men and white male authority in particular. Her misrepresentations were the catalyst for the City's response, and her texts confirm she sought not justice, but expulsion. On this record, qualified immunity is unavailable.

2. Charles Adams is not entitled to qualified immunity.

A public official who knowingly disseminates false and damaging information about an employee, resulting in adverse action, violates clearly established constitutional rights. *See Taylor v. Ways,* 999 F.3d 478 (7th Cir. 2021). Charles Adams, as City Attorney and acting HR official, did exactly that—with discriminatory intent. His personal animus toward Pelishek, whom he viewed as a "white man of privilege," was shaped by his own experience with racism and his mixed-race family background.

Adams knowingly edited and publicly released an investigative report that falsely portrayed Pelishek as having made unsolicited racial slurs and as having lied about an extortion threat tied to DEI actors. He was fully aware that Pelishek had repeated the slur only at the direction of another employee and had corroborated Wolf's extortion concerns. These were not omissions—they were deliberate falsifications.

Despite Pelishek's emotional, repeated pleas—including in tears—not to release the report unredacted, Adams proceeded. He framed Rendall-Araujo as a victim while concealing that she had initiated the false public narrative against Pelishek. The report was not neutral; Adams weaponized it to solidify a damaging narrative, denying redaction even after acknowledging it misrepresented Pelishek's

27

statements. Adams did not merely adopt Rendall-Araujo's version of events—he engineered it. He initiated the investigation based on her evolving and false claims of "multiple" slurs, even though Council members had discredited those allegations. He hired the outside investigator, fed her the narrative, and oversaw the report's content, edits, and public release. Crucially, Adams ordered the creation of a written report—not required after Wolf's termination—solely to revise and publish it, ensuring a lasting, defamatory portrayal of Pelishek.

When Wolf defended Pelishek, Adams advised leadership to charge Wolf with misconduct and publicly announce that and arranged for police to be sent to Wolf's home—furthering the retaliation. As in *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372 (7th Cir. 2011), liability attaches when a supervisor knowingly adopts biased claims. Adams went further—he originated the retaliation and institutionalized it.

Additional evidence underscores Adams's intent. He withheld contract materials from Pelishek, undermining his ability to perform his duties.After stepping back from HR, Adams coordinated with Westbrook to continue silencing Pelishek, including through directives requiring legal oversight for basic communication about the investigation. Together, they sustained pressure on Pelishek even as he showed visible emotional distress and objected repeatedly

This was not neutral policy enforcement. It was targeted, personal, and discriminatory. Adams's bias was explicit, his actions intentional, and his knowledge of their impact undeniable. His claim that Pelishek never made a formal redaction request is legally irrelevant—what matters is that Adams knew, or should have known, that his conduct would destroy Pelishek's reputation. Adams's central role in engineering, approving, and publishing falsehoods under color of law strips him of qualified immunity. His conduct violated clearly established constitutional rights. Summary judgment must be denied.

28

3. <u>Sorenson is not entitled to qualified immunity.</u>

A supervisor may not claim qualified immunity where they direct, condone, or fail to remedy constitutional violations by subordinates. See *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021); *Swetlik v. Craw*, 738 F.3d 818, 829 (7th Cir. 2013); *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011). Supervisory liability under § 1983 attaches where the official knew of the misconduct and facilitated, approved, or deliberately ignored it. See *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

Mayor Ryan Sorenson is liable under both theories of supervisory liability and as a direct participant because he was Plaintiff's supervisor beginning on November 8, 2022, after Wolf was placed on leave. He personally amplified the false narrative that Chad Pelishek was a racist, encouraged public humiliation against him—often directly in front of him without giving him an opportunity to present his side, refused to allow Pelishek to correct the record, and facilitated reprisals against those who defended him. During public meetings responding to outrage over the slur incident—generated from Rendall-Araujo's false narrative—Sorenson declared "there is no room for racism," a pointed message made without allowing Pelishek to speak.

Sorenson also stripped Pelishek of core responsibilities and redirected them to DEI activists, including Heather Cleveland, one of the individuals who had publicly demanded Pelishek's removal. He removed Pelishek from a Board of Directors position Pelishek had held for nearly 10 years without so much as notice or a heads up before Pelishek learned this at a Common Council meeting. Decl. Pelishek. Sorenson not only insisted that Pelishek support Cleveland's appointment for these tasks, but falsely informed Adams and Cleveland that Pelishek had approved the procurement. This directly implicated Pelishek in potential violations of state and federal procurement law, which he had expressly objected to Sorenson's misrepresentation exposed Pelishek to legal liability and further signaled that he was being

29

set up to take the fall for unlawful decisions made without his consent. Likewise, in *Swetlik*, the

Seventh Circuit held supervisors liable for endorsing or ignoring falsified records and public defamation,

especially when linked to protected speech. Sorenson's conduct fits squarely within these contours. He

did not merely fail to act—he orchestrated key components of the retaliation.

Sorenson also participated in conduct that would independently bar immunity. He directly told

Pelishek there were "multiple strikes" against him, made these statements in front of staff, and forced

Pelishek to work alongside the same DEI group that was actively calling for his termination. He refused

to speak to City partners on Pelishek's behalf, thereby exacerbating his professional isolation. When

Wolf defended Pelishek, Sorenson backed the City's retaliatory firing of Wolf, including public

declarations of misconduct and the late-night dispatch of police to Wolf's residence.

Additionally, Sorenson met weekly with HR Director Westbrook and Vice President Filicky-

Peneski—both of whom had received direct complaints from Pelishek and knew of his emotional

breakdown following the Hall Report. *See* Pl. Resp. to Defs. PFOF filed contemporaneously. Sorenson

himself witnessed Pelishek crying during a management meeting about the report, after which he

continued to pressure him to work with DEI members and failed to intervene. Pl. Resp. to Defs. PFOF.

Whether Pelishek reported these facts "directly" to Sorenson is immaterial; the standard is whether a

supervisor knew or should have known. See *Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir.

2003) (supervisors not entitled to immunity where they actively participated in and ignored known

discriminatory conduct); *Matthews*, 675 F.3d at 708.

The retaliation was not passive. Sorenson's actions targeted Pelishek with humiliation,

reassignment of duties to ideological opponents, public misrepresentation, and threats—all after

Pelishek reported concerns of discrimination and false allegations. The pattern of escalating reprisals,

denial of workplace protections, and official silence in the face of community-wide attacks reflects a campaign that Sorenson facilitated at every stage.

Because Sorenson actively contributed to, approved, and allowed known constitutional violations to persist—while holding a leadership role in shaping the City's response—qualified immunity does not apply. His conduct violated clearly established norms of supervisory liability, free speech protections, and Fourteenth Amendment due process. The Court should deny qualified immunity and allow the claims against Sorenson to proceed to trial.

## CONCLUSION

For the foregoing reasons including those in Plaintiff's proposed findings of fact in support of his partial motion for summary judgment, Chad Pelishek has provided sufficient evidence to create genuine disputes of material fact on every claim. Because of this, the Defendants' summary judgment motion must be denied in its entirety.

Dated: April 30, 2025

Respectfully Submitted,

 _/s/ Jennifer T. DeMaster_
Jennifer T. DeMaster
Wis. Bar No. 1124201
DEMASTER LAW LLC
361 Falls Rd # 610
Grafton, WI 53024
Phone: (414) 235-7488
Fax: (262) 536-0515
attorney@jenniferdemaster.com
jennifer@demasterlaw.com

_/s/ Christopher I. Kachouroff_
Christopher I. Kachouroff

31

VA Bar No. 44216*
MᴄSᴡᴇᴇɴᴇʏ, Cʏɴᴋᴀʀ & Kᴀᴄʜᴏᴜʀᴏꜰꜰ, PLLC
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com


*Attorneys for Plaintiff Chad Pelishek*