# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

CHAD PELISHEK,

        Plaintiff,         CONFIDENTIAL

   -vs-              Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

        Defendants.

--------------------------------------------------------

        Examination of CHAD PELISHEK, taken at
the instance of the Defendants, under and pursuant to
the applicable Rules of Civil Procedure, before
SAMANTHA J. SHALLUE, a Registered Professional
Reporter and Notary Public in and for the State of
Wisconsin, at MWH Law Group, 735 North Water Street,

Suite 610, Milwaukee, Wisconsin, on July 31, 2024,

commencing at 10:10 a.m. and concluding at 4:49 p.m.

HUDSON COURT REPORTING & VIDEO    (800) 310-1769

**New York**        **Hudson Court Reporting & Video**        **New Jersey**
**212-273-9911**        **1-800-310-1769**        **732-906-2078**
Case 2:23-cv-01048-WED   Filed 05/07/25   Page 2 of 18   Document 170-1

1          that you were going to do that wasn't accurate?

2     A    Hire an outside consultant to lead the City's

3          comprehensive plan and use federal CDBG dollars

4          to do that, and it wasn't eligible for that

5          funding.

6     Q    Is that the only issue you had?

7     A    There was another situation where I was told I

8          needed to write a grant in less than two days

9          to the Wisconsin Economic Development

10         Corporation for Uptown Parklet improvements

11         when Heather Cleveland from an outside

12         organization failed to follow through on it.

13    Q    Was it your job as the director of planning --

14         planning and development to write grants?

15    A    Yes.

16    Q    And did you get that grant completed and

17         submitted?

18    A    Yes.

19    Q    And did you receive the grant money?

20    A    I believe they received it after I resigned.

21    Q    Wasn't it Green Bicycle Company that was hired

22         to complete the comprehensive plan -- to update

23         the City's comprehensive plan?

24    A    Well, that was the organization that he -- that

25         the Mayor wanted to bring on board to do it,

1          MS. DeMASTER:  Objection.  This has

2     been asked and answered.  Further, I mean, I

3     don't know, what's it been, ten Post-it notes

4     that have been passed down by the defendants?

5     If it's going to start getting a little

6     distracting, maybe we can just try to keep it

7     to a minimum, but that has been asked and

8     answered.

9          MS. MURPHY:  You can answer the

10     question.

11          THE WITNESS:  Yes.

12  BY MS. MURPHY:

13  Q    Did you tell the Mayor that you would just go

14     ahead and prepare the grant that you said

15     needed to be completed by you in less than two

16     days to submit to the Wisconsin Economic

17     Development Group?

18  A    No.

19  Q    Then how was it that you came to actually

20     complete that grant?

21          MS. DeMASTER:  Objection; asked and

22     answered.  He's already said that.

23          MS. MURPHY:  You can answer.

24          THE WITNESS:  He came down and told

25     me that -- from his office that Heather

1    Cleveland had failed to follow through on a

2    commitment that she said she was going to

3    submit it and it was due in two days and he

4    really wanted something submitted because he

5    made promises with the Wisconsin Economic

6    Development Corporation that we were going to

7    be submitting a grant for this funding and

8    supposedly they allocated funding to Sheboygan

9    and we really needed to get this submitted, so

10   I felt obligated to take it on.

11          MS. DeMASTER:  Objection.  Again,

12   while my client's answering a question we've

13   got notepads [sic] being written.  We've got,

14   what is it, a half a dozen now?  Almost ten

15   notes have been passed down the table.  This is

16   distracting.  If we can just try to keep it

17   quiet when we're ripping notes off of paper, I

18   would appreciate that.

19          MS. MURPHY:  My clients can

20   communicate with me during this deposition, and

21   that will continue as they feel it is

22   necessary.

23          MS. DeMASTER:  Sure.  They can do it

24   more quietly and less disruptive.

25   BY MS. MURPHY:

```
1    Q    As the director of the planning and development
2         department, it was your job to oversee grant
3         drafting and submission, correct?
4    A    Yes.
5    Q    So in that position you would have known the
6         status of this grant that was -- that was
7         supposed to be being drafted to the Wisconsin
8         Economic Development Group, correct?
9    A    Under normal conditions, yes, but under this
10        condition the Mayor was taking the lead on it
11        with the mayor's office.
12   Q    So your claim is that you had no knowledge of
13        the status of that grant until the Mayor came
14        down to you to tell you that it had not been
15        drafted?
16   A    That is correct.
17   Q    Okay.  But you acknowledge that in your role it
18        was -- it was your job duty and responsibility
19        to draft and submit grants, correct?
20   A    Yes.
21   Q    Did you know Emily Rendall-Araujo before she
22        was hired as the director of senior services
23        for the City?
24   A    I did, yes.
25   Q    How did you know her?
```

1    and issues that the two of you had?

2              MS. DeMASTER:  Objection as to form.

3              THE WITNESS:  Yes.

4    BY MS. MURPHY:

5    Q    What did you discuss with Ms. Kalista in

6         relation to your spouse and issues that the two

7         of you had?

8    A    The marriage issues and the challenges with my

9         kids.

10    Q    What marriage issues were you having with your

11         wife?

12    A    Stress and anxiety, not being able to find a

13         job, afraid to go out in public.

14              MS. DeMASTER:  He's crying right now.

15    Can I borrow these tissues?

16              MS. MURPHY:  Absolutely.  Please move

17    them over.

18    BY MS. MURPHY:

19    Q    Any other marriage issues that you were having

20         with your spouse that you discussed with

21         Ms. Kalista?

22    A    Financial, not being able to get a job, not

23         sure on how to provide for my family.

24    Q    Anything else?

25    A    Not that I'm aware of.

**New York**        **Hudson Court Reporting & Video**        **New Jersey**
**212-273-9911**        **1-800-310-1769**        **732-906-2078**
Case 2:23-cv-01048-WED    Filed 05/07/25    Page 7 of 18    Document 170-1

```
 1   Q    Did you talk with her about your frustrations

 2        with your spouse and her boundaries at work?

 3   A    I did.

 4             MS. DeMASTER:  Objection as to

 5        foundation.

 6             THE WITNESS:  Sorry.

 7             MS. DeMASTER:  It's okay.

 8   BY MS. MURPHY:

 9   Q    And what did that discussion consist of?

10   A    She's -- she was working a lot of hours because

11        of short staff.

12   Q    Is that all the issues that you talked about

13        with Ms. Kalista related to your spouse?

14   A    I believe so.

15   Q    What about challenges with your kids?  What did

16        you talk with Ms. Kalista about in relation to

17        that?

18   A    The relationship with my daughter.

19   Q    What's your daughter's name?

20   A    Sofia.

21   Q    And is Sofia the younger or the older one?

22   A    She's the older one.

23   Q    12?

24   A    Hm-hm.

25   Q    What issues did you discuss with Ms. Kalista
```

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Case 2:23-cv-01048-WED    Filed 05/07/25    Page 8 of 18    Document 170-1

1      resumé you have a number of bullets of

2      information that you put.  Were you just trying

3      to highlight things that you completed during

4      your employment as planning director for the

5      City of Sheboygan?

6   A  Yes.

7   Q  Okay.  And on there you indicate that you're

8      accountable for the City's two five-year

9      strategic plan drafting and implementation; is

10     that correct?

11  A  Yes.

12  Q  And did you, in your resumé, generally describe

13     your job duties and responsibilities as the

14     director of planning and development?

15               MS. DeMASTER:  Objection as to form.

16  BY MS. MURPHY:

17  Q  Did you attempt in your resumé to describe your

18     general job duties and responsibilities as

19     planning -- planning and development director

20     for the City of Sheboygan?

21  A  Yes.

22  Q  Okay.  Do you remember what boards you were on

23     in your role as director of planning and

24     development?

25  A  Some.

1   Q    Just you were on some, but you don't remember

2         which ones?

3   A    Well, is the time frame from when I became the

4         director till when I resigned?

5   Q    Well, did they change over time?

6   A    Yes.

7   Q    Okay.  Are there any that you were on for the

8         entire duration of the time you were planning

9         and development director?

10   A    I don't recall.

11   Q    Were there some boards that you were required

12         to be on as director of planning and

13         development?

14   A    Yes.

15   Q    Do you know which ones those were?

16   A    The Transit Commission.

17   Q    What else?

18   A    That's the only one.

19   Q    That's the only one you were required to be on

20         as planning and development director?

21   A    Per my position.

22   Q    Okay.  And what do you mean when you say that?

23         Was it an ordinance that required that?

24   A    Yes.

25   Q    Okay.  Were there others that you were required

**New York**        **Hudson Court Reporting & Video**        **New Jersey**
**212-273-9911**        **1-800-310-1769**        **732-906-2078**
Case 2:23-cv-01048-WED    Filed 05/07/25    Page 10 of 18    Document 170-1

1     to be on by the city administrator?

2  A  No.

3  Q  So any other board that you were on -- here you

4     say in your resumé that you chaired the Area

5     Room Tax Commission and Visit Sheboygan board

6     of directors.  Were those positions that you --

7     that they asked you to be on as part of your

8     role as planning and development director?

9  A  Yes.

10 Q  Were there any boards that you volunteered to

11    be on?

12 A  No.

13 Q  What about the Harbor Centre board?  Were you

14    on that board?

15 A  Yes.

16 Q  What years were you on that board?

17 A  I don't recall the exact time frame.

18 Q  Was that a board that you volunteered to be on?

19 A  I don't know that I volunteered to be on it.  I

20    don't know what the definition of "volunteer"

21    is.  The council approved appointment to that

22    board as the government lead.

23 Q  Right, but did you volunteer or ask to be on

24    that board?

25 A  For some appointments, yes.  Others, no.

| | | |
|---|---|---|
| 1 | Q | Okay.  Was Harbor Centre one of them that you |
| 2 | | asked to be appointed to that role? |
| 3 | A | Sometimes, yes.  Other times, no. |
| 4 | Q | So I guess I'm not -- I'm confused by that |
| 5 | | answer.  So was it an annual appointment? |
| 6 | A | Yes. |
| 7 | Q | Okay. |
| 8 | A | Under some -- under one mayor I was asked, and |
| 9 | | under another mayor I was told it was part of |
| 10 | | my duties. |
| 11 | Q | Which mayor asked you to do it, and which mayor |
| 12 | | told you to do it? |
| 13 | A | Mayor Vandersteen told me, and I believe Mayor |
| 14 | | Sorenson asked. |
| 15 | Q | I want to talk to you about the racial slur |
| 16 | | incident that occurred at the department head |
| 17 | | meeting on August 22nd of 2022, and I am going |
| 18 | | to give you a copy of the amended complaint. |
| 19 | | I'm not going to mark it as an exhibit.  I'm |
| 20 | | just going to let you have a copy for |
| 21 | | reference. |
| 22 | | Okay.  So I'm going to refer you to |
| 23 | | Page 46 of your amended complaint and just read |
| 24 | | that paragraph -- |
| 25 | A | I don't have a 46. |

```
1   A   I don't believe so.
2   Q   What did you do after the common council
3       adjourned at that meeting on November 7th of
4       2022?
5   A   Went to Todd Wolf's house.
6   Q   Did you have any conversation with Assistant
7       City Attorney Majerus following that common
8       council meeting on November 7th?
9   A   I don't recall.
10  Q   Why did you go to Todd Wolf's house after the
11      common council meeting?
12  A   Because I was scared and I didn't know what was
13      going to happen next.
14  Q   Did you go into his house?
15  A   Yes.
16  Q   How long were you there?
17  A   An hour or so.
18  Q   What did you talk about while you were there?
19  A   Basically that we were surprised that he was
20      put on leave and didn't know what the next
21      steps were going to be.
22  Q   Who all was present when you were at his house?
23  A   His attorney, myself, his wife, and neighbor.
24  Q   What's the neighbor's name?
25  A   Henry Meller.
```

1  Q    What false allegations do you claim were made
2       against you?
3  A    That I'm a white man of privilege and I don't
4       have the right to talk about racism.
5  Q    That's the false allegation you allege was made
6       against you?
7  A    And the false information that was shared in
8       the multiple articles.
9  Q    What false information was shared in the
10      articles?
11 A    That I repeated a racial slur.
12 Q    You did repeat a racial slur, correct?
13 A    Yes.
14 Q    So that statement in the articles was accurate,
15      correct?
16           MS. DeMASTER:  I'm going to object as
17      to form; foundation.  We don't have this
18      article in front of us.
19           MS. MURPHY:  You can answer.
20           THE WITNESS:  If it was the first
21      article, I believe that it did not clarify that
22      it was a repeat.
23 BY MS. MURPHY:
24 Q    Really?
25           (Exhibit No. 18 was marked.)

1    BY MS. MURPHY:

2    Q    You've been handed Deposition Exhibit 18.  Is

3         this a copy of -- oh, I'm sorry.  It is not the

4         right one.  Sorry about that.

5                   MS. MURPHY:  I apologize.  I only

6         have two copies of that.

7                   MS. DeMASTER:  That's fine.

8    BY MS. MURPHY:

9    Q    All right.  You've now been handed Deposition

10        Exhibit 18.

11   A    This is the same article.

12   Q    Is it October 10?

13   A    October 10th, but that was --

14   Q    That was that one, too?  So you got one, and

15        you can give your attorney a copy.

16   A    Okay.

17   Q    That's where the other copy went.

18                  MS. DeMASTER:  That's 18?

19                  MS. MURPHY:  Yes.

20   BY MS. MURPHY:

21   Q    So you've been handed Deposition Exhibit 18

22        which is a copy of the October 10, 2022,

23        article; is that correct?

24   A    Yes.

25   Q    In the second -- I don't know if it's the

1    second or third paragraph technically, but it

2    starts with the words "Pelishek said the slur

3    while quoting a resident's comments from a

4    neighborhood meeting."  Did I accurately read

5    that?

6  A  Yes.

7  Q  "He used the offensive word as an example of a

8    racist incident brought to his attention and

9    asked other department heads how the City can

10   help address racial issues at the neighborhood

11   level."  Did I read that accurately?

12 A  Yes.

13 Q  And that was information that City

14   Administrator Todd Wolf gave to Maya Hilty

15   according to the article; is that correct?

16 A  Yes.

17 Q  And that's an accurate statement of what

18   happened at the August 22 department head

19   meeting, correct?

20 A  Yes.

21 Q  There's nothing false in that statement,

22   correct?

23 A  Correct.

24 Q  Okay.  The article also says on Page 3 of

25   Exhibit 18, the last full sentence, "All city

1     directors contacted by the Sheboygan Press

2     declined to comment or referred our reporter to

3     the Mayor and the City Administrator for

4     comment."  Page 3, the sentence right above

5     "more."  Did I read that accurately?

6   A   Yes.

7   Q   Okay.  And Ms. Rendall-Araujo was a city

8     director at the time of the October 10th

9     article, correct?

10  A   Yes.

11  Q   And Ms. Rendall-Araujo has repeatedly told you

12     and others that she did not talk to the media,

13     correct?

14         MS. DeMASTER:  Objection; foundation;

15     misstates testimony; assumes facts not in the

16     record.

17         THE WITNESS:  I don't have an answer.

18     I don't know.

19  BY MS. MURPHY:

20  Q   Your claim is that she never told you that she

21     didn't speak to the media?

22  A   Correct.

23  Q   Okay.  And based on Deposition Exhibit 9,

24     Mr. Wolf had a follow-up call with Maya Hilty

25     to talk about the context of -- in which you

1    Q    The article doesn't call you a racist, does it?

2    A    No, but the public perception was.

3    Q    What investigation are you referring to when

4         you claim that the City financed and

5         facilitated an investigation only to protect

6         Ms. Rendall-Araujo?

7    A    Can you provide where that is?

8    Q    It's at Page 17 of your answer to City

9         Interrogatory No. 4.

10   A    Jill Hall's investigation.

11   Q    Okay.  In relation to the -- the false

12        narrative that you say was occurring in the

13        media, didn't you really just want the articles

14        to stop and the -- the focus on it to stop?

15   A    Yes.

16   Q    So if the City had released a press release,

17        wouldn't that have just drawn more attention to

18        the situation?

19   A    I can't answer that.  I don't know.  It may

20        have; it may not have.

21   Q    Okay.  So in relation to Jill Hall's

22        investigation, do you have any evidence, other

23        than speculation, to support that the City

24        financed a sham -- a -- a sham investigation

25        only to protect Ms. Rendall-Araujo?