# EXHIBIT B

```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WISCONSIN


------------------------------------------------------
CHAD PELISHEK,

                                    CONFIDENTIAL


          Plaintiff,                    VOLUME II


     -vs-                        Case No. 2:23-CV-1048


CITY OF SHEBOYGAN, et al.,


          Defendants.
------------------------------------------------------
```

        Examination of CHAD PELISHEK, taken at the
instance of the Defendants, under and pursuant to
the applicable Rules of Civil Procedure, before
SAMANTHA J. SHALLUE, a Registered Professional
Reporter and Notary Public in and for the State of

Wisconsin, at MWH Law Group, 735 North Water Street,

Suite 610, Milwaukee, Wisconsin, on

September 12, 2024, commencing at 9:08 a.m. and

concluding at 4:59 p.m.


HUDSON COURT REPORTING & VIDEO      (800) 310-1769

1       Interrogatory -- the answer to Interrogatory

2       No. 7 which is now your amended and

3       supplemental response to that interrogatory for

4       the City, and I want you to take a moment to

5       review that answer specifically in relation to

6       City Attorney Adams.

7    A  Okay.

8    Q  What information do you have to support your

9       allegation that City Attorney Adams directed

10      and worked with Jill Hall to investigate only

11      whether Emily was subjected to harassment and

12      retaliation for purportedly and falsely

13      reporting your racism?

14   A  What -- sorry.

15   Q  What information do you have to support that

16      allegation?

17   A  Well, again, he -- the comments that he made

18      that he was amending the report with Jill Hall

19      and that it wasn't being released because he

20      was still reviewing it.  I sat in the meeting

21      wondering why is he -- why is he editing the

22      report when this was supposed to be an

23      independent investigation, and one would think

24      that if you hired an outside investigator,

25      whatever the report was that you were given,

1       you would have taken the information and went

2       with it, and then when the report was released

3       and it exonerated Emily, but didn't exonerate

4       me, it painted me as a racist.

5   Q   Is that everything that you are relying on to

6       assert that allegation?

7   A   I believe so.

8   Q   What facts do you rely on to contend that his

9       conduct -- his alleged conduct was motivated by

10      your race or gender?

11  A   Because they protected everything that had

12      happened up until that point.  I was never able

13      to share my context to the story of what

14      happened, and it was all geared towards

15      protecting Emily Rendall-Araujo and retaliation

16      supposedly against her.

17  Q   Your only involvement in the Hall investigation

18      was that she conducted an interview of you,

19      correct?

20  A   Correct.

21  Q   So you have no knowledge of what her

22      investigation involved, correct?

23  A   Correct.

24  Q   And you have no knowledge of what -- what

25      involvement, if any, City Attorney Adams had in

1   so with the approval of common council, right?

2  A   Again, I can't answer that.

3  Q   Do you have any information that the mayor is

4   the one that approves the hiring of outside

5   companies for PR?

6  A   I -- I don't know that the City's ever hired

7   outside companies, so I don't know, for PR.

8  Q   What information do you have that the mayor

9   never spoke to any city partners who refused to

10   work with you?

11  A   The mayor's assistant, Veronica Valdez, came to

12   me and said that she had been having a

13   conversation with the -- a person at the

14   Sheboygan County Chamber of Commerce and that

15   they were afraid to have me go on an economic

16   development tour with their group because they

17   were concerned that I was going to release

18   unsolicitated [sic] racial slurs to the group

19   and that she felt that we needed to have a

20   conversation with the HR director, Adam

21   Westbrook, at the time to discuss how to handle

22   this situation.

23  Q   And you did, in fact, have a conversation with

24   Adam Westbrook about that, didn't you?

25  A   Yes.

1  Q    And you've produced that as MMPEL003, correct?

2  A    I don't know what the "MMPEL" means.

3  Q    If I have an audio recording of a conversation

4       between you and Adam Westbrook and Veronica

5       that you produced discussing that topic, would

6       you have any reason to dispute that?

7  A    No.

8  Q    Okay.  And you came up with a solution during

9       that meeting with Adam Westbrook as far as how

10      that would be handled, correct?

11 A    Yes.

12 Q    Any other city partners that refused to work

13      with you after the racial slur incident?

14 A    No.

15 Q    And --

16 A    Not that I'm aware of.

17 Q    -- did you actually go on the chamber of

18      commerce tour that you were referring to

19      earlier?

20 A    I don't recall if I did or if I didn't.

21 Q    Do you have any other evidence that the mayor

22      refused to speak to the chamber about them not

23      wanting to have you attend that tour?

24           MS. DeMASTER:  Objection; form.

25           THE WITNESS:  I'm not sure.

1    BY MS. MURPHY:

2    Q    You're not sure if you have any other evidence?

3    A    I don't believe I do.

4    Q    Okay.  How is a statement by the mayor at the

5         October 17 council meeting that there is no

6         place for racism conduct that's hostile towards

7         you?

8    A    Because I don't believe that that's a comment

9         that the mayor would just make at any council

10        meeting without referring back to the incident

11        that happened prior.

12   Q    You put in quotes that -- the fact that he said

13        there's no place for racism is hostile towards

14        you.  Explain to me why that statement is

15        hostile towards you.

16   A    Because it's -- as I stated, it's -- the

17        August 22nd meeting and the events leading as

18        part of that after that and the fact that the

19        comment was made that there's no -- that this

20        is no place for racism insinuates to me that it

21        was directed towards me and what was said at

22        that meeting.

23   Q    He didn't reference you in that statement,

24        correct?

25   A    Correct.

1   Q    Okay.  And there's nothing wrong with the
2        actual words "There's no place for racism,"
3        correct?  Do you take issue with that quote,
4        "There's no place for racism"?
5                    MS. DeMASTER:  Objection; form.
6                    THE WITNESS:  No.
7   BY MS. MURPHY:
8   Q    Okay.  What do you think the mayor could have
9        done to stop the articles that Maya Hilty and
10       the Sheboygan Press published in relation to
11       the racial slur incident?
12                    MS. DeMASTER:  Objection; form.
13                    THE WITNESS:  I don't have an answer
14       for that.  I don't know.
15  BY MS. MURPHY:
16  Q    Well, you make the allegation that he met with
17       Hilty before the articles, knew of other
18       articles being published about you, but did not
19       stop them.  So what did you believe he could do
20       to stop them?
21  A    He could have shared the context of the meeting
22       and tried to say that this was not a -- this
23       was done in a closed meeting and that this
24       isn't a public issue and that I'm not a racist
25       and I don't go around and issue unsolicited

1    that you have or evidence you have in relation

2    to her whistleblower complaint?

3  A  Yes.

4  Q  Have you ever heard Ms. Rendall-Araujo make a

5    statement that white men of privilege can't

6    comment on certain things?

7  A  I have not heard her say that, but I've seen it

8    printed.

9  Q  Where was it printed?

10  A  I stated previously.

11  Q  Refresh my memory.

12  A  On a -- it was said at a public meeting, and it

13    was published on a Facebook page.

14  Q  Is that where you're talking about the comment

15    dismantle the patriarchy?

16  A  Yes.

17  Q  You're saying that she made the comment that

18    white men of privilege can't speak about

19    certain things during that same meeting?

20  A  Sorry, I was referring to the dismantle the

21    patriarch.

22  Q  Okay.  So have you ever heard her say, "White

23    men of privilege can't speak about certain

24    things"?

25  A  I have not heard her say that, but I've heard

1       secondhand from Todd Wolf.

2    Q  So when did Todd Wolf tell you that she made

3       that statement?

4    A  In a one-on-one meeting in his office.  I don't

5       know the exact date.

6    Q  So did he tell you that she only made that

7       statement once to him?

8    A  I can't answer that.

9    Q  Do you have any information as you sit here

10      today that he told you that she made that

11      statement any more than one time to him?

12   A  No.

13   Q  Okay.  Have we discussed all of the conduct you

14      allege Ms. Rendall-Araujo engaged in that was

15      disparate treatment of you based on your

16      gender?

17              MS. DeMASTER:  Objection; form.  You

18      can answer.

19              THE WITNESS:  I believe so.

20   BY MS. MURPHY:

21   Q  I'd like to refer you to your amended and

22      supplemental response to the Individual

23      Defendants' Interrogatory No. 8 which asks you

24      to describe with specificity the conduct that

25      you allege Ms. Rendall-Araujo engaged in that

1    communication with Derek Muench that -- to

2    support this allegation?

3  A  I don't believe so.

4  Q  Okay.  The next allegation of misconduct you

5    have in relation to Mr. Westbrook is that he

6    "would not release or encourage release of any

7    statement that plaintiff was reporting racism

8    and the context where he was asked to repeat

9    the slur so the public would not think he was a

10    racist anymore."  What information do you have

11    to support that allegation?

12  A  Meetings in my office with him.

13  Q  Okay.  So what statements do you claim he made

14    to you in meetings in your office?  Was it your

15    office or his office that you were meeting in?

16  A  He came into my office.

17  Q  Okay.  So what -- what do you claim he said

18    during those meetings?

19  A  The first time I said that I wanted to file a

20    complaint against Emily for what was going on,

21    and he told me that I couldn't do that because

22    I just needed to play it out and that it had

23    happened prior and that he couldn't fix what

24    happened in the past and release any context

25    related to that.

1  Q   Did you record that conversation?

2  A   I did not.

3  Q   Did you write about it in your notes?

4  A   I can't confirm that.

5  Q   Did you -- when you made those notes, were they

6      made, like, at the time things were happening,

7      or when did you create those notes?

8  A   Some of the notes were; some of the notes

9      weren't because there was a lot going on and I

10     was trying to just do my job and continue to do

11     what I can, but also to try to keep track of

12     what was happening.

13 Q   Okay.  When did that meeting take place?

14 A   I don't know the exact date, but I think it was

15     in January.

16 Q   Is that the extent of what you claim

17     Mr. Westbrook said and what you said during

18     that meeting?

19 A   I believe so.

20 Q   Was anyone else present?

21 A   I don't believe so.

22 Q   Did you -- do you have any documents in

23     relation to that meeting?

24 A   Well, you just asked if it was in the notes,

25     and I said I don't know if it's in the notes.

1         That's the only documentation I would have.

2   Q   Okay.  So there's no e-mail, follow-up e-mails,

3        between the two of you on that?

4   A   I don't know.  I don't think so.

5   Q   When did the second meeting occur?

6   A   The second meeting was the meeting between us,

7        myself, and Veronica related to the city

8        partners.

9   Q   And that's the one that we have the audio

10       recording of?

11  A   Yes.

12  Q   Do you recall when that occurred?

13  A   Maybe in February.

14  Q   Was that in your office, or was that somewhere

15       else?

16  A   His office, Adam's office.

17  Q   And your first meeting with him, did that just

18       involve your request to file a complaint

19       against Emily?

20  A   Can you clarify?  Are you just wondering if

21       that was the only thing we discussed?

22  Q   Well, what I'm trying to understand is you said

23       he "would not release or encourage release of

24       any statement that plaintiff was reporting

25       racism and the context in which he was asked to

**New York**      **Hudson Court Reporting & Video**      **New Jersey**
**212-273-9911**      **1-800-310-1769**      **732-906-2078**
Case 2:23-cv-01048-WED    Filed 05/07/25    Page 13 of 25    Document 170-2

1     repeat the slur," so I'm just trying to figure

2     out if you discussed him -- you know, a

3     statement being released during that first

4     meeting or if that was only discussed during

5     the second meeting?

6  A  I did discuss a statement being released as

7     part of that discussion on the complaint, and

8     that's when he told me that that was done in

9     the past and that he can't fix the past.  He

10    had just started with the City and was going

11    around and meeting with department heads and

12    trying to understand what was going on and

13    trying to see if he could fix some of the

14    issues that were happening in each of the

15    departments.

16 Q  To your knowledge, did Adam Westbrook release

17    any statements on behalf of the City during his

18    employment?

19            MS. DeMASTER:  Objection; form.

20            THE WITNESS:  A clarifying question.

21    To who?

22            MS. MURPHY:  The public, release a

23    statement to the public.

24 BY MS. MURPHY:

25 Q  Did he release any statements to the public

**New York**      **Hudson Court Reporting & Video**      **New Jersey**
**212-273-9911**      **1-800-310-1769**      **732-906-2078**
Case 2:23-cv-01048-WED    Filed 05/07/25    Page 14 of 25    Document 170-2

1    that you're aware of during his employment with

2    the City?

3  A  Are you reading that in this paragraph?

4  Q  Your allegation is that Mr. Westbrook would not

5    release or encourage release of any statement

6    that plaintiff was reporting racism and the

7    context in which he was asked to repeat the

8    slur so that the public would not think he was

9    a racist.  So my question to you is whether or

10    not you -- to your knowledge, Mr. Westbrook

11    released any statements on behalf of the City,

12    public statements, on any subject during his

13    employment?

14  A  I can't verify that.

15  Q  Can you recall of any as you sit here today?

16  A  I don't know.

17  Q  Your next allegation against Mr. Westbrook is

18    that he issued the March 8th, 2023, directive.

19    That e-mail was sent to all city users,

20    correct?

21         MS. DeMASTER:  Objection; foundation.

22         THE WITNESS:  I do not know.  If you

23    have a copy of it, I could verify that, but I

24    don't know.

25         MS. MURPHY:  Oh, actually, I take

1          that back.

2     BY MS. MURPHY:

3     Q    That was sent to department heads, correct?

4     A    I don't know.

5               (Exhibit No. 23 was marked.)

6     BY MS. MURPHY:

7     Q    You've been handed Deposition Exhibit 23 which

8          is a copy of the March 8, 2023, e-mail.  Now

9          that you've had a chance to look at it, was

10         that sent to city department heads?

11    A    Yes.

12    Q    So what information do you rely on to support a

13         contention that that was issued -- that that

14         e-mail was motivated by your race or gender?

15              MS. DeMASTER:  Objection; form.  You

16         can answer if you know.

17              THE WITNESS:  Because it's in

18         reference to the Jill Hall report.

19    BY MS. MURPHY:

20    Q    It was sent to all the department heads which

21         are both male and female, correct?

22    A    Yes.

23    Q    Okay.  So any other information that you're

24         relying on to contend that it was -- that that

25         e-mail was sent based -- motivated, you know,

1    by your race or gender besides what you've just

2    stated?

3             MS. DeMASTER:  Objection to form.  If

4    you know you can answer.

5             THE WITNESS:  I don't know.

6    BY MS. MURPHY:

7    Q    How many times did you meet with Adam

8         Westbrook?

9    A    While he was --

10   Q    Well, I'll ask a better question.  How many

11        times did you talk with Adam Westbrook in his

12        office?  You talked to me about two times.

13        Were there other times where you met with him

14        and specifically discussed either the

15        August 22nd racial slur incident or the Hall

16        investigation?

17   A    Yes.

18   Q    When?

19   A    I don't know the exact date, but there was a

20        meeting between Mayor Sorenson and Adam

21        Westbrook where both of them came into my

22        office and wanted to tell me that they had

23        received a lawsuit for Todd Wolf and that I was

24        going to be the main witness in that lawsuit.

25   Q    Anyone else present besides the three of you:

```
1            the mayor, Adam Westbrook, and yourself?

2    A      I don't believe so.

3    Q      What did you say in response to their comment

4           that you would be the main witness in that

5           lawsuit?

6    A      I didn't understand the reason why it would

7           have been -- why I would have been the main

8           witness, and I may have referenced that I

9           needed to seek an attorney.

10   Q      You don't recall if you said that or not?

11               MS. DeMASTER:  Objection; misstates

12          testimony.

13               THE WITNESS:  I can't confirm if it

14          was at that meeting or the following meeting

15          after that.

16   BY MS. MURPHY:

17   Q      Okay.  And did the mayor or Adam Westbrook say

18          anything else in that meeting?

19   A      Related to?

20   Q      Anything.  I mean, did they say anything else

21          during that meeting?

22   A      I don't believe so.

23   Q      Did you say anything else during that meeting?

24   A      I'm not sure.

25   Q      As you sit here today, can you recall saying
```

1          anything else during that meeting?

2     A    I'm not sure.

3     Q    Did you record that meeting?

4     A    I did not.

5     Q    You referenced another meeting.  When was the

6          next meeting that you had with Mr. Westbrook?

7     A    The last meeting was when the Hall report was

8          released.

9     Q    Where did that meeting take place?

10    A    In my office.

11    Q    Who was present?

12    A    Mayor Sorenson, Adam, and myself.

13    Q    What was said by the mayor and Adam?

14    A    That the Hall report -- actually, Adam gave me

15         a copy of the Hall report to read, and when I

16         read it I almost lost it because it did not

17         reference anything that I had stated in my

18         review and it insinuated that I was a racist.

19    Q    So after they handed you the report and you

20         read it, what was said?

21    A    I said that I will need to get an attorney and

22         that this will be figured out in court at which

23         time Mr. Westbrook asked Mr. Sorenson to leave

24         the room.

25    Q    And did the mayor say anything during that

1       meeting?

2   A   I don't recall.

3   Q   So as you sit here today you don't recall him

4       saying anything?

5               MS. DeMASTER:  Objection; asked and

6       answered.

7               THE WITNESS:  I don't recall him

8       saying anything.

9   BY MS. MURPHY:

10  Q   Okay.  So what did Adam say during that

11      meeting?

12  A   He referenced the fact that there was

13      discussion in the Hall investigation about the

14      demand for money at the -- with the DEI group

15      and that that didn't align with the testimony

16      that I had previously told him, and he was

17      trying to -- he was trying to understand which

18      information was correct.

19  Q   And how did you respond?

20  A   I think I then responded that it'll have to be

21      figured out in court.

22  Q   Did either of you say anything else during that

23      meeting?

24  A   I don't believe so.  I don't know.

25  Q   Did you record that meeting?

1  Q   What was the dialogue?

2  A   Related to the fact that white men had more

3      privilege than other people and that we needed

4      to -- that him and I -- that there was a target

5      against us and that I needed to be -- watch

6      what I say.

7  Q   What did you expect Mr. Wolf to do with your

8      complaint?

9  A   Well, I had hoped that they were going to hire

10     this PR company to help clean up the narratives

11     and --

12 Q   Do you believe he did anything to follow up on

13     any of the complaints you made to him?

14 A   I can't answer that.

15 Q   Is there some reason you didn't name him as a

16     defendant in this lawsuit?

17 A   I can't answer that.

18 Q   Well, it's your lawsuit.  You can answer that.

19 A   I don't know.

20 Q   You don't know why you didn't name him?

21 A   The main reason that I probably didn't name him

22     is because he was the only person that was

23     defending me in city hall during this whole

24     thing.

25 Q   Do you believe he didn't do his job in relation

1       to your complaints?

2    A    I'm not going to answer that because I don't

3         know.

4    Q    You do have to answer that.  Do you have any

5         information that would lead you to believe he

6         did not do his job in relation to your

7         complaints of harassment that you allege you

8         made to him?

9              MS. DeMASTER:  Objection as to form.

10        Subject to that you can answer.

11             THE WITNESS:  I don't have a response

12        to that because I don't know what his

13        day-to-day job duties entailed.  He was my

14        boss.

15   BY MS. MURPHY:

16   Q    Do you know whether he did anything about your

17        complaints?

18   A    Well, he did -- I mean, the next one says he --

19        he did follow up with a letter to the council

20        that we talked about in the first deposition

21        and tried to defend my actions.  So I'm

22        guessing that that all played into it.

23   Q    Fantastic.  So his November 7th letter to

24        council was what you believed was a response to

25        your complaints of harassment, right?  Right?

1     acknowledge that the Fehr Graham environmental

2     job was also, I believe, a local job.  They

3     have a local Sheboygan office, and I believe

4     that they may have known about the narratives

5     related to that as well because I never got a

6     job offer.

7  Q   I believe earlier you had said something about

8     health issues or other things like that.  Can

9     you clarify a little bit any physical injuries

10    you've had as a result of your --

11  A   Sure.  So I've -- I've -- well, besides the

12    loss of sleep and issues with my wife and my

13    family, I've had low testosterone and hair loss

14    and anxiety and panic attacks.  I have high

15    blood pressure.

16  Q   And all of that started when all of this

17    started going on at the City?

18  A   Yes.

19  Q   You had testified earlier in the deposition

20    when talking about one of the articles that it

21    was a false narrative and something about you

22    repeating a racial slur.  Can you clarify, is

23    that the only injury you're alleging, or

24    what -- what happened to you?  Is it just about

25    an article or --

**New York**          **Hudson Court Reporting & Video**          **New Jersey**
**212-273-9911**          **1-800-310-1769**          **732-906-2078**
Case 2:23-cv-01048-WED    Filed 05/07/25    Page 23 of 25    Document 170-2

1   Q    So you never saw this -- an e-mail like this

2        come out in relation to any litigation, whether

3        it was by a former female City employee or a

4        former male City employee, correct?

5   A    I have never seen an e-mail like this come out.

6   Q    Irrespective of the sex of the employee that

7        filed the lawsuit, right?  You've never seen

8        another e-mail like that?

9   A    Correct.

10   Q    Okay.  You recall I told you at the beginning

11        of your deposition that if you didn't

12        understand any of my questions you were to stop

13        me and let me know so I could rephrase it,

14        right?

15              MS. DeMASTER:  Objection to form.

16              THE WITNESS:  I believe so.

17 BY MS. MURPHY:

18   Q    And, in fact, you actually stopped me multiple

19        times and asked me to explain my question or

20        restate my question, didn't you?

21   A    Yes.

22   Q    Okay.  Not once did you ever tell me that you

23        didn't understand the word "evidence" as I was

24        using it in one of my questions, did you?

25   A    I'm not sure.

**New York**       **Hudson Court Reporting & Video**       **New Jersey**
**212-273-9911**       **1-800-310-1769**       **732-906-2078**
Case 2:23-cv-01048-WED   Filed 05/07/25   Page 24 of 25   Document 170-2

1   Q   And you understand the word "information,"

2       right?  When I asked you what information you

3       have regarding various allegations, you

4       understood that, right?

5   A   Yeah.

6   Q   So the questions that you answered -- when you

7       answered my questions, if you didn't ask me to

8       clarify it, you were responding to the question

9       understanding what was being asked, weren't

10      you?

11   A   I believe so.

12   Q   Okay.  How did the -- you know, in the Hall

13      report which I believe was Exhibit 24 you only

14      identified four bullets of -- in that report

15      that you believed related to you in any manner;

16      is that -- do you recall that?

17   A   Yes.

18   Q   Okay.  I'm handing you Deposition Exhibit 24.

19      The first bullet you referred to was on Page 3

20      of 6 of Exhibit 24 that says halfway down the

21      first paragraph "Among other topics, he,"

22      referring to Mr. Wolf, "talked extensively

23      about personnel matters and discipline

24      regarding a director who had disclosed

25      Pelishek's utterance of a racial slur in a

**New York**          **Hudson Court Reporting & Video**          **New Jersey**
**212-273-9911**          **1-800-310-1769**          **732-906-2078**
Case 2:23-cv-01048-WED    Filed 05/07/25    Page 25 of 25    Document 170-2