# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHAD PELISHEK,

     Plaintiff,

  v.        Case No. 23-CV-1048

CITY OF SHEBOYGAN, et al.,

     Defendants.

## DECISION AND ORDER

### 1. Background

At an August 22, 2022, meeting of the City of Sheboygan's department heads, Director of Planning and Development, Chad Pelishek (ECF No. 144, ¶ 15), raised a concern over racist comments having been made by citizens at community meetings. (ECF No. 144, ¶ 28.) Director of Senior Services and peer of Pelishek, Emily Rendall-Araujo (ECF No. 144, ¶¶ 5, 6), asked Pelishek what was said (ECF No. 144, ¶ 28; *see also* ECF No. 118-2 at 10-12). In responding, Pelishek repeated the slur that a city employee had told him a citizen used at a neighborhood meeting—the N-word, although Pelishek used the actual word. (ECF No. 144, ¶ 29.)

Rendall-Araujo spoke to Pelishek after the meeting and said that he should have said "the N-word" rather than saying the full word. (ECF No. 144, ¶ 41.)

A month and a half later, on October 10, 2022, the Sheboygan Press published an article under the headline, "Sheboygan leader says racist slur in meeting," which stated in part:

> A city director's use of an offensive term for Black people and the way the Sheboygan administrator responded have exacerbated what residents say are persistent equity issues at City Hall.
>
> Chad Pelishek, Sheboygan's director of Planning and Development, said the N-word during an internal meeting of department heads in August.
>
> Pelishek said the slur while quoting a resident's comment from a neighborhood meeting. He used the offensive word as an example of a racist incident brought to his attention and asked other department heads how the city can help address racial issues at the neighborhood level, City Administrator Todd Wolf said.
>
> Wolf was concerned not that a white department head repeated the racist term but that other staff members told people outside the meeting ….

(ECF Nos. 144, ¶¶ 36-37; 152-7.) The parties dispute how the Sheboygan Press learned of the incident.

On October 26, 2022, the Sheboygan Press published a follow-up article under the headline, "'People are angry': Sheboygan residents, elected officials respond to city administrator's handling of director repeating a racial slur." (ECF Nos. 144, ¶ 38; 152-8 at 1.) The article focused on the common council's response to Wolf's handling of the incident. (ECF No. 152-8 at 1-6.)

At least one community group expressed discomfort in continuing to work with Pelishek in light of his repeating the racial slur. (ECF No. 144, ¶ 135.) Pelishek continued to work with another group, allegedly at the demand of Sheboygan Mayor Ryan Sorenson, that had called for Pelishek to be fired because he had repeated the slur. (ECF No. 144, ¶¶ 141-46.) Others, including allegedly Amanda Salazar, a former member of Sheboygan's city council, sought Pelishek's termination, but Pelishek does not know if Salazar's efforts were associated with his repeating the citizen's use of the N-word or their past disagreements. (ECF No. 144, ¶¶ 12, 152.)

Sheboygan eventually retained Attorney Jill Hall to investigate Wolf, with the stated purpose being to investigate "Wolf's actions that may have negatively impacted employees at the City of Sheboygan." (ECF Nos. 144, ¶¶ 57-59; 152-21.) Around that time, in November of 2022, Pelishek retained Attorney Jennifer DeMaster to represent him. (ECF No. 151-2 at 3.)

Hall interviewed Pelishek as part of her investigation. (ECF No. 144, ¶ 67.) Although it was not a focus of her investigation, Hall wrote in her February 6, 2023, report, "Among other topics, [Wolf] talked extensively about personnel matters and discipline regarding a Director who had disclosed Pelishek's utterance of a racial slur in a meeting." (ECF No. 152-21 at 3.) Hall also referred to "the matter of Pelishek uttering a racial slur on August 22, 2022," "Pelishek's racial slur," and "the fact of Pelishek uttering a racial slur." (ECF No. 152-21 at 3.) Hall further stated that "*no* attendee," including

Pelishek, supported Wolf's assertion that Pelishek uttered the slur because another employee "demanded" that Pelishek repeat the slur. (ECF No. 152-21 at 4 (emphasis in original).)

The Common Council fired Wolf on January 9, 2023. (ECF No. 144, ¶¶, 13, 69.) As a result, Mayor Sorenson replaced Wolf as Pelishek's supervisor. (ECF No. 144, ¶ 119.)

On February 6, 2023, Wolf, with DeMaster as his attorney, filed a federal lawsuit against Sheboygan and those involved in his termination. (ECF No. 144, ¶ 70.) Assistant City Attorney Liz Majerus sent an email to city employees on February 7, 2023, that stated in part, "Because the City is a defendant, all City employees are directed to have no communication with Mr. Wolf or Attorney DeMaster. If either contacts you, please do not respond and please let me know." (ECF No. 13-5.) The email also "encourage[d]" employees not to talk to "friends, neighbors and even coworkers" about Wolf's case. (ECF No. 13-5.) Pelishek did not inform Majerus that he had already retained DeMaster as his own attorney. (ECF No. 144, ¶ 75.)

A month later, on March 8, 2023, shortly before the city publicly released Hall's report on Wolf pursuant to an open records request, the city's human resources director, Adam Westbrook, sent an email to all department directors. (ECF No. 144, ¶¶ 77, 114.) It included the following: "Because the City is a party to a federal lawsuit, no employee is allowed to speak about matters related to former Administrator Wolf or business of the City of Sheboygan involving former Administrator Wolf to anyone without our Attorneys

being present." (ECF Nos. 13-6 at 1.) Pelishek did not inform Westbrook that he had already retained DeMaster as his attorney. (ECF No. 144, ¶ 84.)

On March 26, 2023, Pelishek began leave under the Family and Medical Leave Act. (ECF No. 144, ¶ 90.) On May 12, 2023, while still on leave, Pelishek resigned his employment with the city. (ECF No. 144, ¶ 92.)

Pelishek filed this lawsuit on August 7, 2023, with a complaint (and subsequent amended complaint) that was paradoxically both verbose and vague, and paid little heed to the requirement that a complaint be both "short" and "plain." The defendants moved to dismiss Pelishek's amended complaint. (ECF No. 23.) The court granted the motion in part, narrowing Pelishek's claims and dismissing certain defendants. *Pelishek v. City of Sheboygan*, No. 23-CV-1048, 2024 U.S. Dist. LEXIS 41909, at *35-37 (E.D. Wis. Mar. 11, 2024). After a contentious period of discovery, *see Pelishek v. City of Sheboygan*, No. 23-CV-1048, 2025 U.S. Dist. LEXIS 44559 (E.D. Wis. Mar. 12, 2025); *Pelishek v. City of Sheboygan*, No. 23-CV-1048, 2025 U.S. Dist. LEXIS 15593 (E.D. Wis. Jan. 29, 2025), both the plaintiff and the defendants have moved for summary judgment (ECF Nos. 115; 123).

The court has jurisdiction under 28 U.S.C. § 1331. All parties have consented to proceed before this court in accordance with 28 U.S.C. § 636(c).

### 2. Pelishek's Repeated Misrepresentations

Nearly two months after Pelishek's attorneys, Christopher Ivan Kachouroff and Jennifer DeMaster, filed their[1] Brief in Support of Plaintiff Chad Pelishek's Motion for Partial Summary Judgment (ECF No. 125), they filed a "Notice of Errata for ECF 125." (ECF No. 160.) The Notice of Errata states, "On April 28, 2025, Plaintiff discovered sua sponte that some of the descriptions of the cited cases were not accurate or that typographical errors existed." (ECF No. 160 at 1.)

Counsel identified six case citations that included materially false representations. For example, in their initial brief, in support of the proposition that disputing a public report is a matter of public concern, Kachouroff and DeMaster included the following citation: "*Swetlik v. Crawford*, 738 F.3d 818 (7th Cir. 2013) ('falsified government records affecting taxpayer funds' are of significant interest to the public and matters of public concern)." Despite being in quotes, the phrase "falsified government records affecting taxpayer funds" (or anything close to it) appears nowhere in *Swetlik*. Therefore, in their revised brief, Kachouroff and DeMaster changed the parenthetical to "Police officer's union activities about alleged untruthful statements made in outside investigation report could be matters of public concern." (ECF No. 161 at 9.)

---

[1] Although courts generally refer to filings as belonging to the party rather than counsel, because this discussion relates to the actions of counsel, the court ascribes the filings to counsel.

Kachouroff and DeMaster identified similar misrepresentations in their brief in opposition to the defendants' motion for summary judgment and likewise filed a revised version of that brief. (ECF No. 162, 163.) In addition to similar changes to case descriptions, the corrections of this brief included various typos and missing citations. (ECF No. 162 at 2-3.) Most significantly, Kachouroff and DeMaster deleted their reference to *Gomez v. City of Chicago*, 2022 WL 3211422 (N.D. Ill. Aug. 9, 2022), which they had represented as holding "liability imposed on city attorney for retaliatory orchestration under color of law." (ECF No. 143 at 31.) A couple of pages later Kachouroff and DeMaster cited *Gomez* again, representing that it was directly on point and supportive of their argument: "These actions mirror the conduct in *Gomez v. City of Chicago*, 2022 WL 3211422 (N.D. Ill. Aug. 9, 2022), where supervisory liability was imposed on a mayor and city attorney who facilitated retaliatory and discriminatory acts." (ECF No. 143 at 33.)

But *Gomez* does not exist. The citation, 2022 WL 3211422, corresponds to *McKenna v. Verint Americas Inc.*, No. CV 22-02370 (FLW), 2022 WL 3211422 (D.N.J. Aug. 9, 2022), which addressed a motion to remand for fraudulent joinder. The court was able to track down a Title VII case entitled *Gomez v. City of Chicago*, but the facts and discussion in the decisions in that case are far afield from what Kachouroff and DeMaster described. *See Gomez v. City of Chi.*, No. 16 C 7743, 2019 U.S. Dist. LEXIS 99712 (N.D. Ill. June 14, 2019); *Gomez v. City of Chi.*, No. 16 C 7743, 2017 U.S. Dist. LEXIS 5063 (N.D. Ill. Jan. 13, 2017).

A few days before Kachouroff and DeMaster reportedly recognized the errors in the briefs they filed, Kachouroff appeared for a final pretrial conference in the District of Colorado. *Coomer v. Lindell*, Civil Action No. 22-cv-01129-NYW-SBP, 2025 U.S. Dist. LEXIS 77555 (D. Colo. Apr. 23, 2025). At the conference, the court noted that a brief filed by Kachouroff and DeMaster contained numerous significant misrepresentations:

> These defects include but are not limited to misquotes of cited cases; misrepresentations of principles of law associated with cited cases, including discussions of legal principles that simply do not appear within such decisions; misstatements regarding whether case law originated from a binding authority such as the United States Court of Appeals for the Tenth Circuit; misattributions of case law to this District; and most egregiously, citation of cases that do not exist.

*Id.* at *4.

The court ordered Kachouroff and DeMaster to show cause why it should not impose sanctions and refer them for disciplinary proceedings. *Coomer*, 2025 U.S. Dist. LEXIS 77555, at *8. In a declaration in response to the court's order to show cause, Kachouroff declared, "I always conduct verification of citations before filing." *Coomer v. Lindell*, 22-CV-1129, ECF No. 311-6, ¶¶ 6, 7. DeMaster attributed the misrepresentations to her having mistakenly filed an earlier draft of the brief. *Id.* ECF No. 311-5.

On July 7, 2025, the court ordered DeMaster and Kachouroff to pay sanctions of $3,000 each, finding incredible their explanation that the errors were attributable to DeMaster mistakenly filing an earlier draft. *Coomer v. Lindell*, Civil Action No. 22-cv-01129-NYW-SBP, 2025 U.S. Dist. LEXIS 128372 (D. Colo. July 7, 2025).

In the Notice of Errata filed in this court Kachouroff and DeMaster do not provide any explanation for the errors in their briefs. (ECF No. 160, 162.)

Most recently, on May 9, 2025, Kachouroff filed a second corrected brief in support of Pelishek's motion for summary judgment. (ECF No. 175.) It is unclear what changed from the first corrected brief that counsel filed. (ECF No. 161.)

### 2.1. Misrepresentations in Pelishek's Motion for Summary Judgment

Even after Kachouroff and DeMaster have now twice corrected their brief in support of Pelishek's motion for summary judgment, it still contains material misrepresentations. For example, the brief contains the following paragraph:

> The Seventh Circuit has established that to determine whether a government employer's restriction on speech constitutes an unconstitutional prior restraint, courts must consider: (1) whether the speech addressed a matter of public concern; (2) whether the government's interest in restricting the speech outweighs the interests of the employee(s) and the public in the speech; and (3) whether the restriction was narrowly tailored to meet that interest. *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749-50 (7th Cir. 1999); citing *NTEU.*

(ECF No. 175 at 7.) But the test articulated is nowhere to be found on the cited pages nor gleaned from the text of *Jones*. The discussion in *Jones* is so far afield from what is contained in Kachouroff's and DeMaster's brief that the court cannot characterize what they wrote as simply a matter of counsel having neglected to introduce the citation with a "see" or even a "cf." signal.

Similarly, the twice-corrected brief includes the following sentence:

> To establish municipal liability under 42 U.S.C. § 1983, Pelishek must show that the constitutional violation resulted from: "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

(ECF No. 175 at 15.) The quoted language is not found in *Howell* and reflects material modifications from what the court actually said: "A plaintiff must show that the violation was caused by (1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell*, 987 F.3d at 653. There are also comparatively minor misrepresentations, such as when counsel quoted *Harman v. City of New York*, 140 F.3d 111, 124 (2d Cir. 1998), as having said "any guidelines" when it said simply "standards." (ECF No. 175 at 14-15.)

What is of greater concern to the court are counsel's repeated, persistent, and sometimes egregious factual misrepresentations. Factual statements in a summary judgment brief must be supported by a proposed finding of fact. And each proposed finding of fact must be supported by a citation to the original source material. *See* Civ. L.R. 56(b)(1)(C)(i). Statements of fact in a brief must align with the corresponding proposed finding of fact so that the opponent is able to directly respond to every factual assertion. *See* Civ. L.R. 56(b)(2)(B).

This procedure allows for the efficient consideration of motions for summary judgment. The court identifies the relevant facts from reading the briefs, turns to the non-

movant's response to the proposed findings of fact, and in the event of a material dispute assesses its veracity by going to the cited source material.

In their briefs Kachouroff and DeMaster repeatedly make factual statements that are not supported by the cited proposed finding of fact. In spot-checking the factual statements in Pelishek's brief in support of his motion for summary judgment, it appears that the majority of the statements do not align with the proposed finding of fact. Some are comparatively minor but nonetheless material variations. For example, the brief contains the following: "In response, Emily Rendall-Araujo, a city official, instructed him to repeat the slur verbatim, stating that she wanted to hear 'exactly' what had been said. PPMF ¶5." (ECF No. 175 at 2.) By placing the word "exactly" in quotes, Kachouroff and DeMaster represent that Rendall-Araujo used the word "exactly" when asking Pelishek what was said. And the statement that she said for him to repeat "exactly" what was said factors prominently in their arguments. But the corresponding proposed finding of fact does not state that Rendall-Araujo asked Pelishek to repeat "exactly" what was said.

The next sentence of the brief reads, "After Pelishek complied, Rendall-Araujo broadcasted Pelishek's repetition and stated she was standing up to his racism. PPMF ¶¶ 6-7." (ECF No. 175 at 2.) The cited proposed findings of fact do not support the assertion that Rendall-Araujo "stated she was standing up to his racism."

Then the next sentence of the brief says, "Shortly thereafter, City Administrator Todd Wolf defended Pelishek, arguing that he had done nothing wrong. PPMF ¶¶ 16-17,

19, 30." (ECF No. 175 at 2.) Despite citing four paragraphs for what seems to be a simple proposition, none support the statement that Wolf defended Pelishek, much less that Wolf had argued that Pelishek did nothing wrong.

These examples come from just the first two paragraphs of the "Facts" portion of the brief filed by Kachouroff and DeMaster. The court is not going to spend additional time recounting all of counsel's misrepresentations—there are simply too many.

Not only are sentences in the brief often not supported by the cited proposed finding of fact, the proposed findings of fact are often not supported by the cited materials. Again, the court limits itself to just a few examples.

"On September 20, 2022, City Attorney Adams denied Pelishek the opportunity to make comments and respond to the reporter about the racial slur incident, so Pelishek directed the reporter to Mayor Sorenson and Administrator Todd Wolf rather than commenting to her." (ECF No. 126, ¶ 9.) In support, Kachouroff and DeMaster cite Exhibit 1 to Pelishek's declaration, which is an email exchange between Pelishek and a local reporter. (ECF No. 127-1.) No portion of the email supports the crucial part of the proposed fact—that "City Attorney Adams denied Pelishek the opportunity to make comments and respond to the reporter about the racial slur incident."

As to a fact that is of crucial significance to Pelishek's summary judgment motion—why he went on leave and ultimately quit—Kachouroff and DeMaster offer the following proposed facts:

49. A few weeks after the March 8 directives, Pelishek went on unpaid leave under the Family Medical Leave Act (FMLA) based, in part, on the March 8 directives where he feared providing any opinions, disputes, or statements even to his friends or family about the investigation report or Todd Wolf's lawsuit allegations. *See id*.

50. Pelishek ultimately resigned, believing, in part, that the City would take adverse action against him if he spoke to even his family, friends, or private legal counsel about his opinions or information regarding the investigation, investigation report, or Todd Wolf's lawsuit as long as he was employed. *Id*.

(ECF No. 126, ¶¶ 49-50 (citing ECF No. 127, ¶¶ 22-33).)

The crucial part of these proposed findings of fact is Kachouroff and DeMaster's representation that a causal link exists between the instruction that he not talk to anyone about Wolf or his lawsuit and Pelishek's decision to take leave and eventually quit. But none of the 11 paragraphs of Pelishek's declaration that Kachouroff and DeMaster cite provide that causal link.

The court cannot even infer that the instruction that he not talk about Wolf or his lawsuit led to Pelishek's resignation because the cited portions of Pelishek's declaration state that he was afraid of speaking out even before he was told he couldn't (ECF No. 127, ¶¶ 22, 25; *see also id.* ¶ 29) and provide other reasons for his decision to leave his job (ECF No. 127, ¶¶ 28, 30, 33).

So here the court has a brief where counsel has misrepresented what courts have said, what their own proposed findings of fact say, and what the record before this court

says. In short, the brief filed by Kachouroff and DeMaster is so riddled with misrepresentations at every level that the court cannot credit anything it contains.

In light of counsel's persistent and egregious misrepresentations, Pelishek's motion for summary judgment will be denied. This is not a sanction for counsel's apparent misconduct; the court will address that matter later. Rather, the denial of Pelishek's motion for partial summary judgment reflects merely that, by presenting a brief riddled with material errors, Kachouroff and DeMaster have failed to satisfy their burden to show that no genuine dispute of material fact exists and that Pelishek is entitled to partial summary judgment.

### 2.2. Misrepresentations in Pelishek's Response to Defendants' Motion

Turning to the response that Kachouroff and DeMaster filed to the defendants' motion for summary judgment, it likewise appears to be replete with misrepresentations. Take, for example, just the first additional fact that Kachouroff and DeMaster included in their response—"PEL Fact ¶ 1.[2]" Kachouroff and DeMaster cite this single fact in their brief for the following propositions:

> "Violation of these directives carried the threat of discipline and termination." (ECF No. 163 at 6.)

---

[2] Kachouroff and DeMaster use the citation "PEL Fact." In a footnote they state, "Hereinafter, Pelishek incorporates by reference his simultaneously filed Statement of Additional Facts which Require Denial of Summary Judgment (hereinafter referenced as 'PEL Fact')." (ECF No. 163 at 6, fn. 2.) Kachouroff and DeMaster did not file any document titled, "Statement of Additional Facts which Require Denial of Summary Judgment." The court presumes they intend to refer to the document captioned, "Plaintiff Chad Pelishek's Additional Proposed Findings of Fact Opposing Defendants' Motion for Summary Judgment." (ECF No. 145.).

"Pelishek complied, refraining from speaking to legal counsel, City colleagues, and the press until after resigning after my FMLA leave." (ECF No. 163 at 6.)

"He testified that he was afraid to contact his own attorney or pursue his EEOC complaint due to the City's written orders." (ECF No. 163 at 6.)

"Pelishek's months of silence—including his inability to consult legal counsel or correct the public narrative—were the natural and intended result of the City's prior restraint." (ECF No. 163 at 6.)

"and prohibited from speaking about the facts underlying these false accusations to anyone" (ECF No. 163 at 15.)

"When Pelishek pleaded for redactions and the chance to consult an attorney, he was told by HR Director Adam Westbrook that he could not obtain legal representation and was instead subjected to gag orders forbidding him to speak about the matter—even to his lawyer." (ECF No. 163 at 16.)

For a single proposed finding of fact to say all that would run afoul of Civil Local Rule 56(b)(2)(B)(ii) requiring that each separately numbered paragraph be limited to one material fact. But "PEL Fact ¶ 1" does not say all of that. What it actually says is: "In addition to the February 7 and March 8 email directives, Chad Pelishek was given verbal directives by Defendants Sorenson, Adams, and Westbrook not to speak with anyone, including the media, about racism allegations or whether the Hall Report findings were false." (ECF No 145, ¶ 1.) It says nothing about threatening termination or discipline, that Pelishek complied with the instruction not to talk to anyone, that he was afraid to speak to an attorney or file an EEOC complaint, that Pelishek was silent for months, that any consequences were intended from the directives, that Pelishek pleaded for redactions or

the chance to consult with a lawyer, or that Westbrook told him he could not consult a lawyer.

Throughout this action, including in response to the defendants' motion for summary judgment, Kachouroff and DeMaster repeatedly assert, sometimes in slightly different forms, that Pelishek attempted to file a discrimination complaint against Rendall-Araujo but was told by Westbrook that he couldn't because, as a white man, he was not protected from discrimination. (ECF No. 163 at 10, 22; *see also, e.g.*, ECF Nos. 1, ¶¶ 122, 173, 192; 58 at 21; 144 at 53; 145, ¶ 9; 163 at 10; 173-1 at 8; 173-1 at 14, 16, 20, 22, 24, 28, 30, 31, 33, 34.)

Pelishek audio recorded his conversation with Westbrook, and it does not support Kachouroff and DeMaster's representations. Pelishek told Westbrook he was being characterized as a racist and he felt he was being discriminated against. (ECF No. 144, ¶ 169.) Westbrook responded that this was not discrimination because he was not being treated differently because of any protected status. (ECF No. 144, ¶ 170.) Westbrook never suggested that Pelishek, as a white man, could not suffer discrimination or that Rendall-Araujo, as a woman, could not discriminate. He said only that being called a racist is not the same as being treated differently because of a protected status. Westbrook's response was not only significantly different from what Kachouroff and DeMaster represent, but it was legally correct. *See Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) ("[A] statement that someone is a 'racist,' while potentially indicating unfair dislike,

does not indicate that the object of the statement is being rejected *because of his race.* 'Racism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race." (citation omitted; emphasis in original)); *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 U.S. Dist. LEXIS 25485, at *7 (W.D.N.C. Feb. 16, 2018) ("[S]tating that Plaintiff is 'racist' is not racial on its face and is not related to Plaintiff's race.").

Kachouroff and DeMaster's amended brief likewise contains significant errors in legal citations. Some would ordinarily be excused as perhaps trivial typos. For example, Kachouroff and DeMaster state, "That remains true even after a challenged policy ends— damages for past unconstitutional speech suppression remain actionable. *McLean v. City of Alexandria*, 86 F. Supp. 3d 475, 481 (E.D. Va. 2015)." (ECF No. 163 at 7.) There is no page 481 in the *McLean* decision.

But on the same page counsel state: "Under *Reyes v. City of Lynchburg*, 300 F.3d 449, 453 (4th Cir. 2002), and *AFGE v. United States*, 634 F. Supp. 336, 340 (D.D.C. 1984), the chilling of protected speech constitutes actionable harm." (ECF No. 163 at 7.) AFGE involved a challenge to the president's use of sequestration to cancel cost of living adjustments for federal retirees. *Am. Fed'n of Gov't Emps. v. United States*, 634 F. Supp. 336, 338 (1986). It did not hold that "the chilling of protected speech constitutes actionable harm," or anything close to it; the case had nothing to do with the First Amendment.

In their discussion of Pelishek's hostile work environment claim Kachouroff and DeMaster cite three cases and egregiously misrepresent the holding of each. They falsely represent that the court in *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007), held, in their words, "ostracism and workload manipulation support hostile work environment claims." (ECF No. 163 at 22.) It said no such thing. The court in *Boumehdi* pointed to evidence of a supervisor's repeated sexist comments to conclude the plaintiff was entitled to a trial on her hostile work environment claim; it made no reference to ostracism or workload manipulation. *Boumehdi*, 489 F.3d at 788.

Ironically, the next case they cite, *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 704 (7th Cir. 2001), does refer to ostracism. Except it says, "But, in *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027 (7th Cir. 1998), we found that ostracism by co-workers that did not result in material harm to the plaintiff was not enough to constitute an adverse employment action." *Stutler*, 263 F.3d at 704 (citing *Parkins*, 163 F.3d at 1039). In other words, the Seventh Circuit in *Stutler* and *Parkins* actually said the opposite of what Kachouroff and DeMaster represent it as having held in *Boumehdi*. As for *Stutler*, Kachouroff and DeMaster state that it held that "retaliatory gagging contributes to hostile environment." (ECF No. 163 at 22.) *Stutler* held no such thing. *Stutler* was not a hostile work environment case and made no mention of anything that could be characterized as "retaliatory gagging."

Kachouroff and DeMaster go on to state, "In *Woods v. City of Berwyn*, 803 F.3d 865 (7th Cir. 2015), the court recognized that false accusations of racism, especially when widely publicized and reinforced by employer silence or complicity, can create a hostile work environment." (ECF No. 163 at 22.) Not only did the court say nothing of the sort, *Woods* had nothing to do with allegations of racism or even a hostile work environment. It dealt with claims of age, disability, and FLMA discrimination under a cat's paw theory. *Woods*, 803 F.3d 865.

The pattern repeats with respect to Pelishek's constructive discharge claim. Kachouroff and DeMaster state:

> Courts have repeatedly recognized that where fabricated accusations of racism, threats of retaliation, and reputational harm intersect, constructive discharge may be established. See *Green v. Brennan*, 578 U.S. 547 (2016); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005); *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006). In Green, as here, an employer manufactured a false narrative and then pressured the employee to resign in the face of untenable working conditions. In *Whittaker*, the Court emphasized that public accusations eroding an employee's professional standing may justify resignation. And in *Ulrey*, a sustained campaign of exclusion and retaliation was sufficient to support a jury's finding of constructive discharge.

(ECF No. 163 at 18.) The Court in *Green v. Brennan*, 578 U.S. 547, 550 (2016), addressed the statute of limitations vis-à-vis a claim of constructive discharge. It did not address whether the plaintiff's allegations would sustain a hostile work environment claim. And the court in *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005), said nothing close to what Kachouroff and DeMaster represent. It dealt with sexist comments that the court

found did not rise to the level of a hostile work environment (and thus did not support a constructive discharge claim).

*Patton v. Keystone RV Co.*, 455 F.3d 812 (7th Cir. 2006), at least involved an allegation of a false statement—a tangential aspect of the plaintiff's claim was that a supervisor falsely said he was in a sexual relationship with her. But the court did not point to that statement or "fabricated accusations of racism, threats of retaliation, and reputational harm" as support for a constructive discharge claim. It held that the plaintiff was entitled to a trial on her constructive discharge claim because of evidence of unwanted sexual contact that could be characterized as sexual assault as well extreme obsessive conduct by a supervisor. *Id.* at 818.

Finally, in *Ulrey v. Reichhart*, 941 F.3d 255, 263 (7th Cir. 2019), not only did the court make no mention of "a sustained campaign of exclusion and retaliation," it *rejected* the plaintiff's constructive discharge claim.

The fact that Kachouroff and DeMaster corrected some of their misrepresentations before the court or the defendants identified them would ordinarily mitigate their conduct. But the reality is that Kachouroff and DeMaster acted only after the Colorado District Court in *Coomer v. Lindell* noted similar misconduct. That so many misrepresentations persist supports the inference that counsel's conduct was not mere negligence but an intentional effort to mislead the court.

Moreover, this sort of conduct has not been limited to the summary judgment proceedings. In each decision this court has issued in this case it has been necessary to comment on errors, misrepresentations, or general sloppiness attributable to plaintiff's counsel. *See, e.g.*, *Pelishek*, 2025 U.S. Dist. LEXIS 44559, at *4-5 ("It was the sort of motion that never should have merited court intervention, much less counsel's hyperbolic allegations of an 'egregious violation of discovery rules' and that defendants had engaged in 'blatant perjury.' In short, Pelishek's was precisely the sort of motion that the threat of fee-shifting exists to deter."); *Pelishek*, 2025 U.S. Dist. LEXIS 15593, at *7-8 ("In support, he cites an answer he gave in his deposition (ECF No. 92 at 7), but the cited passage does not support his assertion."); *Pelishek*, 2024 U.S. Dist. LEXIS 41909, *16 ("A string citation to dozens of paragraphs in a complaint does little to aid the court or respond to a motion to dismiss. This is especially true when (as here) the citations tend not to support the proposition the plaintiff cites them for."). It is unnecessary to belabor the point with further examples. The court's point is merely to say that, if the obligations of Rule 11 and the ethical obligations inherent upon all lawyers were not enough, the court provided numerous proverbial shots across the bow.

Given what appears to be persistent and egregious misconduct by Kachouroff and DeMaster, the court finds that it is compelled to order counsel to show cause as to why sanctions, including dismissal of Pelishek's action in its entirety, should not be imposed.

The court further notes its independent obligation to "inform the appropriate professional authority" whenever it "knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Wis. SCR 20:8.3.

3. **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmovant is entitled to "the benefit of conflicting evidence and any favorable inferences that might be reasonably drawn from the evidence." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

4. **First Amendment**

After Wolf filed his lawsuit, Assistant City Attorney Liz Majerus sent an email on February 7, 2023, to all city email users that stated, in part, "Because the City is a defendant, all City employees are directed to have no communication with Mr. Wolf or Attorney DeMaster. If either contacts you, please do not respond and please let me

know." (ECF No. 13-5.) The email also "encourage[d]" employees not to talk to "friends, neighbors and even coworkers" about Wolf's case. (ECF No. 13-5.)

One month later, on March 8, 2023, immediately before the public release of the investigative report, Adam Westbrook sent an email to city administrators, including Pelishek, which included the following: "Because the City is a party to a federal lawsuit, no employee is allowed to speak about matters related to former Administrator Wolf or business of the City of Sheboygan involving former Administrator Wolf to anyone without our Attorneys being present." (ECF No. 13-6 at 1.)

Pelishek initially alleged that his rights under the First Amendment were infringed by certain city ordinances. He abandoned that aspect of his claim by not addressing the ordinances in his response to the defendants' motion for summary judgment. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). What remains is his claim that his rights under the First Amendment were infringed by the instructions contained in the February 7 and March 8, 2023, emails.

### 4.1.Standing, Mootness, and Jurisdiction

Article III limits the power of federal courts to cases or controversies. Art. III, § 2. Encompassed in this limitation is the doctrine of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338.

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). A connection must exist between the injury and the complained-of conduct. *Id*. And, finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo,* 578 U.S. at 338.

"Implicit in the 'case-or-controversy' requirement of Article III is the principle that 'federal courts may not give opinions upon moot questions or abstract propositions.'" *Wernsing v. Thompson*, 423 F.3d 732, 744 (7th Cir. 2005) (quoting *Worldwide St. Preachers' Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir. 2004)). A case is moot if the defendant has ceased its challenged practice and "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)). The party asserting mootness has the "heavy burden" of showing "that the challenged conduct cannot reasonably be expected to start up again." *Id.* (quoting *Concentrated Phosphate Export Assn.*, 393 U.S. at 203).

The instruction not to talk to anyone about Wolf or his lawsuit related to Wolf's action against the city. That action has been resolved. Moreover, the instructions applied only to city employees. Pelishek no longer works for the city and there is no prospect of him doing so again; he is not, for example, seeking reinstatement. Pelishek's assertion that the city could implement similar policies in the future and thus affect other city employees (ECF No. 163 at 7), while perhaps true, misses the point. Pelishek can only assert his own rights *See St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 628 (7th Cir. 2007) ("Even though *someone* may be affected by the IRFRA amendment, that 'someone' is no longer Rest Haven, and it is well established that the 'case or controversy' requirement applies to declaratory judgments, just as it applies to every other kind of litigation in federal court." (emphasis in original)).

Consequently, because it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," as to Pelishek's request for prospective relief, including declaratory relief, the claim is moot. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020) (quoting *Friends of the Earth*, 528 U.S. at 189 (2000)); *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 861-62 (7th Cir. 2018); *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*, 708 F.3d 921, 931 (7th Cir. 2013); *Wernsing*, 423 F.3d at 744-45.

The limited exception to mootness for declaratory relief recognized in *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115 (1974), is inapplicable. Although the dispute that gave rise to *Super Tire* was resolved for the moment, the underlying issue remained a

"continuing and brooding presence, cast[ing] what may well be a substantial adverse effect on the interests of the petitioning parties." *Id*. at 122. Here, with Pelishek's resignation and the end of the Wolf litigation, the underlying issue has truly "evaporated or disappeared." *Id.*

However, any claim for injuries Pelishek sustained while he was still a city employee and subject to the instruction that he not speak with anyone about Wolf or his lawsuit is not moot. *See Wernsing*, 423 F.3d at 745. Whether the claim presents a live case or controversy depends on whether Pelishek suffered an injury in fact.

A public employee's free speech claim usually arises when an employer disciplines the employee. *See United States v. Nat'l Treasury Emples. Union*, 513 U.S. 454, 466 (1995) (noting that cases arising under *Pickering* "usually involved individual disciplinary actions taken in response to particular government employees' actual speech"). Pelishek was never disciplined for violating the don't talk instruction. In fact, there is no evidence that the city ever enforced the instruction against anyone.

Pelishek contends that simply being subject to an allegedly unconstitutional restriction on speech is itself an injury in fact. He relies on the Supreme Court's statement in *Elrod v. Burns*: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976); (ECF No. 163 at 6.) But as the use of the phrase "irreparable injury" suggests, the Court was speaking in terms of the sort of harm a plaintiff must identify to obtain a preliminary

injunction. *Id.* The Court did not hold that a person who was subject to an unconstitutional restraint on his speech suffered a concrete injury sufficient to sustain a claim for damages.

In other contexts, the Court of Appeals for the Seventh Circuit has underscored that a concrete harm requires more than simply receiving a communication that was arguably unlawful. *See, e.g., Spuhler v. State Collection Serv.*, 983 F.3d 282, 286 (7th Cir. 2020); *Larkin v. Fin. Sys. of Green Bay*, 982 F.3d 1060, 1066 (7th Cir. 2020). Annoyance, indignation, and confusion are not sufficient to constitute a concrete injury. *Pennell v. Glob. Tr. Mgmt. LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021); *Gunn v. Thrasher, Buschmann & Voelkel, P.C.*, 982 F.3d 1069, 1071 (7th Cir. 2020) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982)). "Nor does stress by itself with no physical manifestations and no qualified medical diagnosis amount to a concrete harm." *Pennell*, 990 F.3d at 1045. Rather, there must be evidence that the communication affected the plaintiff's behavior. *Spuhler*, 983 F.3d at 286; *Larkin*, 982 F.3d at, 1066.

Even an award of nominal damages requires a concrete injury in the form of a "*completed* violation of a legal right." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (emphasis added). A communication that did not affect the plaintiff's behavior cannot be characterized as a completed violation of a legal right merely because it hypothetically could have restrained conduct protected by the First Amendment.

The court has identified only a single case where plaintiffs obtained damages because an unconstitutional policy prevented them from exercising a First Amendment right. In *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004), the district court awarded the plaintiffs each nominal damages of $1,000 because a policy prevented them from communicating to prospective student athletes their view that the University of Illinois's Chief Illiniwek mascot was offensive to Native Americans. However, it was undisputed that, as a result of the policy, the plaintiffs in *Crue* stopped communicating with prospective recruits. In other words, there was a completed violation of a legal right because the plaintiffs changed their behavior as a result of an unconstitutional policy.

Similarly, in *Wernsing*, 423 F.3d at 745, the court held that the plaintiffs' demand for "monetary damages for humiliation, stress and emotional anguish resulting from the imposition of the directive" prevented their case from being rendered moot. While stress, without physical manifestations, is not a concrete harm, *Pennell*, 990 F.3d at 1045, when combined with "humiliation" and "anguish," the injury becomes sufficiently concrete.

Pelishek failed to offer any alternative to his erroneous argument that simply being subject to an allegedly unconstitutional instruction or communication constitutes a concrete injury. (ECF No. 163 at 6.) Nonetheless, the city has not conclusively shown that Pelishek's claim is moot. For example, if Pelishek proves at trial that, but for the instruction that he not talk with anyone about Wolf or his lawsuit, he would have

engaged in specific constitutionally protected activity, he may be entitled to at least nominal damages.

The court underscores, however, that to prove a concrete injury on this theory it is not enough for Pelishek to point to constitutionally protected activity that he *could* have engaged in. Rather, he must prove that he *would* have engaged in the protected speech but did not because of the instruction that he not do so. Absent proof that Pelishek would have engaged in protected speech, this theory of injury is purely hypothetical and insufficiently concrete for purposes of Article III. *Cf. Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016) (holding that a jury's finding that the plaintiff "refrained from protected speech in response to the City's unconstitutional ordinances" "describes an injury-in-fact sufficient to support standing"); *Norton v. City of Springfield*, 324 F. Supp. 3d 994, 1000 (C.D. Ill. 2018) ("Based on their representations, the Plaintiffs did refrain from protected speech because of the threat of enforcement of the Ordinance. This is sufficient to constitute an injury-in-fact, even though the City eventually repealed the law.").

That Pelishek struggled to identify any damages he sustained from the directives when asked to do so at his deposition (ECF No. 118-7 at 94-97) certainly does not bode well for his First Amendment claim at trial. But given the nature and purpose of nominal damages, Pelishek's deposition testimony does not render his claim moot.

Because Pelishek may be entitled to at least nominal damages for injuries arising from the period he was subject to the instruction that he not talk to anyone about Wolf or his lawsuit, he has standing to pursue his First Amendment claim, which is not moot. Consequently, the court must consider the sufficiency of his First Amendment claim.

### 4.2. Merits of First Amendment Claim

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id*. Thus, government employers may impose restrictions on the speech of their employees that would be unconstitutional if imposed on the general public. *Nat'l Treasury Emples. Union*, 513 U.S. at 465.

But government employees do not give up their rights under the First Amendment by virtue of their employment. *Garcetti*, 547 U.S. at 417. Although government employees have no constitutional protection for statements made within the scope of their employment, they generally retain the ability to speak out on matters of public concern. *Id.* at 418. A government employer may restrict employees' speech on matters of public concern only by showing that its interest in promoting efficient government service outweighs the interest of the employee to comment on matters of public concern. *Nat'l*

*Treasury Emples. Union*, 513 U.S. at 465-66; *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968).

This balancing requires "a highly fact-specific inquiry into a number of related factors." *McGreal v. Ostrov*, 368 F.3d 657, 675-76 (7th Cir. 2004). This includes considering:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002). The city argues that the restrictions imposed upon Pelishek and the other city employees were appropriate to serve the city's compelling interest in defending itself in active litigation. (ECF No. 116 at 43.)

The city does not point to any case holding that the existence of pending litigation authorizes a municipality to categorically restrict the right of its employees to speak on any matter relating to the litigation. While litigation may present a compelling reason for a municipality to circumscribe an employee's speech, a categorical ban is unlikely to pass muster. Not only are the sorts of matters that give rise to litigation against a municipality likely to involve matters of public concern, but the litigation itself is likely a matter of public concern. Thus, while a municipality presumably could bar an employee from disclosing confidential matters, such as litigation strategy or attorney work product, the city has failed to prove that its categorical ban on any speech "about matters related to

31

former Administrator Wolf or business of the City of Sheboygan involving former Administrator Wolf to anyone" (ECF No. 1-10) is constitutional.

Insofar as the city may be arguing that the March 8 directive did not actually restrict any speech because it merely required the city's attorneys to be present (*see* ECF No. 116 at 43), the argument is unpersuasive. The presence of the city's attorneys may itself chill speech. Moreover, anonymous speech—an important component of First Amendment speech, *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995),—would be rendered largely impossible if the city's attorneys were present.

Of course, much would depend on specifically what, if anything, Pelishek would have said but for the directives. If he fails to convince a jury that he would have engaged in protected speech but for the instruction not to talk about Wolf or his lawsuit, or if his deterred speech was not protected by the First Amendment because, for example, it was not related to a matter of public concern, his claim will fail.

Finally, the city notes that Pelishek testified that his only interest in speaking to DeMaster was as his personal counsel. (ECF No. 116 at 43.) Insofar as the city may be arguing that the First Amendment does not protect a public employee's right to consult counsel unless it is a matter of public concern, that is not true. *See Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000) ("In sum, the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter." (discussing cases)). And the city has failed to demonstrate that it has a compelling interest in preventing

Pelishek from consulting DeMaster as his own attorney. *See id.* at 951 (discussing *Pickering*, 391 U.S. at 568); *see also Barry v. Luzerne Cty.*, 447 F. Supp. 2d 438, 449 (M.D. Pa. 2006) (holding that employer proved that employee's demand for an attorney was sufficiently disruptive so that it was not protected by the First Amendment); *cf. Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 786, 797 (7th Cir. 2005) (holding that employee did not have the right to consult counsel in a private interview room).

Therefore, the defendants have failed to prove that they are entitled to summary judgment on Pelishek's First Amendment claim.

### 4.3. *Monell*

Pelishek initially brought his First Amendment claim against the city and all five individual defendants, alleging that each drafted, "knowingly turn[ed] a blind eye to," "participated, directed, facilitated, and/or knew of" the instruction not to talk about Wolf or his lawsuit. *Pelishek*, 2024 U.S. Dist. LEXIS 41909, at *27. He did not name as defendants either of the individuals who actually issued the instruction.

Pelishek failed to identify any authority clearly establishing that instructions like those contained in the February 7 and March 8 emails were unconstitutional. While general principles such as that a public employee has the right to speak on matters of public concern were well-established, that broad principle looked at the issue at too high of a level of generality. *Pelishek*, 2024 U.S. Dist. LEXIS 41909, at *30. Because Pelishek failed to demonstrate that any defendant's alleged conduct rose to the requisite level of plain

incompetence or a knowing violation of the law, all were entitled to qualified immunity. *Id*. at *31.

That left the city as the only defendant regarding Pelishek's First Amendment claim. The city is liable only if its conduct injured Pelishek.

Unlike other torts, there is no respondeat superior liability under § 1983, meaning that a municipality is not liable merely because it employed a tortfeasor. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a municipality is liable only if the plaintiff was injured as a result of an official policy or custom of the municipality. *Id.* at 691.

In support of its motion for summary judgment, the city does not argue that *Monell* bars Pelishek's First Amendment claim. It addresses *Monell* only with respect to Pelishek's equal protection claim. (ECF No. 116 at 31-33.) Consequently, the court does not consider the issue, and it will deny the city's motion for summary judgment on Pelishek's First Amendment claim.

## 5. Title VII

It is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Over the years, courts have articulated various tests or formulas by which a plaintiff may prove

such a claim but ultimately it is this statutory language that guides the court's analysis. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024).

Pelishek alleges that he suffered disparate treatment, was subjected to a hostile work environment, and was eventually constructively discharged. To sustain any of these claims, he must prove that his race or sex was a motivating factor. 42 U.S.C. § 2000e-2(m).

### 5.1. Disparate Treatment

A disparate treatment claim arises when an employer changes the terms or conditions of an employee's job because of a protected status. This requires proof of some disadvantageous change in the plaintiff's employment, or more simply a practice that treats an employee worse because of a protected status or trait. *Muldrow*, 601 U.S. at 354. The negative change need not be economic or even tangible to be actionable. *Id*. The plaintiff need only "show some harm respecting an identifiable term or condition of employment." *Id*. at 355. The harm does not need to be significant. *Id*. The plaintiff must then prove that "an employer had a discriminatory motive for taking a job-related action." *Ernst v. City of Chi.*, 837 F.3d 788, 794 (7th Cir. 2016).

Pelishek offers a list of grievances. (ECF No. 163 at 14-15.) The court disregards those that are not supported by a proposed finding of fact (*e.g.*, "His core responsibilities were incrementally stripped and assigned to a DEI group calling for his removal[]") and those that do not reasonably constitute a change in the terms or conditions of his

employment (*e.g.*, "Unknown to Pelishek, unknown officials were forging his name on documents showing payment of government funds to the DEI group.").

However, unfavorable work assignments and removal from a Board of Directors position[3] could constitute changes in the terms or conditions of employment. All such actions were taken by Sorenson who, after Wolf was placed on leave, became Pelishek's supervisor. Thus, Pelishek must present evidence that Sorenson was motivated to take these actions because of some unlawful bias. *See Ernst*, 837 F.3d at 794.

Pelishek frames his argument using the abrogated direct and indirect methods of proof. *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (discussing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016)). Looking past the labels that Pelishek used and considering all the evidence together, *see Chatman v. Bd. of Educ. of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021), Pelishek fails to point to evidence that Sorenson was biased. He refers to his own false assertion that Westbrook barred him from filing a discrimination claim, that Adams edited Hall's report and refused to redact Pelishek's name (ECF No. 163 at 11), that Rendall-Araujo spoke publicly about the incident, that Salazar made similar statements, that Rendall-Araujo called him a "white

---

[3] Pelishek states, "Sorenson removed Pelishek from a Board of Directors position on the Business Improvement District that Pelishek had held for almost 10 years. (PEL Fact ¶31)." The cited proposed finding of fact states only that he was on the board, not that he was removed. (ECF No. 145, ¶ 31.) Ordinarily, the court would disregard Pelishek's factual assertion as unsupported (especially in light of counsel's misconduct in responding to the motion for summary judgment). After all, it is not the court's role to search out support for a plaintiff's assertions. *See, e.g., D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015). Nonetheless, the court recognizes that Pelishek's next proposed finding of fact states that Sorenson removed him from the board. (ECF No. 145, ¶ 32.)

Case 2:23-cv-01048-WED    Filed 07/23/25    Page 36 of 52    Document 176

man of privilege," that a worker's complaint about a homosexual supervisor was ignored, and that Pelishek was replaced by a woman following his resignation. (ECF No. 163 at 10-12.)

But none of these actions is attributable to Sorenson. He is not even mentioned. Perhaps it is reasonable to infer that Sorenson was instrumental in hiring Pelishek's replacement, but Pelishek does not suggest how that was indicative of discrimination. Significantly more detail would be required about the candidates and the hired woman to give rise to an inference of bias.

Pelishek's effort to sustain his burden under the *McDonnell Douglas* burden shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), likewise falls short. He points to Rendall-Araujo as someone who was treated better than he was, but he has failed to demonstrate that she is an appropriate comparator. Pelishek has failed to present evidence that she, for example, repeated a citizen's use of a racial slur but was not removed from a board position.

Pelishek has not presented evidence from which a reasonable finder of fact could conclude that Sorenson was motivated by anti-male or anti-white bias when he, for example, removed Pelishek from the Board of Directors. Because Pelishek does not advance any alternative theory to sustain his disparate treatment claim, the court will grant the city's motion for summary judgment as to Pelishek's disparate treatment claim.

### 5.2. Hostile Work Environment

Title VII's prohibition on discrimination encompasses discrimination in the form of a "workplace … permeated with … discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quoting *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005)). "To establish a hostile work environment claim, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023). "Courts look to several factors to determine whether alleged harassment is objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007).

The court begins by considering what *specifically* Pelishek alleges he endured that was subjectively and objectively offensive. He first points to the same circumstances he pointed to in an attempt to support his disparate treatment claim: removing him from a board of directors position; requiring that he work with a community member who had called for his firing; assigning him to complete a grant proposal for that community

member; after the community member failed to complete the grant application, requiring Pelishek to complete it on an extraordinary timeline; a supervisor referring to Pelishek as having acquired "strikes"; forging his name on documents; the allegedly false narrative that emerged regarding his use of a racial slur; and prohibiting him from speaking out and correcting this false narrative. (ECF No. 163 at 14-15.)

In the portion of his brief addressing his hostile work environment claim, he alleges that Rendall-Araujo "falsely stated to the media, City officials, and colleagues that Pelishek had made racist statements, including using the phrase 'colored people,' which he never said. (PEL Fact 18)." This sparked community outrage against him, and Sorenson encouraged the public to keep speaking out. (ECF No. 163 at 21.) He alleges that "[h]e was stripped of responsibilities, excluded from meetings, and denied collaborative support necessary to fulfill core duties." (ECF No. 163 at 21-22.) But he does not support these assertions with any citation to a proposed finding of fact.

Pelishek then treads into new territory by alleging he "had been subjected to DEI-driven marginalization, including being held to different dress standards than female employees, given impossible goals by leadership with ties to the DEI group, and targeted for termination as early as 2020 from a DEI group founder and City Alderwoman." (ECF No. 163 at 21.) In an attempt to support his claim that these circumstances constitute a hostile work environment, Pelishek points to *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007), *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 704 (7th Cir. 2001), and

*Woods v. City of Berwyn*, 803 F.3d 865 (7th Cir. 2015). (ECF No. 163 at 21-22.) But, as discussed above, his arguments are based on egregious misrepresentations of what these cases say. Pelishek has failed to point to any authority suggesting that the circumstances he encountered constitute a hostile work environment.

Setting aside that Pelishek often offers only spurious support for his factual assertions, even if he could prove all of the allegations he presents in his brief in support of his hostile work environment claim, his claim would fail as a matter of law. The circumstances he points to were not objectively offensive.

At the core of Pelishek's hostile work environment claim is his allegation that Rendall-Araujo publicized the fact that he had repeated a racial slur and ascribed racist intent to it. This led to internal and external denunciations and calls for his firing.

Pelishek insists he did nothing wrong. Not only did he merely repeat what a citizen said, he did so in the context of asking his coworkers for help dealing with racist community members, and only then after being asked to say exactly what he heard was said. But what is racially offensive is highly subjective. And calling a person a racist is not racial discrimination. *See Maraschiello*, 709 F.3d at 97 ("[A] statement that someone is a 'racist,' while potentially indicating unfair dislike, does not indicate that the object of the statement is being rejected *because of his race.* 'Racism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race." (citation

omitted; emphasis in original)); *Squitieri*, 2018 U.S. Dist. LEXIS 25485, at *7 ("[S]tating that Plaintiff is 'racist' is not racial on its face and is not related to Plaintiff's race.").

It is undisputed that many in the community found Pelishek's conduct objectionable; the resulting community backlash is a core component of his claim. He points to the Sheboygan Press articles as the primary source of this outrage. Yet the Sheboygan Press included the context in which Pelishek repeated the racial slur. (ECF Nos. 144, ¶¶ 36-37; 152-7.) This reinforces the obvious—a person may reasonably conclude that any use of a racial slur, regardless of context, is offensive. "It goes without saying that the N-word is an egregious racial epithet." *Scaife v. VA*, 49 F.4th 1109, 1116 (7th Cir. 2022). "No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580, 404 U.S. App. D.C. 291 (D.C. Cir. 2013) (Kavanaugh, J., concurring)). There are some who believe that that word should never pass a person's lips for any reason.

Even if public outrage was a foreseeable or intended consequence of Rendall-Araujo's alleged publicization of what Pelishek said, it does not give rise to a hostile work environment claim. Rendall-Araujo had the right to speak out on a matter of public concern. The press was entitled to cover the story, and the public was entitled to express their views and decide whether they wished to interact with Pelishek. Being called a

racist, especially for conduct that was subjectively the antithesis of racism, would undoubtedly be upsetting. While Pelishek regards his conduct as innocent, his coworkers' disagreement does not support a hostile work environment claim under Title VII.

At its heart Title VII aims to counter racism in workplaces and protect employees who bring such discrimination to light. To say that an employee's opposition to what she regards as racism will give rise to a co-worker's Title VII claim would thwart the objective of the statute, if not turn it on its head.

As for all of the other instances Pelishek points to, the most egregious example is perhaps Pelishek's allegation that Rendall-Araujo falsely reported that he used the phrase "colored people" rather than "people of color." (ECF No. 144, ¶ 42.) But this and all other circumstances that Pelishek points to as allegedly constituting a hostile work environment, even when considered collectively with all the circumstances of this case, add up to only the sorts of gripes that routinely affect persons in their employment. *See, e.g., Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023) (discussing workplace annoyances and inconveniences vis-à-vis a hostile work environment claim); *cf. Bell v. EPA*, 232 F.3d 546, 554 (7th Cir. 2000) (holding that "demeaning assignments, verbal abuse, surveillance, diminished responsibilities, refusal to cooperate on job assignments, and placements in situations designed to result in failure" did not add up to an adverse employment action for purposes of a retaliation claim).

Accordingly, the court will grant the city's motion for summary judgment as to Pelishek's hostile work environment claim.

### 5.3. Constructive Discharge

There are generally two ways a plaintiff may prove constructive discharge. *Scaife*, 49 F.4th at 1119. Under the first method, "a plaintiff must prove that his working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). This requires proof that the plaintiff's working conditions were even more egregious than those necessary to sustain a hostile work environment claim. *Id.* An employee is generally expected to keep working and try to fix the problems he faces. *Id.* The second method requires proof that the employer did something that would cause a reasonable person in the plaintiff's position to believe he was about to be fired. *Scaife*, 49 F.4th at 1119.

In his response, Pelishek develops an argument only with respect to the first theory of a constructive discharge claim. Because his hostile work environment claim fails, his constructive discharge claim on the theory that his working conditions became intolerable also fails. *See Scaife*, 49 F.4th at 1119 ("Under the first, a plaintiff must "demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment." (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008)).)

The court will grant the city's motion for summary judgment as to this claim and dismiss Pelishek's Title VII claim in its entirety.

### 6. Equal Protection

Like Title VII, "the Equal Protection Clause protects against intentional discrimination on the basis of race or national origin, and 42 U.S.C. § 1983 provides an employee subjected to such discrimination a path to relief." *Silva v. Wisconsin*, 917 F.3d 546, 559 (7th Cir. 2019). Courts "evaluate [employment] discrimination claims brought under both Title VII and § 1983 using the same standard." *Silva*, 917 F.3d at 559. The claims differ in that a Title VII claim may only be brought against an employer, 42 U.S.C. § 2000e-2(a), whereas a claim under § 1983 may be brought only against a "person," 42 U.S.C. § 1983. As discussed above, a municipality is a person under § 1983 but it is liable only for its own actions in the form of an unconstitutional policy or custom. *Monell*, 436 U.S. at 694. The fact that the Constitution prohibits only intentional discrimination can also lead to slightly different inquiries when it comes to hostile work environment claims. *See Huff v. Sheahan*, 493 F.3d 893, 902 (7th Cir. 2007).

### 6.1. Emily Rendall-Araujo

Pelishek's equal protection claim against Rendall-Araujo again rests on the premise that, given that Pelishek repeated a citizen's use of a racial slur in the context of seeking to address racism in the community and only in response to Rendall-Araujo's

question, Rendall-Araujo's alleged outrage must have been motivated by Pelishek's race or sex.

But, as discussed above with respect to Pelishek's Title VII claim, Rendall-Araujo's actions did not give rise to an equal protection violation. Absent the sort of extreme conduct that would independently support a hostile work environment claim, expressing a view, even vehemently and vociferously, that a colleague engaged in racially offensive behavior does not violate equal protection. Pelishek's disagreement with Rendall-Araujo's view as to the propriety of his conduct does not present a jury question. The court will grant Rendall-Araujo's motion for summary judgment.

### 6.2. Charles Adams

In the portion of his response outlining his claim against Adams, Pelishek failed to provide a single factual citation. (ECF No. 163 at 30-31.) Aside from failing to provide factual support for his allegations, even if true his allegations would not support a claim against Adams.

Pelishek's claim against Adams focuses on his alleged role in editing and publicly releasing Hall's report. Looking past the absence of any factual citation in his brief and instead looking at his additional proposed findings of fact, Pelishek relies on own deposition and a declaration of Carrie Arenz, a city employee, to support his allegation that Adams edited Hall's report. (ECF No. 169, ¶ 14.) As to his own deposition, he refers to comments that Adams allegedly made in a meeting Pelishek attended where Adams

said that he was not releasing Hall's report because he was still "amending," "editing" or "reviewing" it (Pelishek's recollection varies). (ECF No. 170-2 at 3-4.) Arenz similarly states in her declaration that Adams said he was "'continuing' to work on the Hall investigation report," and later said he "was still editing it." (ECF No. 146, ¶¶ 32-33.) From this, Pelishek extrapolates that Adams is the source of everything in the report that is unfavorable to him.

Pelishek has failed to present any specific, tangible evidence that Adams substantively changed the report at all, much less did so in a way to intentionally put Pelishek in a false light. Pelishek has not, for example, presented a version that was submitted by Hall and identified changes from that version and the one that Adams publicly released. And, notably, the report bore Hall's name and was submitted on her law firm's letterhead.

From Adams's references to editing the report, Pelishek asserts it is reasonable to infer Adams went beyond the sort of proofreading traditionally associated with editing and instead re-wrote the report to cast Pelishek as a racist. That Hall's report omitted the context in which Pelishek used the racial slur is unremarkable given that Pelishek's conduct was not a focus of or even particularly relevant to Hall's investigation. Hall was investigating Wolf, and largely his response to Rendall-Araujo's suspected disclosure of the incident, accusations Wolf made regarding a demand for grant funds, and statements that Wolf and DeMaster made to the media. (ECF No. 152-21 at 2.) One such statement

was DeMaster's statement that Rendall-Araujo "demanded" that Pelishek repeat the racial slur. (ECF No. 152-21 at 4.) Hall noted that no one, including Pelishek, supported that statement. (ECF No. 152-21 at 4.)

Pelishek points to this as an example of him being cast as a racist, but Hall was not investigating whether Rendall-Araujo "asked," "requested," "inquired," "solicited" or otherwise prompted Pelishek to repeat the slur; Hall was determining only whether Rendall-Araujo "demanded" he repeat it. Pelishek seems to assert that this finding suggests he made the slur unsolicited when it reflects merely Hall's finding that DeMaster mischaracterized the evidence when she said that Rendall-Araujo demanded that Pelishek repeat the slur. (ECF No. 152-21 at 4.)

Beyond that, even if Pelishek could prove that Adams was responsible for the report omitting the context in which Pelishek used the slur, Pelishek has failed to present evidence of how this would constitute an equal protection violation. Insofar as the context of Pelishek's use of the racial slur was material to the public perception of him, that context had been included in the media reports that formed the basis for the public narrative. Hall's report did not contradict that narrative; it merely omitted the context and found that DeMaster had mischaracterized the facts in her public statements.

Pelishek's alternative argument is that Adams refused to redact Pelishek's name from the report. Pelishek has failed to prove that Wisconsin's open records laws even permitted Adams to redact Pelishek's name under the circumstances. Beyond that, this

argument suggests that redaction would have made a difference. Given that Pelishek's role in the events detailed in the report were already widely publicized in news reports, a knowledgeable reader would have readily recognized that it was Pelishek's name that was redacted.

More importantly, Pelishek has failed to present evidence from which a reasonable finder of fact could conclude that any of Adams's actions were the result of race or sex-based animus towards Pelishek. The court will grant Adam's motion for summary judgment.

### 6.3. Ryan Sorenson

As noted above, Pelishek has failed to present evidence from which a reasonable finder of fact could conclude that any of Sorenson's actions were the result of race or sex-based animus towards Pelishek. The entire portion of Pelishek's brief addressing his equal protection claim against Sorenson is devoid of even an attempt to present such evidence. (ECF No. 163 at 32-34.) The court will grant Sorenson's motion for summary judgment.

### 6.4. City of Sheboygan

As noted above, a municipality is liable under § 1983 only for its own acts in the form of official policies or customs. There are three ways a plaintiff may establish an official policy or custom under *Monell*: (1) an express policy of the city like an ordinance; (2) a widespread practice that is so permanent and well-settled that it might as well be an

express policy; or (3) an action by a person with final policymaking authority. *Palka v. City of Chi.*, 662 F.3d 428, 434 (7th Cir. 2011) (quoting *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010)).

"*Monell* liability is difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct." *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020). "A person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government—by the city council, for example, rather than by the police officer who made an illegal arrest." *Vodak v. City of Chi.*, 639 F.3d 738, 747 (7th Cir. 2011). In other words, the plaintiff must be able to prove that his injury was caused by the city itself and not simply an act of its agent or employee. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 373 (7th Cir. 2017).

"The most straightforward *Monell* claims are those in which a plaintiff alleges that an affirmative municipal action is itself unconstitutional." *J.K.J.*, 960 F.3d at 377. These are cases where a plaintiff can point to an express policy, ordinance, regulation, or decision officially adopted by municipal decisionmakers, such as a city's common council. *See id*.

Alternatively, municipal policy may be manifested in the action of an individual authorized to act on behalf of the municipality. *Monell*, 436 U.S. at 694. Whether an official has final policymaking authority is a question of state or local law. *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). It is not enough that an official has discretion.

*Id.* Rather, "[w]hether a public official has final policymaking authority often turns on whether his decisions are subject to review by a higher official or other authority." *Id.*

Finally, a custom may amount to a policy of the municipality when "the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Id.*

Pelishek contends that Sheboygan's DEI policies, by highlighting the city's commitment to "equity" and "fair outcomes by focusing on those who have been historically marginalized and excluded," constitute an "anti-white" policy. (ECF No. 163 at 24.) He further argues that the DEI policies are anti-male because "Rendall-Araujo, a known 'man-hater' was widely accepted as the unofficial DEI enforcer, educator and director who had approval from the City Administration and Mayor Sorenson to educate 'white men of privilege' on how they should stay silent and how to talk." (ECF No. 163 at 25.)

This argument represents a shift from the theory Pelishek propounded in discovery. (ECF No. 170-6 at 27-30.) But it is not necessary to address the propriety of his shift. Pelishek's attempt to hold the city liable fails because, as discussed above, he has not presented evidence from which a reasonable finder of fact could conclude that he was subjected to unlawful discrimination.

Because Pelishek was not subjected to a hostile work environment, he was not constructively discharged. And he has failed to produce evidence that Sorenson was motivated by animus based on Pelishek's race or sex when he took the challenged actions that provide the basis of his claim that he was discriminated against in the form of disparate treatment.

### 7. Conclusion

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 115) is **granted in part**. The motion is denied with respect to Pelishek's First Amendment claim against the City of Sheboygan. The motion is granted as to all other claims. All defendants other than the City of Sheboygan are dismissed.

**IT IS FURTHER ORDERED** Pelishek's motion for partial summary judgment (ECF No. 124) is **denied**.

**IT IS FURTHER ORDERED** that the defendants' motion to seal (ECF No. 123) is **granted as follows**. The request to seal is denied. The court will grant the motion to restrict the document (ECF No. 123-1) to case participants.

**IT IS FURTHER ORDERED** that the plaintiff's motion to restrict (ECF No. 154) is **denied**. Pelishek states that he opposes restricting the referenced filings and filed the documents as restricted only to comply with the court's protective order. The defendants have not responded to the motion in accordance with General Local Rule 79(d). The court

finds that no good cause exists to support restricting these documents (ECF Nos. 152-25 and 152-41) from the public.

**IT IS FURTHER ORDERED** that no later than **14 days** of this decision Christopher Ivan Kachouroff and Jennifer DeMaster shall show cause as to why sanctions, including dismissal of this action in its entirety, should not be imposed for the repeated false representations of law and fact contained in their summary judgment submissions.

The defendants are not required to respond but are invited to submit any response within **7 days** thereafter. The court invites the defendants to address any additional material misrepresentations or other egregious misconduct associated with Kachouroff and DeMaster's summary judgment filings, as well as any applicable law or argument regarding the scope and propriety of sanctions.

Kachouroff and DeMaster may reply no later than **7 days** thereafter.

Dated at Milwaukee, Wisconsin this 23rd day of July, 2025.

WILLIAM E. DUFFIN
U.S. Magistrate Judge