UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHAD PELISHEK,

    Plaintiff

v.    Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

    Defendants.

**RESPONSE TO SHOW CAUSE ORDER**

**I.    Introduction**

Chris Kachouroff, the undersigned, with great respect for the Court's concerns regarding the accuracy and reliability of the summary judgment filings, files this response to the Court's show cause order on behalf of himself and Mrs. Jennifer DeMaster.

**II.    Clarification of Attorney Kachouroff's Role**

Attorney Kachouroff is not responsible for, nor did he personally author or directly verify, the factual statements and legal citations contained in the original filings cited by the Court. As outlined in his declaration dated July 30, 2025 and attached to this response as Exhibit A, Attorney Kachouroff's entry into this case was after the close of discovery and was for two purposes: 1) to provide a response to Defendants' attorney fee request (ECF 110) and 2) to assist as co-counsel in any potential jury trial. Concerning the subject filings, he told Attorney Jennifer DeMaster explicitly and clearly that he lacked time and availability to thoroughly review each summary judgment document prior to filing. As such, he could not be responsible for those documents. Mrs. DeMaster has confirmed this role in her declaration attached as Exhibit B.

### III. Context of Errors identified by the Court.

While acknowledging the gravity of the errors identified by the Court, Mr. Kachouroff respectfully notes that these arose not from intentional misconduct or direct negligence on his part or intentional misrepresentation on Mrs. DeMaster's part. It arises from Mrs. DeMaster's inadequate training, experience, an overreliance on citation verification tools in Westlaw, and organizational oversight issues. Based on his personal work with Mrs. DeMaster and a review of the pleadings at issue here, Mr. Kachouroff can demonstrate that Mrs. DeMaster's errors were not intentional misconduct. Mr. Kachouroff also emphasizes that at no point did he or Mrs. DeMaster intend to mislead or misrepresent any material fact or case citation to this Court.

It is important to distinguish the *Coomer* order from this case. The undersigned has great respect for Judge Wang. However, Mr. Kachouroff respectfully disagrees with her order and will be filing an appeal. To that end, Judge Wang graciously permitted a stay of the sanctions order until a final order had been entered. We believe that the sanction was not fair, condign, or warranted under the circumstances. The *Coomer* filing arose from a mistaken filing of a wrong draft. Judge Wang did not believe that Mr. Kachouroff had seen the final draft because she saw no transmission email. Mr. Kachouroff submitted a screenshot of his Signal App to the Court that he uses as a primary means of communication. The screenshot showed that he and Mrs. DeMaster were communicating that day on the Signal App. Transmission of communications and documents in that app is superior to email because it is instant and there is no waiting for a server response that one has through email servers. Ruefully, Mr. Kachouroff's retention settings were set to auto-delete documents and communications after four weeks. Thus, it was impossible to prove what communication concerning the *in limine* motion occurred even though Mr. Kachouroff stated under oath that he had seen it and had read the appropriate filing.

In addition, Judge Wang unfairly implied guilt in *Pelishek* by pejoratively stating that counsel "quietly" filed the *errata*. The *errata* in this case were not filed under seal but in full view of the public. Whatever Judge Wang may have meant by "quietly," she could not have known what transpired in this case and whether it was similar conduct. What happened in the *Coomer* case is far from this case. For an explanation of how the *errata* in this case came to be filed in the first place and other background information, Mr. Kachouroff incorporates his declaration attached as Exhibit A.

## IV. The Court's Order characterizing Mrs. DeMaster's factual citations.

Mr. Kachouroff has carefully reviewed this Court's show cause order and reviewed the filings. While agreeing that *a fair number* of factual citations and case citations are not accurate, he respectfully disagrees with the Court's concern of intentional misrepresentations. Were the factual citation errors intentional, it would serve no purpose if other citations existed to support the fact. The record actually does support a fair majority of the facts articulated by Mrs. DeMaster and demonstrates that the citation errors were not intentional. This is not to minimize or detract from the gravity of the concerns raised by the Court but intended solely to show the Court that there are facts supporting many of the citations and to give an explanation for the errors. Mr. Kachouroff has gone through the following with Mrs. DeMaster:

### A. Pelishek's Motion for Partial Summary Judgment

For partial summary judgment, Mrs. DeMaster's numbered her exhibits consecutively For example, Mr. Pelishek's Declaration is filed as ECF 127 and corresponds to four exhibits 127-1 through 127-4. Mrs. DeMaster's Declaration also introduced an additional eight exhibits (Exhibits 5-12) which correspond with ECF 128-1 through 128-8.

Page **3** of **20**

Case 2:23-cv-01048-WED    Filed 08/06/25    Page 3 of 20    Document 177

Mrs. DeMaster reference to Rendall-Araujo's meeting with the reporter and "standing up to racism" is a fact is found in ECF 126 - PPMF ¶5's reference to Exhibit 5, Consolidated text messages between Salazar and Rendall Araujo's and Valdez Depo pages. Exhibit 5 is ECF 128-1. On the docket ECF 128-1 is labeled as Exhibit 5:

| 03/04/2025 | 128 | DECLARATION of Jennifer DeMaster (Attachments: # 1 Ex. 5 Texts, # 2 Ex. 6, # 3 Ex. 7, # 4 Ex. 8, # 5 Ex. 9, # 6 Ex. 10, # 7 Ex. 11, # 8 Ex. 12) (DeMaster, Jennifer) |
|---|---|---|

ECF 128-1 supports that Rendall-Araujo was broadcasting to multiple people, including Amanda Salazar, and "standing up to the racism." ECF 128-1 at 2.

The Court is correct that Mrs. DeMaster's partial summary judgment appears to be unsupported because of the Court would have to look at the docket in order to link "DeMaster Decl. Ex. 5" with ECF 128-1.

In addition, it was not a misrepresentation to say that Defendant Rendall-Araujo told Pelishek to state "exactly" what was said. This is contained in the exhibits attached to Pelishek's Declaration (ECF 127). Specifically, ECF 127-2 is the Hall recording where Pelishek states that Defendant Rendall-Araujo told him to say "exactly" what was said. However, the problem is that ECF 127 contains four exhibits and the citation did not clarify which exhibit.

Ample support also exist elsewhere in the record. For example, two eyewitnesses stated that Defendant Rendall-Araujo told Pelishek to state "exactly" what was said. This can be found in Todd Wolf's Declaration and Carrie Arenz's Declaration. (ECF 145 at ¶ 52). Carrie Arenz states "My memory is that her question clearly sought the *exact* words of the racial slur . . . ." *Id*, (emphasis added). In another citation referencing his interview with investigator Hall, Chad states that Rendall-Araujo told him to state "exactly" what was said: "I believe she said, What

are they *exactly* saying?" (ECF 145 at ¶12 citing Recorded Hall Interview (ECF 153-3 at minute 33:05)(emphasis added)

### B.  It was not a misrepresentation to state that Wolf defended Pelishek

The specific citation in support of this contention is correct albeit the citation should have been narrowed to ECF 126 at ¶19. Paragraph 19 refers to ECF 30-1 (Exhibit 1) filed by Defendants in support of their motion to dismiss. That exhibit is a November 7, 2022 letter from Todd Wolf to the Common Council where, on page 4 beginning at the 7th full paragraph, Wolf is defending Chad Pelishek and did not believe he should be punished. In addition, Mr. Pelishek testified by affidavit that Todd Wolf defended him and refused to fire him. (ECF 153, Pelishek Declaration at ¶19). The characterization that Pelishek "had done nothing wrong should" have been modified to Pelishek "had done nothing wrong to merit punishment." Mr. Kachouroff believes that Mrs. DeMaster could have been more precise in her working

### C.  City Attorney Adams denied Pelishek the opportunity to make comments

The Court is partially correct that the citation refers to Pelishek's Declaration and Exhibit 1, the email. However, Pelishek's Declaration also included paragraph 3 (authenticating the email) and paragraph 4 (Adams' denial):

> 3. Attached as Exhibit 1 is a true and accurate copy of the email I received from Sheboygan Press reporter Maya Hilty about the racial slur and my response that City Attorney Adams directed me to give her.
>
> 4. Based on that directive from City Attorney Adams, I believed that I was not allowed to communicate or speak to Ms. Hilty about the racism incident. *See id*.

(ECF 127). This paragraph should have been fully pointed out.

### D.  Pelishek's decision to resign was caused by the distress he was suffering as a result of the order not to speak with anyone.

This Court found a lack of a causal link between Pelishek being ordered not to speak and his ultimate resignation. Respectfully, Mr. Kachouroff disagrees. The proposed finding of fact at

ECF 126 at ¶50 states that Pelishek "ultimately resigned, believing, *in part*, that the City would take adverse action against him . . . ." (Emphasis added). Pelishek's Declaration states:

> 21. *After* I saw the false information in the investigation report that I was shown by Adam Westbrook on March 7, 2023, and the Directives from Adam Westbrook issued on March 8, 2023, I was scared that disputing the report, discussing the DEI threats and racism and retaliation issues at the City from Todd Wolf's investigation could result in accusations of fraud, false statements, or discipline under the City's policies and directives, *including Westbrook's* [March 8] *directive*.
>
> 22. *I was also scared* that I could not report my concerns about the false information because everyone involved, including the City's own attorney, participated in the false statements*, the report,* and had power over my career and my life.
>
> 28. *When* I saw the false information in the Hall Report, I feared false accusations of fraud against me and my family, and I suffered severe emotional distress, *requiring me to take medical leave*.
>
> 29. *At no time could I have spoken out to defend myself from the false accusations in the press because the defendants would not allow me to nor could I publicly or privately express any of my opinions about what was going on*. Those opinions included fraud, waste, and abuse in the City government *as well as the falsity of the report that the City published* and racism and discrimination at the City.
>
> 30. My fear of false accusations and public firing ultimately by the very people who created the false report placed me in a catch 22 and led to me to resign. I felt I had no choice but to resign to preserve my chances of finding another job without additional public humiliation and to be able to obtain an attorney.

(ECF 127 at ¶¶21, 22, 28-30) (emphasis added).

Respectfully, counsel believes that the causal link between the instruction and resignation is present. "When" Pelishek saw the March 2023 Hall Report, he "feared false accusations" and then "[a]t no time" could he have spoken out about the false accusations. This is both before and after the March directive that Pelishek not speak out about the false accusations in the Hall report. While Pelishek had been instructed before the Hall Report not to speak out about the investigation, the report was the final culmination. It was there that Pelishek hoped to have relief. However, it did not. Thus, the report and the March 8 directive added a new element and new

pressure. It is reasonable to infer that this, too, heightened Pelishek's fears and emotional distress. The reason this inference is reasonable is because Pelishek took medical leave just three weeks later and stated that he believed he was now in a "catch 22." The catch 22 is that he could not talk about the false accusations *in the report* but if he did, he would be publicly fired. Ultimately and as a result of the instruction, Pelishek chose to resign while on medical leave *after* the report and directive had been issued.

Respectfully, nothing in the declaration or cited facts show that Pelishek was, as this Court puts it, "afraid of speaking out even before he was told he couldn't." (ECF 176 at 13). Pelishek was certainly concerned about false accusations of fraud and the campaign to get rid of him. However, paragraph 21 states the time frame: "After" Pelishek saw the false information in the Hall report, along with the directives, he was scared to dispute the report. Paragraph 22 of his declaration adds to paragraph 21 because it states *why* Pelishek was scared. Pelishek was "also" scared that he "could not report [his] concerns about the false information [in the report] because everyone involved, including the City's own attorney, participated in the false statements, ***the report***, and had power over my career and my life."

### E. Pelishek's Response to Defendant's Motion.

The confusion over PEL Fact ¶1 is both Mrs. DeMaster's verification and typographical error. It was not intentional as factual support does exist. The correct citations should have been as follows:

- Violation of these directives carried the threat of discipline and termination. (ECF No. 152-17 (Sorenson's November directive threatening termination that was not rescinded) and Plaintiff's response at ECF 144 to DPF 72.

- Pelishek complied, refraining from speaking to legal counsel, City colleagues, and the press until after resigning after my FMLA leave. (ECF 153, Pelishek Declaration at ¶¶15-16, and 18-19, and 29).

- He testified that he was afraid to contact his own attorney or pursue his EEOC complaint due to the City's written orders. (ECF 153, Pelishek Declaration at ¶¶15-16).[1]

- Pelishek's months of silence—including his inability to consult legal counsel or correct the public narrative—were the natural and intended result of the City's prior restraint. (No fact citation should have been stated for this conclusion.)

- and prohibited from speaking about the facts underlying these false accusations to anyone. (ECF 153, Pelishek Declaration at ¶¶19 and 29).

- When Pelishek pleaded for redactions and the chance to consult an attorney, he was told by HR Director Adam Westbrook that he could not obtain legal representation and was instead subjected to gag orders forbidding him to speak about the matter—even to his lawyer. (ECF 152-26, Ex. 27 at 352:17-353:5; ECF 153, Pelishek Declaration at ¶¶16, 18, and 29; and ECF 146 at ¶39).

**F. The Westbrook recording is not a misrepresentation.**

When the Westbrook recording is taken in isolation from the other facts, it does not support the contention that Westbrook told Pelishek that he could not file a discrimination complaint because he was a white male. Respectfully, it also does not support the implication drawn by the Court that Westbrook made a technically correct legal statement. Westbrook did not literally say, as the Court contends, "that being called a racist is not the same as being treated differently because of a protected status." (ECF 176 at 16).

As discussed below, Pelishek's argument is that he was being called a racist as a ploy as part of a campaign to get rid of him, not because calling him a "racist" was treating him differently. As this Court knows, discrimination cases almost never turn on a single, isolated fact but typically rely on circumstantial evidence, inferences, and implications. Indeed, the framework of the hallmark case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), exists to analyze circumstantial evidence.

---

[1] It should be noted that there is no specific reference to "EEOC" but to a general reference to a "discrimination claim." Mrs. DeMaster has conveyed that she thought this was in the record but it is not and was something told to her by Mr. Pelishek.

Pelishek's case has always been circumstantial. When combined with other factual evidence, the implication in Westbrook's recording is that the campaign to brand Pelishek a racist was for the purpose of getting rid of a white Christian male and thus he could not be part of a protected class. We agree with the Court that merely labelling someone a "'racist,' while potentially indicating unfair dislike, does not indicate that the object of the statement is being rejected because of his race." *Maraschiello v. City of Buffalo Police Dept.*, 709 F.3d 87, 97 (C.A.2 (N.Y.), 2013). But *Maraschiello* also states the following:

> This alleged remark similarly cannot support a claim that the failure to promote him was on the basis of his race, despite Maraschiello's *conclusory and unsupported argument* that it 'constitutes a clearly race-based bias.'

*Maraschiello*, 709 F.3d at 97. Pelishek's case is not that the racist remark is discriminatory and unlike *Maraschiello*, his claim is not conclusory or unsupported. Rather, Pelishek's evidence was that he was called a "racist" in order to gin up a campaign to get rid of him because he was a white male.

The evidence at trial would have been that Westbrook—now a convicted felon for distributing child pornography[2]—was not going to do anything about Rendall-Araujo falsely calling a white man a racist in order to get rid of Pelishek. Stating that a white male like Pelishek *could not be* a member of a protected class in the City of Sheboygan simply because he was called a "racist" twists Pelishek's claim, and by circumstantial evidence, lends the opposite inference.

Drawing this implication is entirely reasonable. In his Objections and Responses to

---

[2] Brian Kerhin, *Former Outagamie County HR director convicted in federal child porn case*, FOX 11 NEWS, (September 17, 2024) *available online at* https://fox11online.com/news/crime/adam-westbrook-child-pornography-sexual-abuse-material-federal-court-conviction-outagamie-county-human-resources-director-sauk-county-preston-kite-racine-sheriff-deputy.

Defendants' Proposed Findings of Fact, Pelishek offered numerous facts in support. For example:

> In early March of 2023, Pelishek called Common Council Vice President Roberta Filicky-Penski to complain and seek help because "there is a war going on against white Christian men at the City." Filicky-Penski replied, "I know. There's nothing I can do about it." Decl. Pelishek ¶ 17

ECF 144, Pl. Resp. to ¶121. This damning admission of a high-level City official about the war against white men is not all, however.

The City's policy appears to overtly exclude a white skin color by prescribing "fair outcomes *by focusing on those* who have been *historically marginalized* and excluded," and that *people of color and other communities* continue to be . . . excluded . . . ," (ECF 144, Pl. Resp. to ¶7), Pelishek also offered, for example, other circumstantial factual evidence to show that the City was discriminating against him:

- Female employees believed there was a custom and practice against males. *See, e.g.*, Decl. Arenz ¶7.

- In Pelishek's first [non recorded] meeting with Westbrook where he tried to file a complaint against a white female (Rendall-Araujo), Westbrook told him no he "couldn't do that because" Chad had to "let it play out." Decl. DeMaster, Ex. 27 – Pelishek Depo. 340:17-25.

- Veronica Valdez testified that the anger and outcry against Chad Pelishek being permitted by the City was because he was a "white man of privilege." *See* Decl. DeMaster, Ex. 35 - Valdez Dep. 126:10-17.

- Todd Wolf told him [Pelishek] that Defendant Rendall-Araujo told him [Wolf] a "white man of privilege" should be silent and that both Rendall Araujo and Filicky-Peneski discussed that "white men of privilege" could not make offensive remarks that females or non-white persons could make. Decl. Wolf ¶ 13.

(ECF 144, Pl. Resp. to ¶121). Other supporting evidence is found in both Wolf's and Arenz's Declarations (ECF 146 ¶¶48, 49 & 147 at ¶¶ 17, 19).

Page **10** of **20**

Case 2:23-cv-01048-WED   Filed 08/06/25   Page 10 of 20   Document 177

Thus, using the term "racist" as a ploy to gin up political controversy and pressure to get rid of Pelishek is a reasonable implication in the context of a war "against white Christian males." HR departments across the nation take in all sorts of complaints and determine whether they are founded or unfounded. As the argument goes, Westbrook would not take any complaint from Pelishek against Defendant Rendall-Araujo because Pelishek "had to let it play out." Not taking Pelishek's complaint is an HR department failure.

Respectfully, the Court isolated the Westbrook recording to characterize it as a misrepresentation without considering it in the broader factual context Pelishek provided in his Objections and Responses to Defendants' Proposed Findings of Fact. (ECF 144). Pelishek is entitled to rely on this type of circumstantial evidence to prove his case: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted).

Pelishek's argument is that he was being called a racist precisely because using that term was the primary means to gin up support and get rid of a white Christian male. After all, what better way to get rid of a white Christian male than to accuse him with the scarlet letter of "racist"? Had Pelishek been a person of color and said the "N" word—as Councilwoman Amanda Salazar had done and gotten away with (ECF 144, Pl. Resp. to ¶121)—his skin color would have been of no great moment. Rendall-Araujo's attempt to use the moniker would have failed.

It is precisely because Pelishek was a white male that Rendall-Araujo used the "racist" moniker to get try and get rid of him because she openly discriminated against white males without repercussion. (ECF 146 ¶¶ 7, 48, 49 and ECF 147 ¶¶17, 19). Under these circumstances, a jury could determine that branding a white male as "racist" to get rid of him—provided there

was evidence of such bias—was a reasonable implication from the things that Defendant Rendall-Araujo and others had been saying.

V. **There are mitigating factors for Mrs. DeMaster's legal citation errors.**

In December of 2025, Mrs. DeMaster's legal research tool was Case Text. However, Case Text was bought out by Westlaw and Mrs. DeMaster had to sign up for Westlaw in late 2024 in order to continue using the legal research tool. She was approached by a Westlaw representative to add on a special feature that promised cite checking on a whole new level that she could rely on. Westlaw's Precision "Quick Check" is an Artificial Intelligence ("AI") tool that is supposed to not only cite check but it supposedly also checks quotations from cases for accuracy and recommends other cases.

Westlaw told Mrs. DeMaster that this is the citation checking tool that judges rely on to assess inaccuracies in cases and case descriptions as well as how they compare briefs from opposing parties. The Westlaw representative did not inform her at any point that Quick Check employed "regenerative AI," choosing to focus the pitch as the tool that judges and federal courts use. She was told that a separate Westlaw AI research tool would kick start legal research. She has since learned these results are not reliable. Westlaw has promoted those tools as integrated with their premier legal case database and search features. Mrs. DeMaster received instruction from Westlaw on how to use the system and heavily relied on its features.

However, Westlaw's new features did not catch, for instance, the single phantom case *Gomez* and it did not catch *any* of the errors pointed out by the Court. In addition to the remedial measures discussed below, Mr. Kachouroff instructed Mrs. DeMaster to run the Westlaw Quick Check reports *again* on the original, uncorrected briefs, Defendants' briefs, and to save a copy of the reports. The total number of pages is approximately 340 pages.

In terms of Mrs. DeMaster's uncorrected briefs, the recently run reports did not catch either the phantom *Gomez* case or any of the quotation issues raised by this Court in ECF 176. It also raised no "red flags" on case citations or pin cite errors for Mrs. DeMaster's uncorrected briefs. It did, however, raise 14 quotation errors which may have included missing commas or periods.

In comparison, the report on Defendants' briefs raised a total of 11 "red flags" for cases that were superseded, overruled, or abrogated. In Westlaw, a red flag indicates that a legal document, such as a case or statute, is no longer considered good law for at least one point it contains. For example, one red flag case cited by Defendants, *Andrews v. CBOCS West, Inc.*, 743 F.3d 230 (C.A.7 2014) was expressly overruled by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (C.A.7 2016) (holding that district courts should evaluate evidence as a whole and expressly overruling *Andrews. Id.* at 765.). (ECF 116 at 30).

Additionally, the report also indicates pin-cite errors; the quotation analysis of Defendants' briefs also shows 109 quotation errors. Mr. Kachouroff confirmed that Defendants did intentionally change a fair number of case quotations that make them misleading. As an example, Defendants cite *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (C.A.7 2006) and quote: "[W]here a deposition and an affidavit are in conflict, the affidavit is to be disregarded." (ECF 140 at 4-5.) The actual quote is materially different and Defendants placement of a period left out the 38 words italicized below:

> Consequently, '[w]here a deposition and affidavit are in conflict, the affidavit is to be disregarded *unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy*.'

Another of Defendants' misleading quotes uses a retaliation case and excludes important words in order to make the quote apply to a prior restraint case. In their brief, Defendants quote *Aldous v. City of Galena*, 702 Fed. Appx. 439, 441-42 (7th Cir. 2017):

> Simply put, 'public employees have no cause of action under the First Amendment . . . for speaking pursuant to their official duties, even if the speech is on a matter of public concern."

(ECF 140 at 10-11). The actual quotation with the deleted language italicized is:

> Simply put, "public employees have no cause of action under the First Amendment *when they are disciplined* for speaking pursuant to their official duties, even if the speech is on a matter of public concern.

Discipline of an employee for previous speech is not the same as Pelishek's prior restraint claim.

Regardless, Mr. Kachouroff's ultimate conclusion is that the Westlaw tool is not helpful. As a result, Mr. Kachouroff instructed Mrs. DeMaster to request a cancellation of these Westlaw features altogether and not use them. However, before doing so, Mrs. DeMaster downloaded the reports for the purposes of the show cause order. A link can readily be provided to this Court should it desire to see the 340 page reports.

At this time, Mrs. DeMaster does not know where the *Gomez* citation came from and is suspicious that this may have somehow been the product of Westlaw. Mr. Kachouroff tried, but was unable to verify that assumption. He does not use this tool in his practice. What is relevant is that Mrs. DeMaster has returned to organic searches and manual verification of cases only.

Consistent with Mr. Kachouroff's supervision and mentoring efforts, he required Mrs. DeMaster to go through the cases cited by the Court and to create tables comparing what the Court said to what was represented, and whether she believed she was in error. See Exhibits C and D. This exercise is intended, apart from the response to the show cause order, to give Mr. Kachouroff the ability to evaluate her reading of cases and determine whether she can describe

the relevant holdings. It is also intended to coach Mrs. DeMaster on the importance of case organization of cited facts, exhibits, and filings to support arguments.

VI. **Mrs. DeMaster is a new solo practitioner who lacks training and practical experience.**

Mrs. DeMaster's legal education and work history is a relevant factor here. After graduating law school in 2015 and passing the District of Columbia bar, Mrs. DeMaster did not engage in the practice of law. As detailed in the attached Exhibit B, she engaged in non-law work until late 2020. Mrs. DeMaster passed the Wisconsin Bar in the beginning of 2021 with a goal of establishing herself as a trial lawyer. She was eventually able to secure a position as an assistant city attorney with the City of Milwaukee in late of October 2021.

Within days of her hiring, however, activist groups called for her termination because of her political views found online. Without any training, she was thrown into the fire, tasked with handling a federal jury two weeks before trial was to commence. She had never conducted a trial before and she was defending police officers. She had no training and had not "worked up" that case at that point. Whatever reason the City of Milwaukee employed to have Mrs. DeMaster handle that trial under those circumstances is unknown. Yet, Mrs. DeMaster won that trial at a time when the public's view of law enforcement was dim because of George Floyd. She ended up being let go five months after being hired, days after another outcry surfaced over views concerning the Ukraine before Russia invaded. She was told she was a "poor fit" with the office. During her time in this position, Mrs. DeMaster was never reprimanded and never accused of any performance issues. She was also never trained. She believes that political pressure led to her termination.

Apart from that brief position, Mrs. DeMaster did not have training on practical aspects of solo law practice let alone extensive federal experience. She partially recognized this when

she sought to find an experienced attorney to represent Chad Pelishek. She was not successful. She also sought guidance concerning this case from a number of employment law practitioners in Wisconsin. None responded to her.

As the Court surely knows, it is incredibly difficult for a solo practitioner to obtain the requisite experience *let alone resources* that come from years of seasoned practice. In Mr. Kachouroff's opinion, Mrs. DeMaster's winning of her first federal jury trial provided her with a false sense of experience. No doubt, this Court's patience was likely tested in the *Wolf* case even though Mrs. DeMaster successfully concluded that case with a settlement. Yet she has been by herself without any resources, guidance, or even a paralegal. Mr. Kachouroff, on the other hand, had the benefit of mentoring as a new lawyer in 1999 and is part of an established law firm. As indicated in his declaration, Mr. Kachouroff seeks to pass this mentoring on to Mrs. DeMaster because she demonstrated an outstanding work ethic, a dedication to law, and legal acumen while working with a team of lawyers. Mr. Kachouroff has assumed full responsibility for Mrs. DeMaster's future conduct in this case.

A. **Proactive remedial actions and supervision**

After the *Coomer* order, Mrs. DeMaster and Mr. Kachouroff engaged in lengthy discussions about her experience, her current case load, and the need for her to be trained on the practical aspects of the profession. Mrs. DeMaster expressed a strong desire to be trained. As confirmed in Mr. Kachouroff's Declaration, he gave her specific and rigid terms. Mrs. DeMaster agreed to abide by those terms and to date, has fulfilled what is expected of her, does not complain about arduous tasks, and does not repeat mistakes.

Mr. Kachouroff has also restricted Mrs. DeMaster from taking on any more cases other than *Pelishek* and limited post-trial work in *Coomer* and one other related case. He has permitted

her to handle one misdemeanor citation in state court that she previously made a commitment to handle and to finish one other state records disclosure case which is nearing completion. The reason for permitting the state court cases is not because of her previous commitment to clients but because Mr. Kachouroff believed this was helpful so that she could see the difference between state court proceedings and compare them with the rigors of a federal practice. Consistent with this instruction, Mrs. DeMaster recently instructed potential clients that she could not take their case. *After* filing the *errata*, but *before* learning of this Court's justifiable concerns, Mr. Kachouroff also implemented significant proactive remedial measures aimed at ensuring accuracy, reliability, and ethical compliance in all future filings, including:

- Instituting mandatory citation and factual verification protocols requiring second-attorney review and Mr. Kachouroff's explicit written approval before filing *anything*.

- Assuming personal supervisory responsibility over co-counsel Attorney DeMaster's research, drafting, organization, filings, and submissions.

- Engaging actively in mentoring Attorney DeMaster with specific, detailed instruction on proper case management covering citation practices, factual gathering, and compliance with local and federal procedural rules.

- Establishing weekly training and oversight meetings to reinforce practical components of private practice, professional standards, and prevention of similar errors.

**B. Specific example of training and mentoring**

To give this Court a flavor of the type of practical training, Mr. Kachouroff trained Mrs. DeMaster on case management from intake and up to trial. This includes things like the research and collection of legal elements for each cause of action, how to efficiently store supporting case law and relevant facts for each element, and ensuring that key data is flagged for use in motions practice. He explained how he conducted this organization years ago with manilla folders and accordion pocket folders to assemble this data because it is like the architecture of modern case management software. Mr. Kachouroff explained that an electronic case database links the data

points together permanently, enabling concise reports and providing greater efficiency and clarity. The ultimate result is that organization for pleadings like summary judgment and statements of fact are instantly clear and instantly available; provided, however, that pain staking entry is done at the outset and maintained throughout the case.

Under this system, the assembly of electronic fact integration charts showing a chronological ordering of facts *with embedded evidence and case law* are now at one's fingertips and give an unparalleled command of the case from the complaint stage and up through trial. Mrs. DeMaster had never seen this type of case management and was disheartened to see how deficient her system was. She readily accepted that structure is critical.

Mr. Kachouroff also explained to Mrs. DeMaster that attempting to institute this case management process in arrears while forming a summary judgment brief is nearly *impossible* for one lawyer, let alone an inexperienced lawyer. In *Pelishek*, Mrs. DeMaster was essentially combing through evidence she had poured through numerous times to find what she believed she had once seen, attempting to place these facts within responses and place them within multiple responses and statements of facts. The problem that arose here is due to the confusion of which statement of facts Mrs. DeMaster was citing from after combing through previous exhibits multiple times instead of having a centralized reference that does not change. This caused her to overlook supportive exhibits that had been filed to buttress the facts.

When this Court's show cause order issued (and as stated earlier), Mr. Kachouroff tasked Mrs. DeMaster with going through each of the Court's findings and locating both the problematic cases and facts. She was tasked to determine whether the factual reference should have been cited at all, if it should have, what the correct cite should have been, whether she disagreed with the Court or whether it was her fault. Mrs. DeMaster followed Mr. Kachouroff's

instructions. Mr. Kachouroff has produced that document to show the Court an example of the type of supervisory oversight he is requiring. See Exhibits C (Fact Citations) and D (Case Citations).

The purpose of this exercise was to show Mrs. DeMaster the level of circumspection required, the problem with string citations, and conduct a retrospective evaluation of what happened. This exercise drives home the importance of the initial collection and organization of data that must occur in her future filings.

These actions underscore Attorney Kachouroff's personal commitment to professional integrity and proactively rectifying any systemic issues contributing to Mrs. DeMaster's inaccuracies.

## VII. Conclusion

Mrs. DeMaster's filings in this case were not the product of intentional misconduct but respectfully, the result of a lack of practical experience and not realizing the complexity of a civil case such as Pelishek. As Mr. Kachouroff's declarations make clear, Mrs. DeMaster is a newer attorney with very little experience or training but she has performed exceptionally well in a team environment. She is contrite, more than willing to learn, has demonstrated an aptitude for legal work, and has an outstanding work ethic. Given the mitigating factors contained in this response, along with Mr. Kachouroff's supervision and remedial efforts, Mr. Kachouroff respectfully submits that dismissing Mr. Pelishek's case or assessing a monetary sanction against Mrs. DeMaster would not be fair or serve any more of a deterrent effect. She has spent in excess of 60 hours unpaid, working through Mr. Kachouroff's tasks relating to this Court's show cause order (ECF 176).

Respectfully, Mr. Kachouroff would welcome the opportunity to address the Court in person or virtually at the Court's request should the Court have any questions or concerns.

>Respectfully submitted,
>
>*/s/ Christopher I. Kachouroff*
>Christopher I. Kachouroff
>Va. Bar No. 44216
>chris@mck-lawyers.com
>
>**MCSWEENY, CYNKAR & KACHOUROFF P LLC**
>13649 Office Place, Suite 101
>Woodbridge, VA 22192
>703.853.0160
>
>*Attorney for Plaintiff Chad Pelishek*