UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHAD PELISHEK,

    Plaintiff

v.                                    Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

    Defendants.

---

**DECLARATION OF JENNIFER T. DEMASTER**

---

1.    My name is Jennifer DeMaster, and I have been the lead attorney on this case until July 25, 2025 when Mr. Kachouroff took over. I want this Court to know that I did not intentionally mislead the Court in my facts or legal citations.

2.    Mr. Kachouroff asked that I provide my background experience as a lawyer so that this Court would have a better perspective of my abilities, background, and circumstances.

3.    After I graduated from law school in 2015, I chose not to practice law and instead worked for humanitarian and other non-profit organizations. I traveled to parts of the Middle East and Africa helping displaced persons and minority populations with supplies and goods. I also was a public speaker, commentator and author for various issues regarding terrorism and geopolitical matters with specific Middle East focus.

4.    In 2020, I decided I wanted to practice law and work to fulfill my goal of becoming a trial lawyer. I took the Wisconsin Bar examination in or around January or February 2021.

5.    I began applying for jobs in Wisconsin in the spring of 2021. This included an

application to the City of Milwaukee's City Attorney office. I learned in law school that the best way to gain substantial training and experience in law is to work in local government attorney offices.

6. After a lengthy interview process, I started at the City of Milwaukee City Attorney's office under Tearman Spencer in or around late October 2021. This was almost 6 years after law school.

7. Within a few days of my starting, I was notified by the City Attorney's Chief of Staff, Celia Jackson, that she was aware of my working for "Muslim hate groups" and she expressed concern that I had interned with an organization whose Senior Counsel represented Donald Trump at an impeachment hearing during his first term. I do not hate and have never hated Muslims, a group of people I helped in the Middle East. I noted to Ms. Jackson that I provided my resume, background, prior work, and maiden name with my application materials.

8. This negative press began a week after I was hired and continued for several weeks. Several articles were published over a period of weeks accusing me of working with alleged "Muslim hate groups" and casting other details of my non-legal background (some factual, some not), in a highly negative light. These articles led to the Local and National Chapters of the Council on American Islamic Relations (CAIR) to publicly call for my termination.[1]

---

[1] CAIR, 19 Wisconsin Groups Call for Meeting with Milwaukee City Attorney Over Islamophobic Attorney, November 18, 2021, https://www.cair.com/press_releases/cair-19-wisconsin-groups-call-for-meeting-with-milwaukee-city-attorney-over-islamophobic-attorney/

Video: Milwaukee City Attorney's Office Responds to New Staffer's Work for Hate Groups, Nov. 18, 2021, https://youtu.be/NQeaog0ojfM?si=ZCwTuN7INdF69K1a

Isiah Holmes, Milwaukee City Attorney catches heat on controversial hire, Wisconsin Examiner, Nov. 4, 2021, https://wisconsinexaminer.com/briefs/milwaukee-city-attorney-catches-

9. Within one week of these initial articles, my supervisor, Yolanda McGown, assigned me as lead counsel for an upcoming jury trial in the Eastern District of Wisconsin representing seven current and former Milwaukee Police officers, entitled *Shaw v. Gordon, et. al.,* Case No. 19-CV-1059-WCG. I two weeks to prepare and it seemed that I was put on this case to lose it.[2]

10. District Judge William Griesbach presided over the case and a respected law firm Eimer Stahl LLP represented the *pro se* plaintiff.

11. My direct supervisor (McGowan) told me she would be "second chair." She did not provide any training or guidance other than ordering our paralegals and support staff to "find evidence" that had not been exchanged in discovery just one week before trial. Without having practiced law let alone any federal jury trials, I spent my time researching trial procedures, case law, and speaking with the police officers. I also read through the discovery that had been obtained by the other attorneys on that case over the previous few years.

12. At the end of trial, a twelve-person jury ruled that the police officers were not guilty of all claims. After this, Ms. McGowan assigned me to roughly over two dozen other outstanding cases regarding various laws or claims. Most filings and case management were my

---

heat-on-controversial-hire/

Bice: Muslim leaders criticize City Attorney Tearman Spencer for hiring lawyer who worked for anti-Islamic 'hate groups', Milwaukee Journal Sentinel, Nov. 2, 2021, https://www.jsonline.com/story/news/investigations/daniel-bice/2021/11/02/city-attorney-tearman-spencer-hires-lawyer-tied-anti-muslim-groups/6197763001/

[2] *See* Daniel Bice and Alison Dirr, *Whistleblower complaint accuses City Attorney Tearman Spencer's office of anti-police bias, losing cases on purpose*, MILWAUKEE JOURNAL SENTINEL, (June 3, 2022), https://www.jsonline.com/story/news/local/milwaukee/2022/06/03/milwaukee-city-attorney-tearman-spencers-office-rife-mismanagement-whistleblower-says/7485703001/ ("The complaint said one federal case had a total of six different city lawyers assigned to it in less than a year. In another case, U.S. District Judge William Griesbach pointed to the lack of motions filed by the Milwaukee City Attorney's Office overseen by McGowan and, later, DeMaster.")

own responsibility and the only help I had at the City Attorney's office for my cases was the support staff including non-lawyer legal assistants, other support, paralegals, and a couple other *new* ACAs. Neither I nor they participated in a single training session with the exception that I was allowed to shadow two other ACAs at depositions.

13. I was terminated approximately five months later. The impetus for me being terminated occurred because of my appearance on a new broadcast concerning the Ukraine conflict. Prior to the Russian invasion into Ukraine, I appeared on a short interview on Russia Today (as I'd done in my previous work) to comment about recent news relating to a referendum vote by the people in the Donbass region seeking independence. I also commented on the prospect of a conflict between Russia and Ukraine that the Biden Administration was stating could involve U.S. involvement. I briefly noted in that interview (which was only played live around 10:00 PM central time and not replayed) that semi-autonomous regions have a right to self-determination. In relation to the Biden administration warning of getting involved in a conflict between Russia and Ukraine, I commented that following COVID-19, America should stay out of foreign conflicts and allow both Russia and Ukraine to work out any issues while we repaired our own matters here. I did not believe Russia would invade Ukraine, and Russia had not invaded Ukraine, when I gave this interview. I did not speak as a City Attorney in Milwaukee, did not introduce myself as a Milwaukee City Attorney, and believed that my maiden name would have been used. I commented only as a citizen and former analyst.

14. Following this interview, Russia invaded Ukraine within days, which became international news. Immediately after the invasion, the Milwaukee Journal Sentinel published the article of my prior interview, that many still believe showed I was backing the invasion of

Ukraine given the timing. (Again, the invasion had not occurred when I was interviewed).[3]

15. The February 25 article was published on a Friday, and I was fired Monday morning citing, in part, "poor fit." The articles gained national attention and were top stories in Wisconsin.[4]

16. Although the City Attorney told me I was a "poor fit" and my "job performance." I told her that I was never given any reprimands, warnings, nor any information at all that I was incompetent or was performing my job poorly prior to my termination. I was never provided with any written documentation or notice about any poor performance issues in my legal work. During the meeting where I was terminated, I asked her what issues with my job performance

---

[3] See Bice: 'An odd thing for a city attorney to be weighing in on': Milwaukee official backs Putin in appearance on Russia Today TV, Feb. 25, 2022, https://www.jsonline.com/story/news/investigations/daniel-bice/2022/02/25/city-milwaukee-lawyer-jennifer-demaster-justifies-putins-actions-russia-today-tv/6886771001/

[4] See, e.g., Alison Dirr and Daniel Bice, Milwaukee assistant city attorney Jennifer DeMaster who backed Putin on Russia Today TV is fired, Milwaukee Journal Sentinel, https://www.jsonline.com/story/news/local/milwaukee/2022/02/28/milwaukee-assistant-attorney-who-backed-putin-russia-today-tv-fired-jennifer-demaster/9322215002/

Alison Dirr and Daniel Bice, National Muslim group applauds firing of Milwaukee assistant city attorney who worked for anti-Islamic groups and praised Putin, Milwaukee Journal Sentinel, March 1, 2022, https://www.jsonline.com/story/news/local/milwaukee/2022/03/01/national-muslim-group-cair-applauds-firing-milwaukee-assistant-attorney-jennifer-demaster/6979897001/

Debra Weiss, Assistant city attorney who backed Putin on TV is fired, partly for 'poor fit', March 2, 2022, https://www.abajournal.com/news/article/assistant-city-attorney-who-backed-putin-on-tv-is-fired-partly-for-poor-fit

Jeramey Jannene, Putin-Backing Assistant City Attorney Fired, Urban Milwaukee, February 28, 2022, https://urbanmilwaukee.com/2022/02/28/city-hall-putin-backing-assistant-city-attorney-fired/

Milwaukee assistant city attorney fired after backing Putin on Russian news show, CBS58, Mar. 1, 2022, https://www.cbs58.com/news/milwaukee-assistant-city-attorney-fired-after-backing-putin-on-russian-news-show

there were or whether anyone had addressed any job performance issues and she responded, "well I'm telling you now." Yet she never gave any further details. I do not believe there were any and that political pressure led to my termination specifically given the timing. My termination was the next business day after the "Russia" article.

17. Prior to my termination, I expressed concerns to multiple people at the City Attorney's office about, in part, lack of training for the litigation department and the volume of cases new hires were being given without guidance from our department supervisor. A subsequent whistleblower complaint was filed by someone else who purportedly voluntarily resigned long after my termination but also noted some of these concerns. (Note, I am not the so-called whistleblower but merely note that I was not sufficiently trained, and that fact was known by others in the office.)[5]

18. After the widespread media coverage following my termination from the City

---

[5] Daniel Bice and Alison Dirr, Whistleblower complaint accuses City Attorney Tearman Spencer's office of anti-police bias, losing cases on purpose, Milwaukee Journal Sentinel, (June 3, 2022), https://www.jsonline.com/story/news/local/milwaukee/2022/06/03/milwaukee-city-attorney-tearman-spencers-office-rife-mismanagement-whistleblower-says/7485703001/. ("The complaint focuses primarily on Spencer and two of his top two aides, Deputy City Attorney Yolanda McGowan and Celia Jackson, his chief of staff….The whistleblower also alleged that two former assistant city attorneys — Nicholas Zales and Jennifer DeMaster — filed an internal complaint with Spencer about their manager only to be fired soon afterward. That came despite their winning major cases recently, the complaint states.")

Jeramey Jannene, 27-Page Complaint Blasts City Attorney, Urban Milwaukee (June 1, 2022), https://urbanmilwaukee.com/2022/06/01/city-hall-27-page-complaint-blasts-city-attorney/

H. Nelson Goodson, Inside Whistleblower At Milwaukee City Attorney's Office Claims Fraud, Kickbacks, Embezzlement, Public Taxpayer Dollar Waste And Inept City Attorneys Who Don't Know The Law, Hispanic News Network (Blog), https://hngwiusa.wordpress.com/2022/06/05/inside-whistleblower-at-milwaukee-city-attorneys-office-claims-fraud-kickbacks-embezzlement-public-taxpayer-dollar-waste-and-inept-city-attorneys-who-dont-know-the-law/

Attorney's office in Milwaukee, I tried to start networking to find a job as a trial lawyer. This included going to legal events, reaching out to legal contacts, law firms, and seeking advice from others about my future options.

19. I reached out or applied to law firms and state/local attorney offices for jobs in Wisconsin and did not receive a single response—not even a written denial. This includes one state job opening that signified desperate hiring needs covering *two* counties in Wisconsin.

20. In the summer of 2022, I started networking through Republican events in and near Milwaukee and Waukesha to make more Wisconsin-based connections. After one event in Waukesha, I was told to connect with the Chairman of the Sheboygan County Republican Party so that I could volunteer and meet more people in Wisconsin, so I scheduled a meeting with him.

21. When I met with the Sheboygan GOP Chairman, he told me that he was aware of the articles about me and that there was someone in Sheboygan that needed to talk to a lawyer. I told him that I could not take any cases nor agree to do so but would meet with the person he was referring to. He connected me to Chad Pelishek.

22. When I first met with Chad Pelishek, I told him that I did not have experience regarding anything he was concerned about, and I advised him more than once to retain an established law firm in Wisconsin. Mr. Pelishek told me on more than one occasion that he was unable to find an attorney or firm to represent him, noting at least one instance where a law firm specifically cited political reasons in refusing to take his case.

23. I said that I would take him as a client but was unsure about a lawsuit and continued to advise that he find an employment law firm. He did not find an employment law firm to represent him.

24. I told Mr. Pelishek that I would do my best but would require additional advising

from experienced attorneys in Wisconsin that he would be financially responsible for. He agreed.

25. During the pendency of Mr. Pelishek's case, I reached out to at least four established employment law firms or attorneys in Wisconsin through various methods to seek informal advice or help, even offering compensation. Each time, I provided my full name, yet no attorney or firm I contacted responded to my requests. No employment or any other attorney in Wisconsin has ever been willing to guide me in this matter at any stage, even on a "non-appearing" or confidential basis.

26. Only one attorney in Wisconsin agreed to meet with me after the *Wolf* case began, but he noted he was essentially retired and had no litigation or employment experience and only served as general counsel for corporations several years ago so he could not advise or provide any help on any Sheboygan case.

27. In or around early Fall 2024, I connected with another retired attorney from another state who had recently moved to Wisconsin. He agreed to do very limited advising on some issues regarding federal rules and discovery noting that he was not licensed here and advised that I notify the court sooner rather than later of my spoliation concerns that precipitated my Motion to Compel or for Sanctions.

28. In *Pelishek* (and in *Wolf*) I carefully read the court's orders and statements about my Complaint, responses to 12(b)(6) motions, and a single Motion to Compel in each case and tried to implement that information to the best of my ability. I have carefully read this Court's orders on issues such as mediation, disclosures, and the Local Rules of the Eastern District of Wisconsin. This includes reading "Tips for Practicing Before Judge Duffin" document that I followed including ensuring the use of Bluebook citations in filings—which I have tried to follow and adhering to Local Rules (specifically Rule 7) with filing, such as seeking extension

on page limits and filing any oversized briefs as attachments to a motion.

29. In lieu of any Wisconsin-based attorney responding to me or being willing to mentor, train, or advise me on this matter, I searched and downloaded multiple briefs, filings, and orders in related actions to study formatting, case laws, and styles—by various judges in both the Eastern and Western Districts of Wisconsin as well as attending numerous CLE courses-even those online courses I could not use for CLE credits (on-demand or past live date) that were relevant to this matter.

30. From approximately December 2022 – December 2024, I used the legal research platform "Casetext.com" solely for legal research, as well as Fast Case as a backup. In 2024, I learned that Casetext.com was bought by Westlaw/Thomson Reuters and would no longer be available for legal research. A Westlaw representative contacted me offering a discount for their platform as a Casetext customer.

31. During my initial Westlaw sales call around late 2024, the Westlaw representative advised me to purchase Westlaw Precision and specifically told me about two tools. One was Westlaw's AI Case Search Tool and another was called "Quick Check". He did not tell me that Quick Check used AI. According to the representative, he represented that Quick Check was used by most federal courts and judges. He told me the tool would analyze my briefs, my opponent's briefs, and show me what a judge sees. The representative stated that their tools were integrated with their case research platform and would utilize all the case law information in their database. He stated that the analyzer "Quick Check" tool, which he said was used by federal courts, would catch (1) quotation discrepancies, (2) pin cite errors, (3) non-existent or non-relevant cases, and (4) assess whether cases in my draft brief were not properly described along with providing me recommendations for other cases to use that might be better. Westlaw noted,

as I knew, my ethical obligations to clients to spend less time while still ensuring quality work and saving my own time for my client's cases.

32. Based on that call, I decided to purchase Westlaw Precision that included these two tools and began using them in January of 2025. I received other Westlaw communications that federal courts were now using these same Westlaw tools to assess cases before them. One of these emails from Thomson Reuters came as recently as April 11, 2025 stating, "As of April 9, 2025, the Federal judiciary, including the Supreme Court, have chosen Westlaw Precision, Practical Law, and CoCounsel for their legal research and AI needs." The email continued, "It makes a ton of sense to align the way your firm conducts legal research and uses AI moving forward with the same tools the Federal Judiciary will be using." I have this email saved and available should the Court want to see it. I do not believe this is any excuse for my ethical obligations and responsibilities. Rather, I believed this was fulfilling my duties to use the more expensive and cutting-edge technologies to aid case citations.

33. In February of 2025, I utilized both tools, along with basic research, for the summary judgment briefs in *Pelishek* at issue with the Court's Order (ECF 176) as well as a few drafts in the *Coomer v. Lindell, et al.* matters relating to the court's order to show case there.

34. I was introduced to Attorney Kachouroff in November 2024 regarding unrelated connections.

35. I did not ask Attorney Kachouroff to assist me in the *Pelishek* case until February 2025 in relation to the Court's denial and award of attorney fees for Plaintiff's Motion to Compel or in the alternative for sanctions. I asked for his help, and Attorney Kachouroff said that he did not have time to engage in detailed pretrial filings or review of summary judgment materials. He did agree to give me a high-level overview of the summary judgment filings, but he specifically

told me that he could not be responsible for them because he did not have time. He stated that he would draft and file a response to the Defendants' request for attorney fees and costs and that he would serve as co-counsel at a potential future jury trial in this matter.

36. I am solely responsible for all summary judgment filings for the Plaintiff in this matter, and I accept that responsibility. Any indication of more involvement on the summary judgment filings by Mr. Kachouroff because of his name appearing on the brief was an error based on templates or oversights by me.

37. Following Judge Duffin's Order on the parties' summary judgment motions and Order to show cause (ECF 176), Attorney Kachouroff met extensively with me via phone and video conferencing to obtain detailed information about the *Pelishek* case including a review of the complaints, filings, case docket, exhibits, and summary judgment filings. I previously agreed to be mentored and supervised by him after the *Coomer* order but before the *errata* were filed.

38. It has not been easy to follow his supervision, but I clearly see the practical experience that I have been missing, and I am learning a great deal from his mentoring including legal writing and case organization, what a judge expects to see and does not want to see, and what parts of a judicial opinion are important for a holding in a case.

39. In or around late 2024 or early 2025, I turned down two potential clients—referring one of them to one of the employment law firms that had not called me back previously. On August 1, 2025, at Mr. Kachouroff's direction, I told another client that I could not represent them and suggested they contact other attorneys that were more established.

40. Even though I have lived in Wisconsin since 2018, I still do not have many contacts—specifically to lawyers or law firms in this state. Those I have met have not maintained regular contact nor provided guidance following the articles and my termination from

Milwaukee.

41. In addition to *Pelishek, Coomer,* and another case for Mr. Lindell and his company, I am counsel on two minor state cases that do not involve employment matters. For one of these, I am local counsel for a larger law firm. For the other, I am the only attorney, but I only agreed to remain on that case after lead counsel suffered an emergency health issue and had to suddenly withdraw. Attorney Kachouroff has agreed to oversee my filings in that latter matter which should hopefully be resolved, and which the parties are working towards an agreement.

42. Based on my mentoring from Attorney Kachouroff, my desire for training from him and the opportunity to work with his established practice and colleagues, I have followed his plan. I will not be taking any new cases on my own nor will I appear on any new cases without the express approval and oversight of Attorney Kachouroff for the immediate future.

43. Because of Attorney Kachouroff's thorough review of my filings, I now see that my lack of training and experience in case fact organization led to confusing fact patterns and much of the issues present relating to the Court's Show Cause order (ECF 176) here. I believe his experience and guidance, as well as training, would have benefitted me in ensuring integrity in my citations of relevant facts and cases. It did not occur to me at the time but in hindsight, I was too overloaded under my system and as such was unable to ensure accuracy.

44. Prior to being mentored by Attorney Kachouroff, I had no idea that case organization beyond simple folders on a computer could help organize facts, documents, and case filings to streamline motions, briefs, and trial. Prior to Attorney Kachouroff's willingness to formally mentor me, train me, and oversee my legal work, not a single Wisconsin litigator or long-time attorney responded or expressed willingness to train me following the articles and my departure from the City of Milwaukee.

45. I will follow all guidance and training that Attorney Kachouroff and his law firm provide to me and have already begun taking these intentional steps. He advised me that the duty of candor with this Court is paramount and that if I were to continue practicing in front of Judge Duffin or any other Wisconsin judge, I needed to ensure that my work could be trusted. I accept full responsibility for any mistakes and errors in these filings. I am truly sorry to this Court and counsel.

46. I respectfully ask this Court not to dismiss Mr. Pelishek's case, not for my sake, but for his. I will also take any corrective action this Court deems necessary.

I declare under penalty of perjury the foregoing is true and correct.

Dated: August 6, 2025.

*/s/* Jennifer DeMaster      .
Jennifer T. DeMaster
