CHAD PELISHEK,

    Plaintiff

v.                                          Case No. 2:23-CV-1048

CITY OF SHEBOYGAN, et al.,

    Defendants.

**PLAINTIFF'S SUR-REPLY TO DEFENDANTS' REPLY (ECF No. 178)**

## Introduction

The Court asked a focused question: why sanctions—up to dismissal—should not issue for the citations identified in the Court's July 23, 2025 order. And it offered Defendants the opportunity to reply to Plaintiff's response. (ECF No. 176 at 52). However, Defendants' reply is unserious and ranges beyond that order. The reply below addresses the Court's concerns directly and, where there is error, responsibility is accepted with precision.

**I. The show-cause inquiry is bounded by the Court's order; Defendants' reply strays.**

The Court invited Defendants to respond with additional material and authority regarding Plaintiff's summary judgment submissions and the Court's show cause order:

> The court invites the defendants to address any additional material misrepresentations or other egregious misconduct associated with Kachouroff and DeMaster's summary judgment filings, as well as any applicable law or argument regarding the scope and propriety of sanctions.

(ECF No. 176 at 52). Instead of offering *any* factual analysis showing misconduct—Defendants

Page **1** of **16**

expressly leave this job to the Court[1] and seem to relitigate the merits disputes.

In terms of providing authority for the scope and propriety of sanctions, Defendants (an established employment defense law firm with far more experience and resources than Mrs. DeMaster) provides virtually no analysis of the cases or the facts they cite, nor do they contest the mitigation factors employed by Mr. Kachouroff either *before* or *after* the show cause order was issued. For the purposes of brevity, the attached table sets out Plaintiff's position on Defendants' sanctions cases. *See* Decl. Kachouroff, Ex. A, Defs. Sanctions Cases.

**II. We candidly concede two already-corrected errors the Court identified—and explain why they do not warrant the extreme sanction of dismissal.**

    **A. *Swetlik v. Crawford*.**

Our initial brief described *Swetlik v. Crawford* with an in-quote parenthetical that the case does not contain. We corrected that misstatement in a revised brief—exactly as the Court recounted. (ECF No. 176 at 6). That correction reflects candor, not concealment.

    **B. "*Gomez v. City of Chicago*"**

We also withdrew a stray "Gomez" citation after recognizing it did not exist; again, precisely as the Court noted. (ECF No. 176 at 7). Self-correction before judgment is the opposite of defiance. Indeed, in response to the show cause order, Plaintiff's counsel even attempted to identify the source of the stray citation and recounted the steps that Mrs. DeMaster took to cite check her brief. Mrs. DeMaster was told by Westlaw in September 2024 that the tools it was charging her additional money for were the same tools used by the federal courts and show what judges see. ECF No. 177-2 ¶31. Westlaw did not advise her *at that time* that its new tools also

---

[1] Defendants state: "While Defendant sincerely appreciates the Court's invitation to submit additional examples of misconduct, the existing record already speaks volumes." ECF No. 178 at 4.

used generative artificial intelligence ("GAI"). Second Decl. DeMaster ¶1.

Defendants' citation to the ABA ruling on July 29, 2024 is helpful because it explains that technology is changing quickly and notes the perils of numerous GAI tools targeting the legal profession. As the article points out, it is GAI, a subset of "artificial intelligence", that has drawn the harsh criticism. Every lawyer relies on the electronic "stacks", the online databases to conduct legal research of which Westlaw and Lexis are the two largest providers. Mrs. DeMaster was contacted by Westlaw in September of 2024 and told that the she was subscribing to were the tools that federal courts and judges use. She was never told that these tools employed GAI. See Ex. B, Westlaw September 2024 Email. Nothing in Mrs. DeMaster's Westlaw contract she signed would give any legal practitioner the ability to know that the tools it was offering to Mrs. DeMaster—tools that are not even listed on the contract including in its hyperlinks—use GAI. See Ex. C, Westlaw Contract. The first time Mrs. DeMaster received notice that her Westlaw tools were using GAI was sometime in April of 2025 when she received an email to that effect mentioning that the federal judiciary had a new contract to use their GAI tools. See Ex. D, Westlaw April 2025 Email.

Without adequate notice to Mrs. DeMaster that a specific Westlaw tool uses GAI, it would be unfair and unreasonable to impose a duty on her (or any lawyer) who thought they were only performing a database query with vanilla artificial intelligence to speed up searches as opposed to GAI.

### III. ECF 178's two headline accusations—"11 contradictions" and the March 8 "quote" formatting—do not show intentional misrepresentation.

#### A. The "11 contradictions."

In seeking the ultimate sanction of dismissal, Defendants argue the merits of Pelishek's partial summary judgment brief. They front-load a new list of 11 supposed "contradictions" that

they claim "are contradicted by [Pelishek's] own deposition testimony." ECF No. 178 at 2. Rather than give any detail, Defendants string cite references from their own objections to Plaintiff's proposed facts in support of partial summary judgment. *Id* at 2 & 4. Discussing just one core string cite objection here is helpful and illustrative. Otherwise, we have attached a table addressing each of the Defendants' string cites to show that a factual basis existed or that their cited objections do not show egregious misconduct or material misrepresentations. See Exhibit E, Chart of Defs.' Fact Objections.

PPMF No. 5 & 29 claim that Rendall-Araujo instructed Plaintiff to repeat verbatim the slur that was said and told him to repeat "exactly" what was said. (ECF 141 ¶¶5 & 29). Whether it was verbatim hinged on whether the word "exactly" was used. Defendants' responses claim the Hall Interview recording contradicts this fact and that "Rendall-Araujo did not ask Plaintiff to repeat 'exactly' the racial slur at the August 22 meeting." (ECF No. 141 at Defs. Resp. to ¶¶5 & 29, at pp. 7 & 32). Defendants quote the recording in their objections as follows:

> "And Emily Rendall-Araujo, who was sitting across the table from me said, 'Well, what --' and I'm not sure -- she said, "What are they saying --" I thought, *I'm pretty sure she said, 'What is being said?'*"

(ECF No. 141 at 7 & 32 *citing* Plaintiff's Exhibit, ECF No. 127-2 at 33:30-33:46) (emphasis added). But that is not what the Hall Interview recording contains. The following is the true wording from the recording:

> " 'And Emily Rendall-Araujo, who was sitting across the table from me said, 'Well, what?' And I'm not sure. She said, 'What are they saying?' I thought . . . **I believe she said, 'What are they *exactly* saying**?' "

(ECF No. 127-2, at 33:30 – 33:46) (emphasis added). By omitting the word "exactly," Defendants argued Plaintiff's fact was a material misrepresentation and not a verbatim demand.

In his Response, Plaintiff set forth additional anchor points that exist in the factual record for factual support that Rendall-Araujo sought the "exact" word or a verbatim repetition (*see e.g.*

ECF No. 177 at 4 referring to Arenz and Wolf Declarations.) Plaintiff's partial summary judgment brief properly reflected that Rendall-Araujo asked for the exact phrased content; the paragraph-level citations in Plaintiff's additional proposed facts (ECF No. 145 ¶12 at 3) confirm the same; and our Response to the Show Cause Order acknowledged that earlier citations in other proposed facts should have specified the sub-exhibit. That is not invention; it is record-based and now precisely cited.

Apart from the fact that the deposition testimony does not appear to contradict the facts—many of Defendants' questions at Plaintiff's deposition were either vague, ambiguous, not precise, or sought legal definitions from a lay person—Plaintiff disagreed then and does now with Defendants' factual argument.[2] But the purpose here is not to reargue the merits of a motion the Court declined to consider. It is to illustrate that Defendants' claims that factual assertions were misrepresented are not accurate. The claim that Plaintiff's counsel is engaged in "fabrication" fails. The Court should disregard consideration of these alleged 11 contradictions as well as Plaintiff's other string cited objections. *See* Ex. E, Chart of Defs.' Fact Objections.

**B. The March 8 Email is one directive; Plaintiff referred to several "directives"**

Turning to the March 8 email, Defendants maneuver to set up a straw man and then knock it down. They claim that Plaintiff uses the March 8 email to support six propositions from Plaintiff's brief. Plaintiff's reply in support of summary judgment adequately addresses that these statements were paraphrases of what the *verbal* and *written* directives (plural) meant to Pelishek. (ECF No. 171 at 6.) Defendants know that Plaintiff's counsel also proposed additional facts in support of both *verbal* and *written* directives. (ECF 145 ¶1 at 1.) Defendants virtually concede

---

[2] Pelishek also disputed Defendants' mischaracterization of facts in his responses and objections to Defendants' proposed facts. See e.g. ECF No. 144, Plaintiff's Responses to ¶¶ 41, 72, 76, 80, 81, 86, 94-96, 106, 107, 113, 138, 142, 143, 155, 172, 177, 180, 192.

this point when, in referring to ECF No. 125[3], they quote Plaintiff's plural word, "directives," in describing their effect. ECF No. 178 at 4. The supporting information was not cited originally, and it should have been.

Defendants' contention here merely repackages merits disputes; it does not establish that counsel knowingly advanced false facts or misrepresentations of the sources of those facts. The show-cause standard concerns Mrs. DeMaster's conduct, not whether a record is messy at the edges—especially where the Court has now resolved summary judgment and confined what remains.

Defendants' main contention is a stylistic critique about quotation marks around what were intended to be a summary of the *verbal* and written directives (plural), including the March 8 email. ECF No. 178 at 4. It is true that factual citations should have included not merely the March 8 directive at PPMF ¶43 but the other citations *which were in fact* set forth in Plaintiff's Proposed Additional Facts (ECF No. 145 at 1) and in his Partial Summary Judgment Reply: "See infra Part II(a). (PPMF ¶¶ 21, 22, 24, 47, 37, 43, 44, 51; PPMF 2 ¶¶1, 8, 20, 35, 49)." (ECF No. 171 at p. 6.) It could not be clearer that Plaintiff's "directives" referred to the universe of verbal and written directives and are factually supported.

A stylistic summary is not fabrication; it is at best a drafting choice that should have been clarified and which we do not repeat. In any case, those disputes go to evidentiary weight already resolved (or mooted by Court order) in its summary-judgment rulings; they are not the stuff of attorney sanctions.

### C. "Standing up to the racism."

Pelishek's Response to ECF No. 176's show cause order tied the "standing up to the

---

[3] Defendants cite to ECF 125. The corrected brief is filed under ECF 175.

Page **6** of **16**

Case 2:23-cv-01048-WED   Filed 08/20/25   Page 6 of 16   Document 181

racism" phrasing to PPMF ¶5 and Exhibit 5 (ECF No. 128-1), explaining the docket linkage the Court found opaque. (ECF No. 177 at 3-4.) Again, that is support in the record, not fabrication.

### D. Defendants' claims of fabrication are not serious; their argument does not support dismissal.

We documented that Westlaw flagged incorrect quotations and multiple red-flag authorities in Defendants' briefs, including *Andrews v. CBOCS West, Inc.*, 743 F.3d 230 (7th Cir. 2014)—expressly overruled by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) on the evidentiary framework. Defendants do not deny *Ortiz*'s overruling; they recast it as merely "procedural" and say their use of *Andrews* (for adverse employment action) was unaffected, citing a 2018 district court. Though Defendants do not actually cite the case in a procedural context, the point here is modest but important: even careful lawyers can cite authorities later undercut in part, and reasonable counsel can differ over scope. That reality counsels restraint on sanctions predicated on rhetoric like "fabrication."

We also noted in our Response that Defendants' citation to *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (C.A.7 2006) omitted 38 words. (ECF No. 177 at 13.) Defendants incorrectly cited *Velez* 11 times in ECF No. 141 and 7 times in ECF No. 169. Defendants asked the Court to strike the declarations numerous times based on this partial quotation without indicating that 38 important words were missing. See ECF Nos. 141 & 169. We raise this not for the purpose of deflecting from what the Court has asked in the show cause order but for illustrating another point.

Defendants' Reply doubles down on *Velez*, claiming that "the verbiage omitted is just that, and the representation was made for the legal predicate that where a deposition and an affidavit are in conflict, the affidavit is to be disregarded is [sic] in the case, . . ." (ECF No. 178 at 14.) Defendants certainly misspoke: the legal predicate to disregarding an affidavit that

Page **7** of **16**

Case 2:23-cv-01048-WED   Filed 08/20/25   Page 7 of 16   Document 181

conflicts with a deposition requires the missing 38 words beginning with the word "*unless*." The point we make here is important: even experienced lawyers interpreting numerous case opinions can make mistakes about what parts of quotations are important or what they mean. Once again, this counsels against sanctions predicated on Defendants' rhetoric of "made-up or fictional material in Plaintiff's briefing." (ECF No. 178 at 14.)

Two more examples are appropriate to show that the Court should not adopt the "fabrication" narrative posed in Defendants' Reply. While they do not ask for an award of fees outright and are not the movant for purposes of the show cause order, their citations to unpublished opinions are aligned in that direction. These citations provide little, if any, support as to applicability here. In one example, Defendants lean into the inference that they are entitled to fees:

> For example, in *Chwarzynski v. Tebbens*, 2008 U.S. Dist. LEXIS 77217, *4-5 (N.D. Ill. Sept. 10, 2008), the Northern District of Illinois took into consideration ***among other items*** a lawyer's 'status as a sole practitioner and his apparent inexperience in federal litigation' in assessing potential sanctions. After considering the same, the court found that '. . . ***an award of one quarter of the fees defense counsel reasonably expended on the suit and none of the costs [was] an appropriate sanction.***'

(ECF No. 178 at 11)(emphasis added.) In so doing, Defendants conveniently leave out what constituted "among other items" that provide a true context. A brief review of the opinion's facts show that it is inapposite to Pelishek.

The *Chwarzynski* plaintiffs pursued litigation for nine months even though defense counsel and the district court told them that litigation could not be maintained in a union's name. *Chwarzynski v. Tebbens*, 2008 WL 4210661, at *1 (N.D.Ill.,2008). That court previously granted the *defense's sanctions motion* pursuant to both Fed. R. Civ. Pro. 11 and 28 U.S.C. § 1927 because those plaintiffs "had asserted a variety of baseless claims and legal contentions and he

and Chwarzynski both unreasonably multiplied and increased the cost of these proceedings." *Id.* The plaintiffs argued for no monetary award while the defendants wanted all defense fees paid. The district court carefully addressed several factors (the "among other items") of both parties:

> On balance, given: (1) the purpose of Rule 11 and section 1927 sanctions; (2) Chwarzynski and Maher's conduct; (3) Maher's status as a sole practitioner and his apparent inexperience in federal litigation; (4) the fact that the suit arose from disputes between the president and the board of a local union whose members have, in the last twenty years, engaged in an almost continual effort to remove whomever they elect as their president (*see* Fran Spielman, *Chicago Firefighters, Union Leader Clash,* Firehouse.com, Dec. 12, 2006, http://cms.firehouse.com/web/online/News/Chicago-Firefighters-Union-Leader-Clash/46$52389); (5) the duplication of effort that defense counsel could have avoided had they made joint submissions; and (6) the amount of resources defendants devoted to this suit, which they knew was largely unfounded, this Court finds ***an award of one quarter of the fees defense counsel reasonably expended on the suit and none of the costs is an appropriate sanction***.

*Id.* (citation omitted)(emphasis added). The point here is that 1) Defendants are not the movants, 2) the status of one of the *Chwarzynksi* attorney's inexperience likely *lowered* the award, 3) Mrs. DeMaster did not engage in vexatious multiplication of litigation, and 4) attorneys often cite cases that are inapposite because they simply got it wrong or fail to read the entire case.

### E. Defendants' citation to Generative Artificial Intelligence (GAI) cases[4]

Defendants do cite cases relevant to this Court's determination of sanctions concerning GAI. (ECF No. 178 at 10.) The cases are distinguishable. In *Mid Cent. Operating Eng'rs Health v. Hoosiervac LLC,* the sanctioned attorney filed three separate pleadings containing a number of non-existent cases and admitted that he did not verify them. 2025 U.S. Dist. LEXIS 100748, at

---

[4] This Court should not give weight to Defendants' cherry-picked statements from unexplained cases in their Reply. Rather than go through each citation here, in the interest of brevity, we address decisions uploaded in ECF 180 in a chart attached as Exhibit G, Chart of Defs. Unpublished Cases Analysis. Most of these cases do not fit with what is before this Court. have completely different sets of facts and Defendants do not attempt to reconcile how those cases are appropriately applied here.

*1-4 (S.D. Ind. May 28, 2025). Mrs. DeMaster did try to verify the case cites and thought she was using Westlaw's traditional tools to verify her cases, unaware that the cite check tool used GAI. See ECF No. 177-2 ¶33. The *errata* removed the single case that appeared to be a phantom citation. As noted in Plaintiff's Response, efforts were made to determine where the phantom case came from but were ultimately unsuccessful.

In *Seither & Cherry Quad Cities, Inc. v. Oakland Automation, LLC*, the court granted defense counsel's motion for sanctions concerning phantom cases from GAI, noted plaintiff's contrition, and did not find bad faith which it stated was required for sanctions under its inherent power. No. 23-11310, 2025 U.S. Dist. LEXIS 143941, at *2-4 (E.D. Mich. July 28, 2025). Because defense counsel was ordered to respond to the updated briefing, the court awarded $1,485 for the harm caused to defense counsel and encouraged counsel to take a GAI related CLE. *Id.* at *4. We believe this case is relevant to the facts here. Noting the Court's concern with the one phantom case and quotations and regardless of the *errata,* Mrs. DeMaster believed she was reasonably cite checking cases in Westlaw as attorneys do every day. She is in the process of terminating her Westlaw GAI subscription and voluntarily signed up for a 8-hour CLE course organized by the Wisconsin Bar that includes AI practice within law practice management, and ethical considerations for use of AI. See Second Decl. DeMaster ¶3; Ex. H (CLE course description and receipt scheduled for August 22, 2025.)

The final case, *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 499 (D. Wyo. 2025) involves attorneys in a recognized law firm with deep resources and years of experience. The court awarded $3,000 against the experienced attorney who drafted the pleading, who admitted he intentionally used GAI, and admitted that he did not verify the numerous phantom citations through the firm's available Westlaw subscription. The Court revoked this attorney's *pro hac vice*

status. The Court also awarded $1,000 against each attorney who supervised the attorney or who otherwise joined in the filing without checking the pleading. In reaching the $3,000 amount, the court considered:

> (1) the number of hallucinated cases in the filing compared to real cases;
> (2) Mr. Ayala's apparent access to legal research resources; and
> (3) the fact that attorneys have been on notice of generative AI's issues in hallucinating cases for quite some time.[5]

*Id.* at *18. As noted, one citation in Mrs. DeMaster's brief was removed via *errata* and an attempt was made to correct quotation errors. The correction attempts were not successful. In addition, as Mrs. DeMaster averred, she thought she properly used Westlaw's citation check tool for drafts and case law which, unfortunately, did not catch any of the errors found by the Court in Plaintiff's opposition brief as to parenthetical descriptions. See ECF No. 177-2 ¶33.

The answer to any such missteps is better screening and current-law checks—not client dismissal.

## V. Defendants' scope and propriety of sanctions is largely inapposite.

We agree with Defendants that the Court has three avenues governing sanctions: the Court's inherent authority, 28 U.S.C. § 1927, and Fed. R. Civ. P. 11.

### A. Use of the Court's inherent authority is not necessary.

The Court's inherent authority to punish contempt "reaches both conduct before the court and that beyond the court's confines, for "[t]he underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (U.S.La., 1991) (citation omitted.) It allows a

---

[5] Mr. Kachouroff is not certain that this notice in the legal community is as widespread as the case suggests.

federal court to vacate its own judgments for fraud on the court, and for tampering with the administration of justice. *Id.* Indeed, "it involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." *Id.*

A court may assess attorney's fees "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 44-45. As *Chambers* explained,

> In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, […], as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order[.]"

*Id.* at 46 (citations omitted). We do not believe that Mrs. DeMaster's conduct rises to this very serious level. The cases cited by Defendants show conduct far more serious than what is present here.[6] In *Sanders v. Melvin*, 25 F.4th 475 (7th Cir. 2022), the court addressed the distinction between an inaccurate statement "not made 'with a degree of culpability that exceeds simple inadvertence or mistake'" verses false statement that "constitutes a 'willfull[] abuse[] [of] the judicial process' or otherwise indicates bad faith." *Id.* at 482.

Mrs. DeMaster has explained her shortcomings forthrightly and has not done anything such as filing a false document, intentionally omitting words from a case holding to mislead the Court, or acted in a way to willfully abuse or obstruct the judicial process. *See Tucker v. Williams*, 682 F.3d 654, 662 (7th Cir. 2012) (clumsy lawyering not sufficient to warrant sanctions under the court's inherent authority.) Mrs. DeMaster has taken proactive steps that this Court would want to see from an attorney who is serious about professional growth. Concerning Mr. Pelishek, there is no indication that he has done anything to fall within the ambit of misconduct as Defendants' cases imposing dismissal as a sanction show.

### B. 28 U.S.C. § 1927

---

[6] Again, in the interests of brevity, we attach a relatively short exhibit discussing Plaintiff's position with respect to Defendants' cases. See Ex. A, Defendants' Sanctions Cases.

To find an attorney liable under § 1927, "[s]ubjective bad faith ... is not always necessary" and "must be shown only if the conduct under consideration had an objectively colorable basis." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006). Mr. Pelishek had a colorable basis and so the inquiry is one of bad faith. "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Id.* (internal quotation marks omitted). *Fletcher v. Doig*, 2025 WL 2112705, at *5 (7th Cir. July 29, 2025).

Defendants have used a broad stroke without the rigors of analyzing the actual conduct here. Bad faith is more akin to filing a lawsuit with a colorable claim that is worth $10,000 and causing the other party to expend $80,000 to defend. That is not present here. Respectfully, Defendants' block quote citation to *In re TCI, Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985) while accurate, has been expanded upon by the 7th Circuit:

> We have explained that a court has discretion to impose § 1927 sanctions when an attorney has acted in an 'objectively unreasonable manner' by engaging in "serious and studied disregard for the orderly process of justice,' [citation omitted]; pursued a claim that is 'without a plausible legal or factual basis and lacking in justification,' *id.,* or 'pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound," *Kapco Mfg. Co. v. C & O Enters., Inc.,* 886 F.2d 1485, 1491 (7th Cir.1989). We have also interpreted § 1927 "to impose a continuing duty upon attorneys to dismiss claims that are no longer viable." *Dahnke v. Teamsters Local 695,* 906 F.2d 1192, 1201 n. 6 (7th Cir.1990).

*Tate v. Ancell*, 551 Fed.Appx. 877, 892 (C.A.7 (Ill.), 2014) (citing *TCI* with approval). Again, we do not believe that sanctions under 28 U.S.C. § 1927 are appropriate here because the level of conduct does not rise to that level.

### C. Fed. R. Civ. P. 11.

Fed. R. Civ. P. 11(c)(4) provides that

A sanction imposed under this rule must be limited to what suffices to deter

repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives.

Rule 11 would appear to be appropriate and adequate for the Court's purposes, even if it were to find bad faith conduct. As this Court knows, it can censure, order remedial measures, or impose a fine as a penalty in order to deter future conduct. The sanction should be condign to achieve that end.

## VI. The Court should credit uncontested points of mitigation: role allocation, training gaps, and prompt correction.

The Response explained that co-counsel Kachouroff joined this case after the close of discovery, a point corroborated in the Response's narrative of roles and attached declarations. It also acknowledged Mrs. DeMaster's education, experience, training, organizational gaps, and overreliance on Westlaw's verification tools—while expressly denying any intent to mislead. Defendants do not engage those facts; they simply assert that intent is irrelevant. But intent matters to sanction choice, especially where counsel attempted to self-identify and correct errors before judgment and has now tightened legal and fact citation and exhibit practices. The *Coomer* mishap was solely based on filing the wrong document and it occurred within days of the *Pelishek* filing. We do not believe the Court should consider this order at this time because the circumstances are different and that order will be appealed.

## VI. Proportional sanctions, if any, should be narrowly tailored; dismissal would punish the client for counsel's corrected missteps.

In its show cause order, the Court noted that "What is of greater concern to the court are counsel's repeated, persistent, and sometimes egregious factual misrepresentations." ECF No. 176 at 10. We have attempted to address each of the Court's concerns to show that the factual support existed but was not cited correctly. Mrs. DeMaster's key factual citations did not completely lack a factual foundation. Respectfully, in Mr. Kachouroff's view, the summary

Page **14** of **16**

Case 2:23-cv-01048-WED     Filed 08/20/25     Page 14 of 16     Document 181

judgment pleadings suffered from far too many, unnecessary facts—on both sides.

The Court should also consider Mrs. DeMasters' financial resources, and that she believed she was using traditional Westlaw tools sold to her as the same as what the federal judiciary uses. That has been rectified. In addition, Mr. Kachouroff agreed after the *Coomer* filing error to supervise Mrs. DeMaster because of his previous work with her, her legal acumen, work ethic, and her commitment to professionalism. To align practice with the Court's expectations, Plaintiff's counsel committed to the following steps:

1. Mr. Kachouroff has agreed to supervise and mentor Mrs. DeMaster as he described in his declaration and demonstrated in part through exhibits attached to filings concerning the show cause order.

2. Mr. Kachouroff will be solely responsible for future filings in this case and Mrs. DeMaster will not file any documents without his express written permission.

3. Before filing, authorities will be independently checked (by two attorneys) for existence and holding; any parenthetical will be descriptive, not in-quote, unless quoted verbatim from the opinion.

4. Any quoted language will be reproduced verbatim with pinpoint source and page/line reference; paraphrases will never appear in quotation marks.

5. Citations to materials will identify ECF No./Dkt number and sub-exhibit.

6. If a correction is needed, an *errata* will be filed immediately—without argument and will include the reason for the *errata*.

7. Mr. Kachouroff currently meets with Mrs. DeMaster at least twice per week for legal practice mentoring on *Pelishek* and his other cases that Mrs. DeMaster is assisting with. These sessions have averaged approximately 8 hours per week.

8. Mr. Kachouroff also has researched the ABA, his own bar, and the Wisconsin Bar for mentoring resources to ensure that he is able to give Mrs. DeMaster the experience she desires.

9. Mrs. DeMaster has upheld her commitment to date, does not repeat mistakes, and immediately acts on Mr. Kachouroff's suggestions, including for instance, attending the CLE course on August 22, 2025.

These steps answer the conduct the Court identified in its order. The Court has already

granted Defendants' motion in substantial part and denied plaintiff's partial motion in full, leaving only a First Amendment claim. Against that backdrop, dismissal as a sanction would visit counsel's lapses on the client's remaining claim. A measured response—such as a written admonition and a requirement that any future filing quoting documents use block-quote reproductions with pinpoint record cites—would vindicate the Court's supervisory interests without over-deterrence.

## Conclusion

We accept the Court's criticisms where they are due and have corrected the record to the best of our abilities. It is clear that greater care is warranted in the future. The items Defendants' Reply spotlights either fall outside the narrow show-cause inquiry or rest on record disputes already resolved or would have been subject to argument and evidentiary weight. The Court should decline dismissal and, if it deems a sanction necessary, impose a proportionate, corrective measure consistent with the explanations and commitments above. We would welcome the opportunity to address any of the Court's concerns not covered here.

Respectfully submitted,

*/s/ Christopher I. Kachouroff*
Christopher I. Kachouroff
Va. Bar No. 44216
chris@mck-lawyers.com

**MCSWEENY, CYNKAR & KACHOUROFF PLLC**
13649 Office Place, Suite 101
Woodbridge, VA 22192
703.853.0160

*Attorney for Plaintiff Chad Pelishek*